# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY,                    :
      Plaintiff            :
                    :          No. 1:01-CV-0206
    v.                          :
                    :          (Judge Kane)
SCOTT BROWN, PAUL EVANKO,       :
BERON F. STEAGER, AND BARRY L.  :
BRINSER, et al.,                :
      Defendants           :

**FILED HARRISBURG**

**MAR 1 2 2001**

MARY E. D'ANDREA, CLERK
Per _____
DEPUTY CLERK

## EXHIBITS IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>

Transcript of Proceedings, Guilty Plea, 2/15/00,
    <u>Commonwealth v. Yordy</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit A

Transcript of Proceedings, Sentencing, 3/23/00,
    <u>Commonwealth v. Yordy</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit B

Court Commitments, 3/24/00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit C

 

**D. MICHAEL FISHER**
**Attorney General**

**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**OFFICE OF ATTORNEY GENERAL**
**15th Floor, Strawberry Square**
**Harrisburg, PA   17120**
**717-787-8106**

**Date: March 12, 2001**

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
                                :            OF
                                : DAUPHIN COUNTY, PENNSYLVANIA
                                :
           VS.                    : Agg. Asslt; DUI; Recklessly
                                : Endangering; Resisting
                                : Arrest
                                :
                                :
RANDY ADAM YORDY               : NO. 685 C.D. 1999

## TRANSCRIPT OF PROCEEDINGS

### GUILTY PLEA

BEFORE:     THE HONORABLE JOSEPH H. KLEINFELTER, P.J.

DATE:      TUESDAY, FEBRUARY 15, 2000
              2:11 O'CLOCK P.M.

PLACE:     COURTROOM NO. 1
              DAUPHIN COUNTY COURTHOUSE
              HARRISBURG, PENNSYLVANIA

A P P E A R A N C E S:

    MICHAEL L. ROZMAN, ESQUIRE
    Chief Deputy District Attorney
      For - Commonwealth

    JOSHUA D. LOCK, ESQUIRE
      For - Defendant

COMMONWEALTH'S
EXHIBIT
4
PENGAD-Bayonne, N. J.

COPY



2

1          <u>TUESDAY, FEBRUARY 15, 2000</u>

2

3          (The following proceedings occur at 2:11 p.m.:)

4

5          MR. ROZMAN:  Good afternoon, Your Honor.

6          THE COURT:  Good afternoon.

7          MR. ROZMAN:  Commonwealth calls the case docketed to

8   685 C.D. 1999, the Commonwealth v. Randy Adam Yordy.

9          The Defendant is present in the courtroom, along

10  with his counsel, Mr. Lock.

11          Defendant is presently charged with criminal attempt

12  homicide, aggravated assault, driving under the influence,

13  recklessly endangering another person, and two counts of

14  resisting arrest.

15          There is a proposed plea agreement in this case,

16  Your Honor.  The plea agreement is as follows:  The

17  Commonwealth would ask the Court to dismiss the criminal

18  attempt homicide.  The aggravated assault which is presently

19  graded as a Felony II and is at Section 2702(a)(2) will be

20  amended to a Felony II aggravated assault, 2702(a)(3).  He

21  will plead guilty to the 2702(a)(3) aggravated assault and the

22  rest of the charges, the driving under the influence,

23  recklessly endangering and resisting arrest.

24          The record should reflect that the trooper that was

25  involved in this is present in the courtroom, Trooper Scott

A-2

1 | Brown, and I would ask Trooper Brown to rise.

2 |         Trooper, you heard me outline the plea agreement to

3 | the Judge.

4 |         Do you agree with the plea agreement?

5 |         TROOPER BROWN:  Yes, sir.

6 |         MR. ROZMAN:  Does the Court have any questions of

7 | the trooper?

8 |         THE COURT:  No.

9 |         MR. ROZMAN:  Again, Mr. Yordy, I am going to go

10 | through some of your rights with you.

11 |         You must answer my questions loudly enough so that

12 | the court reporter can hear you and record your answers.

13 |         How old are you?

14 |         THE DEFENDANT:  I'm 42.

15 |         MR. ROZMAN:  How far did you go in school?

16 |         THE DEFENDANT:  I'm a graduate.

17 |         MR. ROZMAN:  So you read, write, and understand the

18 | English language?

19 |         THE DEFENDANT:  Yes, I do.

20 |         MR. ROZMAN:  Are you presently under the influence

21 | of any alcohol or drugs or anything that would prevent you

22 | from understanding what's going on here today?

23 |         THE DEFENDANT:  No.

24 |         MR. ROZMAN:  If at any point you don't understand

25 | something I say, please stop me, and I will try and explain it

A-3

4

1 | and maybe Mr. Lock will also try and explain it.

2 | Okay?

3 |

4 | (The Defendant nods head up and down.)

5 |

6 | MR. ROZMAN: I want you to understand that any time

7 | you're charged with a crime in Pennsylvania, you have a right

8 | to a trial by jury.

9 | In a trial by jury, 12 people from Dauphin County

10 | sit and listen to all the evidence in the case. They would

11 | decide the case based on that evidence. Their verdict would

12 | have to be unanimous. All 12 of them would have to say that

13 | you're guilty for you to be found guilty, or all 12 of them

14 | have to say you're not guilty for you have to be found not

15 | guilty.

16 | You, along with your attorney and the

17 | district attorney assigned to the case, would pick these 12

18 | people.

19 | Do you understand your right to a trial by jury?

20 | THE DEFENDANT: Yes.

21 | MR. ROZMAN: Do you understand that once you plead

22 | guilty, you give up your right to a trial by jury?

23 | THE DEFENDANT: Yes.

24 | MR. ROZMAN: You also have a right to a nonjury or

25 | bench trial. A bench trial is the same as a trial by jury

A-4

1  except a judge would take the place of a jury and listen to

2  all the evidence and decide whether you are guilty or not

3  guilty based on that.

4          Do you understand your right to have a nonjury or

5  bench trial?

6          THE DEFENDANT:  Yes, I do.

7          MR. ROZMAN:  Do you understand, again, that you are

8  giving up your right to a nonjury or bench trial?

9          THE DEFENDANT:  Yes.

10          MR. ROZMAN:  In either a jury or nonjury trial, you

11  have certain rights.

12          First of all, you are presumed innocent.  The

13  Commonwealth must prove you guilty of each charge beyond a

14  reasonable doubt.

15          You have a right to cross-examine all the

16  Commonwealth witnesses through your attorney.  You have the

17  right to present your own witnesses.  You have the right to

18  take the stand and testify in your own behalf, but if you

19  choose to not take the stand, you cannot be forced to take the

20  stand and testify and that cannot be held against you.

21          Do you understand all those things?

22          THE DEFENDANT:  I understand, yes.

23          MR. ROZMAN:  You understand when you plead guilty,

24  you limit your appeal rights to specific areas.  First, the

25  voluntariness of your plea; whether you're doing this of your

A-5

6

1  own free will.

2          Second is the jurisdiction of this Court in

3  accepting the plea, and so long as the crime occurred in

4  Dauphin County, this Court has jurisdiction.

5          And the third would be the legality of the sentence

6  that the Judge would impose.  If he were to give you an

7  illegal sentence, you could challenge that.  If the sentence

8  he gave you was legal, you couldn't challenge that.

9          Do you understand all those things?

10         THE DEFENDANT:  I understand.

11         MR. ROZMAN:  Now, sir, you understand that

12 aggravated assault, 2702(a)(3), which is what you're pleading

13 guilty to is a felony of the second degree?

14

15         (The Defendant nods head up and down.)

16

17         MR. ROZMAN:  The maximum you could receive -- I'm

18 not saying this is what you're going to get -- but the maximum

19 you could receive is up to 20 years in prison.

20         Do you understand that?

21         THE DEFENDANT:  Yes.

22         MR. ROZMAN:  Driving under the influence is a

23 misdemeanor of the second degree as is recklessly endangering

24 another person as is resisting arrest.

25         The maximum you could receive for each one of those

A-6

7

1 | charges is up to 2 years in prison.

2 | Do you understand that?

3 | THE DEFENDANT: Yes.

4 | MR. ROZMAN: Now, sir, the first count is the

5 | attempted homicide, and we're asking that the Court dismiss

6 | that.

7 | The second count is aggravated assault. And the

8 | aggravated assault, it's charged that on or about February 4,

9 | 1999, that you did cause or attempt to cause bodily injury to

10 | a police officer, which is Trooper Scott Brown of the

11 | Pennsylvania State Police, and what you did is you got into a

12 | fight with Trooper Brown about the time of the arrest. And at

13 | some point right before the two of you parted company, he was

14 | dragged by you in your car for some number of feet.

15 | Do you understand that?

16 | THE DEFENDANT: Yes.

17 | MR. ROZMAN: How do you plead? Guilty or not

18 | guilty?

19 | THE DEFENDANT: You're asking me for attempted

20 | homicide?

21 | MR. ROZMAN: No, aggravated assault.

22 | THE DEFENDANT: Aggravated assault, guilty.

23 | MR. ROZMAN: The third count is driving under the

24 | influence.

25 | It's charged that you did drive, operate, or were in

A-7

8

1 | actual physical control of the movement of a motor vehicle

2 | while you were under the influence of alcohol to such a degree

3 | that you were rendered incapable of safe driving.

4 |     Do you understand that charge, sir?

5 |     THE DEFENDANT:  Yes.

6 |     MR. ROZMAN:  How do you plead?  Guilty or not

7 | guilty?

8 |     THE DEFENDANT:  Guilty.

9 |     MR. ROZMAN:  The fourth count is recklessly

10 | endangering another person.

11 |     You are charged with recklessly engaging in conduct

12 | which placed or may have placed another person in danger of

13 | death or serious bodily injury.

14 |     Again, that's Trooper Brown, and it all has to do

15 | with the fight and dragging him with the pickup truck.

16 |     Do you understand that charge, sir?

17 |     THE DEFENDANT:  Yes.

18 |     MR. ROZMAN:  How do you plead?  Guilty or not

19 | guilty?

