

2 Oct

31
RB9/24

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RANDY YORDY,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:01-CV-0206** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **SCOTT BROWN, PAUL EVANKO,** | : | |
| **BERON F. STEAGER, AND BARRY L.** | : | |
| **BRINSER, et al.,** | : | |
| **Defendants** | : | |

FILED
HARRISBURG, PA

SEP 2 3 2002

MARY E. D'ANDREA, CLE
Per _____
Deputy Clerk

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION IN LIMINE

### STATEMENT OF THE CASE

This is a civil action for damages brought pursuant to 42 U.S.C.

§1983 by plaintiff, Randy Yordy, against members of the Pennsylvania State

Police. The named defendants include three state troopers (Brown, Steager and

Brinser), and the Commissioner of the State Police, Col. Paul Evanko. The case is

on the court's December 2002 trial list.

Plaintiff's complaint alleges that he was assaulted by Trooper Brown on February 4, 1999 during the course of a stop of plaintiff's motor vehicle at a location in eastern Dauphin County.  (Cplt. ¶¶ 14-16).  Plaintiff also alleges that he was assaulted later the same day by Troopers Steager and Brinser when he was taken into custody.  (Cplt. ¶ 19).  Finally, plaintiff alleges that Commissioner Evanko failed to exercise proper control and supervision over Trooper Brown despite, allegedly, knowing that Brown should not have been permitted to continue in police employment.  (Cplt. ¶¶ 22-23).  Plaintiff seeks compensatory and punitive damages for what he claims are violations of his constitutional rights under the Fourth and Fourteenth Amendments to the Constitution.  (Cplt. ¶¶ 10, 25-42).

Defendants have filed a motion *in limine* seeking an order precluding the introduction of evidence, whether in the form of testimony or exhibits, regarding defendant Brown's unemployment history with the Pennsylvania State Police as it relates to the question whether or not he had been the subject of any disciplinary proceedings prior to the events about which plaintiff complains in this case.  This memorandum of law is submitted in support of defendants' motion *in limine*.

## STATEMENT OF FACTS

Submitted to the court under separate cover is a packet of documents demonstrating the results of pre-February 1999 employment notations from Trooper Brown's personnel records with the Pennsylvania State Police.[1]  A one-day suspension imposed for an incident between two employees in April 1998 was reduced to a written reprimand following a grievance arbitration.  **(Exhibit A)**.  An incident in 1997 involving interaction with a juvenile and his family in which the trooper was found to have been discourteous resulted in a one-day deduction from his annual (vacation) leave.  **(Exhibit B)**.  In 1994, the trooper received a reprimand for completing an "assignment report" rather than an "initial crime report".  **(Exhibit C)**.  In 1998, following the imposition of a ten-day suspension for an incident with an uncooperative motorist when Tpr. Brown was off-duty, the arbitrator rescinded the suspension due to the State Police's failure to follow requirements imposed by the collective bargaining agreement between the Commonwealth and the union representing the state troopers.  **(Exhibit D)**.

In sum, between 1991 and 1999, Trooper Brown received two reprimands and a one-day deduction from his leave accrual.

---

[1] These records have been submitted to the court *in camera* in an effort to protect both the privacy of the trooper and the confidentiality of the process.  Supporting documentation for the underlying incidents has been made available to plaintiff's counsel but has not been submitted to the court due to its volume.

3

**QUESTION PRESENTED**

**Whether evidence of Trooper Brown's
employment history with the State Police
should be excluded from trial?**

**ARGUMENT**

**EVIDENCE OF TROOPER BROWN'S EMPLOYMENT
HISTORY WITH THE STATE POLICE SHOULD
BE EXCLUDED FROM TRIAL.**

Evidence of defendant Brown's employment history with the State

Police, which includes some notations in his file concerning performance issues,

should be excluded because it is immaterial to any of the issues for trial or, in the

alternative, has such little probative value that it is outweighed by the danger of unfair

prejudice.  As such, defendants' motion *in limine* should be granted.

Presumably, plaintiff intends to introduce evidence of Brown's

employment history either to show that Brown acted in conformity with alleged "bad

character" or as proof of notice to Commissioner Evanko that Brown would violate

plaintiff's constitutional rights in February 1999.  Our Court of Appeals addressed the

admissibility of evidence of other wrongs or acts under F.R.E. 404(b) in <u>Becker v.</u>

<u>Arco Chemical Co.</u>, 207 F.3d 176 (3rd Cir. 2000).  There, the Court significantly

raised the bar for admitting evidence under Rule 404(b), and directed that the

4

proponent of the evidence clearly must identify the chain of logical inferences that would tend to establish or refute a material fact in issue. In addition, the Court made clear, the chain of logic must include no link involving a propensity inference. Furthermore, even if there may exist a proper basis for admitting the evidence under Rule 404(b), the trial court must conduct the balancing test under F.R.E. 403 to make a final determination of admissibility. Finally, if the court determines the evidence meets this test, the jury must be properly charged so that it considers the evidence only for the limited purpose for which it is admitted. 207 F.3rd at 189.

Thus, Rule 404(b) is one of the rules limiting the admissibility of otherwise relevant evidence.[2] _Id._ A person's character or propensity to act in conformity therewith cannot be proven by evidence of other crimes, wrongs or acts. _Id._ The rule does provide exceptions: the evidence may be admitted "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident..." _Id._

The obligation to establish admissibility lies with the proponent of the evidence and a "mantra-like recitation of the provisions of Rule 404(b)" is inadequate. Becker, 207 F.3rd at 193. A proponent's "incantation of the proper uses

---

[2] We do not concede that evidence of prior employment disputes between Trooper Brown and his employer is in any way relevant to what occurred between him and plaintiff on February 4, 1999; however, even if somehow relevant, Rule 404(b) renders the evidence inadmissible. Becker, 207 F.3rd at 189.

[of Rule 404(b) evidence]...does not magically transform inadmissible evidence into admissible evidence." _Id._ at 191. Rather, the proponent "must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be that the defendant has the propensity to commit the [act or wrong alleged]." _Id._ In addition, "the tendered evidence [must] logically [tend] to establish or refute a material fact in issue, and that chain of logic must include no link involving an inference that a bad person is disposed to do bad acts." Government of the Virgin Islands v. Pinney, 967 F.2d 912, 915 (3rd Cir. 1992).

Although plaintiff has yet to articulate the requisite logical chain of inferences which would tend to establish or refute material facts in issue with respect to the evidence of Brown's employment history, defendants do not believe plaintiff can do so. On plaintiff's claim against Brown, the only facts that are material are those that occurred on February 4, 1999, the date plaintiff claims the trooper "assaulted" him and violated his constitutional rights. There are no claims by plaintiff that Trooper Brown did anything before February 1999 to plaintiff's harm. Evidence of Brown's pre-February 1999 employment history thus is immaterial to the only facts in issue, _i.e.,_ what happened between plaintiff and defendant on February 4, 1999. The only reason plaintiff could have for admitting Brown's employment record is for the jury to draw the improper inference that he must have been a "bad"

6

employee in February 1999. Under <u>Becker</u>, this is a propensity argument and should be rejected.