20 |     THE DEFENDANT:  Guilty.

21 |     MR. ROZMAN:  The fifth count is resisting arrest.

22 |     It's charged that you were being arrested for

23 | driving under the influence and you ended up fighting with

24 | Trooper Brown.

25 |     Do you understand that charge?

*A-8*

1    A    Yes.

2    Q    How do you plead?  Guilty or not guilty?

3        THE DEFENDANT:  Guilty.

4        MR. ROZMAN:  The sixth count is resisting arrest.

5    At the time Troopers Barry Brinser and Beron Steager of the

6    Pennsylvania State Police were arresting you for the incident

7    involving Trooper Brown, and you had a fight with them too.

8        Do you understand that?

9        THE DEFENDANT:  Yes.

10        MR. ROZMAN:  How do you plead?  Guilty or not

11    guilty?

12        THE DEFENDANT:  Guilty.

13        MR. ROZMAN:  Will the Court accept the plea?

14        THE COURT:  Yes.

15        Mr. Lock, I understand from our prior conversation

16    that you wish a pre-sentence investigation in this case?

17        MR. LOCK:  Yes, sir.

18        THE COURT:  All right.

19        Well, we will accept the plea agreement and we

20    accept the guilty plea .

21        I guess I should ask you, Mr. Lock, are you

22    satisfied that your client is entering a voluntary,

23    intelligent, and knowing plea of guilty?

24        MR. LOCK:  Yes, he is.

25        It's reluctant, but it's both knowing, voluntary,

A-9

1  and intelligent.  It is all of those things, yes.

2         THE COURT:  And, Mr. Yordy, are you satisfied with

3  the representation you've received from Mr. Lock?

4         THE DEFENDANT:  Yes, very much so.

5         THE COURT:  Do you have any questions at all about

6  what you're doing here today and the consequences that may

7  flow from your pleas of guilty?

8         THE DEFENDANT:  No.  My attorney was good.  He

9  advised me.

10        THE COURT:  Well, then we will defer sentencing

11 pending the receipt of a county pre-sentence investigation to

12 Thursday, March 23, 2000, at 11:30 in the morning.

13        Now, sir, do you have a driver's license right now?

14        THE DEFENDANT:  Yes, I do.  I don't have it with me.

15 Actually,  I left my wallet in the car.

16        THE COURT:  I see.  Well, I was going to direct that

17 as a condition of continuing bail that you not drive since, as

18 you know, your license will be suspended.

19        MR. LOCK:  If Your Honor wishes, I can make

20 arrangements to have that surrendered to the Clerk perhaps

21 tomorrow -- not perhaps.

22        If it is acceptable to the Court, tomorrow.

23        THE COURT:  We'll ask you to do that, please, and is

24 there anything further we have to do today then?

25        MR. ROZMAN:  Nothing on behalf of the Commonwealth,

A-10

11

1 | Your Honor.

2 |         MR. LOCK:  No.  Thank you, very much.

3 |         THE COURT:  All right.

4 |         Mr. Yordy, where do you live?

5 |         THE DEFENDANT:  In Grantville.

6 |         THE COURT:  Do you own a home there?

7 |         THE DEFENDANT:  Yeah.  We own a whole apartment

8 | building, yeah.

9 |         THE COURT:  Should you move between today and

10 | March 23rd for any reason, you'd be obligated to notify both

11 | the District Attorney and the Clerk of Courts of any change of

12 | address.

13 |         All right?

14 |         THE DEFENDANT:  Yes.

15 |         MR. LOCK:  Thank you, Your Honor.

16 |         THE COURT:  See you back here on the 23rd.

17 |

18 |         (The proceedings are concluded at 2:31 p.m.)

19 |

20 |                         --oOo--

21 |

22 |

23 |

24 |

25 |

*A-11*

12

```
1              C E R T I F I C A T I O N

2

3        I hereby certify that the proceedings and evidence

4   are contained fully and accurately in the notes taken by me on

5   the guilty plea of the above cause, and that this is a correct

6   transcript of the same.

7

8                              _____
                               Bart VanSomeren, RPR-CP
9                              Official Court Reporter

10

11                              C O P Y

12

13

14

15

16        The foregoing record of the proceedings upon the

17   guilty plea of the above cause is hereby approved and directed

18   to be filed.

19

20

21                              _____
                               Joseph H. Kleinfelter, P.J.
22

23

24                              _____
                                          Date
25
```

A-12

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
                                :            OF
                                :   DAUPHIN COUNTY, PENNSYLVANIA
                                :
                 VS.            :   Agg. Asslt; DUI; Recklessly
                                :   Endangering; Resisting
                                :   Arrest
                                :
                                :
RANDY ADAM YORDY          :   NO. 685 C.D. 1999

## TRANSCRIPT OF PROCEEDINGS

### SENTENCING

BEFORE:     THE HONORABLE JOSEPH H. KLEINFELTER, P.J.

DATE:       THURSDAY, MARCH 23, 2000
               11:30 O'CLOCK A.M.

PLACE:      COURTROOM NO. 1
               DAUPHIN COUNTY COURTHOUSE
               HARRISBURG, PENNSYLVANIA

A P P E A R A N C E S:

    MICHAEL L. ROZMAN, ESQUIRE
    Chief Deputy District Attorney
     For - Commonwealth

    JOSHUA D. LOCK, ESQUIRE
     For - Defendant

COMMONWEALTH'S
EXHIBIT
B

COPY



THURSDAY, MARCH 23, 2000

1

2

3    (The following proceedings occur at 11:30 a.m.:)

4

5    MR. ROZMAN:  Good morning, Your Honor.  I apologize.

6 I was in Judge Cherry's courtroom.

7    If it please the Court, this is the case docketed at

8 685 C.D. 1999, the Commonwealth vs. Randy Yordy.

9    As the Court will recall that back on February 15,

10 1999, Defendant entered into a plea agreement whereby the

11 criminal attempt homicide would be dismissed.

12    The Commonwealth amended the aggravated assault from

13 a 2701 aggravated assault to a 2703 aggravated assault,

14 reducing the grading from a felony of the first degree to a

15 felony of the second degree.

16    The Defendant pled guilty --

17    THE Court:  I think you misspoke.  You said 2701.

18    I think you meant to say 2702(a)(2) to 2703(a)(2).

19    MR. ROZMAN:  That is correct.

20    He then pled guilty to that aggravated assault,

21 recklessly endangering another person, driving under the

22 influence, and two counts of resisting arrest.

23    The Court did schedul sentencing for today, and the

24 Court did order that a pre-sentence investigation be

25 conducted.

B-2

1    Commonwealth did review that pre-sentence

2 investigation, and there were just two comments in there that

3 I take issue with.  I don't know how the Court wants to handle

4 that.

5    THE COURT:  You can go right ahead and take issue

6 right now.

7    MR. ROZMAN:  There was one comment in the

8 pre-sentence investigation, Your Honor, talked about

9 Mr. Yordy's prior record, and I believe it was described as

10 negligible or something like that.

11    It is a prior felony drug record, and I don't know

12 how anybody can say it's a minor record or it's negligible or

13 anything like that. The Commonwealth would take issue with

14 that.

15    There was also some discussion about the amount that

16 Mr. Yordy drank before any of this happened.  The Commonwealth

17 was prepared to call a toxicologist who would have testified

18 that based on the material supplied to him, he did have a

19 blood test at Hershey Medical Center that showed that his

20 blood alcohol was a one-five at the time the blood was drawn.

21    The toxicologist would have testified that at the

22 time of the incident his -- the range of his blood alcohol

23 would have been between a one-two and a one-seven, based on

24 his calculations -- and I think that in the pre-sentence

25 report, the Defendant tries to minimize the amount of

B-3

4

1 drinking.  He says he just had a couple.  Well, he would have

2 had to have had more than a couple to get that particular

3 blood alcohol.

4      In regard to the pre-sentence, Your Honor, the

5 Commonwealth has no further comments.

6      THE COURT:  I do have one question and it is this:

7      In 1994 there's an entry from the Cornwall Police

8 Department that a charge was entered for DUI, criminal

9 conspiracy, possession of a controlled substance, corruption

10 of minors, reckless endangerment, and endangering the welfare

11 of a child.

12      Did your office make any effort to contact Lebanon

13 County to find out -- or is this Lancaster -- anyway, the

14 Cornwall Police Department to find out the disposition of

15 those charges?

16      MR. ROZMAN:  I believe, Your Honor, that's the

17 incident where Judge Clark was the Defendant's lawyer at that

18 time, and I believe that he pled guilty to those charges.

19      THE COURT:  All right.  But you didn't ever check

20 the records?

21      MR. ROZMAN:  We made a phone call.  We never got

22 anything on paper.  We never had anything mailed to us.

23      THE COURT:  Why don't you have Mr. Yordy come up

24 here for a second.

25      Raise your right hand and be sworn.

DAUPHIN COUNTY COURT REPORTERS

B-4

5

1          (The Defendant, RANDY ADAM YORDY, is duly sworn

2 according to law.)

3

4 BY THE COURT:

5     Q    We are just going to digress a minute, Mr. Yordy,

6 and ask you to clarify the Randy Yordy as to what happened to

7 those 1994 charges filed by the Cornwall Police Department.

8          Can you help us out there?

9     A    I pled guilty with the -- it was 30 days, but they

10 made it 60 days.  I served 60 days in the Lebanon County

11 Prison.

12     Q    What was the sentence?

13     A    60 days to 23 and a half months.

14     Q    And that was on the DUI?

15     A    That was on the -- that was for all the charges

16 together.

17     Q    For all of the charges.

18          Did you plead guilty to all of the charges that are

19 listed here?

20     A    Yes, I did.

21     Q    Driving under the influence, criminal conspiracy,

22 possession of drugs, corruption of minors --

23     A    Yes.

24     Q    -- reckless endangerment, endangering welfare of a

25 child?

B-5

6

1     A    Yes.

2     THE COURT:  All right.  Thank you.  That squares

3 that away.