If plaintiff intends to use evidence of Brown's employment history not against Brown but against Commissioner Evanko, the evidence nonetheless should be excluded. Apparently, plaintiff's theory against Evanko is that the Commissioner should have known that Brown would violate plaintiff's constitutional rights on February 4, 1999. Such a high-level policymaker as the Commissioner cannot be held liable under 42 U.S.C. §1983 on a theory of *respondeat superior*. <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3rd Cir. 1988). Instead, such a high-level policymaker may be held liable under §1983 only if he or she establishes a constitutionally inadequate state procedure for depriving persons of a protected interest. <u>Sample v. Diecks</u>, 885 F.2d. 1099, 1114 (3rd Cir. 1989). Plaintiff's complaint does not plead a claim against Commissioner Evanko based on an allegedly constitutionally inadequate procedure; thus, evidence of Brown's employment history is immaterial to any fact in issue with respect to a claim against Evanko and should be excluded.

Finally, even if this proffered evidence somehow were relevant to a claim against Commissioner Evanko, the evidence's probative value is far outweighed by the danger of unfair prejudice or confusion of the issues and should

7

be excluded under F.R.E. 403.  There is great potential that the jury could use the evidence for the improper purpose of propensity against Brown or, worse, against Troopers Steager and Brinser who are not alleged to have had any connection with Trooper Brown, supervisory or otherwise.  Furthermore, in order to refute the testimony, defendants would be required to call witnesses and introduce testimony to explain the circumstances of Brown's personnel file notations, resulting in mini-trials on these unrelated events, which could confuse the jury.

Evidence is unfairly prejudicial if it appeals to a jury's sympathies, provokes its instinct to punish, or "otherwise may cause a jury to base its decision on something other than the established propositions in the case."  Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 193 (3rd Cir. 1990), quoting Carter v. Hewitt, 617 F.2d 961, 972 (3rd Cir. 1980).  Such a danger is clearly present in this case if plaintiff's proffered evidence is not excluded.  As the Court of Appeals observed in Becker, "great care must be taken when a party offers Rule 404(b) evidence." 207 F.3rd at 207.  Under the material facts of plaintiff's §1983 claims in this case, the court should exclude evidence of prior disciplinary notations in Trooper Brown's employment file.

## CONCLUSION

For the above-stated reasons, defendants' motion *in limine* should be granted.

Respectfully submitted,

D. MICHAEL FISHER
Attorney General

By: *Gregory Neuhauser*

GREGORY R. NEUHAUSER
Senior Deputy Attorney General

SUSAN J. FORNEY
Chief Deputy Attorney General
Chief, Litigation Section

OFFICE OF ATTORNEY GENERAL
15th Floor, Strawberry Square
Harrisburg, PA   17120
717-787-8106

DATE: September 23, 2002

2808

## IN THE MATTER OF ARBITRATION BETWEEN

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,<br>PENNSYLVANIA STATE POLICE** | **OPINION AND AWARD** |
| **AND** | **(Trooper Scott Brown)<br>One Day Suspension** |
| **PENNSYLVANIA STATE TROOPERS<br>ASSOCIATION** | |

**GRIEVANCE:**    99-DO-0172 Scott Brown
                      PSTA
                      PA State Police L-102

**HEARING:**     February 24, 1999
                      Harrisburg, Pennsylvania

**BEFORE:**      Lynne M. Mountz
                      Impartial Arbitrator

**APPEARANCES:**   **Commonwealth of Pennsylvania, Pennsylvania State Police:**
                      Dale J. Wetzel

                      **Pennsylvania State Troopers Association:**
                      Gary M. Lightman, Esquire

       The Parties selected the undersigned Arbitrator to hear and decide the instant dispute. A hearing was held in Harrisburg, Pennsylvania on February 24, 1999, at which time both Parties were afforded full opportunity to present testimony, examine and cross-examine witnesses and introduce documentary evidence.

       The Parties waived their right to make oral argument and elected to file post-hearing briefs with the Arbitrator. The record in this matter was closed on March 25, 1999 upon receipt of the briefs.

DEFENDANT'S
EXHIBIT
A

PENGAD-Bayonne, N. J.

### Background

The instant dispute results from a Grievance filed on behalf of Trooper Scott A. Brown (Grievant) on November 13, 1998 (Joint Ex. 2, p. 5), appealing a decision by the Pennsylvania State Police (Department) to suspend him for one (1) day without pay.

The Grievant is a member of the Pennsylvania State Police. The incident giving rise to his suspension occurred during the evening of April 9, 1998. At that time, the Grievant was a Trooper assigned to the Jonestown Station of Troop L. On the evening of April 9, 1998, the Grievant was working patrol zones. At some point during the evening, Corporal Myra Taylor, the shift supervisor, instructed the Grievant to return to the station to assist Police Communications Operator (PCO) Christine Kosh with desk duties. The Grievant complied with that instruction.

The Grievant and PCO Kosh were alone in the communications area for a period of time. Cpl. Taylor had left the Station to assist on incidents that had occurred out on the road. Upon her return, Cpl. Taylor had a conversation with PCO Kosh. During that conversation, PCO Kosh stated that the Grievant had touched her on the shoulders twice when they were alone in the communications area. PCO Kosh reported that the Grievant had apologized after the first time he touched her, but said nothing after the second time.

Cpl. Taylor telephoned the Station Commander, Lieutenant Harold Lacey and advised him about her conversation with PCO Kosh. Cpl. Taylor then told PCO Kosh that the incident had been reported to Lt. Lacey and that she (PCO Kosh) should

document what had happened. Cpl. Taylor also told PCO Kosh that she could file a formal complaint against the Grievant.

Cpl. Taylor next advised the Grievant that he was not to go into the communications area or have any further contact with PCO Kosh. She further informed the Grievant that she had reported the incident to Lt. Lacey. The Grievant offered an explanation to Cpl. Taylor, but was told that he should wait to speak to Lt. Lacey about the matter.

On April 13, 1998, Lt. Lacey met separately with PCO Kosh and the Grievant. In their discussions with Lt. Lacey, PCO Kosh and the Grievant provided different accounts of what had happened when they were alone during the evening of April 9, 1998. PCO Kosh was advised again of her right to file a complaint against the Grievant. PCO Kosh elected to file a complaint.

As a result of the complaint, Corporal Gregory L. Johnson, Internal Affairs Division, conducted an investigation into the events of April 9, 1998.

On August 13, 1998, Captain Michael J. Marcantino, Commanding Officer, Troop L, issued a Disciplinary Action Report and concluded that the Grievant had placed his hands on the shoulders of PCO Kosh on two occasions and that said contact was neither necessary or welcome. (Commonwealth Ex. 5). The Grievant filed a written response to the Disciplinary Action Report on August 16, 1998.

The Department determined that the Grievant's actions in this matter constituted a violation of Field Regulations, Sections FR 1-1.02 (Unbecoming Conduct) and FR 1-2.02 (Performance of Duty) and notified the Grievant that he would be suspended for one day without pay. The instant Grievance was filed. The matter being

unresolved between the Department and the Pennsylvania State Troopers Association (PSTA), it proceeded to arbitration.

### Issue

Whether the Department had just cause to suspend the Grievant without pay for a period of one (1) day and, if not, what shall the remedy be?

### Position of the Parties

Department

The Department asserts first that this matter involves an issue of credibility regarding the testimony of PCO Kosh and the Grievant regarding the incident that occurred on April 9, 1998. That issue, according to the Department, must be resolved in favor of PCO Kosh. The Department contends that the Grievant has a motive to be less than truthful regarding the events of the night in question. Specifically, the Grievant is attempting to negate the disciplinary action and the potential impact it might have on his opportunity for promotion. Additionally, the Department asserts that the Grievant's account of the incident has been inconsistent at times throughout the investigation and during his testimony at the hearing.

The Department argues that PCO Kosh, on the other hand, has repeatedly and consistently offered the same account of the incident. Moreover, according to the Department, PCO Kosh has no reason to fabricate the incident against the Grievant. At the time in question, PCO Kosh was a new employee occupying a civilian position with the PSP and the Grievant was a Trooper.