4     Now we're back over to you, Mr. Rozman.

5     MR. ROZMAN:  Yes, Your Honor.

6     THE COURT:  What do you want to present by way of

7 information to me for sentencing?

8     MR. ROZMAN:  Your Honor, the Commonwealth would ask

9 that Trooper Yordy and his wife be permitted to make a

10 statement to the Court -- Trooper Brown.  I'm sorry.

11

12     (SCOTT A. BROWN is duly sworn according to law.)

13

14 BY MR. ROZMAN:

15    Q    Sir, would you please state your full name?

16    A    Scott A. Brown.

17    Q    How are you employed?

18    A    I am employed with the Pennsylvania State Police and

19 currently stationed up in Montoursville.  I'm a corporal on

20 patrol.

21    Q    Now, Trooper Brown, you've already given a statement

22 to the person writing the pre-sentence investigation?

23    A    Yes, sir, I did.

24    Q    Is there anything you wish to add to that statement

25 and tell the Court before he renders sentence?

B-6

1    A    Yes, I do.  Um, I'd also like to address Mr. Yordy.

2         Your Honor, I don't think he's taken responsibility

3  for his actions.  I don't think he even has any remorse for

4  his actions.  Case in point would be the day he pled guilty,

5  the shenanigans he pulled over at The Spot, which is a

6  restuarant where I was eating with my mother and my wife,

7  okay?

8         Mr. Yordy came within two to three feet of my wife,

9  stopped dead in his tracks, turned to me -- I had to stand up

10 and address him and say, Can I help you, Mr. Yordy?  At which

11 time he turned, smiling, and left the restaurant.

12        I don't -- anything I say, sir, is not going to be

13 able to get through to him.  I don't think he thinks he did

14 anything wrong.

15        As you are aware, sir, it would have been very

16 simple for him to be arrested for DUI and as a Pennsylvania

17 resident, per Rule 102, he would he have went home that night

18 had he just submitted to the blood test and been done.  I

19 wasn't the one who escalated the situation.

20        As I've said the whole way, it was fairly cordial.

21 The last thing I want to do is get into a life or death

22 situation.  To this day I battle with the thought that I

23 had -- that I was forced into the -- to make the decision to

24 take another person's life, and only by the grace of God is he

25 still here.

B-7

1        I am a firearms' instructor and I shoot a perfect

2   300.  I don't make mistakes with firearms; hence, the badge I

3   wear (indicating).  I short-stroked the trigger.  He came

4   within an eighth of an inch of losing his life, and he put

5   himself in that position, not me.

6        I walked into this courtroom, and I heard somebody

7   from his family say, There's the jerk.

8        Well, folks, I didn't do this to him.  He did this

9   to me.  He did this to me.

10        I struck my head on concrete.  I am not right since

11   that time.  I don't know if it's psychological or

12   neurological.

13        It has been hell on me for the last year, and I wish

14   to God I could look at him and say, Sir, I forgive you; I turn

15   the other cheek.  But I can't do that.  There's just too much

16   anger in me.  He turned a simple situation into something

17   where I could have lost my life.

18        I have two children.  I take this uniform off.  I'm

19   just like you; I'm just like anybody in this courtroom.  I'm a

20   man with a family.  My daughter is four years old and

21   disabled.  I've had to fight for her and lead her since she

22   was born.  If I died that night, where would my daughter be?

23        It has wreaked havoc on me mentally and it has

24   wreaked havoc on my family.  My wife has to call me three and

25   four times a shift to see if I'm okay.

B-8

1    And I see Mr. Yordy standing there looking at me

2 like that, and I honestly, sir, don't see him having any

3 remorse.  He sees and his family sees that I did this to him.

4    And if you watch that video, sir, I defended myself

5 to the utmost that I could.  The last thing I wanted was to be

6 put in that situation.  Mr. Yordy put me in that situation.

7 Mr. Yordy was the one who escalated the situation, and I did

8 the best I could to get the hell home at the end of my eight

9 hours.

10    This is a job.  Unfortunately, I carry a gun, and

11 I'm tasked to do this job.  I am not the same person I was a

12 year ago, and I don't know if it's psychological or

13 neurological, I really don't.  I said that before.

14    I don't know whether it's because I hit my head and

15 I had tears in my brain or if it's just the actual going

16 through the situation, but I relive it every day.

17    My guys go out on shift.  I make sure that they know

18 to be safe.  I preach to them every day that nothing is

19 routine, nothing is routine.  Don't put yourself in a

20 situation.  Get backup.

21    Well, unfortunately, with the state police we don't

22 have backup.  We're on our own.  Had Mr. Yordy and Miss Smith

23 just cooperated, they would have been brought to Hershey Med,

24 they would have bled, they would have been released from the

25 hospital, and it would have been done in a half hour.

1    I would have gone home, none the worse, and so would

2  they.  But instead the man standing over there (indicating)

3  escalated it.

4

5  BY MR. ROZMAN:

6    Q    Trooper, I just have one question, and you and I

7  have discussed this, and I discussed it generally with

8  Mr. Lock.

9    Two days ago he filed a sentencing memorandum, and

10  in this sentencing memorandum he makes some sort of comment

11  concerning an incident involving a Trooper Brown and people on

12  horses?

13    A    Mm-hmm; I'm aware of it.

14    Q    You're aware this has been discussed in the past?

15    A    Yes, sir.

16    Q    Are you the Trooper Brown who was involved in that

17  difficulty?

18    A    No, sir.  That's Trooper Kenny Brown.  He's down at

19  the Academy.  He's in the equestrian team.  Okay?  He rides

20  the horses.

21    Sir, you can make a phone call.  He knows we're here

22  and he's willing to tell you that it was him and that's

23  already been dealt with on his end of it.  It was not me.

24    THE COURT:  What page is that?

25    MR. ROZMAN:  Page 5, Your Honor, in the footnote.

B-10

1  The first full paragraph that begins, Finally.

2          THE COURT:  All right.  Thank you for clarifying

3  that.

4          MR. ROZMAN:  Your Honor, I don't have any further

5  questions of Trooper Brown.

6          I don't know if Mr. Lock has any.

7          MR. LOCK:  I have no questions.

8          Thank you.

9          THE COURT:  Thank you, Trooper.

10         THE WITNESS:  Thank you, sir.

11         MR. ROZMAN:  Mrs. Brown.

12

13         (DONNA MARIE BROWN is duly sworn according to law.)

14

15 BY MR. ROZMAN:

16     Q    Would you please state your full name?

17     A    Donna Marie Brown.

18     Q    Now, you've already given the person writing the

19 pre-sentence report a statement.

20         Is there anything else that you wish to tell the

21 Judge before he imposes sentence?

22     A    Yes.

23     Q    Okay.  Please say it.

24     A    Your Honor, my name is Donna Brown, and this man

25 standing here next to me is Scott Brown.

B-11

1          THE COURT:  Why don't you move to the microphone

2   here so that I can hear you a little better.

3          A    This man standing next to me, Scott Brown, is my

4   husband and my best friend.  He's also the father of our two

5   young children, Amanda, who is four and a half and who is

6   disabled, and our son, Richard, who is three.

7              My husband puts on his uniform every day and

8   protects our family and our community from people like

9   Mr. Yordy.

10             I watched that video, and I saw how Mr. Yordy almost

11  killed my husband.  The man on the left, Mr. Yordy, performed

12  this act without any regard for any life or even a look back

13  to see what he had done.

14             No sentence could be hard enough or stiff enough

15  that could make the fears and anxiety that I now live with any

16  easier.  I now have nightmares and I have to call my husband

17  several times during his shifts to make sure he's okay.

18             Since this incident with Mr. Yordy, my husband has

19  not been okay.  I truly believe he was seriously hurt.  He is

20  not the same man as he was before.

21             I will be living with these anxieties and nightmares

22  until my husband retires, and whatever permanent damage has

23  been received because of the incident may be forever.

24             I hope you take this into consideration when you

25  sentence Mr. Yordy so he, too, never forgets and so that no

B-12

13

1  other wife has to stand here before you like I am now.

2          That's all I have to say.

3          THE COURT:  All right.  Thank you.

4          No questions?

5          MR. LOCK:  I'm sorry.

6          No, sir.

7          THE COURT:  Anything else, Mr. Rozman?

8          MR. ROZMAN:  Commonwealth has no testimony,

9  Your Honor.

10         I don't know if the Court has the guidelines.

11         THE COURT:  I do not.  I'd like to see what you've

12  computed.

13         And while you're showing this to me, let me ask

14  Mr. Lock if you've had a chance to see these and whether you

15  agree with the calculations made by the D.A.?

16         MR. LOCK:  Mr. Rozman has shown them to me,

17  Your Honor, and I believe they are accurately calculated.

18         THE COURT:  All right.  Then we're ready to hear

19  from you, Mr. Lock.

20         MR. LOCK:  Your Honor, I do have some brief

21  testimony to present from two witnesses -- there are more

22  people than that here -- but I've asked two of them to address

23  the Court.

24         THE COURT:  All right.  You can call those

25  individuals.

B-13

1        I have the benefit of your sentencing memorandum,

2   and I have scanned the many letters that you appended in

3   Exhibit J.

4        MR. LOCK:  Thank you, Your Honor.  That's one reason

5   that I don't think it will be necessary to extend this

6   unnecessarily.

7        Mr. Yordy also wishes to exercise his right to

8   allocution.  He would like to address the Court as well.

9        THE COURT:  Well, begin with somebody.

10       MR. LOCK:  Well, I just want to -- if I could, I

11  understand that Your Honor desires to hear the testimony, but

12  there are some things that have been said that I would like to

13  address first, because they really were not intended to be

14  part of my presentation.

15       The material that I have in my pre-sentence report

16  with respect to Trooper Brown was reduced to a footnote.  I

17  took it out of the text.  Indeed, an offer was made to delete

18  it completely.  I had subpoenaed the personnel file, and I

19  never got it.  I received a photocopy of it from the District

20  Attorney's Office to whom it was sent.

21       I was asked to return that and, in fact, I did

22  return it to Mr. Rozman and was asked to certify that no

23  copies of it had been made and it hadn't otherwise been

24  disseminated, and I did certify that.