It is the Department's position that the Grievant's actions on the night of April 9, 1998 were inappropriate. Specifically, the Grievant placed his hands on the shoulders of PCO Kosh on two separate instances. This contact, according to the Department, was unsolicited and unwelcome. The Department asserts that this is the second time that the Grievant has engaged in similar inappropriate behavior. The Department argues that the investigation established that less than one year earlier, the Grievant was counseled and given a supervisor's notation for massaging the shoulders of another female PCO.

Finally, the Department denies that there was any conspiracy among any of the Department witnesses to entrap the Grievant. The Department specifically denies any allegation that the Grievant was disciplined because of Cpl. Taylor's bias towards him and points out that no evidence was provided to support that allegation.

Based upon the previous incident that gave rise to the supervisor's notation, the results of the investigation and the Grievant's response thereto, the Department contends that there is just cause for a suspension without pay for one day.

PSTA

PSTA argues that no discipline is warranted in this case and would not have been imposed but for the improper actions of the Department in utilizing a supervisor's notation as a stepping stone for progressive discipline. PSTA contends that it had no ability to challenge the supervisor's notation, that the notation itself does not constitute discipline and cannot be used as a basis for discipline in the current proceeding.

PSTA further argues that even if PCO Kosh's testimony that the Grievant touched her twice is accurate, that fact alone does not make the Grievant's testimony any less credible. Specifically, it is plausible that the Grievant tripped when he touched PCO Kosh the first time, for which he apologized, and that he inadvertently touched her a second time in the confined quarters without realizing it. PSTA contends that the Grievant and PCO Kosh were engaged in friendly conversation when the contact occurred. It is PSTA's contention that only after Cpl. Taylor inappropriately divulged confidential information about the Grievant's supervisor's notation to PCO Kosh, did PCO Kosh become concerned enough to file a complaint.

PSTA also argues that the Department did not fairly investigate this matter, but sought to entrap the Grievant. In making this argument, PSTA notes that during the investigation the Department deliberately failed to inform the Grievant that there were discrepancies in the two accounts of the incident on April 9, 1998 thereby denying him the opportunity to explain them.

Finally, PSTA asserts that the one-day suspension is not only undeserved but will unfairly serve to deprive the Grievant of a promotion for which he would otherwise be eligible. Accordingly, PSTA requests that he Grievance be sustained and that it be specifically ordered that the Grievant be eligible for promotional opportunities.

## Discussion

The sole issue presented is whether or not the Department had just cause to suspend the Grievant for one day without pay for inappropriate conduct when he was alone in the communications area with a civilian female employee, PCO Kosh. Both

Parties to some degree have referenced the impact of discipline on the Grievant's potential eligibility for a promotion[1]. The only relevance the Grievant's eligibility for a promotion has in this proceeding, however, is the inference that it was a factor in the level of discipline imposed in this case. Apart from considering whether or not the Department based its decision to suspend the Grievant, in whole or in part, in an attempt to prevent him from being promoted, the Grievant's eligibility for promotion is irrelevant. Accordingly, this decision will be rendered without consideration of the impact it might or might not have on the Grievant's eligibility for promotional opportunities in the future.

In reviewing the record in this case, it is apparent that PCO Kosh and the Grievant offer differing accounts of what happened when they were alone in the communications area on the evening of April 9, 1998. The Grievant testified that he did touch the shoulders of PCO Kosh when he tripped over a transition strip on the floor and lost his balance. PCO Kosh stated that the Grievant did not trip or fall prior to the contact. She further testified that the Grievant subsequently touched her shoulders a second time that night. The Grievant adamantly denies touching PCO Kosh a second time, asserting that if he did, it was inadvertent and he does not recall it.

It is undisputed that the Grievant touched PCO Kosh on the shoulders on at least one occasion when they were alone. The Grievant's testimony that a trip caused this contact is implausible. PCO Kosh testified credibly that the Grievant did not touch her with the force of someone falling and balancing himself against her shoulders. Nor did she hear a tripping sound immediately before or during the contact.

---

[1] PSTA has requested not only that the Grievance be sustained, but that the Arbitrator direct that the Grievant be eligible for promotional opportunities. The Department in its brief suggests that the Grievant's acrimonious testimony regarding his disdain for State Police Officers investigating "one of their own" for inappropriate behavior calls into question his potential ability to supervise others.

7

Moreover, the Grievant's immediate reaction to the incident was inconsistent with an accidental tripping. The Grievant testified, for example, that after he touched PCO Kosh his first thought was "they are going to screw me with this." To say the least, this is an unusual response to falling into a co-worker accidentally. Similarly, the Grievant apologized to PCO Kosh in a manner that did not reflect the fact that he had accidentally tripped or fallen. Both the Grievant and PCO Kosh testified that immediately after the contact, the Grievant said, "I'm sorry, I shouldn't have done that."

In any event, the Department indicated that had the incident ended at that point, it is likely that no discipline would have resulted. It was the occurrence of the second touch that resulted in the decision to discipline the Grievant.

PCO Kosh's testimony that the Grievant touched her shoulders two times on the evening of April 9, 1998 is credible. PCO Kosh has been consistent in this regard; she reported two separate touches to Cpl. Taylor that same evening, in the complaint she submitted, the interview she provided during the investigation and in her testimony at the hearing. PCO Kosh testified that she was surprised the second time that the Grievant touched her shoulders because he had made a big deal about the first time, apologizing in a manner she described as theatrical. PCO Kosh further testified that the Grievant said nothing after the second incident.

The Grievant adamantly denies being aware of touching PCO Kosh a second time. He contends that if this actually happened, it was unintentional and occurred without thinking. The Grievant stated that he frequently "talks with his hands" and it is possible that he touched PCO Kosh without realizing it. The Grievant further stated that if he had consciously touched PCO Kosh a second time he certainly would

have apologized. The Grievant added that he loved his family and needed his job and would have risked neither by deliberately touching PCO Kosh.

Despite the self-serving nature of this testimony, it is not inconsistent with PCO Kosh's immediate reaction to the incident. Although PCO Kosh was very uncomfortable and troubled by being touched by the Grievant, she believed that the first time he touched her, it was a mistake for which he apologized. With regard to the second incident, the investigative report filed by Cpl. Johnson detailing his interview with PCO Kosh includes the following statement: "When Trooper BROWN placed his fingertips on her shoulders the second time, PCO KOSH immediately thought he shouldn't have done it. PCO KOSH said she did not know why Trooper BROWN would have touched her the second time. She believes Trooper BROWN gets excited while talking and does this to emphasize his point." (Commonwealth Ex. 1, p. 3). PCO Kosh admitted at the hearing that this was still a possible explanation for the Grievant's actions.

PCO Kosh has never maintained that the Grievant's conduct was sexual in nature or that she felt threatened by him. In fact, the contact occurred during or about the time that they were engaged in cordial conversation about their families. Regardless of his motives, however, it is clear that the Grievant's physical contact with PCO Kosh was neither solicited nor welcome. PCO Kosh legitimately felt uncomfortable when the Grievant touched her.

At the time of the incident, the Grievant was a Trooper with the Pennsylvania State Police; the complainant a newly hired female civilian employee. At least by perception, PCO Kosh occupied a position of lesser status. They were working

alone in a confined area.  The Grievant had no legitimate reason to place his hands on PCO Kosh's shoulders.  His conduct was inappropriate and is not excused because he is a "touching" person by nature.  Moreover, the Grievant had reason to know and apparently did know that he could get into trouble for touching a female PCO.  The Grievant had received a supervisor's notation regarding a prior incident involving a female PCO, the facts of which remain in dispute[2], which warned him that if he engaged in certain conduct in the future he could be subjected to an investigation.  It is presumably because of this warning that the Grievant apologized to PCO Kosh after touching her and worried that he would be "screwed."