25       I agreed were Mr. Rozman that I would not address

B-14

1  issues involving the trooper, if the trooper chose not to

2  speak at this hearing.  He has every right to do so, and he

3  did.

4          He said some things that I feel constrained to take

5  issue with, despite the fact, as I think I pointed out in my

6  pre-sentence report, that he is the victim in this case, and I

7  concede that; despite the fact that he is not on trial in this

8  case, and I concede that as well.

9          But there are some things that are irrefutable and

10  many of those things are contained -- some of them are

11  contained in that footnote.

12          For example --

13          THE COURT:  Well, this is a footnote where you

14  accuse the victim in this case of entering a premises

15  occupied by retarded citizens and dragging an adult with

16  mental retardation from one of the horses and proceeded to

17  beat him.

18          You made an accusation against this Trooper Brown.

19  Do you retract that now?

20          MR. LOCK:  No, because the person who provided me

21  with that information is present in the courtroom today, and

22  if he says he didn't do it, I assume it's possible that he did

23  not.  And I'm not prepared to call him a liar, but I am also

24  not prepared to retract it, given the fact the source of my

25  information is present in this courtroom, and there is an

B-15

1 additional source of information who doesn't happen to be

2 present.

3     THE COURT:  Well, let me tell you that this is a

4 very serious accusation that you've made, and unless you have

5 a very good source for that information, it's somewhat

6 unprofessional, to say the least, to make an accusation like

7 that unless you really know what you're talking about.

8     Now, we've had sworn testimony here from the victim

9 in this case that that's not him.  Now, why don't we just stop

10 right now and have your witness come up here that's going to

11 swear under oath that it is him.

12     MR. LOCK:  That wasn't one of the witnesses that I

13 was going to present.

14     As I said, the witness who is present in court today

15 knows it because she was told it by someone else.

16     THE COURT:  Oh, well, listen.  Hearsay and rumor and

17 innuendo are cheap.

18     MR. LOCK:  Your Honor, there are two other

19 incidents, one of which is of an extremely serious nature that

20 are also enumerated in that footnote.

21     That footnote also makes reference to a report once

22 again obtained by me from a third party.  It happens to be

23 Mr. Gochenauer (phonetically), whom I regard to be a reliable

24 source of information, that there have been innumerable

25 episodes of excessive use of force in this case.  I refer to

B-16

1 | the pistol whipping in this case.

2 |      I did not witness that case, but I do know the law

3 | firm that was involved --

4 |      THE COURT:  I'm not going to turn this proceeding

5 | into some kind of nightmare against the victim in this case.

6 |      MR. LOCK:  That's not my point.

7 |      THE COURT:  That's exactly what it looks like your

8 | point is here.

9 |      MR. LOCK:  I was questioned about it, and I

10 | responded to the answer.

11 |      Now, what I think is important to understand is that

12 | in a transcript made of the testimony presented at the

13 | preliminary hearing where another state trooper testified that

14 | he assisted in effecting the arrest that occurred at

15 | Mr. Yordy's home after this incident, that he was surprised

16 | that Mr. Yordy was involved -- excuse me -- was involved in

17 | this.

18 |      THE COURT:  How is that important to me right now?

19 |      MR. LOCK:  Only because it was repeatedly suggested

20 | to you that photographs -- that I would respectfully submit

21 | to the contrary notwithstanding -- that Mr. Yordy is totally

22 | responsible for this; that Mr. Yordy came within an inch of

23 | causing the trooper's death, and I agree he was in a perilous

24 | position and anybody --

25 |      THE COURT:  I heard it the other way.  Mr. Yordy was

B-17

18

1  losing.

2          MR. LOCK:  He said that as well.  He pulled his gun

3  and was prepared to shoot him.

4          THE COURT:  That's what I heard.

5          MR. LOCK:  His exact statement in the preliminary

6  hearing is quoted in that brief.

7          No matter how he got there, he was on the side of

8  the truck that was moving and at some point fell from that,

9  and that's a perilous position for anyone to be in.

10          THE COURT:  Well, of course it was.

11          At that point your client was under arrest and was

12  fleeing the scene.

13          MR. LOCK:  And that is why he pled guilty to

14  resisting arrest, and that is why he acknowledged

15  responsibility for causing the injuries, and I acknowledge

16  that in the brief -- excuse me -- in the sentencing memorandum

17  as well.  I acknowledged that.

18          What I am unwilling to acknowledge is that merely

19  because he is the only Defendant in this case, at least for

20  present purposes, that he is exclusively responsible for

21  everything that happened in this case.

22          Now, just to give you an example -- and because I

23  know that Mr. Rozman wrestled in high school, Mr. Gochenauer

24  wrestled in high school, and I wrestled in high school -- if

25  anyone takes a look at one of these photographs attached as

B-18

19

1  Exhibit A, they will see a classic example of what's called a

2  single arm bar.

3          Now, that is a move that's used -- and I'm not

4  saying it's not legitimate for police to use it -- to cause

5  someone sufficient pain that you can roll them on their back,

6  and it happens when you stick your arm through theirs, and

7  you're in this position.  And it is clearly indicated that it

8  was at that point that a lot of this stuff happened.

9          Now, what is also clearly apparent from the

10  videotape -- which I might point out was voluntarily turned

11  over to the probation office -- was, as the trooper

12  acknowledged and as I indicated in the pre-sentence report,

13  that Mr. Yordy was cordial when this started; that everything

14  was pleasant until Miss Smith came up; that there was some

15  considerable unpleasantness after that, because she can be

16  seen walking away in some of these photographs here, is when

17  that incident occurred.

18          Now, it's quite true that under the law of

19  Pennsylvania -- and I acknowledge it is in the sentencing

20  memorandum -- a police officer is allowed to use any force to

21  effect an arrest.  And, furthermore, a person being arrested

22  is not justified in the use of any force to resist that.

23          That doesn't mean, however, that it is not human

24  nature when put in that position to do a relatively simple

25  act -- which is turn in the direction to which the force is

B-19

20

1  being applied to relieve the force -- that that is not human

2  nature.  That's what occurred, and it's apparent from these

3  tapes.

4          The next thing that happened, and it's all

5  sequentially marked by the clock on the timer on the video

6  camera, is he is pulled out of camera sight, and we all know

7  what he looked like when he came back into camera sight.

8          Now, the suggestion was made under oath by the same

9  witness to which Your Honor previously made reference at the

10 preliminary hearing, that punches were thrown back and forth,

11 the trooper did not throw punches with sufficient force to

12 blacken his eyes and swell him up and everything like that.

13         But we know from the officers who made the arrest

14 that they didn't punch Randy Yordy in the face.  We know what

15 Randy Yordy looked like by the time he got to the hospital,

16 and we know that one of the other troopers said exactly what

17 Trooper Brown, himself, admitted was the case before

18 Miss Smith stopped by, that he was very pleasant with me in

19 previous incidents.

20         This was a cordial incident until she turned and

21 walked away and Randy Yordy ended up bearing the brunt of it.

22 That is not to say, and I tried to make it clear that we

23 eschew responsibility for what has happened, given the law in

24 Pennsylvania, and that is why Randy admitted his guilt and

25 pled guilty.  He was intending all along to go to trial in

1 | this matter.

2 | There are many people in this courtroom who wrote

3 | letters.  Some were asked; many volunteered to write them and

4 | sent them unsolicited who know him and know about his nature.

5 | And this callousness, this indifference, this

6 | complete and total lack of respect that was described as

7 | occurring a year ago at the time of this stop is totally

8 | uncharacteristic with what everyone who knows him says about

9 | him.  And I would respectfully submit it is contradicted by

10 | the photographs taken at the scene and thereafter and by what

11 | we know that Trooper Staegar said at the house.

12 | No one should be subjected -- no one in my

13 | opinion -- should be subjected to being put in a position

14 | where their life is at risk, and I concede that the trooper

15 | was.  I understand that.

16 | The only point that I want to make is that I take

17 | exception to the suggestion that simply because criminal

18 | culpability lies exclusively with Randy Yordy, that he is

19 | totally responsible.  I don't mean just in a legal sense, but

20 | I mean compltely responsible, and that is the only point that

21 | I wish to make.

22 | And I don't wish -- and I made this clear to

23 | Mr. Rozman -- it is not my desire to start casting aspersions

24 | or get in the balance of those 20 incidents.  It is not my

25 | desire to get into all of this stuff, but I do think it

B-21

1  important, given what was said, to point that out.

2          That having been said, if I may, may I call a

3  witness.

4          THE COURT:  Certainly.

5

6          (HENRY DOUGHTY is duly sworn according to law.)

7

8  BY MR. LOCK:

9      Q    May we have your full name, please?

10     A    My name is Henry Doughty, D-O-U-G-H-T-Y.

11     Q    Where do you live, Mr. Doughty?

12     A    679 Swatara Street, Hummelstown, Pennsylvania.

13     Q    Do you know Randy Yordy?

14     A    Yes.

15     Q    How do you know him?

16     A    I've known Randy for at least 10 to 12 years.  I

17 originally met him through real estate.  When I was in real

18 estate, he was also involved in real estate, and I've known

19 him since then as far as a contractor; him being a contractor.

20     Q    Do you know other people in the community who know

21 Randy Yordy?

22     A    Yes, quite a few people in the Palmyra/Grantville

23 area.

24     Q    What can you tell the Judge about the type of person

25 that Randy Yordy is?

 1   A    Well, I mean, what I hear does not sound at all like
 2  the Randy Yordy that I know.  I have known him and seen him in
 3  a lot of different circumstances, and I've seen him even, you
 4  know, on jobs where he's been aggravated, and he's never
 5  displayed any kind of a -- anything that would be a threat to
 6  a person or anything even close to that.

 7        I can't -- I just kind of find it kind of hard to
 8  believe.  Something must have happened to make this all happen
 9  to him or to cause the circumstances.  That's why I
10  volunteered to come up here.