The Grievant's allegations that he is the victim of a conspiracy spearheaded by Cpl. Taylor are unsubstantiated.  Clearly, there is no evidence to support his inference that she deliberately placed him into a room alone with PCO Kosh in order to set up a situation that could be used against him.  Moreover, the Grievant's anger at others for investigating him and essentially turning on "one of their own" is misplaced. The Grievant is responsible for his own actions.   If those actions are deemed inappropriate, as in the instant case, he is properly subject to investigation and potential discipline.

PSTA has questioned the integrity of the investigation in this case.  First, it is asserted that the only reason that PCO Kosh filed a complaint against the Grievant is because Cpl. Taylor divulged confidential information to her regarding the supervisor's notation.  Although there was no apparent reason why Cpl. Taylor should have shared this information with PCO Kosh, it seems certain that this information is not responsible

---

[2] The facts involved in the incident that gave rise to the supervisor's notation are not a part of the record in this case and no inference is made regarding them.

for PCO Kosh's decision to file a formal complaint. PCO Kosh was upset about the fact that the Grievant had touched her prior to receiving this information. She testified in a credible fashion that the decision to file the complaint was hers alone and was not influenced by anything said by Cpl. Taylor.

PSTA also contends that the Department attempted to entrap the Grievant by failing to provide him with all of the information in the complaint. In support of this contention, PSTA refers to a statement in the General Investigation Report that indicates that Lt. Lacey did not tell the Grievant about the discrepancy between his and PCO Kosh's account of what happened (that there were two occasions of touching) in order to prevent the Grievant from preparing a new defense. (Commonwealth Ex. 1, p. 10). Fundamental fairness requires that the accused be provided with all of the allegations made against him in order to respond to those charges. Therefore, PSTA raises legitimate concerns regarding this initial questioning of the Grievant. However, the record also reflects that the Grievant was informed of the discrepancies prior to his pre-disciplinary meeting with Captain Marcantino and given an opportunity to respond thereto in a timely fashion. (Commonwealth Ex. 6).

In sum, I find that the Grievant engaged in inappropriate conduct when he touched the shoulders of PCO Kosh on the evening of April 9, 1998. On the basis of the record presented, however, I do not conclude that the Department had just cause to suspend the Grievant for this infraction. According to the Department, its decision to suspend rather than issue a written reprimand to the Grievant was based essentially on

two factors: the prior incident giving rise to the supervisor's notation and the fact that the Grievant touched PCO Kosh twice, not once[3].

The Grievant, however, has no discipline in his record for similar inappropriate conduct. The Department acknowledges that the supervisor's notation is not discipline. The facts giving rise to the supervisor's notation are still in dispute between the Parties. Unlike this case, the incident underlying the supervisor's notation was not the subject of a formal complaint and investigation and no disciplinary action was taken.

Without prior discipline, the circumstances under which the Grievant touched PCO Kosh in this case are important. As indicated above, both the Grievant and PCO Kosh have described him as an excitable person who in essence "talks with his hands." Although his conduct was inappropriate, there is insufficient evidence to establish that the Grievant intentionally sought to intimidate, harass or make sexual advances towards PCO Kosh. Under these circumstances, there is no justification for the Department's failure to utilize progressive discipline in this case. Accordingly, I find that the Department had just cause to issue a written reprimand to the Grievant for his inappropriate conduct.

Mitigating the discipline in this case is not intended to absolve the Grievant of the need to accept responsibility for his own actions in the future nor diminish the fact that the Department is properly concerned with the treatment of its female employees.

---

[3] There is no evidence to support a finding that the Department considered the Grievant's eligibility for promotion when it decided to suspend him.

## **AWARD**

**The Grievant's One-Day Suspension is reduced to a Written Reprimand.**

Dated: *April 26, 1999*

Harrisburg, Pennsylvania

Lynne M. Mountz
Impartial Arbitrator




**PENNSYLVANIA STATE POLICE**
## DISCIPLINARY ACTION REPORT

| | RANK | SSN | DOE | TROOP/STATION |
|---|---|---|---|---|
| Scott A. Brown | Trooper | 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 | 11/12/91 | L - Jonestown |

2. IT.    ....IONS (LIST INFRACTION (S), DATE (S) OF OCCURRENCE AND DETAILS)

On April 9, 1998, between 1830 - 1930 hours, while working the desk with PCO Christine Kosh, you placed your hands on her shoulders on two occasions. Such contact was not necessary nor welcomed by PCO Kosh. Moreover, these actions were not appropriate.

**1.02, UNBECOMING CONDUCT**

**2.02, PERFORMANCE OF DUTY**

_Capt M J Munrate_        8/13/98

SIGNATURE (INITIATING OFFICER)                     DATE

---

3. MEMBER'S NOTICE

IN ACCORDANCE WITH THE PROVISIONS OF THE PSTA CONTRACT, I HAVE BEEN GIVEN NOTICE OF MY RIGHTS AS SET FORTH IN FR 3-3, AND HAVE BEEN AFFORDED THE OPTION OF REPRESENTATION AT THE PRESENTATION OF THIS REPORT.

I ACKNOWLEDGE RECEIPT OF THIS REPORT

_Scott A Brown_  TPR.        08/13/98

SIGNATURE                               RANK        DATE

---

4. ACTION

GRIEVED. ARBITRATOR MOUNTZ'S ARBITRATION AWARD, DATED 4/26/99, SUSTAINED THE GRIEVANCE, REDUCING THE ADJUDICATED 1-SWOP TO A WRITTEN REPRIMAND WHICH WAS SERVED 4/29/99.

_Larry Williams_

SIGNATURE (DISCIPLINARY OFFICER)        RANK        DATE

LARRY WILLIAMS    CAPTAIN    4/29/99

# Prior Discipline Report

**SSN:**   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                          **Name:**    BROWN, SCOTT A.

**DAR Number:**    1998-94                    **IAD Number:**    10523

**Occurence:**

04/09/98 - Between 1830-1930 hrs., while working the desk with PCO Christine KOSH, Tpr. BROWN placed his hands on her shoulders on two occasions.  Such contact was not necessary nor welcomed by PCO KOSH. Moreover, these actions were not appropriate.

**Date Adjuducated:**    10/21/1998              **Adjudicated By:**    CAPTAIN LARRY WILLIAMS

**Grievance No.:**   L-102                       **Arbitrator Decision:**   No

**Resolution:**

RECEIVED WRITTEN REPRIMAND, 4/29/99.

**Arbitrator/Pre-Arb Award:**

REDUCED ADJUDICATED 1-SWOP TO A WRITTEN REPRIMAND.

| Discipline |
|---|
| 1-DAY SWOP |

| Violation | Description |
|---|---|
| 1.02 | Unbecoming Conduct |
| 2.02 | Performance of Duty |

97-155

10248

SP 3-336 (1-93)

PENNSYLVANIA STATE POLICE
## DISCIPLINARY ACTION REPORT

| NAME | RANK | SSN | DOE | TROOP·STATION |
|------|------|-----|-----|---------------|
| Scott A. BROWN | Tpr. | 302-78-~~2078~~ 2676 | 11/21/91 | L-Jonestown |

2 INFRACTIONS (LIST INFRACTION (S), DATE (S) OF OCCURRENCE AND DETAILS)

On August 2, 1997, you conducted a bicycle theft investigation, L2-561990. The investigation involved a Juvenile, Brian PLASTERER. You located Brian PLASTERER and interacted with his family. In this contact, you used foul language, yelled, threatened and lost composure while interacting with these people.