11        I know he's the kind of person -- he's good to the
12  community.  He helps old people out as far as trying to help
13  them out.  He does projects and stuff and does cut them a
14  break.  A lot of contractors don't do that kind of stuff.
15  He's a good member of our community, and that's why I feel it
16  wasn't fair to have anything that was not -- nothing that had
17  to be done legally in excess to him.

18        I just feel he should be given a lenient sentence or
19  whatever because he is a good member of our community.

20   Q    Is it your understanding from your familiarity with
21  other people who know Mr. Yordy, that he is regarded by them,
22  the other people in the community who know him, in a similar
23  fashion that you've described to His Honor?

24   A    Yes.  I'm speaking for other friends and family and
25  people, some that could not be here today, that feel the same

B-23

24

1  way, yes.

2          MR. LOCK:  Thank you, very much.

3          Mr. Rozman may have some questions.

4          THE COURT:  Do you have any questions, Mr. Rozman?

5          MR. ROZMAN:  No, Your Honor.

6          THE COURT:  Thank you, Mr. Doughty for coming in.

7

8              (The witness is excused.)

9

10             (HELEN B. PINKERMAN is duly sworn according to law.)

11

12 BY MR. LOCK:

13     Q    May we have your full name, please?

14     A    My name is Helen B. Pinkerman.

15     Q    Would you please spell your last name?

16     A    P-I-N-K-E-R-M-A-N.

17     Q    Where do you live, ma'am?

18     A    1368 Piketown Road.

19     Q    Do you know Randy Yordy?

20     A    Yes, I do.

21     Q    And, indeed, if my memory serves me correctly, you

22 have been supporting Randy since the day this very incident

23 occurred; is that right?

24     A    I have.

25     Q    I believe you assisted him in posting bail to secure

B-24

1  his release following his arrest; is that right?

2      A    I did.

3      Q    How long have you known Randy, and how did you come

4  to know him?

5      A    I know Randy for close to 20 years or maybe more,

6  and I was referred to him about a job tht some other man

7  started and he got back problems and he couldn't finish it,

8  and they referred me to Randy Yordy, and he's the best thing

9  that ever happened.

10     Q    Can you tell His Honor what you know of Randy's

11 character?

12     A    Outstanding character.  There isn't anybody that

13 I've ever spoke to that doesn't like him.

14          When he does work on my tenant homes, I make it a

15 point to go to those homes and find out how things are going

16 and whether the fellows are being nice, and most everyone says

17 that they have never heard any profanity, don't hear loud

18 music, and they would recommend him to their friends.

19     Q    Is he regarded by the people in the community as an

20 asset to the people who live in the eastern end of the county?

21     A    An asset and an outstanding person, yes.

22     Q    Is he someone that you intend to continue your

23 relationship with, this incident notwithstanding?

24     A    I intend to.  As long as he'll do my work, I will

25 employ him.

B-25

26

1    Q    Will you continue to be a friend of his and support
2  him as long as you're able?

3    A    Yes, I will.

4    Q    Is it also it your understanding that the community
5  at large, in general terms, has similar sentiments with
6  respect to Mr. Yordy?

7    A    They told me to extend their best to him when I came
8  in here and I saw him.

9        MR. LOCK:  Thank you, very much, ma'am.

10        No further questions.  Mr. Rozman may have some
11  questions for you.

12        MR. ROZMAN:  No questions, Your Honor.

13

14  BY THE COURT:

15    Q    Miss Pinkerman, you were here also on behalf of
16  Vickie Smith when she was sentenced?

17    A    Yes, I was.

18        THE COURT:  I'm just curious about this.

19

20  BY THE COURT:

21    Q    You say you've known Randy for about 20 years?

22    A    Yes; mm-hmm.

23    Q    Did you know that he was charged with assault and
24  pleaded guilty or no contest to that charge in Lebanon County
25  within that period of time that you know him?

B-26

27

1    A    I knew he had a problem.

2    Q    Did you know he had a conviction for assault?

3    A    Yes.

4    Q    Do you know he's a convicted drug dealer?

5    A    I didn't know about the drugs.

6    Q    You didn't know that?

7    A    No.

8    Q    Did you know he had a prior DUI?

9    A    That I did.

10    Q    Did you know that he pleaded guilty to possession of

11    drugs and corruption of minors?

12        Did you know that?

13    A    I don't know anything about the drugs.

14        THE COURT:  All right.

15        Thank you.

16

17            (The witness is excused.)

18

19        MR. LOCK:  There are other people in the rear of the

20    courtroom, Your Honor.  They're all prepared to testify.  It

21    would be cumulative.  There really is no purpose for it.

22        Your Honor has the benefit of the letters, which I

23    know you've carefully considered.  You may have seen that I

24    just went back and talked to Commissioner Hoffman.

25        THE COURT:  I've read his letter.

B-27

28

1          MR. LOCK:  I thanked him for that, and

2  Mr. Kimmel is here.

3          THE COURT:  I've read Mr. Kimmel's.

4          MR. LOCK:  I know there's people here that you

5  know --

6          THE COURT:  Most of these letters are from people

7  for whom your client has performed construction services, and

8  in their dealings with him, he has been the perfect gentleman.

9  He's been helpful, honest, forthright, and he has helped

10  others.  They say that.

11          MR. LOCK:  I might point out that I believe that it

12  goes beyond that, because while that characterization of the

13  letters is, indeed, the case, these are his neighbors.

14          Mr. Doughty, for example, isn't in the contracting

15  business.  He's in the real estate business and got to know

16  him in that fashion.

17          THE COURT:  I can't -- in cases like this, I always

18  think of the classic novel about our friend, Dr. Jekyll, and

19  his other personality, Mr. Hyde, who is respected in the

20  community, does all kinds of good things in the community, is

21  loved and respected by his neighbors until something happens

22  to his personality.

23          In this case, and as in so many cases we see, when

24  you start to introduce alcohol into the equation, sometimes

25  this otherwise kind, gentle, considerate person is transformed

B-28

1 into something 180 degrees on the other side.  We see that.

2 You've seen it.  We see it all the time in these courts.  It's

3 part of the curse of alcohol.

4          MR. LOCK:  Sometimes alcohol does have that effect,

5 Your Honor.

6          With respect to that point, the Jekyll and Hyde

7 argument, President Richard Nixon is proof that good people

8 can do bad things.  People in responsible positions and people

9 of respect can do bad things.

10          Let me merely point this out to the Court, and I

11 acknowledge this in my sentencing memorandum.  Until five and

12 a half years ago, Randy Yordy had done nothing to merit the

13 type of respect that is evidenced by the presence of these

14 people in this courtroom.

15          Now, it's true that many people, if they just wanted

16 to, to impress a judge, could assemble a lot of people; could

17 get a petition together -- I mean I hope it's clear from the

18 comments that have been made from Mrs. Pinkerman's action, for

19 example, in getting involved at preliminary arraignment long

20 before I was ever -- that is not what this is all about.

21          In fact, believe me, this whole half of the

22 courtroom could be filled up if that's what this was all about

23 based upon the availability of people to come in here today.

24          Before five and a half years ago, you would not have

25 seen people like this.  You would not have seen people of this

1  character.  You would not have seen his neighbors or his
2  customers prepared to stake their reputations by coming into
3  court and saying to a judge who is about to impose sentence --
4  I'm sure it must be the most difficult task which a judge
5  has -- to say let me tell you something about this person.  He
6  is not a bad person, he is a good person, and this is why.
7         Now, was alcohol involved in this?  Yes, to the
8  extent his blood-alcohol content was, as represented by
9  Mr. Rozman -- and I'm sure that's completely accurate; simply
10 no question about it -- he acknowledged it and acknowledged it
11 by his guilty plea.
12        The plain and simple fact of the matter is he turned
13 his life around five and a half years ago.  All you have to do
14 is look at his criminal history, his criminal record, to know
15 that he couldn't have marshalled this type of community
16 support; that he couldn't have gotten these types of letters;
17 that he couldn't have presented this type of testimony.
18        Five and a half years ago he did something that most
19 people do earlier in their lives, long before their mid-30s.
20 He got serious.  He started his own business; he assumed
21 responsibility for himself and for his actions.
22        And, indeed, despite the frequency of problems that
23 you see reflected in his prior criminal record, you see an
24 absence of any problems since he started that business,
25 because he proved to himself -- he speaks about that business

1 with enormous pride.

2     And Your Honor is right, as I said, in

3 characterizing those letters, and you know the type of work he

4 does and the type of businessman he is.  He speaks with

5 enormous pride about how that business has continued to grow,

6 how that business has been successful, and that business has

7 not only given him self-respect and not only given him

8 self-esteem, it's also done something more important.

9     It's enabled him to become an important member of

10 his community as Your Honor just heard he has become.  That's

11 how Mr. Hoffman knows him, for example.  That's how Mr. Kimmel

12 and Mrs. Antoun know him as indicated in their letters.

13     He has become a valuable member of the community to

14 the point where he can actually help other people.  And you

15 heard references to that today; if someone can't afford it,

16 he'll take care of them.

17     You've heard about the small -- and it's true they

18 are small, but I don't think Your Honor expects to hear that

19 about people charged with crime -- the small acts of kindness

20 routinely performed by Randy when he's at work, such as, for

21 example, having breakfast from a fast food restaurant

22 available to a customer who worked the night shift and was

23 coming home late; feeding the pets and things like that;

24 things that he simply didn't have to do.

25     That's the difference between Randy Yordy and

B-31

1  Dr. Jekyll.  Now, I'm not suggesting Richard Nixon got himself

2  elected President of the United States -- and I'm not

3  suggesting that people who attain positions of responsibility

4  or are otherwise responsible people can't slip -- but

5  Mr. Gochenauer and I took great pains to break that video down

6  frame by frame in an attempt to recreate as accurately as

7  possible what occurred here, and I've stated what I believe

8  occurred here.

9          I believe that these photographs demonstrate the

10  accuracy of those representations.  That beating that he took

11  could only have occurred in one way.  It's inconsistent with

12  the manner that's been described, at least in the preliminary

13  hearing.