2.13, COURTESY

1.02, UNBECOMING CONDUCT

_Capt Michael J Marmo_ 12/10/97
SIGNATURE (INITIATING OFFICER)          DATE

3 MEMBER'S NOTICE   IN ACCORDANCE WITH THE PROVISIONS OF THE PSTA CONTRACT, I HAVE BEEN GIVEN NOTICE OF MY RIGHTS AS SET FORTH IN FR 3-3, AND HAVE BEEN AFFORDED THE OPTION OF REPRESENTATION AT THE PRESENTATION OF THIS REPORT.

I ACKNOWLEDGE RECEIPT OF THIS REPORT

_T.P.R. S.H.B._   TROOPER   12/10/97
SIGNATURE          RANK          DATE

4. ACTION

**GRIEVED.  Pre-Arb Agreement: In lieu of serving adjudicated 1-SV** **one day deducted from Annual Leave Balance.**

DEFENDANT'S EXHIBIT B

_Larry Williams_
SIGNATURE (DISCIPLINARY OFFICER)     RANK     DATE
LARRY WILLIAMS,     CAPTAIN     04/15/98

# Prior Discipline Report

**SSN:** 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                    **Name:** BROWN, SCOTT A.

**DAR Number:** 1997-155              **IAD Number:** 10248

**Occurence:**

08/02/97 - Tpr. Brown conducted a bicycle theft investigation, L2-561990. The investigation involved a juvenile, Brian Plasterer. Tpr. Brown located Brian Plasterer and interacted with his family. In this contact, Tpr. Brown used foul language, yelled, threatened and lost composure while interacting with these people.

**Date Adjudicated:** 01/26/1998        **Adjudicated By:** CAPTAIN LARRY WILLIAMS

**Grievance No.:** L-94                   **Arbitrator Decision:** No

**Resolution:**

HAD 1 DAY DEDUCTED FROM ANNUAL LEAVE BALANCE.

**Arbitrator/Pre-Arb Award:**

IN LIEU OF SERVING ADJUDICATED 1-SWOP WILL HAVE 1 DAY DEDUCTED FROM ANNUAL LEAVE BALANCE.

| Discipline |
| --- |
| 1-DAY SWOP |

| Violation | Description |
| --- | --- |
| 1.02 | Unbecoming Conduct |
| 2.13 | Cooperation with Other Agencies |

SP 3-336 (1-93)

95-C32
8764

PENNSYLVANIA STATE POLICE
## DISCIPLINARY ACTION REPORT

| 1. NAME | RANK | SSN | DOE | TROOP/STATION |
|---|---|---|---|---|
| BROWN, Scott A. | Trooper | 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 | 11/12/91 | H-Harrisburg |

2. INFRACTIONS (LIST INFRACTION (S), DATE (S) OF OCCURRENCE AND DETAILS)

On December 14, 1994, Trooper Scott A. BROWN responded to an incident which appears to have the required elements of a harrassment or assault.  The victim, the suspect, and a witness provided statements that the victim, a juvenile, had been struck and thrown down by the suspect, an adult.  Also, all three indicate markings were present on the victim's neck.

Trooper BROWN completed an Assignment Report and closed out this incident.  Department regulations would indicate an Initial Crime Report should have been completed and prosecution considered.

*Reports*
*Performance of Duty*

BPR-#8764

_H. O. F. Kuty_   Acting Co   3/17/95
SIGNATURE (INITIATING OFFICER)           DATE

3. MEMBER'S NOTICE

IN ACCORDANCE WITH THE PROVISIONS OF THE PSTA CONTRACT, I HAVE BEEN GIVEN NOTICE OF MY RIGHTS AS SET FORTH IN FR 3-3, AND HAVE BEEN AFFORDED THE OPTION OF REPRESENTATION AT THE PRESENTATION OF THIS REPORT.

PSTA - Tpr. Charles Reed

I ACKNOWLEDGE RECEIPT OF THIS REPORT

_T.H. Scott A. Brown_   TROOPER   3/17/95
SIGNATURE                RANK      DATE

4. ACTION   WRITTEN REPRIMAND SRVED APRIL 26, 1995.

DEFENDANT'S
EXHIBIT
C
PENGAD-Bayonne, N.J.

_Thomas F. Williams_
SIGNATURE (DISCIPLINARY OFFICER)   RANK
Thomas F. Williams,  Major        05/02/95  DATE

# Prior Discipline Report

**SSN:**   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          **Name:**   BROWN, SCOTT A.

**DAR Number:**   1995-32          **IAD Number:**   8764

**Occurence:**

- 12/14/94 - Member responded to an incident which appears to have required elements of a harrassment or assault. The victim, the suspect and a witness provided statements that the victim, a juvenile, had been struck and thrown down by the suspect, an adult. Also, all three indicate markings were present on the victim's neck. Member completed an Assignment Report and closed out this incident. Department regulations would indicate an Initial Crime Report should have been completed and prosecution considered.

**Date Adjudicated:**   03/27/1995          **Adjudicated By:**   MAJOR THOMAS F. WILLIAM

**Grievance No.:**          **Arbitrator Decision:**   Yes

**Resolution:**

RECEIVED WRITTEN REPRIMAND, 4/26/95.

**Arbitrator/Pre-Arb Award:**

| Discipline |
| --- |
| WRITTEN REPRIMAND |

| Violation | Description |
| --- | --- |
| 2.02 | Performance of Duty |
| 2.18 | Altering Notices |

4/29/98                    *Discipline*

IN THE MATTER OF ARBITRATION BETWEEN

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA STATE POLICE

**OPINION AND AWARD**

AND

(Trooper Scott Brown)
Statute of Limitations
Suspension

PENNSYLVANIA STATE TROOPERS
ASSOCIATION

**GRIEVANCE:**   98-DS-0067
                 PSP-L-91

**HEARING:**   April 24, 1998
               Harrisburg, Pennsylvania

**BEFORE:**   Lynne M. Mountz
              Impartial Arbitrator

**APPEARANCES:**   Commonwealth of Pennsylvania, Pennsylvania State Police:
                   Chris R. Dunlap

                   Pennsylvania State Troopers Association:
                   James L. McAneny, Esquire


     The Parties selected the undersigned Arbitrator to hear and decide the instant dispute. A hearing was held in Harrisburg, Pennsylvania on April 24, 1998, at which time both Parties were afforded full opportunity to present testimony, examine and cross-examine witnesses and introduce documentary evidence.

     The Parties elected to file post-hearing briefs and reply briefs with the Arbitrator. The record in this matter was closed on May 29, 1998 upon receipt of the reply briefs.



DEFENDANT'S
EXHIBIT
D

PENGAD-Bayonne, N.J.

## Background

The instant dispute results from a grievance filed on behalf of Trooper Scott A. Brown (Grievant), a member of the Pennsylvania State Police, alleging that the Department violated the terms and conditions of the Agreement between the Parties when it initiated disciplinary action against him for an incident which occurred on April 10, 1996.

The Grievant was not on active duty on April 10, 1996. At the time of the incident giving rise to the disciplinary action, the Grievant was out of uniform and driving his personal car. The Grievant's wife and infant daughter were passengers in the car. The Grievant's car was struck in the rear by a second vehicle operated by Rodelio Garcia. The Grievant exited his car and approached Mr. Garcia's car. The Grievant identified himself as a Pennsylvania State Trooper and requested to see Mr. Garcia's driver's license, registration and insurance card. When the Grievant returned to his own car to obtain the same information, Mr. Garcia drove away.