14          It is consistent with the way Trooper Steager

15  described he knew Randy to be.  The Jekyll and Hyde notion is

16  a valid notion, but the issue of provocation, even when

17  there's no justification to defend yourself, which I have

18  conceded in my memorandum and we conceded when we entered the

19  plea, the issue of provocation is a significant provocation --

20          THE COURT:  Well, you know, Mr. Lock, as I've heard

21  you say so many times, you weren't there.  I wasn't there.  We

22  don't know really what happened, and the videotape doesn't

23  tell us exactly what happened.

24          You know, if there were valid defenses, you really

25  should have taken a trial and asserted those defenses.  Or if

33

1  you think that the officer is unjustified in what he did that

2  night, then maybe you should seek redress in some kind of a

3  civil suit against the officer for a violation of your

4  client's civil rights.

5          But what I'm facing here today is an admission by

6  your client that he inflicted, without justification, bodily

7  injury on a law enforcement officer, and this sentencing

8  proceeding is not some kind of ceremony of innocence.

9          We're here because your client has pleaded guilty to

10 the charge, and I'm taking into consideration everything

11 you've said here.

12         But really, as a judge, I am proceeding on the

13 theory that your client is guilty because he's pleaded guilty

14 to a felony of the second degree.  This is a serious offense.

15         MR. LOCK:  I apologize if I have not sufficiently

16 clearly distinguished in my argument to the Court, the

17 distinction that exists between justification on the one hand

18 and mitigation of sentence on the other hand.

19         I am speaking in mitigation of sentence.  Not only

20 did I refer to it -- I have a whole section in the sentencing

21 memorandum that I think I call the basis for the guilty plea.

22 I quote the statutes in Pennsylvania.

23         I am not talking about justification.  What I am

24 attempting to convey, and I'm sorry if I didn't do it --

25         THE COURT:  I really do understand what you're

B-33

1 trying to convey.  You don't have to repeat it again.  I

2 really do understand your position.

3        But you're saying in mitigation of any sentence

4 today, that your client is not totally at fault for the result

5 that happened to Trooper Brown.

6        He's not, you're saying, totally responsible for his

7 DUI, for the resisting arrest, and for the aggravated assault;

8 that there was somehow a provocation, whether it was the

9 wrestling maneuver you described or an overreaction of the

10 police officer.  That is what you're intimating in all of

11 this.

12        MR. LOCK:  If I've created that impression, let me

13 remove it, because it's inaccurate.  He is legally, totally

14 responsible.

15        A sentencing proceeding, of course, looks at all

16 the facts, looks at the Defendant as an individual, can

17 consider, can consider -- this is really what I was getting

18 at, and I'll just be explicit about it -- the conduct of the

19 victim and the extent, if any, to which the victim contributed

20 to the commission of the crime.  That is a legitimate fact,

21 indeed --

22        THE COURT:  How did -- maybe I didn't hear this.

23        Other than the wrestling maneuver, how did the

24 trooper contribute to his own injuries?

25        MR. LOCK:  Randy Yordy did not do -- and I'm showing

1 Your Honor one of the photographs contained in

2 Exhibit H of the pre-sentencing memorandum -- that Randy Yordy

3 did not do that to himself.

4       THE COURT:  But once you resist arrest and once

5 punches are thrown and the officer is engaged in an attempt to

6 subdue his prisoner and prevent his escape, the fact that you

7 show me a photograph that shows that your client suffered two

8 black eyes and abrasions and so forth, I still don't know that

9 that proves somehow that the trooper is responsible for that.

10       MR. LOCK:  I'm sorry.

11       THE COURT:  Once you resist arrest, if you punch or

12 even throw a punch at me as a trooper, and I happen to respond

13 and my punch connects because, perhaps, you were too drunk to

14 throw a good punch and mine connects and you now show me a

15 picture of you with a black eye, that somehow is a mere

16 reflection on the activities of the trooper?

17       MR. LOCK:  Your Honor is right.  Neither of us were

18 there and we didn't see what happened.

19       But we do have some idea, and I'm now holding up

20 another photograph, Exhibit I, which shows the extent of the

21 injuries sustained by the trooper, and I believe --

22       THE COURT:  Your client got the worst of it.

23       MR. LOCK:  No, no, no.  It's not a matter of getting

24 the worst of it.  It disputes the notion that this was a fight

25 for our lives; that this was a mutual exchange of fisticuffs.

B-35

36

1          Other than a bruise, which I have guesstimated to be

2   a quarter of an inch in length on his face, there's not a mark

3   on his face.  There is no evidence that he was struck.

4          Now, if you assume that there was a mutual brawl

5   that was going on in which one person got the better of it and

6   one person got the worst, then that's fine.

7          There is no evidence of a brawl here.  In fact, the

8   videotape -- and this simply could not

9   be --

10          THE COURT:  Well, look.  I don't know that we have

11  to retry the case or even try the case here.

12          Your client entered a plea of guilty to a particular

13  charge.  I have the benefit of a pre-sentence investigation.

14  I have read it through several times.  I've read the letters

15  that you've submitted.  I've considered carefully everything

16  you have to say.

17          Now, what I'd like to do is hear from your client.

18          MR. LOCK:  He does wish to speak.

19          There's only one more thing I'd like to say, and I

20  assume you'd like me to conclude my remarks before he speaks?

21          THE COURT:  Well, no.  You go ahead and finish.

22          I didn't want to continue endlessly on a discussion

23  of the events of that night.

24          MR. LOCK:  Well, I hope it's something more than a

25  discussion of the events of that night, because there is

DAUPHIN COUNTY COURT REPORTERS

B-36

1  physical evidence that shows what occurred, and that's the
2  only reason that I put this together with these exhibits.  The
3  only reason that that was done, and it wasn't done to take up
4  the Court's time; wasn't done to -- or done for any other
5  purpose.

6         THE COURT:  I'm not suggesting it was.  It's a very
7  well done sentencing memorandum.

8         MR. LOCK:  That's the reason for the discussions.
9  It's not a debate; you're quite right that it shouldn't be
10 and, indeed, it's not an attempt to try the case.

11        I was struck when I came in here because of an
12 exegesis on the Bible with which I'm familiar.  And to be
13 honest with you, all the times I've appeared here in this
14 courtroom, I don't know that what is written there, and I'll
15 bet Your Honor doesn't know either what is written on the base
16 of the bar here.

17        There are three words that are written on the base
18 of the bar here, and I've looked at it a hundred times and
19 you've looked at it a hundred times.

20        THE COURT:  I'm sure we have.

21        MR. LOCK:  I couldn't have told you until somebody
22 pointed it out to me this morning what they are.

23        Wisdom, that's how you got where you're at.  Nobody
24 disputes that.

25        Justice.  That's why you're where you're at.

38

1      THE COURT:  And mercy.

2      MR. LOCK:  And that's the exegesis that I'd like to

3  call Your Honor's attention to.  But you didn't tell me you

4  knew the first two.  I don't know.  You did get the one,

5  mercy.

6      THE COURT:  I said the most important one from your

7  client's point of view.

8      MR. LOCK:  I don't know if that's from my client's

9  point of view the most important.

10      This is an exegesis on an Old Testament commentary

11  on a quote from Isaiah -- probably the most famous quote in

12  all of Isaiah -- justice, justice thou shalt pursue.

13      Now, in the Jewish faith, no word in the Bible is

14  regarded as extraneous, as not having a specific purpose, and

15  that has raised the question over the millenia about the

16  reason for the repetition of the word justice, because it

17  appears to create -- to include a word that is superfluous and

18  there have been various commentaries on it.

19      But one of the commentaries by one of the most

20  prominent scholars, Old Testament scholars, is that the root

21  of both words, justice and mercy, in Hebrew is the same, and

22  to transliterate it is T-Z-E-D-E-K.

23      That word, depending on what form of speech it's put

24  into, means mercy, means charity, means excessively generous

25  acts, and that word also means justice, because justice is not

B-38

1  black and white.

2         Justice is not one thing.  Justice has several

3  facets, and the point that I tried to make in the conclusion,

4  the concluding page at least, a separate conclusion of the

5  sentencing memorandum, was that I believe that the Court can

6  structure a sentence in this case which accommodates the needs

7  of justice while simultaneously achieving the ends of mercy.

8  They are not inconsistent in this case.

9         Five and a half years ago they would have been

10  inconsistent.  It would not have been possible for someone

11  seated in Your Honor's position to do that.  Here I believe

12  that it is, and the sentence, without being specific, that I

13  suggested -- he knows he's going to jail.  They know he's

14  going to jail.  They've been told that.  I said it to them in

15  conversation.  He's going to jail.

16         The question is can a sentence be structured that

17  enables him to keep the life that he has put together in the

18  last five and a half years, and that's what I would like

19  Your Honor to consider.

20         THE COURT:  I know what you want.

21         MR. LOCK:  I understand.  I just wanted you to know.

22         THE COURT:  We've been in this business too long,

23  Mr. Lock.

24         MR. LOCK:  That having been said -- you never heard

25  that one before.  You've heard many, but not that one.

B-39

1    Randy, do you want to come up here, please?

2    THE COURT:  But then I don't know that I've ever

3  heard you invoke Old Testament justice.

4    Old Testament justice.  The implication of that can

5  be a very risky game.

6    MR. LOCK:  When Justice McDermott was on the Supreme

7  Court, and I brought that argument up one time, he said, Are

8  you familiar with Genesis, Chapter such and such and Verse

9  such and such, which I was not, but which I am --

10    THE COURT:  Our appellate courts don't want us

11  quoting the Bible anymore.  I guess we can quote it to each

12  other, but not to a jury --

13    MR. LOCK:  Only making a point, Judge.  I think you

14  understand my point.

15    THE COURT:  I understand it.

16    MR. LOCK:  Now, as I indicated, Mr. Yordy does wish

17  to address the Court, because contrary to what has been

18  suggested -- and we are not going to get into that incident at

19  the Spot because it was, in fact, reported to me immediately

20  after it happened what had occurred -- but he does -- he is

21  remorseful and he wants to express to the Court the

22  implications of this thing on his life.