The Grievant followed Mr. Garcia a short distance to a spot where Mr. Garcia's vehicle was stopped in traffic at an intersection. The Grievant again exited his car and approached Mr. Garcia's vehicle. The Grievant demanded that Mr. Garcia provide him with the information he had previously requested. A loud verbal altercation occurred between the two. The Grievant saw Mr. Garcia turn toward the console in the car. At that point, the Grievant drew his service weapon and Mr. Garcia attempted to drive away.

2

The Grievant pulled himself to the roof of Mr. Garcia's car and somehow began to fall upside down through the sunroof. A physical altercation occurred during which time, the car struck a curb and stopped. The Grievant and Mr. Garcia exited the car. The Grievant restrained Mr. Garcia on the ground and after identifying himself as a State Trooper, asked a passing motorist to call the local police.

On April 15, 1996, the West Shore Regional Police Department filed a criminal complaint charging Mr. Garcia with four violations of the Vehicle Code. No criminal charges were filed against the Grievant.

Corporal Glenn C. Domon, PSP, was assigned the responsibility of conducting an internal investigation and preparing a report regarding the Grievant's involvement in the incident. Corporal Domon completed his report in July 1996. At the time of the submission of his report, Corporal Domon knew that no criminal charges were pending against the Grievant. He noted in his report that he had telephoned the Cumberland County District Attorney's Office in an attempt to ascertain whether or not there had been a decision made to file charges against the Grievant.

Lieutenant John R. Brown, PSP, Bureau of Professional Responsibility (BPR), Internal Affairs Division, reviewed the report prepared by Cpl. Doman in July 1996. At that time, Lt. Brown was aware of the existence of a Uniform Investigation Report prepared by the West Shore Regional Police Department in response to allegations of simple assault made by Mr. Garcia against the Grievant as a result of the April 10, 1996 incident. (Commonwealth Ex. 1). Lt. Brown concluded that the BPR report could not be completed without a prosecutorial determination by the Cumberland County District Attorney (DA).

3

Once each in August 1996, October 1996 and January 1997, Lt. Brown placed telephone calls to the DA's office to inquire whether or not a decision had been made to criminally prosecute the Grievant for his actions in the April 10, 1996 incident. On April 22, 1997, Lt. Brown placed a fourth and final call to the DA's office. During that call, he spoke directly with the Assistant District Attorney in charge of the Garcia matter, William Gabig. After that conversation, Lt. Brown concluded that the Grievant would not be the subject of criminal prosecution as a result of his actions during the April 10, 1996 incident. No written correspondence regarding the incident was exchanged between the Department and the DA's office from July 1996 through April 1997. The Grievant provided Lt. Brown with a letter dated May 16, 1997 from William I. Gabig, Assistant DA, to the Grievant which stated that the Grievant was not the subject of any investigation by that office and no charges were ever contemplated against him. (Joint Ex. 2, last page).

On April 30, 1997, the Department issued its notice of administrative findings regarding the Grievant's actions in the April 10, 1996 incident. (Commonwealth Ex. 3, Summary Report). A Disciplinary Action Report was issued on May 8, 1997. (Commonwealth Ex. 5). The Department concluded that the Grievant's actions during the incident on April 10, 1996 were in violation of several Field Regulations and imposed a ten-day suspension without pay. (Commonwealth Ex. 6).

The Grievant, through this grievance, is challenging the ten-day suspension without pay both on a procedural basis and on the merits.

4

## Issues

1. Whether the Department violated the Statute of Limitations set forth in Article 26, Section 7 of the Agreement when it did not issue a notice of administrative findings in this matter until April 30, 1997 and, if not;

2. Whether the Department had just cause to impose a ten-day suspension without pay?

## Contract Provisions Cited

## ARTICLE 26

## DISCIPLINE

\* \* \*

### Section 7. Statute of Limitations

In cases of alleged criminal conduct, cases which could reasonably be construed to give rise to court-martial proceedings, alleged violations of the Governor's Code of Conduct, or cases in which a prosecutorial determination is sought, the Department shall complete its investigation and the member advised of the Troop Commander/Bureau Director's notice of administrative findings within 120 days. The 120 working days will commence on the date the member is notified of the complaint, except as provided below:

1. In cases involving alleged criminal conduct or requests for a prosecutorial determination, the notice of administrative findings shall be issued within 60 working days from the date the Department receives written notice from the member of the disposition/adjudication of the criminal charge or the date the Department receives the prosecutorial determination.

2. In all other cases the Department shall complete its investigation and the member advised of the Troop Commander/Bureau Director's notice of administrative findings within 90 working days of the date the Department is notified of the complaint.

3. In court-martial cases the member shall be notified of the adjudicated penalty within 30 working days of the member's selection of the grievance procedure.

5

4.  If the aforementioned time limits are not met, no discipline in the form of a suspension without pay may be initiated. However, the time limits may be waived by the Department upon a showing of just cause or by mutual agreement of both parties.

Except in cases alleging criminal conduct or cases which give rise to court-martial proceedings, no disciplinary action consisting of a suspension without pay shall be imposed for violations of Department rules and regulations which are discovered more than one year after the date of occurrence unless mandated by the Governor's Code of Conduct. This paragraph shall not apply upon a showing of proof that the member acted to prevent such discovery.

## Cited Provisions of the Field Regulations

### FR 1-1 02 UNBECOMING CONDUCT

Unbecoming conduct is that type of conduct which could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department. Members shall not conduct themselves in a manner which is unbecoming to a police officer.

### FR 1-1.30 USE OF FIREARMS

The use or handling of firearms by members in a careless or imprudent manner, or the unjustified endangering of human lives by firearms in violation of the rules and regulations relating thereto, is strictly forbidden.

### FR 1-2.13 COURTESY

B.  Conduct and Demeanor. Courtesy toward the public shall be strictly observed. Members' conduct and deportment shall always be civil, orderly and courteous. They shall be diplomatic and tactful in the performance of their duties, controlling their temper and exercising the utmost patience and discretion, and shall not engage in argumentative discussions even in the face of extreme provocation; however, when required they must act with firmness and sufficient energy to properly perform their duties. Members shall, at all times, while on duty or in uniform, refrain from using course, violent, profane or insolent language, and from voicing any bias or prejudice concerning race, religion, national origin, sex, age, handicap or politics.

6

## FR 1-2.21  POLICE ACTION – OFF DUTY

Members have the authority and responsibility to take necessary police action with regard to all serious police matters brought to their attention while off duty. Therefore, although certain hours are designated as active duty (on duty) and others inactive duty (off duty), members must be cognizant of their sworn duty and shall take the appropriate police action when required. Members shall immediately thereafter report, via correspondence, such action taken to their Troop Commander/Bureau Director. Such correspondence shall be maintained in the Troop/Bureau Personnel File as temporary information.

## FR 7-3.14  HANDLING OF FIREARMS

All members/enforcement officers are expected to maintain their proficiency with regard to the safe handling and use of firearms. Except for general maintenance, storage or authorization training, members/enforcement officers shall not draw or exhibit their firearm unless circumstances create strong reasonable belief that it may be necessary to lawfully use the weapon in conformance with Department policy. The playful or wanton pointing of a firearm at anyone, on or off duty, or the careless or negligent use of a firearm is prohibited.