23    THE COURT:  Let's move right along.

24    MR. LOCK:  Identify yourself for the record and then

25  address His Honor with the thoughts you wish to express.

B-40

1          THE DEFENDANT:  I'm Randy Yordy and -- I'm losing my

2    voice -- I do take responsibility, and Mr. Brown is wrong if

3    he thinks I'm not sorry.

4          That night I did drink a few too many drinks, and I

5    know that he mentioned a report that said I had a couple.

6          And in the home study, I said I had between -- the

7    pre-sentence, I had between four and five.  I mean I quoted

8    that, and I know that it did have an influence on what

9    happened.  And I wouldn't have swerved on the road, I wouldn't

10   have possibly reacted the way I reacted to cause the chain

11   reaction.

12         At the time where I did flee, I -- like Mr. Brown

13   said, I did come very close to death also by a bullet.  You

14   know, maybe I got what I deserved or maybe the beating I

15   deserved.

16         I did in the last five and a half years work very,

17   very hard to try to contribute and make somebody good to this

18   society.  I worked with people.

19         I'm very, very honored that the people that are

20   behind me did come and are behind me.  I'm very, very honored.

21         Like Mr. Lock said, five years ago that probably

22   wouldn't have happened.  Five years ago I got custody of my

23   children which helped bring everything around, and I know the

24   night of this happening is the day after my birthday.

25         I worked late on my birthday.  I didn't know I was

B-41

1  diabetic.  If you see the medical report, I have 450, I think,

2  blood sugar along with the alcohol, helped influence my wrong

3  decisions.  And, Mr. Brown, I am sorry and I do apologize.

4          I don't know what good it does.  I have the same

5  thing.  I lay in bed, I don't know, for months wondering when

6  they're going to come back and finish killing me.  A broken

7  arm and a broken nose.  I was in pain.  I came to.

8          I actually -- actually was back and forth three days

9  later.  In the hospital I kept waking up.  I felt -- it was

10 maybe a joke like Clint Eastwood that got drugged in out of

11 the prairie --

12         THE COURT:  I'm sorry?

13         THE Defendant:  Like Clint Eastwood who got drug in

14 off the prairie and he said, What day is this?

15         Like three , four days later I came to, and I kept

16 blaring [sic] over it, attempted homicide on a police officer.

17 I couldn't believe it of myself.

18         And I'm not a violent person.  I can stand there and

19 somebody can hit me, and I won't hit him back.  I just -- I

20 don't go hunting; I can't kill something.  I don't know.

21         I'm responsible, I know, for what I did.  I can ask

22 for the word mercy, if I can keep my life and my business and

23 somehow pay my debt for what I've done.

24         That's about all I have to say.

25         THE COURT:  All right, Mr. Yordy.  Thank you.

B-42

1    Anything else anybody wants to say?

2    MR. LOCK:  I have nothing, Your Honor.

3    THE COURT:  We've had the benefit of a county

4 pre-sentence investigation which was very thorough, and we've

5 also had a very thorough sentencing memorandum prepared by

6 Mr. Lock which has brought additional matters to the Court's

7 attention.

8    We considered that Mr. Yordy is 42 years of age;

9 that he has entered a plea of guilty to these charges, a

10 negotiated plea of guilty, in which the more serious assault

11 charges were reduced from a felony of the first degree to a

12 felony of the second degree.

13    We also are going to dismiss the charge of reckless

14 endangerment, inasmuch as we feel that that merges with the

15 count of aggravated assault.

16    He has apologized to the trooper, and he appears

17 genuinely sincere and remorseful in his comments to the Court.

18    The courtroom is filled with quite a number of

19 folks, many of whom I recognize, and many of whom have

20 submitted letters as well as others who have submitted letters

21 on Mr. Yordy's behalf indicating, generally, that they know

22 him to be a kind, honest person, a reliable contractor in his

23 dealings with them, and most of the letters are along those

24 lines.  Their presence here is a testament to their support of

25 him.

B-43

44

1        On the other hand, the charges in front of the Court

2   are very serious.  Every day thousands of police officers

3   across our land put their lives on the line for all citizens;

4   to serve and to protect the citizens of the community.

5        Someone such as Trooper Brown who is out on patrol

6   by himself at night, sees a traffic violation and has reason

7   to believe that someone is impaired, walks up to a vehicle and

8   has no idea as he approaches that car what is going to meet

9   him.

10       The arrest for a DUI is, for most police officers, a

11  rather routine charge.  Some even have their humorous aspects.

12  But where a vehicle operator becomes confrontational, resists

13  the arrest, starts to throw punches, runs to the vehicle,

14  starts the ignition, and drives away dragging the police

15  officer, we all realize that there's nothing amusing at all

16  about that.

17       We realize the real sacrifice and risk that the

18  police officers make when they perform their duties for all of

19  us.  I guess we're all fortunate that the injuries weren't

20  worse than they were, and I have no doubt that both Mr. Yordy

21  and Trooper Brown have had and will continue to have a great

22  deal of time to reflect on the events of that night.

23       The General Assembly of Pennsylvania, through its

24  Commission on Sentencing, provides judges with guidelines.  If

25  we depart from these guidelines, we're supposed to give

B-44

1 reasons for them.

2   The guidelines are essentially composed of two

3 considerations; two elements.  One is called a prior record

4 score, and the other an offense gravity score.

5   With regard to the -- to Mr. Yordy's prior record,

6 we've already made some comment, but the first thing that

7 becomes obvious is that the events of this particular evening

8 were not an isolated instance or aberration in this man's life

9 as far as running afoul of the law is concerned.

10   Twenty-four years ago he was arrested for possession

11 with intent to deliver a controlled substance and he pleaded

12 guilty.  I was struck by something as I studied the -- this

13 report, because that arrest was made by the Pennsylvania State

14 Police.

15   What struck me was a comment apparently made or at

16 least recalled as having been made by Trooper Brown from this

17 incident to the effect that, You staties aren't going to do

18 this to me again.

19   The quote is, I'm not going to let you fucking

20 staties do this again.  When I saw that and I saw the first

21 arrest, I just wondered whether or not Mr. Yordy has some kind

22 of a latent resentment for the state police.

23   But in any event, six years after that disposition

24 in 1982, Yordy was again arrested for possession with intent

25 to deliver a controlled substance, this time by the Attorney

B-45

1 General's Office.  For some reason those charges were

2 dismissed.

3          Two years later in 1984 he entered no contest pleas

4 to two counts of simple assault and criminal mischief and

5 criminal trespass in Lebanon County.

6          In 1991 he pleaded guilty to a charge of retail

7 theft.

8          In 1994 Cornwall Police Department charged him with

9 DUI, criminal conspiracy, possession of a controlled

10 substance, corruption of minors, reckless endangerment,

11 endangering the welfare of a child, and we heard that

12 Mr. Yordy pleaded guilty to that.

13          That brings us to the present charges.  So a prior

14 record score as a result of all of these factors is listed as

15 a 3.

16          The most serious offense here, of course, is the

17 assault on a police officer.  The standard-range sentence for

18 that offense is 12 to 18 months as a minimum sentence.

19          The resisting arrest carries a standard-range

20 sentence of 0 to 4 months.

21          The driving under the influence carries a minimum

22 range of 1 to 4 months and a mandatory minimum sentence,

23 because it's a second offense, of 30 days.

24          The sentence must reflect justice.  Justice for the

25 victim, justice for the folks of this community who -- on

B-46

47

1  whose behalf the charges are really brought and whose laws

2  have been violated; and, of course, justice for the Defendant,

3  Mr. Yordy.

4       I believe the interests are served that Mr. Yordy be

5  sentenced in such a way that will allow him to pursue his

6  business interests and yet at the same time have a penal

7  component that reflects the serious nature of these charges.

8       So in thinking about this, what I've planned to do

9  is impose a state sentence that will be served in the

10  Dauphin County Prison.  But the Defendant's eligibility for

11  work release will be delayed for what I consider to be a

12  period appropriate to the seriousness of the offense.

13       Before I actually begin to impose sentencing,

14  however, I have not heard from the District Attorney any

15  request for restitution.  Is there one?

16       I saw some minor things like uniform dry cleaning

17  and things like that.

18       MR. ROZMAN:  That's the only claim that has been

19  made, Your Honor.  His medical bills were handled by

20  insurance, and the insurance company did not respond to a

21  claim for restitution.

22       THE COURT:  Then I guess I can look it up and see

23  what it is.

24       Well, you know, given everything else, let me ask

25  the trooper.

B-47

48

1    Do you claim $10.50 for dry cleaning of your shirts

2  and pants and $5 for your jacket.

3    Are you seeking that?

4    TROOPER BROWN:  Yes, Your Honor.  I put that out of

5  my pocket.

6    THE COURT:  All right.

7    In the case of the Commonwealth of Pennsylvania v.

8  Randy Adam Yordy, on the count of aggravated assault, it is

9  the sentence of the Court that the Defendant pay the costs of

10 prosecution, pay a fine of $500, make restitution to

11 Trooper Brown in the amount of $15.50, and undergo

12 imprisonment in the Dauphin County Prison for a term, the

13 minimum of which shall be 1 year and the maximum of which

14 shall be 3 years.

15    On the count of driving under the influence, the

16 Defendant will pay the costs of prosecution, a fine of $1,000,

17 and undergo imprisonment in the Dauphin County Prison for a

18 term, the minimum of which shall be 2 months and the maximum

19 of which shall be 1 year.

20    This sentence shall be served consecutively to the

21 aggravated assault count.

22    On the count of resisting arrest, the Defendant will

23 pay the costs of prosecution, a fine of $500, and undergo

24 imprisonment in the Dauphin County Prison for a term, the

25 minimum of which shall be 2 months and the maximum of which

B-48

1  shall be 1 year.

2       This sentence shall be served consecutively with the
3  count involving driving under the influence.

4       We dismiss the charge of reckless endangerment.

5       MR. ROZMAN:  Your Honor, there were two counts of
6  resisting arrest.

7       THE COURT:  There are two counts, but I don't
8  understand why there were two.

9       MR. ROZMAN:  One count of resisting arrest at the
10 scene with Trooper Brown and another count of resisting arrest
11 at Mr. Yordy's house where the second confrontation took
12 place.