### Position of the Parties

Department

The Department initially argues that it issued its notice of administrative findings in a timely manner pursuant to Article 26, Section 7 of the Agreement. In support of this argument, the Department contends that this case falls within that portion of the provision which states, in relevant part, that: "in cases involving alleged criminal conduct or requests for a prosecutorial determination, the notice of administrative findings shall be issued within 60 working days from the date the Department receives written notice from the member of the discharge/adjudication of the criminal charge or the date the Department receives the prosecutorial determination."

7

The Department produced a document marked as "Commonwealth Exhibit 1" which is a Uniform Investigation Report from the West Shore Regional Police Department. In that report, Mr. Garcia alleges that the Grievant had struck him during the incident on April 10, 1996. The alleged offense is noted in the report as a simple assault. The Department asserts that this report is admissible into the record, over strong hearsay objections by PSTA counsel, because it constitutes a public record and is being admitted not for the truth of the allegations, but to document that criminal allegations were made against the Grievant.

The Department contends that the Uniform Investigation Report, which clearly alleges criminal conduct on the part of the Grievant, is sufficient to except this case from the general requirement of Article 26, Section 7 that a notice of administrative findings is to be issued within 120 working days from notification of the complaint. Specifically, the Department argues that it is the allegation of criminal conduct and not the filing of criminal charges which triggers the exception to the 120 day rule.

Additionally, the Department asserts that there was a request for prosecutorial determination which would also serve to except this matter from the 120 day rule. In support of this position, the Department offered the testimony of Cpl. Doman and Lt. Brown that they placed several telephone calls to the Cumberland County DA's office to ask whether or not criminal charges were going to be filed against the Grievant. Even discounting the hearsay information received from the DA's office during these telephone calls, the Department contends it is logical to conclude that Cpl. Doman and/or Lt. Brown would not have continued to make these calls if they had received a decision from that office.

8

Finally, the Department argues that Lt. Brown informed the Grievant in April 1997 that the Department was awaiting a prosecutorial determination from the DA's office. Thus, according to the Department, it is obvious that their defense to the timeliness issue was not concocted after-the-fact.

With respect to the merits, the Department argues first that the Grievant's account of the incident in question should not be afforded much weight. The Department recounts what it believes to be major inconsistencies and contradictions in the Grievant's testimony and emphasizes the fact that the Grievant admitted to lying previously about his use of profane language during the incident. The Department asserts that the testimony of Charles Forney, a disinterested witness, clearly supports a finding that the Grievant's handling of a firearm in this matter was improper, in particular, pointing his gun at Mr. Garcia's head. Finally, the Department strongly contends that self-activation was inappropriate in this case; that serious police matters did not cause the Grievant to self-activate, rather resulted from the Grievant's actions in doing so.

PSTA

Initially, the PSTA contends that the Department exceeded the 120-day period of time in which it is contractually obligated to complete its investigation and initiate disciplinary action. The PSTA asserts that the Department has failed to establish that this case falls within one of the exceptions for compliance with the 120-day requirement.

The PSTA argues that the Department's entire case with respect to the procedural issue is based on hearsay. PSTA counsel objected to the admission into evidence of the Uniform Investigation Report from the West Shore Police Department

9

(Commonwealth Ex. 1) as well as to the conversations Cpl. Doman and Lt. Brown testified that they may have had with any members of the West Shore Police Department and/or the Cumberland County DA's office.

The PSTA contends that the Department's attempts to distinguish "allegations" of criminal conduct from "charges" of criminal conduct are frivolous. The PSTA asserts that the language in Article 26, Section 7, subsection 1, resolves cases of "alleged" criminal conduct by "disposition/adjudication of the criminal charges" and clearly equates "alleged" criminal conduct with "charges" of criminal conduct. The Grievant was never charged with any criminal conduct as a result of his actions during the incident on April 10, 1996.

The PSTA also argues that there is no competent evidence to establish that a prosecutorial determination was ever requested. The Department's efforts to ascertain whether or not a prosecutorial determination had been requested and its resolution, were, according to the PSTA, "lackadaisical at best." (PSTA Brief, p. 2). The PSTA notes that when Lt. Brown did make contact with the DA's office, he was given the docket number of the criminal case pending against Mr. Garcia. The PSTA contends that it is apparent that no file had ever been opened regarding the Grievant.

Finally, the PSTA asserts that the existence of a letter from Assistant District Attorney Gabig to the Grievant, admittedly also hearsay, unequivocally refutes any suggestion that charges against the Grievant were ever considered.

With respect to the merits, the PSTA contends that the Department has erroneously interpreted FR 1-2.21, Off-Duty Police Action, as prohibiting off-duty police action except in "serious police matters." The PSTA points out that at the time of the

10

incident Mr. Garcia was involved in the commission of a crime, hit-and-run, a third degree misdemeanor. The PSTA further asserts that the Grievant did not handle his firearm carelessly or imprudently and no one was endangered. Finally, the PSTA admits that the Grievant must accept responsibility for his use of "street language", but argues that this is not worthy of a suspension without pay.

### Discussion

The Parties presented two issues for resolution arising out of the disciplinary action imposed in this matter, one procedural and one on the merits. The Parties waived their contractual right to have these issues heard in separate hearings and presented testimony and evidence on both issues. It is clear that a decision in favor of the PSTA on the procedural issue would obviate the need to address the merits of the disciplinary action. Article 26, Section 7, subsection 4, provides that "[I]f the aforementioned time limits are not met, no discipline in the form of a suspension without pay may be initiated." Accordingly, I will address the procedural issue first.

Article 26, Section 7 is a new contract provision which, in essence, provides that disciplinary charges be brought in a timely manner. With certain enumerated exceptions, the Department must complete its investigation and issue its notice of administrative findings within 120 working days from the date the member is notified of the complaint. One of the enumerated exceptions is for cases "involving alleged criminal conduct or requests for a prosecutorial determination."

The incident which gave rise to Grievant's discipline occurred on April 10, 1996. The notice of administrative findings was issued on April 30, 1997, clearly in

11

excess of 120 working days. The procedural issue presented is whether or not this case falls within one of the specific exceptions set forth above. For the following reasons, I find that the Department has failed to provide evidence sufficient to establish that this case falls within one of the exceptions. Specifically, the Department has failed to establish that this case involved "alleged criminal conduct" or a "request for a prosecutorial determination".

In support of its position that this case falls under one or both of these exceptions, the Department produced the Uniform Investigation Report from the West Shore Regional Police Department (Commonwealth Ex. 1), which contains allegations by Mr. Garcia that the Grievant assaulted him. However, apart from any hearsay considerations, I do not find that this document is evidence of "alleged criminal conduct."

At the outset, it is necessary to determine what the term "alleged criminal conduct" means in Article 26, Section 7. That provision of the Agreement is new and this case is one of first impression. Article 26, Section 7 does not define "alleged criminal conduct." The Parties argue differing interpretations. The Department argues that the words should be given their plain meaning, that "alleged" means "alleged" and should not be construed as referring only to "charges" of criminal conduct. The PSTA, on the other hand, argues that within the context of Article 26, Section 7, "allegations" of criminal conduct must be interpreted as "charges" of criminal conduct[1].

Article 26, Section 7 exempts cases involving "alleged criminal conduct" from the general 120 day requirement. Section 7, Subsection 1 is critical because it proscribes how those cases are to be handled. That section states:

---

[1] Neither Party offered bargaining history with regard to this contract language.

In cases involving <u>alleged criminal conduct</u> or requests for a prosecutorial determination, <u>the notice of administrative findings shall be issued within 60 working days from the date the Department receives written notice from the member of the disposition/adjudication of the criminal charge</u> or the date the Department receives the prosecutorial determination. (Emphasis added).