13      THE COURT:  Thank you for explaining that.

14      On that count, as well, we impose a fine of $500,
15 the costs of prosecution, and a sentence, the minimum of which
16 shall be 2 months and the maximum of which shall be 1 year.

17      Now, the cumulative sentence is 18 months to
18 6 years.  That is, of course -- I'm sorry.  I can't do that.

19      We're going to make the fourth count concurrent
20 because I have to stay within 5 years.  So the cumulative
21 sentence then is 16 months to 5 years.

22      We do, however, direct that the Defendant shall not
23 be eligible for work release for a period of 6 months.

24      That means, Mr. Yordy, that you're just not going to
25 walk out of here and walk into a work release center.  You're

B-49

1  going to do hard time in Dauphin County Prison.

2          We could have sent you very easily to the state

3  penitentiary.  I'm sure if Trooper Brown were sitting up here,

4  you'd be doing several years in the state penitentiary.

5          But I have, as I said, taken into consideration the

6  fact that you did plead guilty, that you do appear remorseful,

7  and that for the last five years, you apparently have earned a

8  lot of support from the community.

9          But you did enter a plea of guilty; you did admit

10  these things, and as I tried to emphasize at the outset of my

11  remarks, citizens must respect the uniform.  If not the man,

12  at least the uniform.

13          When placed in a position if it should unfortunately

14  ever happen to you again, I'm sure this moment and the events

15  of that night will be brought home to you.

16          Does anyone have any question about the sentence?

17          MR. LOCK:  One point, Your Honor, and I've just

18  confirmed with Professor Russo --

19          THE COURT:  Professor Russo?

20          MR. LOCK:  Where did he get to?  There he is.

21          What I believe to be my understanding --

22          THE COURT:  He's right; he's right.  I know what

23  he's going to say.

24          It has to be one day less.

25          MR. LOCK:  One day less.

B-50

51

1          THE COURT:  That just occurred to me.

2      Thank you, Professor.

3          THE COURT:  All right.  Let's have the record

4  reflect then that every time I said the sentence to a maximum

5  of so many years, it must be that, less a day.

6          So on the assault, 1 to 3 years, less a day.

7          On the DUI, 2 months to 1 year consecutive, but

8  less -- 1 year, less one day.

9          Resisting arrest, 2 months to 1 year, less one day.

10  Consecutive.

11          MR. LOCK:  Thank you, very much, Your Honor.  I have

12  nothing else.

13          We respectfully waive notice of post-sentencing

14  rights.

15          THE COURT:  All right.

16

17      (The proceedings are concluded at 1 o'clock p.m.)

18

19                  --oOo--

20

21

22

23

24

25

B-51

52

# C E R T I F I C A T I O N

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the sentencing of the above cause, and that this is a correct transcript of the same.

_____
Bart VanSomeren, RPR-CP
Official Court Reporter

COPY

The foregoing record of the proceedings upon the sentencing of the above cause is hereby approved and directed to be filed.

_____
Joseph H. Kleinfelter, P.J.


_____
Date

B-52

**DC - 300B  (PART 1)**    *Corrected Commitment*
(Rev. 10-85)

**Type or Print Legibly**

COURT COMMITMENT
COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania
vs.
*Randy Adam Yordy*
COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)

**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS**

**NOTE:** Additional supply of this form available at above address:

☐ **DC-300B  (Part II) attached**

| SEX ☐ F ☒ M | DATE OF BIRTH 2-3-58 | SID | OTN F177106-6 | COURT OF INITIAL JURISDICTION ☐ | COMMON PLEAS ☒ |
|---|---|---|---|---|---|

| COMMITTING COUNTY/MAGISTERIAL DISTRICT *Dauphin* | COURT NUMBER *685CD99 Ct.2* | DATE - TERM *3/23/2000* |
|---|---|---|

The above defendant after  ☒ pleading guilty  ☐ nolo contendre  ☐ being found guilty  was on

*March 3rd*  ,  *2000*  sentenced by *Judge*/District Justice *Hon. J. Kleinfelter*  to a term of

not less than  *1*  years    months    days nor more than  *3 less 1 day*  years    months    days, or

for the offense of  *Agg. Assault*

(Section  *18PaCS§2702(a)(3)*  of the Crimes Code) or (other statute) _____

It is further ordered that the said defendant be delivered by the proper authority and treated as the law

directs at the  *Dauphin County Prison*    facility located at  *501 Mall Road, Harrisburg, PA  17111*

| FINE AMOUNT $ *500.00* To Be Paid To: ☒ COUNTY ☐ COMMONWEALTH | COSTS AMOUNT $ *N/A* To Be Paid By: ☐ COUNTY ☒ DEFENDANT | RESTITUTION |
|---|---|---|

| CREDIT FOR TIME SERVED (EXPLANATION OF CREDIT COMPUTATION ON REVERSE SIDE) | EFFECTIVE DATE OF SENTENCE *March 23, 2000* |
|---|---|

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below:

*Ct. 1 - Crim. Attempt (18Pa.CS§2702(a)(2) - Dismissed*
*Ct. 4 - R.E.A.P. (18Pa.CS§2705) - Merged with Count 2*
*State sentence to be served in Dauphin County Prison - Agg. sentence is 16 mo. to 5 yrs. Less 3 days*

| PROSECUTING ATTORNEY *Rozman* | DISPOSITION OF NON-INCARCERATION OFFENSE(S) |
|---|---|
| DEFENSE ATTORNEY *J.Lock* | |
| COURT REPORTER *Van Someran* | (THIS BLOCK NOT TO BE USED FOR INCARCERATION OFFENSE) |

Certified:  A True Copy

MAR 2 4 2000 (SEAL)

_____
(Clerk of the Court)

In witness, whereof I have hereunto set my hand and seal of said

court, this  *23rd*  day of  *March*    *2000*

*(corr. comm. typed 3-24-00 to clarify sentence)jr*

_____
AUTHORIZED SIGNATURE

COMMONWEALTH'S
**EXHIBIT**
C
PENGAD-Bayonne, N.J.

**DC - 300B (PART II)**  (Rev. 10-85)
(TO BE ATTACHED TO PART I - COURT COMMITMENT)

**Type or Print Legibly**

COURT COMMITMENT
COUNTY CORRECTIONAL INSTITUTION
Commonwealth of Pennsylvania
vs.

*Randy Adam Yordy*
COMMITMENT NAME (LAST, FIRST, INITIAL, SUFFIX)

**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS**

**NOTE: Additional supply of this form available at above address:**

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | |
|---|---|---|
| *685CD99 Cts.3,5,6* | *F177106-6* | |

The above defendant after ☒ pleading guilty ☐ nolo contendre ☐ being found guilty was on

*March 23rd* , *2000* sentenced by **Judge**/District Justice *Hon. J. Kleinfelter* to a term of

not less than ____ years *2* months ____ days nor more than *1 less* / *1 day* years ____ months ____ days, or

*each count* for the offense of *DUI and Resisting Arr. (2)*

(Section *75PS§3731(a)(1-4)* of the Crimes Code) or (other statute)
*18Pa.CS§5104*

| FINE | COSTS | RESTITUTION |
|---|---|---|
| AMOUNT $ *1000.00 Ct.3* / *500.00 Cts.5,6* | AMOUNT $ *N/A* | |
| To Be Paid To: ☒ COUNTY ☐ COMMONWEALTH | To Be Paid By: ☐ COUNTY ☒ COMMONWEALTH | |

| CREDIT FOR TIME SERVE | EFFECTIVE DATE OF SENTENCE |
|---|---|
| | *March 24, 2000* |

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below:

*Ct. 3 is CS to Ct. 2    Ct. 5 is CS to Ct. 3    Ct. 6 is CC to Ct. 3*

| COURT NUMBER | OFFENSE TRACKING NUMBER (OTN) | |
|---|---|---|
| | | |

The above defendant after ☐ pleading guilty ☐ nolo contendre ☐ being found guilty was on

____ , ____ sentenced by **Judge**/District Justice ____ to a term of

not less than ____ years ____ months ____ days nor more than ____ years ____ months ____ days, or

for the offense of ____

(Section ____ of the Crimes Code) or (other statute) ____

| FINE | COSTS | RESTITUTION |
|---|---|---|
| AMOUNT $ | AMOUNT $ *N/A* | |
| To Be Paid To: ☒ COUNTY ☐ COMMONWEALTH | To Be Paid By: ☐ COUNTY ☒ COMMONWEALTH | |

| CREDIT FOR TIME SERVED | EFFECTIVE DATE OF SENTENCE |
|---|---|
| | |

This sentence shall be deemed to run concurrent to any existing sentences, effective the date of imposition unless otherwise stipulated below:

Certified:  A True Copy

MAR 2 4 2000 (SEAL)

(Clerk of the Court)

In witness to the above sentence(s) for offense(s) as well as those found on the reverse side of this document, I have hereunto set my hand and seal of said court

This *24th* day of *March* *2000*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDY YORDY, | : | |
|     Plaintiff | : | |
| | : | No. 1:01-CV-0206 |
|   v. | : | |
| | : | (Judge Kane) |
| SCOTT BROWN, PAUL EVANKO, | : | |
| BERON F. STEAGER, AND BARRY L. | : | |
| BRINSER, et al., | : | |
|     Defendants | : | |

### CERTIFICATE OF SERVICE

I, **GREGORY R. NEUHAUSER**, Senior Deputy Attorney General for the

Commonwealth of Pennsylvania, Office of Attorney General, hereby certify that on **March 12,**

**2001**, I caused to be served a true and correct copy of the foregoing document **Exhibits in**

**Support of Defendants' Motion to Dismiss the Complaint** by depositing it in the United States

mail, first-class postage prepaid to the following:

Spero T. Lappas, Esquire
205 State Street
Harrisburg, PA  17101-0808


**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**