This language simply does not permit the broader interpretation of the phrase "alleged criminal conduct" urged by the Department. Perhaps standing alone the phrase "alleged criminal conduct" might incorporate the routine completion of an investigative report such as Commonwealth Exhibit 1. However, that phrase must be read in context of the section as a whole. The quoted section expressly refers to the "disposition/adjudication of the <u>criminal charge</u>." Consistent with this language, the phrase "alleged criminal conduct" must refer to charges of criminal conduct.

Consequently, the Uniform Investigation Report from the West Shore Regional Police Department can not and does not constitute evidence of "alleged criminal conduct" as that term is used in Article 26, Section 7.

The West Shore Police Department did not file criminal charges against the Grievant based upon the allegations made in that report. The record, in fact, unequivocally establishes that criminal charges were never filed against the Grievant for actions he took during the incident on April 10, 1996. It must be concluded, therefore, that this case does not involve "allegations of criminal conduct" and cannot be excepted from the 120 day requirement on that basis. The question next arises whether there is evidence of a request for prosecutorial determination.

Certainly, the existence of the Uniform Investigation Report from the West Shore Regional Police Department is, in and of itself, insufficient evidence to establish that fact. Although that document **could** have been referred to the DA's office,

13

there is not one competent piece of evidence that it was.  Cpl. Doman, who investigated the incident involving the Grievant and prepared the BPR report, did not testify about the local police report.  Lt. Brown testified only that he was aware of the existence of the report at the time he was reviewing Cpl. Doman's BPR report for completion.  Neither testified to personally sending the document to the DA's office nor to reviewing any files in that office.  No one from the West Shore Regional Police Department testified and no documentation from that department was produced to establish that the Uniform Investigation Report was transmitted in some fashion to the DA's office.

There is no written correspondence between the Department and either the West Shore Regional Police Department or the Cumberland County DA's office regarding a request for prosecutorial determination.  The remainder of the evidence produced by the Department to establish the existence and resolution of a prosecutorial determination in this matter consists of testimony from Cpl. Doman and Lt. Brown that they placed telephone calls to the West Shore Regional Police Department and the Cumberland County DA's office.  The only written documentation of any of these calls is a reference Cpl. Doman made to contacting the DA's office on July 15, 1996 at the end of his report and in the supplemental report filed by Lt. Brown on April 22, 1997.

Cpl. Doman testified that he spoke by phone with Officer Strayer of the West Shore Regional Police Department who thought that there was a possibility that charges would be brought against both Mr. Garcia and the Grievant.  Cpl. Doman did not testify when this conversation took place.  At some point late in his investigation, in July 1996, Cpl. Doman called the Cumberland County DA's office and spoke with Tori

14

Bloser, whom he identified as a secretary in that office. Cpl. Doman testified that he did not speak with any assistant district attorney and did not know which assistant district attorney had been assigned to the case. Based upon his conversation with Ms. Bloser, Cpl. Doman concluded that no decision had been made to file charges against the Grievant, a fact he referenced in his report. The report was then turned over to Lt. Brown and Cpl. Doman's role in the investigation terminated.

Lt. Brown testified that he could not forward the BPR report to the Director of Internal Affairs Division until it was complete. He further testified that based upon the existence of the Uniform Investigation Report from the West Shore Regional Police Department, the report would not be complete without a prosecutorial determination.

On August 23, 1996, Lt. Brown called the DA's office and spoke to a female. Lt. Brown testified that the female gave him a docket number and the name of the assistant district attorney assigned to the case, William Gabig. Lt. Brown thinks he spoke with Mr. Gabig during that conversation and learned that no decision had been made whether or not to bring charges against the Grievant.

Lt. Brown testified that he called the DA's office again on October 24, 1996. He thinks that on this occasion he spoke with a secretary who could not determine whether a decision had been made by that office regarding the Grievant. Lt. Brown recalls requesting a determination letter from the DA's office during this call. Lt. Brown stated that he called the DA's office a third time in January 1997, spoke with a secretary, and again received no conclusive information regarding the Grievant's status.

15

Lt. Brown testified that he placed a final call to the DA's office on April 22, 1997 and spoke directly with Assistant District Attorney Gabig regarding the Grievant. According to Lt. Brown, Mr. Gabig advised him that no criminal charges were being filed against the Grievant. Lt. Brown testified that he requested a determination letter from Mr. Gabig.

All of the testimony from Cpl. Doman and Lt. Brown regarding the possible filing of criminal charges against the Grievant is based upon uncorroborated hearsay; hearsay from an officer of the local police department who may or may have not referred the matter to the DA's office for consideration and hearsay from the DA's office, much of it from one or more secretaries. Under these circumstances, their testimony on this issue has little, if any, probative value.

The Department proposes getting around these hearsay problems by suggesting that it is logical to infer that had either Cpl. Doman or Lt. Brown received the information they were seeking during any of these telephone calls, they would have stopped calling the DA's office. Unfortunately, logic is no substitute for proof. What is missing, quite simply, is any proof that the Grievant was the subject of a prosecutorial determination in the first place.

It is significant to note that the only docket number ever produced in this matter from the DA's office was the docket number in which Mr. Garcia was the subject of criminal charges and the Grievant was the victim. Moreover, despite repeated requests from Lt. Brown to the DA's office for a determination letter, none was ever produced. To the contrary, the only piece of correspondence emanating from that office is a letter from Assistant District Attorney Gabig to the Grievant dated May 16, 1997. That letter

16

explicitly states that the Grievant was never the subject of any investigation by the DA's office and no charges were ever contemplated against him. (Joint Ex. 2, last page).

The Grievant provided the Department with a copy of the letter he received from the DA's office. Importantly, Lt. Brown testified that although he believed that the letter did not comport with his conversation with Mr. Gabig he did not call the DA's office for an explanation of any discrepancies.

It is clear that the Department has failed to produce evidence that a request for prosecutorial determination was ever made to the DA's office or that a written determination was ever provided by that office. Absent these critical pieces of evidence, the existence of a prosecutorial determination cannot be inferred on the basis of the testimony of the Department's witnesses.

In sum, the Department is seeking to except this case from the 120-day requirement provided for in Article 26, Section 7. As such, it bears the burden of presenting facts in support of its assertion that this case involves "alleged criminal conduct" or a "request for prosecutorial determination." There is insufficient evidence to support a finding that either exception exists.

Accordingly, I find that the notice of administrative findings in this case was not issued in a timely manner as required by the Agreement. For that reason, the grievance must be sustained. In rendering this decision, I specifically decline to address the merits of the case.

17

## AWARD

The grievance is sustained.  The Department is directed to rescind the ten-day suspension without pay.

Dated: June 29, 1998

Harrisburg, Pennsylvania

_____
Lynne M. Mountz, Arbitrator

18

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDY YORDY, | : | |
| **Plaintiff** | : | |
| | : | No. 1:01-CV-0206 |
| v. | : | |
| | : | (Judge Kane) |
| SCOTT BROWN, PAUL EVANKO, | : | |
| BERON F. STEAGER, AND BARRY L. | : | |
| BRINSER, et al., | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I, **GREGORY R. NEUHAUSER,** Senior Deputy Attorney General

for the Commonwealth of Pennsylvania, Office of Attorney General, hereby

certify that on **September 23, 2002,** I caused to be served a true and correct copy

of the foregoing document **Memorandum in Support of Defendants' Motion In**

**Limine,** by depositing it in the United States mail, first-class postage prepaid to

the following:

Spero T. Lappas, Esquire
205 State Street
Harrisburg, PA  17101-0808


**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**