2 G

37

10/25/02

ORIGINAL

SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.
2080 Linglestown Road
Suite 201
Harrisburg, Pennsylvania 17110-9670
Telephone (717) 540-9170
Fax (717) 540-5481
By: SPERO T. LAPPAS, Esquire
Pa. Supreme Court ID no. 25745
slappas@ssbc-law.com

FILED
HARRISBURG, PA
OCT 24 2002
MARY E. D'ANDREA, CLERK
Per _______ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RANDY YORDY,<br>PLAINTIFF<br>v. | : |
| | : CIVIL ACTION 1:01-cv-0206 |
| SCOTT BROWN,<br>individually<br>and in his official capacity<br>as an employee and agent of<br>the PENNSYLVANIA STATE POLICE<br>Defendant | : JURY TRIAL DEMANDED<br><br>: JUDGE KANE |
| PAUL EVANKO,<br>individually<br>and in his official capacity<br>as an employee and agent of<br>the PENNSYLVANIA STATE POLICE<br>Defendant, et alii | : |

# PLAINTIFF'S BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTION IN LIMINE

*I. STATEMENT OF THE CASE*

On February 4, 1999 the Plaintiff was driving his motor vehicle when Defendant Scott Brown, a Pennsylvania State Trooper, stopped the vehicle for the purported reason of investigating a possible driving under the influence offense. During the course of that stop, Brown became violent and assaulted the Plaintiff. Randy Yordy narrowly escaped with his life, and in fact Brown shot at the Plaintiff while he was fleeing the assault.

Randy Yordy has sued Scott Brown for assaulting him, two other State Troopers for continuing the assault later that same night, and Commissioner Paul Evanko for failure to exercise proper disciplinary control and supervision over Brown, failure to remove Brown from patrol duties, failure to take adequate steps to protect the public in general and the Plaintiff in particular from Brown's known dangerous proclivities, and failure to institute procedures to effect Brown's reassignment, effective discipline or dismissal. (Complaint, paragraph 23). The Plaintiff has further pleaded that

> "At all relevant times, DEFENDANT BROWN's personality, character, proclivities and record with the PSP was such as to disqualify him from continued employment as a police officer. His personality, character, proclivities and record, and/or his record of prior citizen assaults, disciplinary charges, and official misconducts identified him as one who was illsuited to continued employment, and revealed him as a hazard to the citizens of this Commonwealth."

> "DEFENDANT BROWN's record would have revealed that disciplinary action, removal from duty, or reassignment was appropriate and that he should not be allowed to continue in police employment, or at least that he not be

> allowed to interact with members of the public in such a fashion as to allow his dangerous proclivities to present a menace to the public."

(Complaint, paragraphs 21, 22).

The Defendants have filed a Motion in Limine seeking to have evidence of Brown's extensive and serious pre-1999 disciplinary history excluded on the argued theories that (1) it is irrelevant, or (2) if relevant it is too prejudicial.

The discovery evidence so far amply supports the relevance of Brown's record.

## *II. DISCUSSION OF DEFENDANT BROWN'S DISCIPLINARY RECORD*

Defendant Brown's checkered disciplinary record prior to his assault on Randy Yordy caused one State Police disciplinary officer to comment (as early as June 25, 1997) that

> "A review of Trooper Scott A. Brown's personnel record reveals repeated violations of Department rules and regulations. <u>These recurrent infractions raise serious questions as to Trooper Brown's willingness to conform to acceptable standards of behavior as established by the Department.</u>"

Memorandum of Captain Larry Williams, Exhibit 1 hereto. (Emphasis added.)

These recurrent serious violations include the following:

On or about April 9, 1998, while Defendant Brown was assigned to "desk duties" he engaged in an act of "unwelcomed" and "unnecessary" touching of a female civilian State Police employee

named Christine Kosh. He was suspended for one day, but his suspension was reduced to a written reprimand by a labor relations arbitrator. The arbitrator ruled that the Defendant's actions were "inappropriate" and that his testimony (that his assault on Ms. Kosh was the result of accidently tripping and catching himself by grabbing hold of her shoulders) was "implausible" especially because Ms. Kosh testified that he had touched her twice. Exhibit 2 hereto, page 7. Brown's further defenses consisted of the arguments that he was the victim of a State Police "conspiracy" (Id. at p. 10), that he was the target of "entrap[ment]" (page 11), and that the State Police investigation of his misconduct constituted the wrongful "turning on `on of their own'." (Page 10).

On August 2, 1997, the Defendant was investigating an alleged case of bicycle theft by a juvenile. During that investigation the defendant engaged in such behavior with the juvenile's family that a State Police official Disciplinary Report found him to have "used foul language, yelled, threatened and lost composure." Exhibit 3 hereto. Although his discipline for this misconduct was sustained, Brown thought that the whole thing was "exaggerated" and that his bad conduct was (as hard as it may be for us to understand the cause-and-effect relationship which seems to make sense to the Defendant) the result of "strep throat," clinical depression, and the fact that his misconduct took place on a "hot and humid day."

See, Statement of Scott Brown, December 15, 1997, attached hereto as Exhibit 4, page 2.

Most serious by far is an incident on April 10, 1996. The defendant was driving through the Borough of Lemoyne with his wife and infant child when his car was rear-ended by one Rodelio Garcia in a traffic jam. There were no injuries. The defendant was off duty and in civilian clothes. The Defendant pursued Garcia in traffic, got out of his car, jumped through Garcia's sun roof and (in the words of the State Police officer who investigated this incident) started "pistol whipping him" while Garcia was still driving. Brown's actions risked a second, more serious traffic accident. An impartial eyewitness reported that Brown was pointing his handgun at Garcia and "roughing him up pretty good." During this incident, Brown never told Garcia that he was under arrest, and he subjected him to a barrage of obscenity as well as the physical assaults. (See Summary report of Lieutenant Francis Grolemund, Jr. attached hereto as Exhibit 5.

When questioned about this incident, Brown denied that he had done anything wrong. He later admitted to Lt. Grolemund that his denial that of was "untruthful and a lie." Brown "stated that he lied to avoid getting into trouble." Lt. Grolemund concluded that:

> "The inconsistent statements made by Brown during this investigation and <u>his admission of a deliberate and intentional lie</u> to the investigating officer casts doubt on Brown's credibility on all relevant parts of this investigation in which he is contradicted by evidence or other testimony."

Exhibit 6 hereto, emphasis added.

The State Police suspended Defendant Brown for ten days without pay for violations of regulations dealing with Unbecoming Conduct, Courtesy, Use of Firearms, Police Action Off Duty, and Use of Deadly Force. On May 8, 1997, Brown defended himself by stating that he called Garcia a "motherfucker," drew his weapon on Garcia, and climbed through the sun-roof after him. Brown stated that he "regret[s]" his "decision" in pursuing this course of action, but stated that he was taking "proactive steps to correct my shortcomings," that he has "grown and changed" since the Garcia incident, that he is no longer "the same man as [he] was" during the Garcia incident, and that he was taking psychiatric medication and therapy to address his apparent mental health problems and family issues. See, Statement of Scott Brown, attached hereto as Exhibit 7.

When Brown grieved this disciplinary suspension, the Arbitrator refused to address the merits of the April 1996 incident because she found that the disciplinary action was filed too late, and thus violated the statute of limitations established by the State Police collective bargaining agreement. Her exact finding was that:

> "the notice of administrative findings in this case was not issued in a timely manner as required by the agreement. For that reason, the grievance must be sustained. <u>In rendering this decision, I specifically decline to address the merits of the case</u>."

See, June 29, 1998 Arbitration Decision, attached hereto as Exhibit 8. (Emphasis added.)

Significantly, when Brown was questioned about this arbitration decision at his sworn Deposition in the present case, he was at least as dishonest as he had been to Lt. Grolemund: indeed his testimony about the Garcia Arbitration was pure fabrication.

> "I was vindicated and cleared of all wrongdoing on all counts through the grievance procedure."
>
> * * *
>
> "[H]e [the Arbitrator] felt that I -- in his statements, his findings, he found that I not only complied with Pennsylvania State Police regulations, I also complied with the current law in the Commonwealth of Pennsylvania and was justified in doing what I did."

See Deposition of Scott Brown, NT 18-19, attached hereto as Exhibit 9, emphasis added.[1]

Equally important to the question of whether Commissioner Evanko violated his constitutional duty to avoid deliberate indifference to the risk which Defendant Brown presented to the citizens of this Commonwealth in general and to this Plaintiff in particular, is Brown's pre-February 1999 mental health and

---

[1] Interestingly, after assaulting Garcia, Brown filed a lawsuit based upon injuries which he [Brown] claimed to have suffered during the assault on Garcia. Brown Deposition NT 19. In the present case, Brown has repeated the same pattern of conduct: after assaulting Randy Yordy, Brown has sued Yordy claiming that during his flight from Brown's assault Yordy caused Brown to fall to the ground and suffer head injuries. Id. at 47.

psychiatric history.   On November 17, 2000, psychiatrist Roger Cadieux, M.D., wrote a report which was precipitated by the concern of a State Police captain that "Brown has been involved in a series of incidents which apparently lead to his concern whether Corporal Brown can perform his duties within the nature of their scope." See, November 17, 2000 report of Roger Cadieux, M.D., attached hereto as Exhibit 10.   The State Police were concerned about a recent incident of reckless and aggressive driving of a police car which "needlessly placed himself and others in jeopardy." (Id. at page 2).   Another incident -- apparently similar to the Garcia incident and involving profanity, violence, and misuse of his firearm -- post-dated Brown's assault on Randy Yordy, and so has only limited persuasive relevance to the present inquiry.   Dr. Cadieux's report is helpful in that it recounts the Defendant's pre-February 1999 mental health history.   He had been in treatment with a psychologist named Dr. Larry Walker from 1996 through 1999, and Dr. Walker's findings were that Brown was frequently overwhelmed by the stress of being a State Trooper, and that he frequently reported anger problems.   The defendant's wife told Dr. Walker in 1996 that her husband's anger was increasing.   (Cadieux report at pp. 3-5)

Accordingly, as of his assault on Randy Yordy in February 1999, Scott Brown was an employee whose record as it was available to Evanko, established that he had been repeatedly in serious

trouble for assaultive and threatening behavior, who regularly blamed others for the consequences of his own misconduct, who had been caught in at least one outright lie which he admitted to manufacturing to stay out of trouble, who blamed his disciplinary troubles inter alia on "conspiracies," "entrapment," and the weather, who admitted that one of his misconducts was related to a clinical depression requiring treatment, who had a three year history of mental health treatment for inter alia work stress and anger control difficulty, who in the judgment of one high ranking officer raised "serious questions as to . . . [his] willingness to conform to acceptable standards of behavior as established by the Department," and whose explosive anger had placed the public in jeopardy on at least two other occasions.[2]

## *III. ISSUES AND DISCUSSION*

*1. In a case where the Commissioner of the State Police is sued for failing to supervise, control, appropriately assign, and effectively discipline a police officer with a history of assaultive and threatening behavior as well as other misconduct, the nature and extent of that officer's history is relevant to the question of whether or not the Commissioner's actions amount to civil rights violations.*

The Defendant wrongly presumes that Brown's disciplinary

[2] The Garcia incident, see Exhibit 5, and the reckless driving incident, see Exhibit 10.

record is to be offered by the Plaintiff simply to establish that Brown is a person of bad character. It may be true that such evidence is admissible under FRE 404(b),[3] but this evidence is also relevant to the issue of Evanko's liability.

The Plaintiff is not proceeding against Evanko on a respondeat superior theory. Rather, Evanko is directly responsible for the violations of Plaintiff's right to be free from unlawful police assaults (1) because Evanko had supervisory control over Brown and Evanko failed to act to correct Brown's conduct, see, Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294-95 (3rd Cir. 1997); (2) because Evanko's inaction in the face of Brown's terrible record constituted deliberate indifference to the rights of persons with whom Brown came into contact, see, Kneipp v. Tedder, 95 F.3d 1199, 1212 (3rd Cir. 1996), citing City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1203-04, 103 L.Ed.2d 412 (1989); and (3) because Evanko's inaction created a danger which deprived the Plaintiff of his Fourteenth Amendment substantive due process rights. See, Kneipp, supra, 95 F.3d at 1205.

As the previous rendition of Brown's disciplinary record makes painfully clear, Evanko's inaction in the face of repeated

---

[3] After all, the similar facts of the Garcia and Yordy incidents -- motor vehicle stops which develop into civilian assaults and improper gunplay -- and their aftermaths -- lawsuits by Brown alleging that he suffered injuries during the incidents -- create an prima facie case under FRE 404(b) that Brown's behavior demonstrates his recurring motive to profit financially from his altercations with members of the public.

assaultive misconduct, recorded warnings from disciplinary investigators, and a history of bizarre blame-shifting, is relevant to the elements of Plaintiff's case regarding Evanko's direct responsibility.

*2. In a case where the Commissioner of the State Police is directly responsible for the actions of a trooper, evidence which supports that direct responsibility is not excludable under FRE 403.*

The Defendants' argument on this point is rather difficult to understand but, as they acknowledge, the recent authority of Coleman v. Home Depot, Inc., no. 00-3496 (3rd Cir. 2002) (slip opinion attached hereto as Exhibit 11) is instructive. In that case, the Court of Appeals excluded an EEOC letter only after finding that the letter had "a low probative value." (p. 22). In general, the Court held that "there is a strong presumption that relevant evidence should be admitted" (p. 17), and that "evidence that is highly probative is exceptionally difficult to exclude" (pp. 17-18). The evidence of Brown's record is "highly probative" of Evanko's liability and the Defendants have not pointed to any specific threat of jury confusion or unfair prejudice.[4]

---

[4] The Defendant's threat to engage in a series of "mini trials" about each disciplinary incident is a red herring. First, the actual incidents have been thoroughly investigated and any appropriate inquiry into their particulars will be very brief. Second, the relevant inquiry is whether or not Evanko acted appropriately based upon Brown's disciplinary records which were at

*IV. CONCLUSION*

WHEREFORE, the proffered evidence is relevant and not subject to exclusion under FRE 403. Accordingly, the Defendants' Motion in Limine should be denied.

*RESPECTFULLY SUBMITTED,*

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*

*By:* ______________________________
*SPERO T. LAPPAS, Esquire*
*Pa. Supreme Ct. ID no. 25745*
*2080 Linglestown Road*
*Suite 201*
*Harrisburg, PA 17110-9670*
*(717) 540-9170*
*ATTORNEYS FOR THE PLAINTIFF*

*October 23, 2002*

---

all times available for his (Evanko's) review and information.

*INDEX OF EXHIBITS*

1. Memorandum of Captain Larry Williams, June 25, 1997.
2. April 26, 1999 Arbitration report.
3. December 10, 1997 Disciplinary Report.
4. Statement of Scott Brown, December 15, 1997.
5. Summary report of Lieutenant Francis Grolemund, Jr.
6. General Investigation Report, May 9, 1997.
7. Statement of Scott Brown, May 8, 1997.
8. June 29, 1998 Arbitration Decision.
9. Deposition of Scott Brown.
10. November 17, 2000 report of Roger Cadieux, M.D.
11. Coleman v. Home Depot, Inc., no. 00-3496 (3rd Cir. 2002) slip opinion.

*SERRATELLI, SCHIFFMAN BROWN AND CALHOON, P.C.*
*By: SPERO T. LAPPAS, Esquire*

*Page 13*

STD-501 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE: June 25, 1997

SUBJECT: **CONFIDENTIAL**
Disciplinary Record -
Trooper Scott A. Brown

TO: Commanding Officer, Troop L, Reading
**ATTENTION: Trooper Brown**

FROM: Captain Larry Williams LW
Disciplinary Officer

REFERENCES: (a) General Investigation Report BPR-9534.

(b) General Investigation Report BPR-8764.

1. Disciplinary Action Reports initiated as a result of References (a) and (b) have been evaluated and the decision in each of these incidents has been rendered.

2. A review of Trooper Scott A. Brown's personnel record reveals repeated violations of Department rules and regulations. These recurrent infractions raise serious questions as to Trooper Brown's willingness to conform to acceptable standards of behavior as established by the Department.

3. It is the purpose of this memo to advise Trooper Brown that any further disciplinary action against him may result in a recommendation for court-martial. Trooper Brown should be cautioned to consider the ramifications of his continued employment with the State Police. He should further be advised that if court-martial is recommended, one of the hazards to be faced is that of dismissal from the Department.

4. Any questions on this matter may be referred to me.

RECEIVED BY TPR. Scott A. Brown DATE 07/16/97

cc: **Disciplinary Officer**



2808

IN THE MATTER OF ARBITRATION BETWEEN


COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA STATE POLICE

AND

PENNSYLVANIA STATE TROOPERS
ASSOCIATION

**OPINION AND AWARD**

(Trooper Scott Brown)
One Day Suspension

GRIEVANCE:    99-DO-0172 Scott Brown
PSTA
PA State Police L-102

HEARING:    February 24, 1999
Harrisburg, Pennsylvania

BEFORE:    Lynne M. Mountz
Impartial Arbitrator

APPEARANCES:    Commonwealth of Pennsylvania, Pennsylvania State Police:
Dale J. Wetzel

Pennsylvania State Troopers Association:
Gary M. Lightman, Esquire


The Parties selected the undersigned Arbitrator to hear and decide the instant dispute. A hearing was held in Harrisburg, Pennsylvania on February 24, 1999, at which time both Parties were afforded full opportunity to present testimony, examine and cross-examine witnesses and introduce documentary evidence.

The Parties waived their right to make oral argument and elected to file post-hearing briefs with the Arbitrator. The record in this matter was closed on March 25, 1999 upon receipt of the briefs.



## Background

The instant dispute results from a Grievance filed on behalf of Trooper Scott A. Brown (Grievant) on November 13, 1998 (Joint Ex. 2, p. 5), appealing a decision by the Pennsylvania State Police (Department) to suspend him for one (1) day without pay.

The Grievant is a member of the Pennsylvania State Police. The incident giving rise to his suspension occurred during the evening of April 9, 1998. At that time, the Grievant was a Trooper assigned to the Jonestown Station of Troop L. On the evening of April 9, 1998, the Grievant was working patrol zones. At some point during the evening, Corporal Myra Taylor, the shift supervisor, instructed the Grievant to return to the station to assist Police Communications Operator (PCO) Christine Kosh with desk duties. The Grievant complied with that instruction.

The Grievant and PCO Kosh were alone in the communications area for a period of time. Cpl. Taylor had left the Station to assist on incidents that had occurred out on the road. Upon her return, Cpl. Taylor had a conversation with PCO Kosh. During that conversation, PCO Kosh stated that the Grievant had touched her on the shoulders twice when they were alone in the communications area. PCO Kosh reported that the Grievant had apologized after the first time he touched her, but said nothing after the second time.

Cpl. Taylor telephoned the Station Commander, Lieutenant Harold Lacey and advised him about her conversation with PCO Kosh. Cpl. Taylor then told PCO Kosh that the incident had been reported to Lt. Lacey and that she (PCO Kosh) should

document what had happened.  Cpl. Taylor also told PCO Kosh that she could file a formal complaint against the Grievant.

Cpl. Taylor next advised the Grievant that he was not to go into the communications area or have any further contact with PCO Kosh.  She further informed the Grievant that she had reported the incident to Lt. Lacey.  The Grievant offered an explanation to Cpl. Taylor, but was told that he should wait to speak to Lt. Lacey about the matter.

On April 13, 1998, Lt. Lacey met separately with PCO Kosh and the Grievant.   In their discussions with Lt. Lacey, PCO Kosh and the Grievant provided different accounts of what had happened when they were alone during the evening of April 9, 1998.  PCO Kosh was advised again of her right to file a complaint against the Grievant.  PCO Kosh elected to file a complaint.

As a result of the complaint, Corporal Gregory L. Johnson, Internal Affairs Division, conducted an investigation into the events of April 9, 1998.

On August 13, 1998, Captain Michael J. Marcantino, Commanding Officer, Troop L, issued a Disciplinary Action Report and concluded that the Grievant had placed his hands on the shoulders of PCO Kosh on two occasions and that said contact was neither necessary or welcome.  (Commonwealth Ex. 5).  The Grievant filed a written response to the Disciplinary Action Report on August 16, 1998.

The Department determined that the Grievant's actions in this matter constituted a violation of Field Regulations, Sections FR 1-1.02 (Unbecoming Conduct) and FR 1-2.02 (Performance of Duty) and notified the Grievant that he would be suspended for one day without pay.  The instant Grievance was filed.  The matter being

unresolved between the Department and the Pennsylvania State Troopers Association (PSTA), it proceeded to arbitration.

**Issue**

Whether the Department had just cause to suspend the Grievant without pay for a period of one (1) day and, if not, what shall the remedy be?

**Position of the Parties**

Department

The Department asserts first that this matter involves an issue of credibility regarding the testimony of PCO Kosh and the Grievant regarding the incident that occurred on April 9, 1998. That issue, according to the Department, must be resolved in favor of PCO Kosh. The Department contends that the Grievant has a motive to be less than truthful regarding the events of the night in question. Specifically, the Grievant is attempting to negate the disciplinary action and the potential impact it might have on his opportunity for promotion. Additionally, the Department asserts that the Grievant's account of the incident has been inconsistent at times throughout the investigation and during his testimony at the hearing.

The Department argues that PCO Kosh, on the other hand, has repeatedly and consistently offered the same account of the incident. Moreover, according to the Department, PCO Kosh has no reason to fabricate the incident against the Grievant. At the time in question, PCO Kosh was a new employee occupying a civilian position with the PSP and the Grievant was a Trooper.

It is the Department's position that the Grievant's actions on the night of April 9, 1998 were inappropriate. Specifically, the Grievant placed his hands on the shoulders of PCO Kosh on two separate instances. This contact, according to the Department, was unsolicited and unwelcome. The Department asserts that this is the second time that the Grievant has engaged in similar inappropriate behavior. The Department argues that the investigation established that less than one year earlier, the Grievant was counseled and given a supervisor's notation for massaging the shoulders of another female PCO.

Finally, the Department denies that there was any conspiracy among any of the Department witnesses to entrap the Grievant. The Department specifically denies any allegation that the Grievant was disciplined because of Cpl. Taylor's bias towards him and points out that no evidence was provided to support that allegation.

Based upon the previous incident that gave rise to the supervisor's notation, the results of the investigation and the Grievant's response thereto, the Department contends that there is just cause for a suspension without pay for one day.

PSTA

PSTA argues that no discipline is warranted in this case and would not have been imposed but for the improper actions of the Department in utilizing a supervisor's notation as a stepping stone for progressive discipline. PSTA contends that it had no ability to challenge the supervisor's notation, that the notation itself does not constitute discipline and cannot be used as a basis for discipline in the current proceeding.

PSTA further argues that even if PCO Kosh's testimony that the Grievant touched her twice is accurate, that fact alone does not make the Grievant's testimony any less credible. Specifically, it is plausible that the Grievant tripped when he touched PCO Kosh the first time, for which he apologized, and that he inadvertently touched her a second time in the confined quarters without realizing it. PSTA contends that the Grievant and PCO Kosh were engaged in friendly conversation when the contact occurred. It is PSTA's contention that only after Cpl. Taylor inappropriately divulged confidential information about the Grievant's supervisor's notation to PCO Kosh, did PCO Kosh become concerned enough to file a complaint.

PSTA also argues that the Department did not fairly investigate this matter, but sought to entrap the Grievant. In making this argument, PSTA notes that during the investigation the Department deliberately failed to inform the Grievant that there were discrepancies in the two accounts of the incident on April 9, 1998 thereby denying him the opportunity to explain them.

Finally, PSTA asserts that the one-day suspension is not only undeserved but will unfairly serve to deprive the Grievant of a promotion for which he would otherwise be eligible. Accordingly, PSTA requests that he Grievance be sustained and that it be specifically ordered that the Grievant be eligible for promotional opportunities.

## Discussion

The sole issue presented is whether or not the Department had just cause to suspend the Grievant for one day without pay for inappropriate conduct when he was alone in the communications area with a civilian female employee, PCO Kosh. Both

Parties to some degree have referenced the impact of discipline on the Grievant's potential eligibility for a promotion[1]. The only relevance the Grievant's eligibility for a promotion has in this proceeding, however, is the inference that it was a factor in the level of discipline imposed in this case. Apart from considering whether or not the Department based its decision to suspend the Grievant, in whole or in part, in an attempt to prevent him from being promoted, the Grievant's eligibility for promotion is irrelevant. Accordingly, this decision will be rendered without consideration of the impact it might or might not have on the Grievant's eligibility for promotional opportunities in the future.

In reviewing the record in this case, it is apparent that PCO Kosh and the Grievant offer differing accounts of what happened when they were alone in the communications area on the evening of April 9, 1998. The Grievant testified that he did touch the shoulders of PCO Kosh when he tripped over a transition strip on the floor and lost his balance. PCO Kosh stated that the Grievant did not trip or fall prior to the contact. She further testified that the Grievant subsequently touched her shoulders a second time that night. The Grievant adamantly denies touching PCO Kosh a second time, asserting that if he did, it was inadvertent and he does not recall it.

It is undisputed that the Grievant touched PCO Kosh on the shoulders on at least one occasion when they were alone. The Grievant's testimony that a trip caused this contact is implausible. PCO Kosh testified credibly that the Grievant did not touch her with the force of someone falling and balancing himself against her shoulders. Nor did she hear a tripping sound immediately before or during the contact.

[1] PSTA has requested not only that the Grievance be sustained, but that the Arbitrator direct that the Grievant be eligible for promotional opportunities. The Department in its brief suggests that the Grievant's acrimonious testimony regarding his disdain for State Police Officers investigating "one of their own" for inappropriate behavior calls into question his potential ability to supervise others.

Moreover, the Grievant's immediate reaction to the incident was inconsistent with an accidental tripping. The Grievant testified, for example, that after he touched PCO Kosh his first thought was "they are going to screw me with this." To say the least, this is an unusual response to falling into a co-worker accidentally. Similarly, the Grievant apologized to PCO Kosh in a manner that did not reflect the fact that he had accidentally tripped or fallen. Both the Grievant and PCO Kosh testified that immediately after the contact, the Grievant said, "I'm sorry, I shouldn't have done that."

In any event, the Department indicated that had the incident ended at that point, it is likely that no discipline would have resulted. It was the occurrence of the second touch that resulted in the decision to discipline the Grievant.

PCO Kosh's testimony that the Grievant touched her shoulders two times on the evening of April 9, 1998 is credible. PCO Kosh has been consistent in this regard; she reported two separate touches to Cpl. Taylor that same evening, in the complaint she submitted, the interview she provided during the investigation and in her testimony at the hearing. PCO Kosh testified that she was surprised the second time that the Grievant touched her shoulders because he had made a big deal about the first time, apologizing in a manner she described as theatrical. PCO Kosh further testified that the Grievant said nothing after the second incident.

The Grievant adamantly denies being aware of touching PCO Kosh a second time. He contends that if this actually happened, it was unintentional and occurred without thinking. The Grievant stated that he frequently "talks with his hands" and it is possible that he touched PCO Kosh without realizing it. The Grievant further stated that if he had consciously touched PCO Kosh a second time he certainly would

have apologized. The Grievant added that he loved his family and needed his job and would have risked neither by deliberately touching PCO Kosh.

Despite the self-serving nature of this testimony, it is not inconsistent with PCO Kosh's immediate reaction to the incident. Although PCO Kosh was very uncomfortable and troubled by being touched by the Grievant, she believed that the first time he touched her, it was a mistake for which he apologized. With regard to the second incident, the investigative report filed by Cpl. Johnson detailing his interview with PCO Kosh includes the following statement: "When Trooper BROWN placed his fingertips on her shoulders the second time, PCO KOSH immediately thought he shouldn't have done it. PCO KOSH said she did not know why Trooper BROWN would have touched her the second time. She believes Trooper BROWN gets excited while talking and does this to emphasize his point." (Commonwealth Ex. 1, p. 3). PCO Kosh admitted at the hearing that this was still a possible explanation for the Grievant's actions.

PCO Kosh has never maintained that the Grievant's conduct was sexual in nature or that she felt threatened by him. In fact, the contact occurred during or about the time that they were engaged in cordial conversation about their families. Regardless of his motives, however, it is clear that the Grievant's physical contact with PCO Kosh was neither solicited nor welcome. PCO Kosh legitimately felt uncomfortable when the Grievant touched her.

At the time of the incident, the Grievant was a Trooper with the Pennsylvania State Police; the complainant a newly hired female civilian employee. At least by perception, PCO Kosh occupied a position of lesser status. They were working

alone in a confined area. The Grievant had no legitimate reason to place his hands on PCO Kosh's shoulders. His conduct was inappropriate and is not excused because he is a "touching" person by nature. Moreover, the Grievant had reason to know and apparently did know that he could get into trouble for touching a female PCO. The Grievant had received a supervisor's notation regarding a prior incident involving a female PCO, the facts of which remain in dispute[2], which warned him that if he engaged in certain conduct in the future he could be subjected to an investigation. It is presumably because of this warning that the Grievant apologized to PCO Kosh after touching her and worried that he would be "screwed."

The Grievant's allegations that he is the victim of a conspiracy spearheaded by Cpl. Taylor are unsubstantiated. Clearly, there is no evidence to support his inference that she deliberately placed him into a room alone with PCO Kosh in order to set up a situation that could be used against him. Moreover, the Grievant's anger at others for investigating him and essentially turning on "one of their own" is misplaced. The Grievant is responsible for his own actions. If those actions are deemed inappropriate, as in the instant case, he is properly subject to investigation and potential discipline.

PSTA has questioned the integrity of the investigation in this case. First, it is asserted that the only reason that PCO Kosh filed a complaint against the Grievant is because Cpl. Taylor divulged confidential information to her regarding the supervisor's notation. Although there was no apparent reason why Cpl. Taylor should have shared this information with PCO Kosh, it seems certain that this information is not responsible

[2] The facts involved in the incident that gave rise to the supervisor's notation are not a part of the record in this case and no inference is made regarding them.

for PCO Kosh's decision to file a formal complaint. PCO Kosh was upset about the fact that the Grievant had touched her prior to receiving this information. She testified in a credible fashion that the decision to file the complaint was hers alone and was not influenced by anything said by Cpl. Taylor.

PSTA also contends that the Department attempted to entrap the Grievant by failing to provide him with all of the information in the complaint. In support of this contention, PSTA refers to a statement in the General Investigation Report that indicates that Lt. Lacey did not tell the Grievant about the discrepancy between his and PCO Kosh's account of what happened (that there were two occasions of touching) in order to prevent the Grievant from preparing a new defense. (Commonwealth Ex. 1, p. 10). Fundamental fairness requires that the accused be provided with all of the allegations made against him in order to respond to those charges. Therefore, PSTA raises legitimate concerns regarding this initial questioning of the Grievant. However, the record also reflects that the Grievant was informed of the discrepancies prior to his pre-disciplinary meeting with Captain Marcantino and given an opportunity to respond thereto in a timely fashion. (Commonwealth Ex. 6).

In sum, I find that the Grievant engaged in inappropriate conduct when he touched the shoulders of PCO Kosh on the evening of April 9, 1998. On the basis of the record presented, however, I do not conclude that the Department had just cause to suspend the Grievant for this infraction. According to the Department, its decision to suspend rather than issue a written reprimand to the Grievant was based essentially on

two factors: the prior incident giving rise to the supervisor's notation and the fact that the Grievant touched PCO Kosh twice, not once[3].

The Grievant, however, has no discipline in his record for similar inappropriate conduct. The Department acknowledges that the supervisor's notation is not discipline. The facts giving rise to the supervisor's notation are still in dispute between the Parties. Unlike this case, the incident underlying the supervisor's notation was not the subject of a formal complaint and investigation and no disciplinary action was taken.

Without prior discipline, the circumstances under which the Grievant touched PCO Kosh in this case are important. As indicated above, both the Grievant and PCO Kosh have described him as an excitable person who in essence "talks with his hands." Although his conduct was inappropriate, there is insufficient evidence to establish that the Grievant intentionally sought to intimidate, harass or make sexual advances towards PCO Kosh. Under these circumstances, there is no justification for the Department's failure to utilize progressive discipline in this case. Accordingly, I find that the Department had just cause to issue a written reprimand to the Grievant for his inappropriate conduct.

Mitigating the discipline in this case is not intended to absolve the Grievant of the need to accept responsibility for his own actions in the future nor diminish the fact that the Department is properly concerned with the treatment of its female employees.

[3] There is no evidence to support a finding that the Department considered the Grievant's eligibility for promotion when it decided to suspend him.

10/10/2002  08:10    717-705-7240                    OAG LITIGATION                    PAGE  27

97-155

10248

1-336 (1-93)

PENNSYLVANIA STATE POLICE
DISCIPLINARY ACTION REPORT

| | RANK | SSN | DOE | TROOP/STATION |
|---|---|---|---|---|
| cott A. BROWN | Tpr. | 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 | 11/21/91 | L-Jonestown |

RACTIONS (LIST INFRACTION (S), DATE (S) OF OCCURRENCE AND DETAILS)

On August 2, 1997, you conducted a bicycle theft investigation, L2-561990. The investigation involved a Juvenile, Brian PLASTERER. You located Brian PLASTERER and interacted with his family. In this contact, you used foul language, yelled, threatened and lost composure while interacting with these people.

2.13, COURTESY

1.02, UNBECOMING CONDUCT

*Capt Michael J Mirarit* 12/10/97

SIGNATURE (INITIATING OFFICER)                    DATE

MEMBER'S NOTICE

IN ACCORDANCE WITH THE PROVISIONS OF THE PSTA CONTRACT, I HAVE BEEN GIVEN NOTICE OF MY RIGHTS AS SET FORTH IN FR 3-3, AND HAVE BEEN AFFORDED THE OPTION OF REPRESENTATION AT THE PRESENTATION OF THIS REPORT.

I ACKNOWLEDGE RECEIPT OF THIS REPORT

TPR. *Scott A Brown*  TROOPER  12/10/97

SIGNATURE                    RANK        DATE

ACTION

GRIEVED. Pre-Arb Agreement: In lieu of serving adjudicated 1-SU~~~ one day deducted f~~~~~~ve Balance.

*Larry Williams*

SIGNATURE DISCIPLINARY OFFICER    RANK  CAPTAIN    DATE  04/15/98

DEFENDANT'S
EXHIBIT
B

Ex 3

**BROWN, Tpr. Scott A**
**L, Jonestown**

**DAR # 97-155**
**BPR # 10248**
**D.O.E. - 11/12/91**

*************************************************************

**PREVIOUS D.A.R.(S) RECEIVED - 95-032, 8764; 97-049, 9534**

---

**AGGRAVATING** ____________________

____________________

____________________

**MITIGATING** ____________________

____________________

____________________

---

**PRIMARYCHARGE:** FR 1-2.13 Courtesy

**ADDITIONALCHARGES:** FR 1.1.02 Unbecoming Conduct

____________________

____________________

____________________

**CODES** ____________________

**DATE WRITTEN RESPONSE** 12/15/97 **RECEIVED BY D.O.** 1/2/98

---

**PENALTY :** / **SWOP** ___ **WR** **CM>** ___ **DISMISS** ___ **SWOP** **WM>May** ___ **Shall** ___

**DECISION DATE** 1/26/98 **PACKAGE READY** 1/26/98

**NOTES:** ____________________

____________________

____________________

____________________

____________________

RECEIVED TIME OCT. 10. 9:16AM

# Prior Discipline Report

**SSN:** 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 **Name:** BROWN, SCOTT A.

**DAR Number:** 1997-155 **IAD Number:** 10248

**Occurence:**

08/02/97 - Tpr. Brown conducted a bicycle theft investigation, L2-561990. The investigation involved a juvenile, Brian Plasterer. Tpr. Brown located Brian Plasterer and interacted with his family. In this contact, Tpr. Brown used foul language, yelled, threatened and lost composure while interacting with these people.

**Date Adjuducated:** 01/26/1998 **Adjudicated By:** CAPTAIN LARRY WILLIAMS

**Grievance No.:** L-94 **Arbitrator Decision:** No

**Resolution:**

HAD 1 DAY DEDUCTED FROM ANNUAL LEAVE BALANCE.

**Arbitrator/Pre-Arb Award:**

IN LIEU OF SERVING ADJUDICATED 1-SWOP WILL HAVE 1 DAY DEDUCTED FROM ANNUAL LEAVE BALANCE.

| Discipline |
|---|
| 1-DAY SWOP |

| Violation | Description |
|---|---|
| 1.02 | Unbecoming Conduct |
| 2.13 | Cooperation with Other Agencies |

STD-501x, 9-86

COMMONWEALTH OF PENNSYLVANIA

**DATE:**          December 15, 1997

**SUBJECT:**      BPR# 10248/DAR

**TO:**            Captain Larry Williams
                  Department Discipline Office
                  Executive and Administrative Offices

**FROM:**          Trooper Scott A. Brown
                  Patrol Unit
                  Troop L, Jonestown

**ENCLOSURE:**     (1)  Daily Duty Roster, Jonestown Station, 07/31/97.
                  (2)  Daily Duty Roster, Jonestown Station, 08/01/97.
                  (3)  Norlanco Medical Center Prognosis Diagnosis for Scott
                        Brown dated 08/01/97.

     1.  This correspondence is prepared to offer this officer's interpretation and explanation of the above incident which resulted in the issuance of a Disciplinary Action Report by Captain Michael J. Marcantino, Troop L, Reading under the above BPR Control Number.

     2.  In the first instance, this officer feels that the allegations presented by the Complainant are highly exaggerated and embellished.

     3.  I would like you to note that the language used by myself was intended to be descriptive as to a grouping of individuals rather than insulting to the individual involved.

     4.  At the time, this officer was attempting to present a corrective lecture to the juvenile regarding decisions and their further repercussions.



STD-501x, 9-86                                                          COMMONWEALTH OF PENNSYLVANIA

5. Attachments numbered 1 and 2 reflect that this officer was utilizing sick leave on the immediate days prior to the incident. Attachment number 3 reflects that this officer was being treated for strep throat by a licensed physician during the time period of this incident. Attachment number 3 also reflects a continuing diagnosis/prognosis for depression/stress requiring medication.

6. This officer noted the day in question (8/2/97), according to the National Weather Service, was a hot and humid day with an 85 degree temperature with 65 percent humidity.

7. This officer respectfully requests that with the above presented information you note that I was attempting to provide a positive influence on this juvenile by providing corrective dialogue while diverting him from the Juvenile Justice System. I would also like you to note that during this time period, this officer suffered from medical problems possibly affecting this officer's duty performance and thereby providing mitigating factors.

ATTACHMENT (11)

# SUMMARY REPORT

BPR: 9534
DATE: April 30, 1997
ISSUING OFFICER: Lieutenant Francis H. GROLEMUND, Jr. FHG
TROOP: Troop S, Milesburg

SUBJECT: Trooper Scott A. BROWN
Troop S, Harrisburg Station
Date of Enlistment: 11/12/91
Social Security Number: 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

## REASON FOR INVESTIGATION

A Use of Force or Complaint Reception and Processing Worksheet was initiated as a result of a non-complaint Use of Force incident in which you were involved on April 10, 1996, at approximately 1645 hours, in Lemoyne Boro, Cumberland County.

The investigative findings revealed that the incident started while you were operating your personal vehicle, accompanied by your wife and child. Your vehicle was struck in the rear by another vehicle operated by Rodelio GARCIA, 5129 Haverford Road, Harrisburg, PA 17109. The findings also revealed that no one was injured as a result of this accident. You initially exited your vehicle and had a short discussion with the other operator, Rodelio GARCIA. You identified yourself as a Pennsylvania State Police Trooper and asked for the required information. GARCIA subsequently left the scene without providing the necessary information that is required by law. Off-duty and in your personal car, you pursued the subject, GARCIA.

You encountered GARCIA a short distance from the initial accident scene. You approached GARCIA and ordered him to shut off his vehicle, identifying yourself as a Pennsylvania State Police Trooper. You did not advise GARCIA that he was under arrest. GARCIA ignored your order and attempted to leave the scene. You then drew your service pistol and pointed it at GARCIA. When he continued to try to leave the scene, you entered his vehicle through the open sunroof area. You engaged in a physical altercation with GARCIA while he was traveling on the highway. During this altercation, you admittedly struck GARCIA at least twice with your service pistol. At no time during this encounter, according to your statement or the statement of GARCIA, did you ever advise him that he was under arrest.

GARCIA advised that you struck him several times without justification. GARCIA also advised in a statement to the local police that you were yelling, "Get the fuck out of the car!" GARCIA's statement is partially corroborated by an eye witness, Mr. Charles Fortney, as he said you were yelling at the top of your lungs, "Open the fucking door!" Information was provided by another eye witness to this incident, Mr. Roger E. Sentiwany, as he said you were "roughing up GARCIA pretty good" and pointing your service pistol at GARCIA's head at the conclusion of this incident.

I call your attention to FR 1-1.02, Unbecoming Conduct, FR 1-1.30, Use of Firearms, FR 1-2.13, Courtesy, FR 1-2.21, Police Action/Off-duty, and FR 7-3, Use of Deadly

EXHIBIT 5

Force, in its entirety. Please review the aforementioned Directives as I feel they are germane to your conduct in this matter. To say that I am disappointed in the manner in which you handled this incident would be an understatement.

Your use of firearms in this police action off-duty was entirely inappropriate. You escalated a minor traffic accident into a serious police incident by your use of your service pistol. At no time, according to the findings, did you advise GARCIA that he was under arrest. His illegal behavior, by not stopping at the scene of a minor traffic accident, does not justify your pulling your service pistol and waving it around, and possibly endangering not only yourself and GARCIA, but others of the motoring public. Your jumping through the sunroof of GARCIA's vehicle and "pistol whipping him" was entirely inappropriate. Your actions caused a second traffic accident, endangering additional motorists.

You failed to pursue reasonable avenues of investigation that were open to you. You could have easily followed GARCIA's vehicle, obtained the registration number, and reported that information to the appropriate authorities. You personally observed GARCIA and could have identified him at a later time. Your explanation concerning why you drew your service pistol is unconvincing. At most, GARCIA was guilty of Hit and Run of attended vehicle, without injury, a misdemeanor of the third degree. That did not rise to the level of a serious police matter, that required you to take necessary action pursuant to FR 1-2.21. Finally, your use of obscene language during this incident, witnessed by the motoring public, was inappropriate and unacceptable..

The District Attorney of Cumberland County has declined to prosecute you criminally for your actions in this matter. However, that does not excuse you from the administrative rules and regulations required by the Pennsylvania State Police.

This Summary Report and attachments are being provided to inform you that I am considering the issuance of a Disciplinary Action Report (DAR), with regard to your conduct in this matter. If you desire to meet with me to discuss any justification or information being considered for use in the issuance of said DAR prior to my final determination, you may request a meeting by contacting me or Sergeant William A. Horgas, Acting Staff Services Section Commander, within three days of your receipt of this summary.

RECEIVED BY [signature] DATE 5/6/97 TIME 1450

WITNESS [signature] DATE 5/6/97 TIME 1450

SP 7-002S (10-83)

PENNSYLVANIA STATE POLICE

# GENERAL INVESTIGATION REPORT

| 1. INCIDENT NO. | 2. DATE OF REPORT |
|---|---|
| BPR-9534 | 05/09/97 |

3. INVESTIGATING OFFICER

Lieutenant Francis H. GROLEMUND, Jr.

4. TROOP-STATION

Troop "S", Milesburg

5. SUBJECT (NATURE OF INVESTIGATION OR NAME AND ADDRESS OF INDIVIDUAL)

Trooper Scott A. BROWN
Troop "S", Harrisburg Station
Date of Enlistment: 11/12/91
Social Security Number: 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

6.

INSTRUCTIONS: REPORT WILL BE PREPARED IN THE FOLLOWING ORDER: REASON FOR INVESTIGATION, SYNOPSIS OF INVESTIGATION, CONCLUSION, RECOMMENDATIONS AND COMMENT (WHEN APPROPRIATE), LIST OF ATTACHMENTS (IF ANY) AND DETAILS WHICH SUPPORT THE SYNOPSIS.

**LIST OF ATTACHMENTS**:

(11) Summary Report, BPR-9534, signed by Trooper Scott A. BROWN on May 6, 1997, at 1450 hours and witnessed by Sergeant Barry E. STAUB, Acting Southeast Section Commander.

(12) Correspondence dated May 8, 1997, to the Acting Commanding Officer, Troop S, Milesburg, from Trooper Scott A. BROWN.

**DETAILS**:

On May 8, 1997, at 1530 hours, I met with BROWN at the Harrisburg Station. As a result of the pre-disciplinary conference, BROWN did not provide me with any new information that would change my mind relative the issuance of a Disciplinary Action Report. BROWN did provide written correspondence further explaining his actions. Refer to Attachment (12).

After reviewing Attachment (12) submitted to me by BROWN, I requestioned him relative his use of obscenities during the incident with GARCIA. He was questioned concerning a statement on Page 1 of Attachment (12) in which he allegedly indicated to GARCIA, "Your under arrest mother fucker. Shut the car off now." That statement contradicts information BROWN gave the investigator which is included on pages 11 and 12 of the investigative report. BROWN had indicated to the investigator that at first he could not remember if he had used any obscenities during the incident. BROWN clarified his statement on Page 12 of the investigative report in which he indicated, after speaking with his wife, he was positive that only basic commands were used during the incident, and that he used no foul language toward GARCIA. BROWN then admitted to me that his initial statements to investigators, relative the use of foul language, was untruthful and a lie. BROWN stated he lied to avoid getting into trouble.

The inconsistent statements made by BROWN during this investigation, and his admission of a deliberate and intentional lie to the investigating officer, casts doubt on BROWN's credibility on all relevant parts of this investigation in which he is contradicted by evidence or other testimony.

Following the pre-disciplinary conference, BROWN was issued a Disciplinary Action Report (DAR) by me. A copy of the DAR and the investigative report were forwarded to the Department Disciplinary Officer. No further action at this time.

7. SIGNATURE [signature] BADGE NO. 246 | 8. ... BADGE NO. | 9. ☐ ORIGINAL ☒ SUPPLEMENTAL

COMMONWEALTH O

ATTACHMENT (12

DATE: May 8, 1997

SUBJECT: Predisciplinary Hearing/conference

TO: LT. GROLEMUND
Troop S. Commanding Officer

FROM: Tpr. S BROWN 6440 SB
Patrol member Harrisburg

1. This officer respectfully requests you consider the following two pages in your decision of discipline.



SP 3-346 (7-88)

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

This officer respectfully requests the following be considered in the issuance of the DAR.

In this situation as in most hind sight is always 20/20. I realize in the past my decision making has been less than stellar. At the time of the incident I believed I made the right decision. If I had it to do all over again who knows what decision I would make but in the past year this incident has been replayed in my head thousands of times. At the time of this incident my family was dealing with a crisis in which it was discovered my daughter is disabled and as a new father with another child on the way I was not dealing with the situation well and in fact was very angry at GOD and myself and dealing with the "who's fault it is my daughter has the problems she has."In the incident itself my vehicle was damaged and I identified my self and only wanted to exchange information so our insurance companies could battle it out. Mr. GARCIA is the one who escalated the incident by taking off and almost hitting me. In my mind he not only committed the misdemeanor hit & run but now recklessly endangering. As I followed Mr. GARCIA's vehicle my intent was to only get the registration and advise the local authorities as I did not want a confrontation with my family present. when I observed the registration it was expired and only secured by one screw on the vehicle. The vehicle was lowered and had so many equipment violations it was obvious to me the tag did not belong to the vehicle and was a dead tag. Therefore any attempt to investigate the subject and vehicle would have met an abrupt end and now as a victim the local police would not have been able to arrest Mr. GARCIA and link him to this crime. (The registration was confirmed a dead tag and my observations substantiated by the local police.) As we were now stuck in traffic I approached Mr. GARCIA with the intent of holding him there for the local police so they could take appropriate action against Mr. GARCIA, not to escalate the situation. After I showed him the badge again and Identified myself as a police officer this is when Mr. GARCIA told me "FUCK YOU" and turned away. In my mind and experience I thought he was reaching for a weapon next to his seat. At this point it was obvious Mr. GARCIA would have to be taken into custody if he was to be prosecuted. Again I yelled "state Police shut the car off." and pulled my weapon to protect myself as I could not see what he was doing with his hands. when he turned around I stated " Your under arrest mother fucker shut the car off now". I did not put this statement in my previous statements as it would of admitted violating the FR by the use of my profane language. I do not condone my choice of words but I did place him verbally under arrest. Mr. GARCIA escalated the situation by pulling away. I feared in this heavy traffic he would hurt others in his attempt to flee arrest. I made the decision to go through the sunroof to affect the arrest. I regret this decision in hind sight and personally feel I should of given up as I caused my wife mental trauma that we are still dealing with as of to date.

SP 3-346 (7-88)

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

Mr. GARCIA caused the second accident as he drove into the other vehicle and at the time I was balancing through the sunroof. After the second accident and we were stopped he was trying to get away and that is when I grabbed the keys out of the ignition. As I had no holster and was upside down in a bad position I could not put my weapon away. Mr.GARCIA was going for my gun and I was trying to retain it. I only struck him with me free hand/weapon hand so he would let go of me and I could secure my weapon. At no time was my weapon pointed at anyone but Mr. GARCIA or the ground. My finger was at no time during his incident in the trigger guard. Again in hind sight I regret pulling my weapon but only for the fact I had no were to secure it after I took it out. I did not "Rough Up Mr. GARCIA. I guided him to the ground and had my knee in his low back so he couldn't get up as he was struggling. My weapon was pointed at center mass. I do not know at what angle the witness saw me but at no time was my weapon pointed at Mr. GARCIA's head. During this incident I did not know my family was unhurt. I found out afterwards. I wish to advise that Mr. GARCIA was arrested for five outstanding warrant for the same violations at the preliminary hearing and in fact has committed these offenses three separate times.

I take full responsibility for my actions in this matter. I do know some of my decisions were avoidable. However I utilized the use of force continuum that was available to me at the time. I DID NOT ESCALATE THIS SITUATION MR. GARCIA ESCALATED THIS INCIDENT. This incident to me was a serious police incident. I love my family more than anything and will protect them no matter what and they are the most important aspect of my life. I can guarantee I will not repeat my actions in this situation, as in hind sight it wasn't worth it to subject my family to witness my taking police action. As a man I have grown and changed in the past year. I am not the same man as I was a year ago. I have taken proactive steps to correct my short-comings. I am currently prescribed medicine for attention deficit hyperactivity disorder, I am seeing the department psychologist Larry WALKER and have come to terms with my family situation. At the time I thought I was making the right decisions but in hind sight it comes down to a 500 dollar deductable. It just wasn't worth it.

6/29/98 Discipline

IN THE MATTER OF ARBITRATION BETWEEN

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA STATE POLICE

AND

PENNSYLVANIA STATE TROOPERS
ASSOCIATION

**OPINION AND AWARD**

(Trooper Scott Brown)
Statute of Limitations
Suspension

**GRIEVANCE:** 98-DS-0067
PSP-L-91

**HEARING:** April 24, 1998
Harrisburg, Pennsylvania

**BEFORE:** Lynne M. Mountz
Impartial Arbitrator

**APPEARANCES:** Commonwealth of Pennsylvania, Pennsylvania State Police:
Chris R. Dunlap

Pennsylvania State Troopers Association:
James L. McAneny, Esquire

The Parties selected the undersigned Arbitrator to hear and decide the instant dispute. A hearing was held in Harrisburg, Pennsylvania on April 24, 1998, at which time both Parties were afforded full opportunity to present testimony, examine and cross-examine witnesses and introduce documentary evidence.

The Parties elected to file post-hearing briefs and reply briefs with the Arbitrator. The record in this matter was closed on May 29, 1998 upon receipt of the reply briefs.



Background

The instant dispute results from a grievance filed on behalf of Trooper Scott A. Brown (Grievant), a member of the Pennsylvania State Police, alleging that the Department violated the terms and conditions of the Agreement between the Parties when it initiated disciplinary action against him for an incident which occurred on April 10, 1996.

The Grievant was not on active duty on April 10, 1996. At the time of the incident giving rise to the disciplinary action, the Grievant was out of uniform and driving his personal car. The Grievant's wife and infant daughter were passengers in the car. The Grievant's car was struck in the rear by a second vehicle operated by Rodelio Garcia. The Grievant exited his car and approached Mr. Garcia's car. The Grievant identified himself as a Pennsylvania State Trooper and requested to see Mr. Garcia's driver's license, registration and insurance card. When the Grievant returned to his own car to obtain the same information, Mr. Garcia drove away.

The Grievant followed Mr. Garcia a short distance to a spot where Mr. Garcia's vehicle was stopped in traffic at an intersection. The Grievant again exited his car and approached Mr. Garcia's vehicle. The Grievant demanded that Mr. Garcia provide him with the information he had previously requested. A loud verbal altercation occurred between the two. The Grievant saw Mr. Garcia turn toward the console in the car. At that point, the Grievant drew his service weapon and Mr. Garcia attempted to drive away.

The Grievant pulled himself to the roof of Mr. Garcia's car and somehow began to fall upside down through the sunroof. A physical altercation occurred during which time, the car struck a curb and stopped. The Grievant and Mr. Garcia exited the car. The Grievant restrained Mr. Garcia on the ground and after identifying himself as a State Trooper, asked a passing motorist to call the local police.

On April 15, 1996, the West Shore Regional Police Department filed a criminal complaint charging Mr. Garcia with four violations of the Vehicle Code. No criminal charges were filed against the Grievant.

Corporal Glenn C. Domon, PSP, was assigned the responsibility of conducting an internal investigation and preparing a report regarding the Grievant's involvement in the incident. Corporal Domon completed his report in July 1996. At the time of the submission of his report, Corporal Domon knew that no criminal charges were pending against the Grievant. He noted in his report that he had telephoned the Cumberland County District Attorney's Office in an attempt to ascertain whether or not there had been a decision made to file charges against the Grievant.

Lieutenant John R. Brown, PSP, Bureau of Professional Responsibility (BPR), Internal Affairs Division, reviewed the report prepared by Cpl. Doman in July 1996. At that time, Lt. Brown was aware of the existence of a Uniform Investigation Report prepared by the West Shore Regional Police Department in response to allegations of simple assault made by Mr. Garcia against the Grievant as a result of the April 10, 1996 incident. (Commonwealth Ex. 1). Lt. Brown concluded that the BPR report could not be completed without a prosecutorial determination by the Cumberland County District Attorney (DA).

Once each in August 1996, October 1996 and January 1997, Lt. Brown placed telephone calls to the DA's office to inquire whether or not a decision had been made to criminally prosecute the Grievant for his actions in the April 10, 1996 incident. On April 22, 1997, Lt. Brown placed a fourth and final call to the DA's office. During that call, he spoke directly with the Assistant District Attorney in charge of the Garcia matter, William Gabig. After that conversation, Lt. Brown concluded that the Grievant would not be the subject of criminal prosecution as a result of his actions during the April 10, 1996 incident. No written correspondence regarding the incident was exchanged between the Department and the DA's office from July 1996 through April 1997. The Grievant provided Lt. Brown with a letter dated May 16, 1997 from William I. Gabig, Assistant DA, to the Grievant which stated that the Grievant was not the subject of any investigation by that office and no charges were ever contemplated against him. (Joint Ex. 2, last page).

On April 30, 1997, the Department issued its notice of administrative findings regarding the Grievant's actions in the April 10, 1996 incident. (Commonwealth Ex. 3, Summary Report). A Disciplinary Action Report was issued on May 8, 1997. (Commonwealth Ex. 5). The Department concluded that the Grievant's actions during the incident on April 10, 1996 were in violation of several Field Regulations and imposed a ten-day suspension without pay. (Commonwealth Ex. 6).

The Grievant, through this grievance, is challenging the ten-day suspension without pay both on a procedural basis and on the merits.

**Issues**

1. Whether the Department violated the Statute of Limitations set forth in Article 26, Section 7 of the Agreement when it did not issue a notice of administrative findings in this matter until April 30, 1997 and, if not;

2. Whether the Department had just cause to impose a ten-day suspension without pay?

**Contract Provisions Cited**

ARTICLE 26

DISCIPLINE

* * *

Section 7. Statute of Limitations

In cases of alleged criminal conduct, cases which could reasonably be construed to give rise to court-martial proceedings, alleged violations of the Governor's Code of Conduct, or cases in which a prosecutorial determination is sought, the Department shall complete its investigation and the member advised of the Troop Commander/Bureau Director's notice of administrative findings within 120 days. The 120 working days will commence on the date the member is notified of the complaint, except as provided below:

1. In cases involving alleged criminal conduct or requests for a prosecutorial determination, the notice of administrative findings shall be issued within 60 working days from the date the Department receives written notice from the member of the disposition/adjudication of the criminal charge or the date the Department receives the prosecutorial determination.

2. In all other cases the Department shall complete its investigation and the member advised of the Troop Commander/Bureau Director's notice of administrative findings within 90 working days of the date the Department is notified of the complaint.

3 In court-martial cases the member shall be notified of the adjudicated penalty within 30 working days of the member's selection of the grievance procedure.

4. If the aforementioned time limits are not met, no discipline in the form of a suspension without pay may be initiated. However, the time limits may be waived by the Department upon a showing of just cause or by mutual agreement of both parties.

Except in cases alleging criminal conduct or cases which give rise to court-martial proceedings, no disciplinary action consisting of a suspension without pay shall be imposed for violations of Department rules and regulations which are discovered more than one year after the date of occurrence unless mandated by the Governor's Code of Conduct. This paragraph shall not apply upon a showing of proof that the member acted to prevent such discovery.

**Cited Provisions of the Field Regulations**

FR 1-1 02 UNBECOMING CONDUCT

Unbecoming conduct is that type of conduct which could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department. Members shall not conduct themselves in a manner which is unbecoming to a police officer.

FR 1-1.30 USE OF FIREARMS

The use or handling of firearms by members in a careless or imprudent manner, or the unjustified endangering of human lives by firearms in violation of the rules and regulations relating thereto, is strictly forbidden.

FR 1-2.13 COURTESY

B. Conduct and Demeanor: Courtesy toward the public shall be strictly observed. Members' conduct and deportment shall always be civil, orderly and courteous. They shall be diplomatic and tactful in the performance of their duties, controlling their temper and exercising the utmost patience and discretion, and shall not engage in argumentative discussions even in the face of extreme provocation; however, when required they must act with firmness and sufficient energy to properly perform their duties. Members shall, at all times, while on duty or in uniform, refrain from using course, violent, profane or insolent language, and from voicing any bias or prejudice concerning race, religion, national origin, sex, age, handicap or politics.

FR 1-2.21 POLICE ACTION – OFF DUTY

Members have the authority and responsibility to take necessary police action with regard to all serious police matters brought to their attention while off duty. Therefore, although certain hours are designated as active duty (on duty) and others inactive duty (off duty), members must be cognizant of their sworn duty and shall take the appropriate police action when required. Members shall immediately thereafter report, via correspondence, such action taken to their Troop Commander/Bureau Director. Such correspondence shall be maintained in the Troop/Bureau Personnel File as temporary information.

FR 7-3.14 HANDLING OF FIREARMS

All members/enforcement officers are expected to maintain their proficiency with regard to the safe handling and use of firearms. Except for general maintenance, storage or authorization training, members/enforcement officers shall not draw or exhibit their firearm unless circumstances create strong reasonable belief that it may be necessary to lawfully use the weapon in conformance with Department policy. The playful or wanton pointing of a firearm at anyone, on or off duty, or the careless or negligent use of a firearm is prohibited.

**Position of the Parties**

Department

The Department initially argues that it issued its notice of administrative findings in a timely manner pursuant to Article 26, Section 7 of the Agreement. In support of this argument, the Department contends that this case falls within that portion of the provision which states, in relevant part, that: "in cases involving alleged criminal conduct or requests for a prosecutorial determination, the notice of administrative findings shall be issued within 60 working days from the date the Department receives written notice from the member of the discharge/adjudication of the criminal charge or the date the Department receives the prosecutorial determination."

The Department produced a document marked as "Commonwealth Exhibit 1" which is a Uniform Investigation Report from the West Shore Regional Police Department. In that report, Mr. Garcia alleges that the Grievant had struck him during the incident on April 10, 1996. The alleged offense is noted in the report as a simple assault. The Department asserts that this report is admissible into the record, over strong hearsay objections by PSTA counsel, because it constitutes a public record and is being admitted not for the truth of the allegations, but to document that criminal allegations were made against the Grievant.

The Department contends that the Uniform Investigation Report, which clearly alleges criminal conduct on the part of the Grievant, is sufficient to except this case from the general requirement of Article 26, Section 7 that a notice of administrative findings is to be issued within 120 working days from notification of the complaint. Specifically, the Department argues that it is the allegation of criminal conduct and not the filing of criminal charges which triggers the exception to the 120 day rule.

Additionally, the Department asserts that there was a request for prosecutorial determination which would also serve to except this matter from the 120 day rule. In support of this position, the Department offered the testimony of Cpl. Doman and Lt. Brown that they placed several telephone calls to the Cumberland County DA's office to ask whether or not criminal charges were going to be filed against the Grievant. Even discounting the hearsay information received from the DA's office during these telephone calls, the Department contends it is logical to conclude that Cpl. Doman and/or Lt. Brown would not have continued to make these calls if they had received a decision from that office.

Finally, the Department argues that Lt. Brown informed the Grievant in April 1997 that the Department was awaiting a prosecutorial determination from the DA's office. Thus, according to the Department, it is obvious that their defense to the timeliness issue was not concocted after-the-fact.

With respect to the merits, the Department argues first that the Grievant's account of the incident in question should not be afforded much weight. The Department recounts what it believes to be major inconsistencies and contradictions in the Grievant's testimony and emphasizes the fact that the Grievant admitted to lying previously about his use of profane language during the incident. The Department asserts that the testimony of Charles Forney, a disinterested witness, clearly supports a finding that the Grievant's handling of a firearm in this matter was improper, in particular, pointing his gun at Mr. Garcia's head. Finally, the Department strongly contends that self-activation was inappropriate in this case; that serious police matters did not cause the Grievant to self-activate, rather resulted from the Grievant's actions in doing so.

PSTA

Initially, the PSTA contends that the Department exceeded the 120-day period of time in which it is contractually obligated to complete its investigation and initiate disciplinary action. The PSTA asserts that the Department has failed to establish that this case falls within one of the exceptions for compliance with the 120-day requirement.

The PSTA argues that the Department's entire case with respect to the procedural issue is based on hearsay. PSTA counsel objected to the admission into evidence of the Uniform Investigation Report from the West Shore Police Department

(Commonwealth Ex. 1) as well as to the conversations Cpl. Doman and Lt. Brown testified that they may have had with any members of the West Shore Police Department and/or the Cumberland County DA's office.

The PSTA contends that the Department's attempts to distinguish "allegations" of criminal conduct from "charges" of criminal conduct are frivolous. The PSTA asserts that the language in Article 26, Section 7, subsection 1, resolves cases of "alleged" criminal conduct by "disposition/adjudication of the criminal charges" and clearly equates "alleged" criminal conduct with "charges" of criminal conduct. The Grievant was never charged with any criminal conduct as a result of his actions during the incident on April 10, 1996.

The PSTA also argues that there is no competent evidence to establish that a prosecutorial determination was ever requested. The Department's efforts to ascertain whether or not a prosecutorial determination had been requested and its resolution, were, according to the PSTA, "lackadaisical at best." (PSTA Brief, p. 2). The PSTA notes that when Lt. Brown did make contact with the DA's office, he was given the docket number of the criminal case pending against Mr. Garcia. The PSTA contends that it is apparent that no file had ever been opened regarding the Grievant.

Finally, the PSTA asserts that the existence of a letter from Assistant District Attorney Gabig to the Grievant, admittedly also hearsay, unequivocally refutes any suggestion that charges against the Grievant were ever considered.

With respect to the merits, the PSTA contends that the Department has erroneously interpreted FR 1-2.21, Off-Duty Police Action, as prohibiting off-duty police action except in "serious police matters." The PSTA points out that at the time of the

incident Mr. Garcia was involved in the commission of a crime, hit-and-run, a third degree misdemeanor. The PSTA further asserts that the Grievant did not handle his firearm carelessly or imprudently and no one was endangered. Finally, the PSTA admits that the Grievant must accept responsibility for his use of "street language", but argues that this is not worthy of a suspension without pay.

**Discussion**

The Parties presented two issues for resolution arising out of the disciplinary action imposed in this matter, one procedural and one on the merits. The Parties waived their contractual right to have these issues heard in separate hearings and presented testimony and evidence on both issues. It is clear that a decision in favor of the PSTA on the procedural issue would obviate the need to address the merits of the disciplinary action. Article 26, Section 7, subsection 4, provides that "[I]f the aforementioned time limits are not met, no discipline in the form of a suspension without pay may be initiated." Accordingly, I will address the procedural issue first.

Article 26, Section 7 is a new contract provision which, in essence, provides that disciplinary charges be brought in a timely manner. With certain enumerated exceptions, the Department must complete its investigation and issue its notice of administrative findings within 120 working days from the date the member is notified of the complaint. One of the enumerated exceptions is for cases "involving alleged criminal conduct or requests for a prosecutorial determination."

The incident which gave rise to Grievant's discipline occurred on April 10, 1996. The notice of administrative findings was issued on April 30, 1997, clearly in

excess of 120 working days. The procedural issue presented is whether or not this case falls within one of the specific exceptions set forth above. For the following reasons, I find that the Department has failed to provide evidence sufficient to establish that this case falls within one of the exceptions. Specifically, the Department has failed to establish that this case involved "alleged criminal conduct" or a "request for a prosecutorial determination".

In support of its position that this case falls under one or both of these exceptions, the Department produced the Uniform Investigation Report from the West Shore Regional Police Department (Commonwealth Ex. 1), which contains allegations by Mr. Garcia that the Grievant assaulted him. However, apart from any hearsay considerations, I do not find that this document is evidence of "alleged criminal conduct."

At the outset, it is necessary to determine what the term "alleged criminal conduct" means in Article 26, Section 7. That provision of the Agreement is new and this case is one of first impression. Article 26, Section 7 does not define "alleged criminal conduct." The Parties argue differing interpretations. The Department argues that the words should be given their plain meaning, that "alleged" means "alleged" and should not be construed as referring only to "charges" of criminal conduct. The PSTA, on the other hand, argues that within the context of Article 26, Section 7, "allegations" of criminal conduct must be interpreted as "charges" of criminal conduct[1].

Article 26, Section 7 exempts cases involving "alleged criminal conduct" from the general 120 day requirement. Section 7, Subsection 1 is critical because it proscribes how those cases are to be handled. That section states:

---

[1] Neither Party offered bargaining history with regard to this contract language.

> In cases involving alleged criminal conduct or requests for a prosecutorial determination, the notice of administrative findings shall be issued within 60 working days from the date the Department receives written notice from the member of the disposition/adjudication of the criminal charge or the date the Department receives the prosecutorial determination. (Emphasis added).

This language simply does not permit the broader interpretation of the phrase "alleged criminal conduct" urged by the Department. Perhaps standing alone the phrase "alleged criminal conduct" might incorporate the routine completion of an investigative report such as Commonwealth Exhibit 1. However, that phrase must be read in context of the section as a whole. The quoted section expressly refers to the "disposition/adjudication of the criminal charge." Consistent with this language, the phrase "alleged criminal conduct" must refer to charges of criminal conduct.

Consequently, the Uniform Investigation Report from the West Shore Regional Police Department can not and does not constitute evidence of "alleged criminal conduct" as that term is used in Article 26, Section 7.

The West Shore Police Department did not file criminal charges against the Grievant based upon the allegations made in that report. The record, in fact, unequivocally establishes that criminal charges were never filed against the Grievant for actions he took during the incident on April 10, 1996. It must be concluded, therefore, that this case does not involve "allegations of criminal conduct" and cannot be excepted from the 120 day requirement on that basis. The question next arises whether there is evidence of a request for prosecutorial determination.

Certainly, the existence of the Uniform Investigation Report from the West Shore Regional Police Department is, in and of itself, insufficient evidence to establish that fact. Although that document could have been referred to the DA's office,

there is not one competent piece of evidence that it was. Cpl. Doman, who investigated the incident involving the Grievant and prepared the BPR report, did not testify about the local police report. Lt. Brown testified only that he was aware of the existence of the report at the time he was reviewing Cpl. Doman's BPR report for completion. Neither testified to personally sending the document to the DA's office nor to reviewing any files in that office. No one from the West Shore Regional Police Department testified and no documentation from that department was produced to establish that the Uniform Investigation Report was transmitted in some fashion to the DA's office.

There is no written correspondence between the Department and either the West Shore Regional Police Department or the Cumberland County DA's office regarding a request for prosecutorial determination. The remainder of the evidence produced by the Department to establish the existence and resolution of a prosecutorial determination in this matter consists of testimony from Cpl. Doman and Lt. Brown that they placed telephone calls to the West Shore Regional Police Department and the Cumberland County DA's office. The only written documentation of any of these calls is a reference Cpl. Doman made to contacting the DA's office on July 15, 1996 at the end of his report and in the supplemental report filed by Lt. Brown on April 22, 1997.

Cpl. Doman testified that he spoke by phone with Officer Strayer of the West Shore Regional Police Department who thought that there was a possibility that charges would be brought against both Mr. Garcia and the Grievant. Cpl. Doman did not testify when this conversation took place. At some point late in his investigation, in July 1996, Cpl. Doman called the Cumberland County DA's office and spoke with Tori

Bloser, whom he identified as a secretary in that office. Cpl. Doman testified that he did not speak with any assistant district attorney and did not know which assistant district attorney had been assigned to the case. Based upon his conversation with Ms. Bloser, Cpl Doman concluded that no decision had been made to file charges against the Grievant, a fact he referenced in his report. The report was then turned over to Lt. Brown and Cpl. Doman's role in the investigation terminated.

Lt. Brown testified that he could not forward the BPR report to the Director of Internal Affairs Division until it was complete. He further testified that based upon the existence of the Uniform Investigation Report from the West Shore Regional Police Department, the report would not be complete without a prosecutorial determination.

On August 23, 1996, Lt. Brown called the DA's office and spoke to a female. Lt. Brown testified that the female gave him a docket number and the name of the assistant district attorney assigned to the case, William Gabig. Lt. Brown thinks he spoke with Mr. Gabig during that conversation and learned that no decision had been made whether or not to bring charges against the Grievant.

Lt. Brown testified that he called the DA's office again on October 24, 1996. He thinks that on this occasion he spoke with a secretary who could not determine whether a decision had been made by that office regarding the Grievant. Lt. Brown recalls requesting a determination letter from the DA's office during this call. Lt. Brown stated that he called the DA's office a third time in January 1997, spoke with a secretary, and again received no conclusive information regarding the Grievant's status.

Lt. Brown testified that he placed a final call to the DA's office on April 22, 1997 and spoke directly with Assistant District Attorney Gabig regarding the Grievant. According to Lt. Brown, Mr. Gabig advised him that no criminal charges were being filed against the Grievant. Lt. Brown testified that he requested a determination letter from Mr. Gabig.

All of the testimony from Cpl. Doman and Lt. Brown regarding the possible filing of criminal charges against the Grievant is based upon uncorroborated hearsay; hearsay from an officer of the local police department who may or may have not referred the matter to the DA's office for consideration and hearsay from the DA's office, much of it from one or more secretaries. Under these circumstances, their testimony on this issue has little, if any, probative value.

The Department proposes getting around these hearsay problems by suggesting that it is logical to infer that had either Cpl. Doman or Lt. Brown received the information they were seeking during any of these telephone calls, they would have stopped calling the DA's office. Unfortunately, logic is no substitute for proof. What is missing, quite simply, is any proof that the Grievant was the subject of a prosecutorial determination in the first place.

It is significant to note that the only docket number ever produced in this matter from the DA's office was the docket number in which Mr. Garcia was the subject of criminal charges and the Grievant was the victim. Moreover, despite repeated requests from Lt. Brown to the DA's office for a determination letter, none was ever produced. To the contrary, the only piece of correspondence emanating from that office is a letter from Assistant District Attorney Gabig to the Grievant dated May 16, 1997. That letter

explicitly states that the Grievant was never the subject of any investigation by the DA's office and no charges were ever contemplated against him. (Joint Ex. 2, last page).

The Grievant provided the Department with a copy of the letter he received from the DA's office. Importantly, Lt. Brown testified that although he believed that the letter did not comport with his conversation with Mr. Gabig he did not call the DA's office for an explanation of any discrepancies.

It is clear that the Department has failed to produce evidence that a request for prosecutorial determination was ever made to the DA's office or that a written determination was ever provided by that office. Absent these critical pieces of evidence, the existence of a prosecutorial determination cannot be inferred on the basis of the testimony of the Department's witnesses.

In sum, the Department is seeking to except this case from the 120-day requirement provided for in Article 26, Section 7. As such, it bears the burden of presenting facts in support of its assertion that this case involves "alleged criminal conduct" or a "request for prosecutorial determination." There is insufficient evidence to support a finding that either exception exists.

Accordingly, I find that the notice of administrative findings in this case was not issued in a timely manner as required by the Agreement. For that reason, the grievance must be sustained. In rendering this decision, I specifically decline to address the merits of the case.

**AWARD**

The grievance is sustained. The Department is directed to rescind the ten-day suspension without pay.

Dated: June 29, 1998

Harrisburg, Pennsylvania

Lynne M. Mountz, Arbitrator

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY, PLAINTIFF : NO.: 1:01-CV-0206
v. : CIVIL ACTION - LAW
: JUDGE KANE
SCOTT BROWN, PAUL EVANKO, BERON STEAGER, AND BARRY L. BRINSER, ET AL, DEFENDANTS : JURY TRIAL DEMANDED

DEPOSITION OF: SCOTT A. BROWN

TAKEN BY: PLAINTIFF

BEFORE: SUSAN M. SIMON, REPORTER-NOTARY PUBLIC

PLACE: LAW OFFICES OF SPERO LAPPAS, 205 STATE STREET, HARRISBURG, PENNSYLVANIA

DATE: JANUARY 18, 2002, BEGINNING 11:26 A.M.

APPEARANCES:

SPERO T. LAPPAS, ESQUIRE
FOR - PLAINTIFF

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE ATTORNEY GENERAL
BY: GREGORY R. NEUHAUSER, ESQUIRE
FOR - DEFENDANTS

Page 2

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| SCOTT A. BROWN | |
| By Mr. Lappas | 3 |

| EXHIBITS: | PRODUCED AND MARKED |
|---|---|
| 1. Photograph | 72 |

COPY

Page 3

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, filing and certification are waived; and that all objections except as to the form of the question are reserved until the time of trial.

SCOTT A. BROWN, called as a witness, being duly sworn, testified as follows:

EXAMINATION

BY MR. LAPPAS:

Q Sir, as you know, my name is Spero Lappas, and I represent Randy Yordy in connection with a lawsuit that he has filed against you and others based upon an incident -- actually a couple of incidents that took place on February 4, 1999.

The purpose of our asking you to be here today is to give a deposition in this case, which means that I'll be asking you questions, and perhaps Mr. Neuhauser will ask some questions as well.

You're sworn to tell the truth, which means that you are obligated to give full, accurate, and truthful answers to the questions, to the best of your ability.

If you don't understand a question that I ask or -- if you don't understand a question for any reason, either because you can't hear me, or because you don't know

Page 4

what I'm driving at, or because my language is not clear to you, then please say so.

You are represented by counsel here today. If you need to take a break at any time during the course of this deposition, for either personal reasons or to confer with your attorney, you have the right to do so. Just tell me that's what you want to do. We'll adjourn the deposition, and you can have as much time as you need to accomplish what you need to do and give you a private place to speak to Mr. Neuhauser, if that's your desire.

If you don't know the answer to a question, "I don't know" is a proper answer, as long as it's a truthful one. If you genuinely do not know the answer to a question, do not speculate or guess or imagine what a good or correct answer would be. Simply tell me you don't know.

If I asked ask you a question and at one point in the past you would have known the answer to it but just as of today you cannot recall, then tell me that you can't recall.

If during the course of your testimony you believe that it would help you to testify if you had access to any documentary materials, reports, I don't know what else exists, but any kind of documents, just say so. If I have it or Mr. Neuhauser has it, we'll make it available to you. I just ask you that as you're testifying, you just







indicate what you're reviewing. Okay?
A Yes.
Q Tell us your full name please.
A It's Scott Allen Brown.
Q I understand you're now a corporal with the Pennsylvania State Police?
A Yes, I am.
Q How long have you been employed by the Pennsylvania State Police?
A Little over ten years now.
Q So, since '91?
A Yep. I was entered into the academy November 12th of '91.
Q That's when you entered?
A I believe so. Yes, entered the academy.
Q Where were you born?
A Born in Red Bank, New Jersey.
Q What is your date of birth?
A 4-20-68.
Q Did you attend public schools in Red Bank, New Jersey?
A No. Cliffwood Beach Elementary School.
Q Cliffwood?
A Cliffwood Beach.
Q Is that the name of a town in New Jersey?

A Yes, sir. It's south of Laurance Harbor. I forget the name of the school. I believe it was named after an astronaut. Leroy Gordon Cooper School.
Q One of the original Mercury 7.
A I remember that because I was looking at, downstairs I was looking at your books and your signs.
Q Did you attend high school in Cliffwood Beach?
A No, I did not.
Q Where did you attend high school?
A We moved to Ohio. I believe it was seventh and eighth grade. I went to West Branch and Salem middle school or junior high or something like that. From there we moved to the Poconos. Wallenpaupack. I went to high school at Wallenpaupack Area High School.
Q What year did you graduate?
A '87, 1987.
Q After high school, did you receive any other schooling?
A Two days after graduation, I went into the United States Air Force, where I became a law enforcement specialist, a security policeman. And was in the military.
Q When were you discharged?
A Oh, I don't know my end date, but it was approximately two and a half years later. And went to Penn State University.

Q Did you receive an honorable discharge from the Air Force?
A Yes, I did.
Q What campus at Penn State did you attend?
A Scranton Worthington.
Q Did you earn any degrees from Penn State?
A No, I did not. Two years into my college education, I was accepted to the Pennsylvania State Police Academy.
Q After graduating from the state police academy, what was your first assignment?
A Patrol in the Harrisburg area, Dauphin County, lower Dauphin County.
Q Troop H?
A Troop H.
Q How long were you assigned to Troop H?
A I was patrolman for approximately two and a half years, at which time I became a criminal investigator in the criminal investigation unit.
Q You held that post for about a year?
A Yes.
Q I should have given that information as well. During the course of your testimony, you should answer verbally --
A Yes.

Q -- as opposed to shaking or nodding your head. And if the answer is yes, say yes. And if it's no, say no.
After that one year in the crimes unit at Troop H, where were you assigned?
A The interstate troop at York.
Q Troop S?
A Troop S, York station.
Q Do you remember when you moved to Troop S, York station?
A No, I do not recall the date. It was approximately '95, ballpark.
Q You entered the state police in '91, and then you did three and a half years at Troop H. So '94, '95, someplace like that?
A I think it was '95, because I got out of the crime unit I believe in '95, beginning of '95.
Q How long were you stationed at Troop S, York?
A I was rammed in a chase after about a year.
Q Say that again?
A Rammed in a chase. We did a rolling roadblock, and I was rammed approximately four or five times. Herniated a disc and had to go on disability where I had back surgery and everything. And I was off for approximately a year where they dissolved the interstate

Page 9

troop.

They gave me my choice of where to go. One of those choices was Jonestown, Lebanon County. So I chose to go to Jonestown.

Q The interstate troop was dissolved around 1999. So if you were out for a year, that would mean you were --

A I'm trying to think.

Q -- at Troop S for about three years.

A No, Troop S was dissolved in '98-ish. Because I was already working at Jonestown, June of '98, I believe. If I recall it correctly.

Q That means you would have had this accident around '97, if you were off for a year?

A I'm not sure about the time frame.

Q Tell me about the ramming incident that resulted in your being disabled for a year.

A A kid had stolen a car with his girlfriend. The captain came over the radio and said let's do a rolling roadblock. Myself and my midnight partner were on the interstate. He had rammed a local police car and the police car rolled. At which time they said let's do a rolling roadblock.

Q Stop. What's a rolling roadblock?

A That's where a police car gets in the front,

Page 10

both sides and the back. Once we caged the vehicle in, you slowly slow down. He's got nowhere to go.

And the theory is, is that he slows down and stops because he's got no place to go. This young gentleman decided that he would go through me. I got rammed half hour into the incident. My back was -- as the adrenaline was coming down, my back started to hurt.

You know, I started going to chiropractors and stuff like that, and eventually I lost feeling in my left leg. And they had to do a laminectomy. L5-S1.

Q So were you out for a year on heart-lung?

A Yeah. Ballpark, ballpark. I'm not sure if it was a year. It might have been nine months.

Q Other than receiving heart and lung or other disability benefits, did you also make any sort of civil claim as a result of that incident?

A Oh, absolutely, yes, sir.

Q Against the person that rammed you?

A Yes, sir.

Q What was his name?

A Oh, I'm not really sure of his name. Well, there was two people that got sued in that incident. With Schmidt, Ronca and Cramer. One name was Garcia, Rogelio Garcia.

Q He got sued?

Page 11

A Well, what happened was, neither of them had insurance, so we had to go against my own carrier. So we went under uninsured-underinsured motorist.

Q Rogelio Garcia was the driver of the other vehicle?

A Of one of the vehicles. What happened was, one was off-duty, one was on-duty. That was the rolling roadblock.

Q That's the one we're talking about now.

A Which one, the rolling roadblock?

Q That's the only one you've told us about is the rolling roadblock in which you and three other troopers boxed in a stolen car and the driver of that car rammed you several times causing you to suffer injuries to your back which necessitated an L5 laminectomy, correct?

A Yes.

Q Who did you sue as a result of that incident?

A I forget the kid's name. His parents. But, like I said, they did not have the insurance. We had to go against my insurance which was Erie at the time.

Q In order to establish the fact that that individual was an uninsured motorist, did you file an actual lawsuit against that driver?

A I'd have to refer you to Schmidt, Ronca and Cramer for the specific filings.

Page 12

Q Would you give them permission to share that information with me?

A Not a problem.

Q Is that a yes?

A Yes, sir.

Q Thank you. So that incident would have been somewhere around '97, '98?

A Somewhere.

Q Okay. You returned to work and were stationed at Jonestown in about '98?

A Yes.

Q In patrol? As a patrol officer or as a crimes officer?

A As a patrol officer.

Q How long were you assigned to Jonestown?

A Two years, something like that.

Q Till roughly 2000?

A Yes, sir. I was promoted in May of 2000.

Q To captain?

A Yes, sir. And was sent to Montoursville.

Q Is that where you are now?

A Yes, sir.

Q Now, you began to tell me a moment ago about an incident -- excuse me for a minute.

-- involving a Mr. Garcia, is that correct?



Page 13

A Yes, sir.
Q Is that the Mr. Garcia with whom you had an incident on April 10, 1996?
A Yes, sir.
Q At approximately 4:48 p.m., on South Third Street in Lemoyne?
A Yes, sir.
Q Tell me about that incident.
A My wife, my daughter -- I have a disabled daughter. She was six months old. My wife -- may have been a little bit older than that. My wife was pregnant.
And we came up over, and was struck from behind in my car. Told my wife, are you okay. She said yes. I said check on Amanda. I got out of the car, surveyed the damage. Walked up to the driver. Identified myself as a police officer, told him that, you know, to pull over, let's get out of traffic so we don't get hit. And we'll switch information.
Turned my back. Next thing I know, Mr. Garcia pulls out and almost hits me. I had to jump out of the way. He flees the scene.
Q You were off duty at that time?
A Yes, I was.
Q Not in uniform?
A Not in uniform.

Page 14

Q Did you show him your badge?
A I showed him my badge, and I was wearing a baseball cap with the Pennsylvania State Police patch on it.
Q Which is not part of the official uniform?
A It is optional, depending upon what you're wearing. If you're wearing coveralls, it is permissible.
Q It's not part of the patrol officer's uniform?
A Well, if you're doing --
Q If you're riding a patrol car driving on the interstate, it's not part of your uniform?
A It depends. If you were going to be doing truck work, MCSAP's, stuff like that, and you're in coveralls, it's permissible.
Q Did you ever wear a baseball cap as part of your official police uniform?
A Yes, in coveralls.
Q On this particular occasion, were you wearing coveralls?
A No, I was not. I was in civilian clothes.
Q So you say he pulled away?
A He accelerated at a high rate of speed around me to get away, squealed the tires and everything. And I had to jump out of the way.
Q Okay.

Page 15

A Had I not, I would have gotten hit. I observed him about a hundred yards up the road. Got stuck in traffic.
Q You observed him from your stationary position?
A Yes, from getting into the car.
Q In other words, when he pulled away you got back in your car?
A Yes, I did. And I drove up to where he was.
Q With your wife and daughter in the car?
A Yes. I identified myself again with my badge.
Q You got out of the car?
A Yes, sir. Walked up to his car, identified myself as a state trooper again. Told him to shut the car off, I don't know what your problem is, but you're under arrest.
Q For what?
A For hit-and-run. It was a misdemeanor. It was also permissible at that time under Pennsylvania law and Pennsylvania State Police regulation, to activate yourself and to make traffic arrests in plain clothes.
At which time he told me to go fuck myself. Sorry about the language, but that's what he said.
He started to reach for something. I thought he might have been reaching for a gun, so I pulled my

Page 16

weapon. I said, I don't know what you're doing, but knock it off.
Q What did he do, when you say he was reaching --
A He was reaching into the console between the bucket seats. This is after numerous times he had told me to go fuck myself.
Q Up till now, had you made any effort to contact the local law enforcement?
A No. This happened like this, sir (indicating). It was a very, very quick incident. Matter of minutes, very few minutes.
Mr. Garcia put the vehicle in reverse, turned the wheels, and brought the vehicle into where I was standing, was backing out and turning the wheels towards me. The only way I could keep myself from getting run over was to go up.
I went up. His sunroof was open. I went down through the sunroof. At which time, he threw a punch. We started to fight. I was still hanging from the sunroof. He grabbed my weapon. He pulled my weapon towards him, so the only way for me to get my weapon from him was to strike him with it. So I struck him with it until he let go. It was approximately two strikes.
When he let go, I pulled my weapon back out of

the vehicle. I got out of the vehicle. Was able to regain my balance. Put my weapon away.

He opened up his door -- by the way, his door and his windows were open -- were up and were locked.

He gave up. I placed him to the ground. There was a Navy seal and a retired -- retired Navy seal and a military policeman who had gotten to the scene at the time. I asked one of them to go to my glovebox to get some handcuffs. He was handcuffed. Local police arrived. He was given to the local police for prosecution.

I then contacted my -- a supervisor, I'm sorry, at Troop H, as it happened in their area. And advised them that I had activated myself due to this incident. And that's when everything was initiated. The investigation was initiated.

Q Who conducted the investigation?

A South Williamsport did the traffic and other incidents, and Harrisburg did the BPR, which is an internal affairs investigation.

It just so happens that Mr. Garcia had warrants out for his arrest, five of them, so that would tend to be the reason --

Plus there was -- everything about the vehicle was illegal. The vehicle was lower, the vehicle wouldn't have passed -- I'm a class 4 inspection mechanic. That

vehicle wouldn't have passed Pennsylvania inspection if it tried.

There was numerous, numerous violations.

Q What kind of injuries did he sustain?

A Scratch to his forehead.

Q What was the result of the BPR investigation?

A I was given ten days suspension without pay.

Q For what? Why?

A The department felt -- well, the powers that be felt, the captain -- I forget which captain it was at that time -- felt that I shouldn't have activated myself and taken action.

But I was vindicated and cleared of all wrongdoing on all counts through the grievance procedure.

Q So the ten days was revoked?

A It was completely revoked, taken out of my file, and dismissed.

Q On what grounds?

A It wasn't justified.

Q That was the decision of an arbitrator?

A Yes, sir.

Q Do you know who the arbitrator was?

A Off the top of my head, sir, I do not.

Q Okay.

A No, I can't remember the name of him.

However, he felt that I -- in his statements, his findings, he found that I not only complied with Pennsylvania State Police regulations, I also complied with the current law in the Commonwealth of Pennsylvania and was justified in doing what I did.

Q Did you say earlier that you eventually filed some sort of lawsuit against Mr. Garcia?

A It was a joint thing, Mr. Garcia and the gentleman who rammed me. These were approximately the same time frame. You'd have to speak with Chuck Schmidt to get the exact --

Q Did you file a lawsuit against Rogelio Garcia, is what I'm driving at?

A I believe so.

Q What were -- were you claiming that you were injured in that accident, the Garcia accident?

A Yes, sir. I had hurt my back.

Q By climbing up on his car?

A Yes, sir.

Q Was that -- did that aggravate the ramming injury?

A Well, I believe Garcia was first.

Q I see.

A And then it was the ramming. And the ramming was the end result that herniated the disc.

Q So the injuries that you sustained from Garcia were not serious enough to cause you to be off duty?

A I was off duty for maybe two weeks.

Q From climbing on a guy's car?

A Yes, sir.

Q And collecting your salary at that time?

A Yes, sir, I would have. I believe it was two weeks of sick leave.

Q Okay. Rogelio Garcia then filed a lawsuit against you, correct?

A Yes, sir. It was thrown out by the courts. With prejudice.

Q This deposition will go smoother and be shorter if you wait till I finish asking my question before you answer.

A Yes, sir.

Q Okay. Rogelio Garcia then eventually filed a lawsuit against you, correct?

A Yes, sir.

Q Did you file an answer to that lawsuit?

A I believe so. Well, it was -- let me see. I'm trying to remember. Oh, Lightman and Welby were the -- was the law firm that represented me at the time. I believe they did do a rebuttal.

Q The suit was filed against you as Trooper

Scott Brown, Pennsylvania State Police. Is it your testimony that this suit was not defended by the Attorney General's Office?

A No, because I was off duty. It was during that entire incident that I was also currently -- I was sued at the same time it was pending the arbiter's decision, okay.

So the Commonwealth took the position that they could not represent me. I was represented by the PSTA, Pennsylvania State Trooper's Association, through Lightman and Welby. It was an agreement that if I did win, the Commonwealth would consider repaying if I won. Which they did.

They wound up paying -- all in all, even though they did not represent me, they paid to represent me.

Q They paid your attorney's bill?

A Yes, sir.

Q Was it Mr. Lightman or Mr. Welby that represented you in case?

A Jim McAneny.

Q From the Lightman and Welby office?

A Yes, sir.

Q Would you authorize him to share with me the contents of that file?

MR. NEUHAUSER: The non-privileged contents?

MR. LAPPAS: No, I'm asking him if he'd waive privilege, so I can see the contents of the file.

MR. NEUHAUSER: That wasn't your question.

MR. LAPPAS: To share the contents of the file.

MR. NEUHAUSER: You're asking him to waive his attorney-client privilege?

MR. LAPPAS: With respect to this incident, which he has freely testified about.

MR. NEUHAUSER: My advice would be talk to your counsel in that case. But you can answer the question, if you want.

THE WITNESS: I'll speak to my attorneys. I'll see how they feel. If they're comfortable, so be it.

BY MR. LAPPAS:

Q Did that same office represent you in connection with the arbitration from the BPR discipline?

A Yes, sir, they did.

Q Other than the Garcia suit and this one, the Yordy suit, have you been sued on any other occasions?

A No, sir.

Q Not for any reason, not individually or as a state trooper or anything whatsoever?

A Elizabethtown Borough put a judgment against

me because my wife forgot to pay the water bill. But that was immediately resolved as soon as the attorney contacted me.

Q Other than the Rogelio Garcia -- I'm sorry. Yes, other than the BPR from the Rogelio Garcia incident, have you had any other BPR's?

A Yes, sir.

Q Tell me -- let's start with the earliest one and work up to the present day. What's the earliest one?

A I did the wrong report. I did an assignment report instead of an incident report, and they gave me a letter of reprimand for doing the wrong report.

Q What is the next one after that?

A Oh, I believe there was one where I was part of it, but I wasn't the subject of it. I was a witness to a bar fight.

Q Um-hum.

A There was another time --

Q Well, we're not done with this one. You got BPR'd for being a witness to a bar fight?

A No, I didn't get a BPR. I was part of the BPR. Because I was -- what happens is, any Pennsylvania state trooper that is on the scene and witnesses someone else use force that requires somebody to be taken to a hospital, okay, is then included in the BPR.

But I wasn't the one who used the force.

Q Okay. Let's concentrate only on BPR's against you.

A Okay. I told a kid who had stolen a bicycle from a disabled child, I called him an asshole.

Q Where did that take place?

A Lebanon County.

Q When was that?

A When I was in Jonestown. I don't recall the dates.

Q 1990 --

A But it was when I was in Jonestown.

Q '97, '98, '99, like that?

A Could be.

Q Well, that's when you were in Jonestown.

A Somewhere -- when I was in Jonestown, that's all I remember.

Q What was the result of that?

A I got a day off. One day suspension.

Q Was there any physical force involved in that complaint?

A Nope.

Q You say you were in Lebanon, but whereabouts in Lebanon were you when you called him an asshole?

A Jonestown Borough is where it happened.


Q On the street?
A Yes, sir.
Q Other than the wrong report and the calling this kid an asshole -- do you remember his name, by the way?
A No, sir, I do not.
Q -- have there been any other BPR's on you?
A There was the Rogelio Garcia one. There's one currently in litigation.
Q What's that about?
A I was responding as the corporal to a hostage situation. An infant was reported as being taken hostage by its paternal -- by its father. It was domestic. The father said -- and was heard over the radio -- call off the F-ing staties or you'll never see the kid again.
I was dispatching in my car, talking over the radio, giving orders, as I was the shift commander. I was the supervisor at the time.
And I was going Code 3, lights and sirens. Got cut off as I was driving, getting on to the interstate, and went on to the berm. Accelerated through the berm and came back on to the roadway. When I came back on to the roadway, I kicked up stones, and chipped all the paint on this woman's minivan.
She came to the state police and complained.

She wanted her van repainted. And I was given a suspension for that.
Q How long?
A Three days.
Q And that was as a result of aggressive driving?
A They felt that I could have given the commands as a supervisor -- it was so severe because I was a supervisor. And I should know better than to drive on the berm. I should have waited until she got out of my way, rather than accelerate on the berm. They felt it was a driving error.
Q So you got three days for that, but I take it you have taken that to arbitration?
A Yes, sir. It's currently in arbitration.
Q Is Mr. Lightman representing you in that matter as well?
A Yes, sir. There were two or three other times through my career that I had been BPR'd, been part of a BPR, where I'm saying the group was BPR'd. In other words, there'd be like three or four guys there at an incident, and we would be BPR'd, because somebody would take force, or somebody would do something and somebody would complain.
I don't remember the specifics. I just know

I've been part of those, but --
Q Just let me interrupt you. There's three other ones that you cannot recall the circumstances of that involve you and other troopers, and you believe the use of force was involved in those?
A No, I just believe there were complaints brought against us for different reasons. I don't know the reasons. But they were so insignificant that they were dismissed. You see what I'm saying? There were complaints, but they were just dismissed by the captain.
Q You feel there's been about three of those?
A Yes, sir, but I wasn't the direct -- I wasn't the one who was being BPR'd. I was part of the group that was there that was being BPR'd.
Q Are those the only ones that you have?
A That I can recall.
Q Do you remember one involving an incident with a bear?
A No.
Q We've heard that there was -- it was referred to as a rumor of an incident that you had with a bear. Have you ever had any involvement with a bear?
A Yes, sir.
Q Tell me about that.
A Okay. We were requested by the Game

Commission to assist on a nuisance bear in Loyalsock Township. The bear had done numerous damage to people's houses and garbage cans and stuff like that. The Game Commission guys said we have to tree it before we can trank it. Tranquilize it.
So basically for 45 minutes, we ran around Loyalsock Township trying to tree this bear. We finally treed it, and we had to trank it. They had a jab stick. The jab stick is an approximately eight-foot pole with a needle on the end that you have to stab the bear with.
And basically I was the only one who at the time was fit enough to go up on the fence. The other gentlemen were quite heavy. I went up on top of a fence, climbed up, and tried to tranquilize this bear.
Which after jabbing, it came down the tree quite fast. We had to jump out of the way. It was kind of humorous. More of a slapstick, Laurel and Hardy type incident.
Prior to that incident, just to give you a heads-up. I've been called Brown Bear. Everybody calls me Brown Bear. Why? Because my last name is Brown. And Smokey the Bear, you know, you're a statie, you're a bear.
Well, that had become my nickname. And after the bear incident, it kind of stuck. So that would be the only bear incident I had.



Q Were there any shots fired during the bear --
A Oh, no, no. We used tranquilizers. That's all we used.
Q How about an incident involving an ambulance?
A Yes, sir.
Q Tell me about that.
A None of those were BPR's.
What happened was, as I was stationed up there, a fatal accident occurred right in front of me. At which time I got out of the vehicle.
I am a first aid and CPR instructor.
Q While you were on duty?
A No, I was off duty.
Q Driving your civilian vehicle?
A My personal vehicle.
Q In uniform?
A No.
At that time there was two ambulances on scene, that came to the scene, as I was doing first aid on -- there was a dead woman.
As soon as we got there, she was deceased. She was the driver. The passenger, however, was all cut up and walking around.
I was trying to help the officer direct traffic at that time. So we were directing traffic, trying

to get things situated. Again, I was first officer on the scene. By regulation, I'm obligated to assist. I can't just put blinders on and drive by. It's a fatal accident.
Tried to get the people involved over to the side, secure the scene as we're taught.
At that time, I was doing first aid with what I had, with my first aid kit in my car. I carry a first aid kit since I was in Germany. It's a requirement in Germany, if you have a car, you have to have a first aid kit. It's just something I kept from being over there.
And did some first aid on this gentleman. Next thing I know, both ambulance crews leave with the woman who is deceased and leave this guy sitting on the curb who's injured, who's laying there.
The trooper was trying to take care of the accident. I said, hey, who here's an EMT? Who here's a whatever, doctor? No doctor. One EMT. The EMT started helping me. I said, all right, look, we're going to have to get this guy to the hospital. Where the hell is the ambulance crew.
They get on the radio to tell them, hey, look, you left this guy here. They screwed up. And they even admitted to us when we got to the hospital.
We got this guy on a backboard. The EMT had taken over. I was assisting at this point. Even though

I'm a first aid instructor, an EMT is higher than me, and you're obligated under the law, basically once somebody of higher quality -- not quality.
Q Qualification?
A Qualifications, he would take over. Young gentleman. We started doing first aid on this guy. Got him on a backboard. He was just involved in a fatal accident. He was a passenger.
Put him on the gurney. There was a whole bunch of people in firefighter suits helping us.
I assisted getting this guy into the ambulance. I was holding pressure to two wounds that he had that were bleeding quite profusely and keeping pressure as the EMT was getting on the phone with the hospital. Evidently he's an ambulance guy. He knew all what to do. So I was just doing what I was told.
Then one of the guys who was in the fire company, drove us to Sunbury Hospital. I stayed with the victim, talked to him. I had worked up a rapport with him. I, at that time, was also gathering information for the trooper who was doing the fatal accident investigation.
I called over the barracks, said, hey, look, I'm here. This is what I'm doing.
I had identified myself, when the trooper

first got on the scene, of who I was. And asked him what he wanted me to do. And that's when we did what we did. We took care of business. It was a fatal accident.
At that time the trooper came. One of the troopers came to the ER, took all the information I had gathered from the fatal, from the woman, for notification, stuff like that.
Was patted on the back by the doctor. Said I did a good job. Went into the patrol car, and he drove me to my personal car, and I drove home. And that's what happened.
Q Were there any complaints made as a result of that incident?
A None whatsoever.
Q I assume you have frequent contacts with ambulances in the course of your business as a state trooper, don't you?
A Fairly. At accidents and stuff like that, yes, sir.
Q Well, we were talking about your disciplinary record, and I asked you if there had been an incident with an ambulance.
What about that incident made it ring a bell when we were talking about disciplinary incidents?
A Made what ring a bell?



Page 33

Q Well, you just told us a very long story about a relatively innocuous contact you had with an ambulance crew.

A Well, you had asked me. I was kidded about it.

Q I asked you about disciplinary incidents, and you told me that story. So what is it about that incident that made it seem to you to be disciplinary in nature?

A Nothing, other than the fact you seemed to go chronologically in order, the bear, and then an ambulance thing that happened. And that would be that.

So I was thinking you were going in chronological order.

Q All right. Have you had any other citizen complaints made against you?

A One was by a gentleman by McNaughton or something like that, that I scratched his -- it was an accident. That I scratched his -- he was driving a really bad vehicle that was all dishevelled. Had to be towed from the place. He complained that I put a scratch in a speaker that he had in the back. At no time did I go in the back.

It was a DUI, plus drugs, Act 64 violation. He felt that I was rude. But I was vindicated, and there were numerous witnesses that testified in my behalf.

Q Any other citizen complaints?

Page 34

A None that I can recall at this moment.

Q Any citizen complaints specifically about your use of force or violence against a citizen?

A You've heard it all.

Q Okay. You're sure?

A That I can recall. If you have information, refresh my memory. We're talking ten years here.

Q Let's get to the facts of this incident.

MR. NEUHAUSER: I was wondering if we were ever going to do that.

THE WITNESS: Would you mind if I got a drink of water?

MR. LAPPAS: Absolutely not.

(Recess taken from 12:13 p.m. until 12:15 p.m.)

BY MR. LAPPAS:

Q While your water is coming, let me just ask you whether to get ready for today's deposition you have reviewed any kind of documents, records, or reports?

A No, absolutely not.

Q You testified at the preliminary hearing in the case of Commonwealth versus Yordy and Smith and also I notice at the sentencing hearing. I'm not sure about the guilty plea hearing, but at least on those two occasions.

Since the date of either of those testimonies,

Page 35

have you reviewed the transcripts of those proceedings?

A No, sir.

Q Have you ever seen the transcript of the preliminary hearing or the sentencing hearing?

A Yes, the preliminary hearing, yes. At the request of the district attorney's office, I was asked to review it prior to the trial, which never occurred.

Q Okay. Do you feel that you have a clear recollection of the events that took place involving you and Mr. Yordy that form the basis of this lawsuit?

A Do I have a clear recollection of what happened?

Q Yes.

A I believe so. There may be some small things that I don't remember.

Q Well --

A But we'll see.

Q Don't forget that if you don't remember something, just say you don't remember.

A Yes, sir.

Q And keeping that in mind, I want you to tell me everything you can remember about your involvement with Randy Yordy on the date in question from the first time you encountered him until the last time you encountered him.

A Okay. I was working the western section of

Page 36

Lebanon County. I was running radar. And Old Jonestown Road and Route 22 are parallel to each other near the Dauphin County line. And it's a nice little loop you can make between those roads.

I don't recall the name of roads, but there's a nice little radar spot on 22 where you can go, and I was running radar there.

I had just cited a violator and was coming back around. At which time, as I was passing the Thoroughbred, a black truck cut me off. Came barreling out of the parking lot. Actually didn't see it until he was on the road -- was partly on the roadway. I had to slam on my brakes.

I looked up. You know, I slammed on my brakes, and, you know, looked, and there it was.

He weaved several times over both lines. You know, it was over the center of the roadway, came back over to the berm, at which time I thought maybe he was intoxicated. Two different indicators. One, he just came from a bar, and two, his driving.

At which time I initiated a traffic stop. My lights, my siren. Called in the traffic stop, told them where it was.

It took him a half a mile, approximately a half a mile, till he pulled over. And this is with lights



Page 37

and siren going. Another indicator.

Exit my vehicle. Approached his vehicle. Smelled a strong odor of an alcoholic beverage emitting from his person.

Walked back with his cards. He fumbled with his cards too. I think he dropped his driver's license, I think, and had to pick it up.

Went back to the car, called it in, took his driver's license and registration and put it on the front passenger floor. It's something that I do all the time. You know, in case of something that would happen, there would be, you know, that person's identification.

Walked up to the vehicle. Asked him to exit the vehicle. Obviously he was intoxicated. Started doing field sobriety tests. Everything was fairly cordial. He was very cordial to me at that time.

Q You asked him to get out of his vehicle?

A Yes, sir.

Q What was his physical condition at that time?

A He was intoxicated.

Q With respect to whether or not he was injured at all, did you observe any signs of injury on him when he was taken out of his vehicle?

A No.

Q Go on. So he was intoxicated, in your

Page 38

opinion, and you had him --

A Field sobriety tests.

Q -- do field sobriety tests. Which tests in particular?

A The walk-and-turn, the one-leg stand. We were interrupted by Vicki Rae Smith. She had pulled over and gotten in the middle of the test. I believe it was -- I forget which test it was. But she had interrupted us.

She reeked of alcohol.

Q She pulled behind your vehicle?

A No, in front of his. And walked over. And I didn't -- you know, I saw her pull over, and I'm used to people pulling over, thinking they're going to ask for directions or something like that. But she walked over to Mr. Yordy, and it was obvious they were together.

She, too, by her walk, her stance, her gaze, her eyes -- Mr. Yordy's eyes were red and bloodshot, glassy -- it was obvious she was drunk too.

I think then I received the radio call, which was his information coming back to me. She kept trying to get behind me for some reason, like to the side of me. And I kept backing away and backing away, because she was making me feel uncomfortable.

Mr. Yordy kept telling her, hey, just stand over there, back off, you know. She was more aggressive

Page 39

than he was.

They started to argue. I advised Mr. Yordy -- I even let him -- it was so cordial, I let him go back and get his jacket. He said he was cold. I said, okay, as long as you don't take off, just go get your jacket. He went and got his jacket. Put his jacket on, you know, because he was cold. Understandable.

Then I went to handcuff him. I told him -- this is a couple seconds, minutes later, whatever. Told him he was under arrest. At the same time, Ms. Smith started to leave.

And I knew I had to handcuff him. So I said you're under arrest for DUI, we're going to get blood and stuff like that. As I was handcuffing him, he took offense to it, pulled away. We started to tussle.

At the time, saying, hey, relax. Stop it. Knock it off. I was shouting commands to him. You're under arrest. You don't need this. You know, just whatever came to mind.

Pushed him up against the tailgate to try and pin him there, so I could get his hand behind his back because he was fighting me. He wiggled away. Next thing I know, I'm getting hit on the side of the head. We go to the ground. The fight's on. We fought fiercely. Fiercely fought.

Page 40

And I was shouting commands the whole time. Stop hitting me. Knock it off. And I was hitting him.

I was hitting him about the face, neck, chest area, whatever I could connect with.

It was a fight for your life. There's no Queensberry rules, sir, when it comes to street fighting and you're fighting for your life. And I was going home at the end of my eight hours. I have a wife and two kids. I make no apologies for striking your client.

When he -- when there was a tactical pause in the fighting -- I use what's called the use of force continuum. It's something -- I'm a firearms instructor in the Pennsylvania State Police, and what they teach you is the use of force continuum.

It goes up and it can go down. Just because it went up to fisticuffs, doesn't mean I can't bring it down a notch. I gave him the chance to stop his action. And that was the whole reason behind doing what I was doing. I gave him a chance to stop his action by pushing off of him, grabbing my pepper spray, and spraying pepper spray on him, okay.

There was a pause in between. That allowed him to stand up, okay.

I could have stayed on the ground with him. We could have continued to beat the hell out of each

other. But I stopped it and backed off of him.

I lowered the use of force from fisticuffs, which he started, down to the pepper spray, which is a -- what is considered a non-physical use of force.

Had no effect on your client. Your client was growling at me. And he was screaming, I'm not going to let you fuckers do this to me again, which I had no idea what he meant. I found out later.

I pepper sprayed him. I emptied my entire canister of pepper spray, the entire canister on him. It had no effect on him. I tried to keep him from injuring somebody else by driving, by approaching him a second time to physically keep him from driving. At the same time shouting commands that he was under arrest and to stop doing what he was doing, because he was in a lot of trouble now.

At which point, we were still fighting. He got in the vehicle. I reached in to shut the vehicle off. He had turned the vehicle on. I reached in to shut it off. I shut it off. But because of the way the ignition is, I couldn't get the key out with my one hand.

Because at the same time I'm reaching to shut the vehicle off, I'm putting my hand up to him and pushing him back because he's hitting me. Okay.

So I'm trying to restrain your client at the

same time of shutting the vehicle off to keep him from driving while intoxicated and killing somebody on the road.

At which time he grabbed my arm, pinned it between the car door and the armrest. Same time, you know, I emptied my can of pepper spray, threw it down. He started to take off with me, and him pushing on my arm, I couldn't go anywhere.

As I last -- he's driving, my legs went out from under me, and my whole weight went on my shoulder. The only reason I did not fall to the ground was because your client was holding my arm, pinning it to the car door. The inside of the car door.

At which time I feared for my life and wanted to go home to my children and my wife. Your client, through his actions, forced me to make the decision to use deadly force to get him to stop. He was using a 4,000 pound vehicle to throw me through the air.

I pulled my weapon. I fired at the tire, because it was the first thing that came to my mind. Stop the vehicle from moving.

I came up, took aim at the center mass of what I could see, and decided to stop the action. I short-stroked the trigger. When your client saw me pull that weapon up, that's when he let go of my arm. Only because he had a gun pointed at him.

He wanted to hurt me. It was obvious.

I came back. I struck my head. I woke up with an extremely bad headache. I saw bright light. Walked back to my vehicle, and that was about it. I don't recall anything past that other than being taken in an ambulance, taken to the hospital. I was immediately taken to Hershey Medical Center.

Q Is that everything you recall about the incident?

A I believe so.

Q All right. You don't remember calling for help when you returned to your vehicle?

A No. I did call for help, Signal 33, while we were fighting.

Q Did you go anyplace after going back to your vehicle, or did you wait there for help to arrive?

A I do not recall. However, due to watching the video, I drove to the nearest driveway and parked at the nearest driveway. But that is recalled only because I watched the video. I don't remember doing it.

Actually, I don't remember walking back to my car either. I just remember being on the ground and then being in the car, then I remember the ambulance ride.

Q Do you know an individual named Adam Walmer, W-a-l-m-e-r?

A Walmer? I believe that's the old gentleman in the one house who witnesses the incident. If I recall correctly.

Q Did you go to his house?

A No.

Q Did you speak to him at all that night?

A No.

Q Now, getting to the point --

A I went to the house -- if you know the intersection of Route 743 and Old Jonestown Road, the first house across from the barn. That's the house I went to.

Mr. Walmer's house is approximately a hundred, 200 yards past that on the opposite side of the road.

Q What happened at the house that you went to?

A There's a woman on the phone. Like I said, I don't recall this. Only because I watched the video. She was on the phone. And then a bunch of other people arrived on scene, troopers. And I believe a corporal.

Q Do you remember who the corporal was?

A Rodriguez, I believe it was.

Q All right. Starting at the time when the first physical force was used, either by you or Mr. Yordy, you said the first incidence of violence was he hit you?

A We wrestled first. The first use of force was me physically grabbing him to say you're under arrest.



That's considered force.
Q To try to handcuff him?
A Yeah. But all that is, is I do that by shaking your hand, you know. Are you splitting hairs? Do you want to know specifically who touched who, or do you want to know who was aggressive towards who?
Q Let's start with the wrestling. You're trying to handcuff him, and you say that he started wrestling with you?
A He pulled away. He grabbed my jacket and pushed away. And I said -- at one point, we were face-to-face. And I said don't go there. You're under arrest for DUI. Don't escalate this, you know.
And we started wrestling, and my whole mind set was just handcuff this gay.
Q When you say wrestling, do you mean that you're grappling while you're standing or on the ground?
A Grappling while we're standing, sir.
Q At any point in time, did you strike him while the two of you were still on your feet?
A No. The first thing that I did was push him into the tailgate.
Q How did you come to be on the ground?
A He had struck me. You can see it right on the tape, if you slow it down. You see the first strike, him

throwing his right hand.
Then we started to wrestle, and I got on uneven ground. I got on gravel and stuff like that and started to lose -- you know, we started losing our footing. And we just went to the ground. I mean, it was a fight, you know.
It was more mutual going to the ground -- I mean, I didn't throw him to the ground, no.
Q From the time that the fight started until the time that it ended by him walking away from you and getting back in the truck, how much time passed?
A I can't tell you. I don't know.
Q Estimate it for me.
A Seemed like forever.
Q Half an hour?
A Oh, hell, no. A minute. There's a timer on the camera of the car. By the time we went to the ground, by the time you see us come back in -- you can see us start to go to the ground, and then you can see us after I had sprayed him with pepper spray. And I believe that's like a minute and a half. So I'd have to say we were probably fighting for about a minute.
Q You have seen the video?
A Yes, sir. Absolutely.
Q On several occasions?

A At least twice.
Q When is the last time you saw it?
A Year ago. My psychiatrist and psychologist said it wouldn't be productive to keep rehashing the incident.
Q Now, you told us that after the incident was over, you were taken to Hershey Medical Center?
A Hershey, um-hum.
Q Did you remain there overnight?
A Yes, I did. For observation, due to closed head trauma.
Q When were you able to return to work after this incident?
A A couple weeks maybe. I don't recall the exact time. I really don't. But I think it was a couple weeks. It wasn't a very extended period of time.
Q Now, I understand you have filed a civil lawsuit against Mr. Yordy?
A Yes, sir.
Q Is that accurate?
A Yes.
Q What are you contending in this that lawsuit?
A It has been found through tests, numerous, numerous tests --
Q Just tell me what you're contending.

A I have post-concussion syndrome and post-traumatic stress disorder. I'm currently taking two different types of medicine that I will have to live with for the rest of my life because of your client's actions.
Q What kind of medicine is that?
A I'm currently taking Neurontin and Celexa.
Q Celexa is an anti-depressant. Do you feel that you are depressed?
A At times.
Q And Neurontin is an anti-cycling drug. It's used to stabilize moods.
A Yes, sir.
Q Do you feel you have a mood control problem?
A At this time, I do, sir.
Q How would you describe your mood control problem?
A I have a lot of anger.
Q I've noticed that. Anything else?
A Lot of anger towards your client, towards the situation. I'm not the same man I was prior to the incident.
Q How? In what way are you different?
A Before I was more liberal, more understanding of people's needs, not as quick tempered. And now I'm more -- I get angry very quickly without medication. I



have anxieties. I get nightmares.
Q Had you ever been treated psychiatrically or psychologically prior to the incident with Mr. Yordy?
A We get twelve free visits. I had some marital problems, and we sought help with the psychologist.
Q That was marital counseling?
A Yes, sir. It was one-on-one, and then two-on-one, and stuff like that.
Q Dealing with marital issues?
A Marital and work stress.
Q Had you suffered any kind of emotional stress after the incident with Mr. Garcia?
A Just Mr. Yordy.
Q With Mr. Garcia there was no post-traumatic stress disorder?
A No. None that I can recall.
Q You weren't treated for any?
A No.
Q When you testified at the sentencing proceeding in Mr. Yordy's case, at page 8 you said, quoting, I'm not right since that time. I don't know if it's psychological or neurological.
When you said that -- closed quote.
When you said that, were you describing the same kinds of problems you just told me about a moment ago?

A Yes, sir. It has to do what I was told by the doctors. I didn't know what was wrong with me. I just knew there -- something wasn't right. I mean, my wife and I had been getting along, things were great.
This incident happened, and you know, I started having mood problems, nightmares. It's hard to explain what I went through other than, you know, I am severely depressed. I was very angry. I couldn't concentrate on menial tasks that I had had prior to that that I could -- you know, something that you can keep your focus on. You know, you sit there and you focus on something.
You can read a book. I used to read quite avidly. I mean, I was a Louis Lamoure fan. I could read a book in one night. Now I can't sit for five pages without getting antsy and having to stop.
My focus is -- my child who's five years old has a better focus than I have at this point without medication. With medication, I'm a little bit better. I'm nowhere near the man I was prior to this incident.
Q What doctors have been treating you for these disorders?
A I can't name them all because some of them took tests and some of them are treating me. The psychiatrist and psychologist who are treating me is

Mr. Townsend Velkoff. He's a psychologist. And my psychiatrist is -- oh, my mind just went blank. I can see him in my mind. Hold on.
Q Are they both up in the Montoursville area?
A Yes, sir. Both out of Williamsport.
Q Do they work in the same practice?
A No, sir, they do not. They used to, but they don't anymore.
Q After the incident with Mr. Yordy took place, were you treated by anybody in the Harrisburg area? Harrisburg, Hershey.
A No, because I had gotten promoted. I was up for promotion prior to Mr. Yordy. We were just waiting for the date to get promoted.
Couple months after Mr. Yordy, I got promoted to corporal and sent up to Montoursville.
Q You told me you got promoted in May of 2000.
A Maybe -- let me think. This happened when?
Q 1999.
A I'm terrible with dates now.
Q February of '99. Excuse me, did you just say that because of -- you're terrible with dates now, this incident has caused you to have difficulty with dates?
A Yeah. I used to be able to give dates, just rattle it off, you know, but -- it was shortly

thereafter -- I got promoted shortly after the incident happened with Mr. Yordy.
Hold on.
Q Well, I can tell you that when you testified at the sentencing hearing, you had already moved to Montoursville.
A Yes, sir. Okay, this happened when? It was in '99. I'm sorry, it was in '99, that I got promoted. It was '99, when I got promoted. So couple months after the incident with Mr. Yordy, I was sent up to Montoursville as a corporal.
Like I said, I'm not that good at dates anymore. I'm good with faces though.
Q Just so I can understand this. You say that as a result, you feel -- you contend, as a result of the incident with Mr. Yordy, you have sustained personality changes, including that you are now more short-tempered than you were before, is that correct?
A Yes.
Q So prior to the incident with Mr. Yordy, would you have described yourself as an even-tempered person?
A Maybe. You know, I mean, that's --
Q It's a subjective --
A It's very subjective.
Q But would you have considered yourself to be

even-tempered?
A I would have considered myself, yes.
Q Okay.
A I mean --
Q I understand.
A It's hard to explain.
MR. LAPPAS: Now still on the record, we're going to turn on a videotape which has been represented to me to be video of a camera in your patrol car on the night of this incident.
MR. NEUHAUSER: Can we turn the lights off behind you?
THE WITNESS: Yeah, that's L-27. That was the car I was driving.
BY MR. LAPPAS:
Q All right. Now the time -- I'm going to pause it right here. The time shown is, looks like 21 --
A 27 maybe?
Q That's what I think. Colon 27. Can you tell us what's happening right now?
A I had pulled him over. You can see the lights are on. And I'm approaching the vehicle.
Q All right.
A Standard procedure.
Q Okay. Let's just -- you can just give us a

running description of what's going on here.
A At this point I'm doing the regular spiel that everybody's taught. Sir, I'm Trooper Scott Brown of Pennsylvania State Police. I pulled you over because you're weaving. Need to see your driver's license, registration, proof of insurance.
That's standard. I would have said something to that effect.
Q I understand.
A I'm also -- you know, during this time, you observe the individual. You observe the fact that, you know, he has bloodshot, glassy eyes. He emits an odor of an alcoholic beverage.
Q Excuse me. Now, at 21:28:52, you're leaving the vehicle, returning to your car?
A Yes, sir. At which time you'll probably see when you transmit it, it sometimes flickers the stuff. Yeah, right there, see that? That was me keying the mike to give the registration, insurance and stuff, to have them run a 2728, which is run the registration and the driver's license.
It's a terrible copy.
MR. LAPPAS: Well, off the record.
(Discussion held off the record.)
THE WITNESS: By Pennsylvania law, you're not

allowed to record someone's voice. So that's why there's no sound.
BY MR. LAPPAS:
Q Right.
A I had already made a decision to do field sobriety, so I had to make some room for us to do some field sobriety tests.
Q That's why your car appears to have backed up?
A Well, it did. I backed the car up.
Q About 21:10 and 10 seconds, you backed your car up.
Okay, now at 21:10 and 36 seconds, you're walking back towards Mr. Yordy's vehicle, and you appear to be shining a flashlight in front of you, is that correct?
A Yes.
Q So you had a flashlight with you when you approached the vehicle for the first time, and you have one now approaching for the second time, correct?
A Yes, sir. It's to see inside the vehicle, make sure they don't have any weapons or anything like that. Not everybody turns on their interior light for you.
Q And we can see the flashing. That appears to be the reflection of your --
A No, those were cars. See?

Q No, on the right --
A They're not flashlights, they're cars. That one right there is me.
Q Yes. Do you see right above Mr. Yordy's head that flashing on and off? Is that the reflection of your police lights?
A Yes, sir. You have to keep it on because we're on the side of the road. The last thing you need at nighttime is somebody coming and smashing into you.
Q So, now what's going on? Now, we're at 21:11:29. What's going on?
A I'm discussing with Mr. Yordy, telling him what's going on. What my suspicions are that he is under the influence of an alcoholic beverage. To make sure, I have to do field sobriety tests. If he passes them, he goes home. If he doesn't, then what we do, because he's a Pennsylvania resident, is we take a blood sample or a breath sample.
And then we -- as long as he can have a sober person come pick him up, he's released for the night, and he'll receive charges in the mail. And that's what I explained.
Q I'm rewinding the tape now.
A As I can see, I'm flipping through my -- I'm explaining the --

Q Okay, hold it. Is that Ms. Smith's vehicle?
A Looks -- well, it's pulling over. Yeah.
Q 21:12:02.
A And I'm explaining the field sobriety test to him. I believe it was the one-leg stand.
Q What are you holding in your hand here?
A That's a pad. I have my flashlight underneath my arm, and I'm shining the light on to my note pad. It's dark, you know. So I'm writing, I'm taking notes.
Q What are you taking notes of? His performance of the field sobriety test?
A Yes, sir. There's a form that you have to fill off out at the end of -- you know, when it's all said and done, you have to fill out reports that are going to be the basis for your prosecution. So the only way to do that is take field notes. There's actual field notes for DUI's.
If a person does this right or this wrong, you indicate that on the form. That's what I'm doing. I'm writing in my pad indicating, you know, what he's doing. And putting his name down and time. Because you have to document everything, you know, to prosecute a case. Obviously, you know that.
Q Turn your attention back to the TV. Now, we're at 21:12:38. Mr. Yordy appears to be --

A Attempting it.
Q -- still doing a field sobriety test. There's another person approaching. This would be Ms. Smith?
A Yes, sir.
Q We see she just sort of put her arm around Mr. Yordy, and now she's approaching you.
A Um-hum. As you see, she keeps walking backwards. I keep walking even further backwards away. Because I don't know her, I don't know what she's trying to do or anything.
But the idea is to try to keep the people in your purview, you know, to keep yourself in a safe situation.
Q It appears that over towards the left of the screen there's an object in the roadway. Do you have any idea what that is?
A No, that's not an object. That's a light from a house.
Q On the bottom?
A That's a reflection off my --
MR. NEUHAUSER: Is this what you're referring to, counsel (indicating)?
MR. LAPPAS: Yes.
THE WITNESS: That's a reflection of the light off of my car hood.

BY MR. LAPPAS:
Q Oh, I see. Okay. All right.
Now, we're at 21:12:54. It appears that Mr. Yordy and Ms. Smith are both standing by the rear end of his truck.
A Yes, sir. I have control of the scene by having her go stand over there. I was trying to continue with the field sobriety test with Mr. Yordy.
Q What are you doing now?
A He had given up. He gave up on the one-leg stand just prior to her coming. He goes, oh, I can't do it. So he had given up. So that's an automatic fail on that test.
She comes, we talk a little, I secure her, tell her go stand over there, so I can finish with Mr. Yordy. Just stand there where I can see you, so we can finish.
I started doing the walk-and-turn with Mr. Yordy. As you can see, I was explaining the walk-and-turn. I even turned my back on him, you know, slightly trying to explain the walk-and-turn.
See, right there. And I explained exactly how to do it. I showed him the pivot on the video, what I explained from it. Right now I'm standing to the side. I'm writing notes as he's failing miserably the

walk-and-turn.
And Ms. Smith is walking around.
MR. LAPPAS: Let's go off the record for a minute.
(Pause taken off the record from 12:56 p.m. until 12:57 p.m.)
MR. LAPPAS: Back to the tape. Back on the record.
THE WITNESS: There I'm explaining that I want him to stand there. And I'm explaining, you know, how he performed on the test, and, you know -- and I started to explain it. He said he was cold, could he get his jacket. I said, you know, as long as you don't take off, go ahead and get your jacket. Because he was cold.
BY MR. LAPPAS:
Q And Ms. Smith is still at the back of the vehicle?
A I'm talking to Ms. Smith and observing that she is obviously intoxicated, and I'm going to have to arrest her too, because I watched her drive past. So she was in actual physical control of a motor vehicle.
So I have two intoxicated individuals.
Q Had you called for assistance by now?
A No. Because it wasn't an incident that I thought -- it was a mistake, I should have called for

backup. But I felt that it was cordial enough to where they would comply. I really didn't have any indicator that he was going to lose it, you know.

And I felt a little uncomfortable that there was two of them, but I felt I could handle it.

Q Okay. Let's go back to the tape. Just continue to tell me what's going on as the tape progresses.

A Discussing with both of them, just, you know, what I'm observing and what I think. You know, being bluntly honest, you know, that I think they're -- they've both been drinking, and I have to do tests on both of them, you know, to make sure that they can drive.

So, she said that she wasn't too good at like walking and turn. I said, okay, fine, we'll do the horizontal gaze nystagmus test, which is a simple test, okay. Pretty much no physical movement whatsoever. Just the eyes. It gauges the nystagmus of the eyes, the jerking.

So I was doing that. She failed it miserably.

Oh, I think I backed up because I got a radio call. I think that's when I got the radio call, I think. It appears.

Oh, no, I'm sorry.

Q What kind of radio call did you receive?

A His information came back on the computer.

But here I explained the one-leg stand for her. I figured she might be able to do that one. And that's when he -- I kept asking him, just stand over here, and he wouldn't comply. He wasn't listening to me.

Q Now we're at 21:18:15, and it appears the three of you are all in close proximity to one another.

A She's pleading with me not to arrest him. I already had my handcuffs out and told him. They saw my handcuffs.

Q At this point she's walking away. Now, she's coming back. Why did she walk away?

A I have no idea. You'd have to ask her.

Q Why did you let her walk away, if she was going to be arrested?

A How can I control two people? I had to arrest him first.

Q So, your answer is, the reason you let her walk away was because you couldn't prevent it?

A No, I couldn't prevent it.

Q Now she's returning. Now what's going on? We're at 21:13:36.

A We're fighting.

Q You and Randy. Now, everyone appears to be

off of camera.

A Except for her. You can see her kick me.

Q I don't see it now. Tell me when she kicks you.

A Reverse it. Rewind.

Q Certainly.

A We're on the ground. You can actually see her leg move. There. Do you see that?

Q 21:18:50, you've made a comment. Was that the movement of her leg?

A Yes. And there you go again. See, right there she kicked me. If you see, you can see my socks.

Q 21:18:58. I think I can slow it down here. The image quality suffers, but it's going slower.

A Like I said, we're on the ground, and we're fighting.

Q So while the two of you are on the ground, Vicki Rae Smith kicked you?

A Yeah.

Q Twice?

A Yeah. And I'm shouting commands. While we're fighting, I'm shouting commands, you know. Knock it off. Stop. I mean, I was trying to tell your client to stop. It was all up to him. It's his decision to continue.

Q It appears 21:19:17, Vicki Rae Smith walks

away from the scene that you've described as being the spot where you were fighting?

A Yes, sir. We're barely off camera. You can still see parts of us. I mean, every once in a while you see something shiny or white. See that right there? I think that might be the shirt of my uniform. It's light gray. And my boots. And his feet too. You can see his feet.

That's him. And I'm spraying him.

Q Now, it's 21:19:58. So, I'm pausing it. The incident started at 21:19:50, and it went to 21:20:58, so that's about 42 seconds that you were fighting on the ground. Is that consistent with what you observed here?

A Yes, sir, looks about right.

Q So now the two of you appear to be walking back to the cab of the vehicle. There's some sort of an altercation before he enters the cab. What's going on now?

A We're punching and kicking. He even knee'd me in the groin. You can see that when his leg lifts. I'm trying to keep him from the vehicle.

Q He's in and you're out?

A Yes.

Q 21:20:18.

A He started -- you could see the car jump. Truck jump. That's where I had shut the vehicle off. And



now we're wrestling. I throw the can of pepper spray down. That's where -- you can see my arm is pinned because I'm like this (indicating). You know what I mean? There's no way I can hold up 200 pounds by just going like this (indicating). He pinned my arm.
Q Your left arm?
A Yes. And I'm wide open.
Q Have you drawn your gun yet?
A No. You can see my hands like this.
Q Actually I can't see it that clearly on this video. At the time that he's driving away, you have not yet drawn your gun?
A No. You can actually see, when I'm turning, I'm like this (indicating). I'm wide open, because he pulls away with me.
Q Let's direct our attention to the TV. Now it's 21:20:42. It appears he's gone.
A That's him turning right now. He actually used his turn signal.
Q Can you see yourself in this picture?
A No. I see a little dot, which I think might be something of me.
Q Okay.
A I think that's me. Yep, that's me.
Q All right. Now at 21:21:33, we see you coming

back into plain view carrying something in your left hand.
A You can see blood on my head. You can see my pants were all -- I'm all disheveled, all my stuff is off.
Q Before we get to that, what are you carrying in your left hand?
A My radio.
Q Did you take your jacket off?
A I have my jacket on.
Q Let's rewind it again.
A Excuse me. Stop it. Here you can see he had ripped my tie off. This is my jacket. Right here I have blood on my head. My pants are all covered with dirt from the roadway and from fighting. And I even have a rip in my pants.
Q Do you see an object swinging from your left hand?
A Yes. That's my radio. It had come off my gun belt. That's my radio. The radio is a Motorola radio, and it has a spiral cord with a mike, and that mike goes on your lapel. And during the course of him dragging me, that's what fell.
Q 21:21:55, your vehicle is in motion. And now we see you pulling into what appears to be a residential driveway.
A Um-hum. There's the woman -- this is all from

video. I don't recall any of this happening. But these people were on 911. I don't know who they are. All I know is for some reason I drove to this house. The only analogy I can say is maybe it was like a moth to a flame. You know what I mean? I saw a light, and I drove to it.
Q Backing up a little bit, when you were out of your vehicle interacting with Mr. Yordy, both the cordial part and the violent part, you had your radio on, or on your person?
A Yes, sir.
Q Okay. Was it in turned on?
A Yes, sir.
Q What is the purpose of you having a radio issued to you in that way?
A To use it.
Q If you need to?
A Yeah.
Q Okay. Do you have it on so there's an open channel between you and the dispatcher when you were talking to Mr. Yordy?
A Oh, no, no, no. That would be illegal.
Q How would you -- I'm not so sure about that. How would you activate it, if you wanted to make a transmission?
A You physically have to grab it and push a

button.
Q On the microphone on your lapel, or on the belt part?
A On the lapel.
Q Did you ever try to do that while you were fighting with Mr. Yordy?
A Oh, yes, I did.
Q But you were not able to.
A No, I did, while we were fighting. I yelled Signal 33. Car number.
Q So there was an open channel for some of that time that you were fighting with him?
A Yeah. I was screaming into the radio as I was trying to hold your client down. It was one of the tactical pauses I had talked about. When there's a tactical pause in the fighting, you try to do what you can.
Q Have you heard those tapes, by the way?
A No.
Q I notice that as part of the BPR to your discharging your weapon -- I forget the lieutenant's name, the person who has custody of those cases -- asked to turn them over. You have never reviewed them?
A Never reviewed them. Have no idea what's on them.
Q Okay.

A When they do a BPR on you, you're out of the game.

Q What was the result of the BPR in this case, by the way?

A I was totally justified in the use of my force.

Q You've seen this before. Is there anything -- well, let's just watch the rest of it. It's probably nothing too relevant, but let's just see what it is.

A By the way, I just sat in my car from what everybody told me. I wouldn't answer anybody's questions. I just kind of sat there staring for some reason. Like I said, I don't recall any of it.

MR. LAPPAS: Okay, I'm stopping the tape now.

THE WITNESS: Can we take a tactical pause, so I can go to the men's room?

MR. LAPPAS: Sure.

(Recess taken from 1:12 p.m. until 1:19 p.m.)

THE WITNESS: I had thought of something while we were on break. I'm going to speak to both my attorneys, Schmidt, Ronca and Cramer, and also Lightman and Welby, and find out if they want to -- or what their legal advice would be to give you information or not.

BY MR. LAPPAS:

Q Okay. Do you know weather, in connection with

the lawsuit that you filed against Randy Yordy, do you know whether or not the attorney defending him in that case has subpoenaed your psychiatric records?

A Yes, he has. I believe he has. I think my doctors declined to send him information, that they're not going -- I don't think they're going to --

I know Velkoff, Dr. Velkoff had come to me privately and said that he was not going to comply with the subpoena. He said something about by the law he doesn't have to. That part of the law is above my head, so --

Q Have you been asked to release psychiatric and psychological information in that case?

A By him?

Q By anybody.

A Because of it's a work-related injury, the department, yes.

Q Well, it sounds as if in that lawsuit you're alleging that you suffered psychiatric injuries, and usually in a case like that the records are reviewed by counsel for both sides.

A I'm not part of that. I let the attorneys do it. That's their job. One less aggravation and stressor that I have to worry about.

Q Can you estimate how many times you struck Mr. Yordy during the incident in question?

A Numerous times. I can't give you a number, but I'd have to say, you know, as many as you can during that 45 seconds or whatever it was. I mean, it wasn't a constant barrage, but, you know, we were wrestling, punching, kicking.

It was a fight for my life. So I hit him as many times as I could to stop the action. I was trying to stop his action.

I know I cut him. I know that, because I know on one punch, you know, I did observe blood.

Q How did he appear to you as he was driving away, what was his condition of his face?

A Had blood on it.

Q Were both his eyes black?

A I don't know. I don't recall. I remember him being like very angry and having like a blank stare straight ahead.

Q We're not interested in his staring right now, just the condition of his face as to whether it was injured or not.

A It was injured. I hit him numerous times about the face, yes.

Q Did you do anything during the course of this incident which could have, in your judgment, resulted in a broken arm to him?

A Yeah, we went down hard, and I landed on top of him. You know, like I said, we lost our footing, and 200 pounds coming down on you. And it was all rock. It wasn't any dirt. It was all gravel and rock in the area.

If you look at the pictures, I remember seeing a picture of the scene. There's a bunch of rocks there and gravel. There's even a spot of blood, I'd have to estimate maybe 8 inches by 8 inches ballpark that you can see, you know.

Just to point something out, your eyes don't become black immediately. It takes a while for it to come. I've broken my nose before.

MR. LAPPAS: I'm going to show you a photograph which we'll mark as Exhibit 1 to this deposition.

(Photograph produced and marked as Brown Deposition Exhibit Number 1.)

(Photograph handed to Mr. Neuhauser and witness.)

BY MR. LAPPAS:

Q Now, look at that picture please, and tell me if you've ever seen it before today.

A Yes, I have seen it before.

Q That's a photograph of you as you appeared after the incident with Mr. Yordy, is that correct?





A After I had cleaned up. I had taken a shower -- rather washed my face. Yeah.

Q Was it taken within 24 hours of the incident?

A Yes. It was the next day that I believe it was taken.

Q It shows a small mark to your chin. Was that something that happened during this incident?

A Yeah, I got cut. Mr. Yordy had rings on, and that's where he had made contact.

My left eye is a little swollen also.

Q Now, I'm going to show you some photographs that are attached as Exhibit A to the plaintiff's brief in opposition to defendants' motion to dismiss the complaint.

Some of them appear to have been taken in the prison, but they all show Mr. Yordy after the incident of February 4th.

(Photographs handed to witness.)

BY MR. LAPPAS:

Q I'll ask you to flip through those photographs, and tell me if it is your belief that you caused all of that damage to Mr. Yordy?

A I could have. I very well could have.

Q It certainly appears, comparing that photograph to Brown Exhibit 1, that he got the worst of this?

A Absolutely.

Q So would it be your testimony that in order to subdue him, you needed and you feel you were justified in using sufficient force to cause the injuries which we see in those photographs?

A Yes, sir. I had training in how to fight, and what you do is called a turtle maneuver. You put your head down, bring your shoulders up, and you come down. And that's what was happening.

He was making contact with my vest and hitting me about the upper chest area and the stomach. And he was missing shots at my face. He connected a couple times to my face, but I kept ducking and weaving. And he kept coming, and I kept defending myself.

Q And it wouldn't have been possible for you to subdue him using less force that you used?

A No, he was out of control. Pepper spray didn't even stop him. I've never in ten years seen pepper spray not affect a man.

Q Of course, by the time you used the pepper spray, the fighting was over?

A No, it wasn't. We fought again at the car door. I pepper sprayed him as we were fighting.

Q That's what I meant, the fighting on the ground was over.

A Then we went to the door, and we fought again. Where contact was made.

Q All right. Now, during this incident, the February 4th incident with Mr. Yordy, your psychological condition as you knew it would have been the more even-tempered attitude that you feel you had in those days?

A Yes, sir. Except I was fighting for my life.

Q Would that be the same even-tempered attitude that you displayed with Rogelio Garcia?

A Mr. Garcia tried to run me over. What would you do, sir? I was defending myself. I was trying to survive. It is a human nature.

Q Let me just ask, without regard to what I would have done, what I'd like you to do is answer my questions.

A I did.

Q Do you feel that your encounter with Mr. Garcia revealed the even-tempered attitude characterized by your psychological makeup of those days?

A I'd say yes. If you were fighting, if somebody was hitting you, yes. I was defending myself. That is the idea. Human survival.

Q When I asked you about the various BPR and disciplinary incidents that you have sustained, you did not tell us about the case of Earl Blose, Junior.

Would you like to do so now?

A If you can refresh my memory.

Q Earl Blose, Junior, was an individual residing in Hummelstown, Pennsylvania, that made a complaint against you November 9, 1993, concerning an incident that took place at District Justice Rathfon's office.

A I don't recall anything like that.

Q Let me show you -- you are Scott A. Brown?

A Yes.

Q Let me show you a letter addressed to Earl Blose, Junior, signed by Kathryn Doutt, Captain of the Pennsylvania State Police.

A See, now also, BPR's may not necessarily -- you might not be told about them. This might be a complaint, but I was never told about it.

Q If there's an internal affairs --

A Not necessarily, no.

Q Please let me finishing asking my question.

If there's an internal affairs investigation that comes back with a complaint being sustained, you would be made aware of it, correct?

A Yes, sir. Let me read this.

(Brief pause taken off the record.)

THE WITNESS: I do not recall anything to do with this. Yes, it is me, Scott A. Brown. I have been to

District Justice Rathfon's office.

BY MR. LAPPAS:

Q According to your testimony, you would have been assigned to the Harrisburg area at the time of this incident?

A Yes, sir.

Q So your testimony is you have no recollection of an incident involving you and Earl Blose, Junior, taking place at District Justice Rathfon's office on the date in question?

A No, I don't. It indicates that improper conduct.

Q And indicates that the complaint was sustained.

A I have no idea what the complaint was. I do not recall this.

Q Do you remember an incident that took place on that date in which -- well, let me ask you this.

Do you remember arresting Earl Blose, Senior, and charging him with beating up a 25-year-old tenant at one of his properties?

A No, I do not. I don't recall it.

Q All right. So you would not recall that at the hearing for that charge, Mr. Blose, Junior, questioned your judgment, and you responded by poking him in the chest

repeatedly and calling him a punk?

You have no recollection of that, I guess?

A No, I don't.

Q Is there anything you'd like to add to or change concerning any of the testimony you have given today?

A Not at this time. But I do reserve the right to review the transcript and sign off on it, make any changes at that time.

Q Well, just so you understand, the kind of changes you can make, and the only kind of changes you can make, are changes that you feel are necessary, or that you feel that you should suggest to correct stenographical errors.

MR. NEUHAUSER: Well, Counsel, that's not quite right.

MR. LAPPAS: Well, he's not entitled to go back and say yes instead of no.

MR. NEUHAUSER: There's case law that says you can to supplement discovery, and I don't want to get into an argument of what he can or can't do.

MR. LAPPAS: He can make supplemental answers, that's correct, but he can't change the transcript.

MR. NEUHAUSER: And we reserve the right to come back and question him again, if necessary, but I'm

capable of giving him advice as to his rights on the deposition review.

MR. LAPPAS: Believe me, I'm not trying to usurp that -- if there's anything --

Okay, enough said.

BY MR. LAPPAS:

Q But as of now, you do not want to alter, change, or supplement any answers you've given today?

A Not that I can remember.

MR. LAPPAS: Very good. That concludes the deposition.

MR. NEUHAUSER: I have no questions.

(The deposition was concluded at 1:33 p.m.)

COMMONWEALTH OF PENNSYLVANIA )

) SS

COUNTY OF DAUPHIN )

I, Susan M. Simon, do hereby certify that before me, a Notary Public in and for the County and Commonwealth aforesaid, duly commissioned and qualified, personally appeared

SCOTT A. BROWN

who was then by me first duly cautioned and (sworn, affirmed) to testify the truth, the whole truth and nothing but the truth in the taking of (his, her) oral deposition in the cause aforesaid; that the testimony given as above set forth was reduced to stenotype by me in the presence of said witness and afterwards transcribed by me or under my direction.

I do further certify that said deposition was taken at the time and place in the foregoing caption specified.

I do further certify that I am not a relative, counsel or attorney for either party, nor am I otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of January, 2002.

NOTARIAL SEAL
SUSAN M. SIMON, Notary Public
Harrisburg, Dauphin County
My Commission Expires Oct. 30, 2002

Susan M. Simon
Reporter-Notary Public

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.





COMMONWEALTH AFFILIATES, P.C.
A Psychiatric & Psychological Association

Suite 38, Northwood Office Center
Office: (717) 540-5353
2215 Forest Hills Drive
Fax: (717) 540-5151
Harrisburg, PA 17112

November 17, 2000

Michael S. Marrone, MD, State Police Medical Officer
PA State Police
Bureau of Personnel
1800 Elmerton Avenue
Harrisburg, PA 17110

Re: Corporal Scott A. Brown

Dear Dr. Marrone:

I met with Corporal Brown on 9/29/00 and explained to him the mechanics of an independent medical evaluation, i.e., that I was not employee of the PA State Police or himself but a private practitioner in psychiatry who would provide to your office, as well as to the PA State Police, my best opinion as to the presence or absence of psychiatric illness and/or symptoms. I clearly stated that what he would say in this interview was not to be held confidential, and he appeared to understand that position and was cooperative with the process.

Prior to my meeting with Corporal Brown, I had the opportunity to read your letter of September 22, 2000 soliciting my input as to Corporal Brown's psychiatric condition. In addition, I had the opportunity to review a memo from Captain Coleman J. McDonough, Commanding Officer Troop F, Montoursville, to Ms. Linda M. Bonney, Director, Bureau of Personnel, dated September 19, 2000. I also had the opportunity to review the general investigation report as it related to the incident of April 10, 1996 prepared by the investigative officer, Corporal Glenn C. Domon, dated June 18, 1996. In reviewing those records, the most germane observation is Captain McDonough's concerns that Corporal Brown has been involved in a series of incidents which apparently lead to his concern whether Corporal Brown can perform his duties within the nature of their scope. He suggested that there are a number of incidents which occurred recently and ultimately led to his request. In recalling those incidents, Captain McDonough noted that the first "involved Corporal Brown's response to a report of a 'kidnapping.' While traveling toward the scene of the incident, Corporal Brown twice drove off the traveled portion of the divided highway onto the left berm, passing approximately seven vehicles and causing stones and damage to the

Ex 10

vehicles.  The driving maneuvers were executed at a very high rate of speed, and witnesses described Corporal Brown's patrol car 'fishtailing' about the highway.  Corporal Brown needlessly placed himself and others in jeopardy during his response, and was subsequently issued a disciplinary action report as a result of the incident."  The second incident was described by Captain McDonough as follows:  "In an incident that occurred on August 23, 2000, Corporal Brown was responding to assist Montoursville Borough Police at a reported gas station robbery.  Corporal Brown was a passenger in the responding PSP vehicle, driven by another PSP corporal.  A description of the vehicle seen leaving the gas station had been broadcast and when a borough police officer stopped the vehicle, Corporal Brown and the other PSP corporal arrived to assist.  Corporal Brown allegedly exited the patrol car screaming profanities at the car's occupants, waving his weapon about in disregard for the other two officers' positions as well as the location of the stop, the main street of the borough in the heart of the busy business district.  When the occupants of the stopped vehicle indicated that they were innocent and that a second car, now passing, held the guilty actors, Corporal Brown leapt into the PSP patrol car, following the second suspect vehicle and the borough patrolman.  Unfortunately, Corporal Brown's actions failed to account for his PSP partner, now stranded in a rainstorm without a vehicle and/or backup.  He also failed to account for one of the occupants of the first vehicle, whom Corporal Brown had left handcuffed and lying in the traffic lane of a busy street during the heavy rain.  The abandoned PSP corporal, who had been occupied with handcuffing and securing a second individual, was notified of Corporal Brown's prisoner's precarious position by a citizen passerby."

In reviewing the investigative report of Corporal Domon of June 18, 1996, the synopsis of the investigation is as follows:  "On April 10, 1996 at approximately 1645 hours, Trooper Brown was stopped in traffic on 3rd Street, southbound, approximately 20 yards south of Market Street, Lemoyne Borough, Cumberland County.  Garcia, also traveling south on the same location, failed to stop and struck Trooper Brown's vehicle in the rear.  Garcia failed to remain at the scene and exchange information.  Traveling south on 3rd Street, Garcia stopped due to traffic and was approached by Trooper Brown.  Trooper Brown alleges that he identified himself as a State Trooper and ordered Garcia to shut off the vehicle.  Garcia reached between the seats, which prompted Trooper Brown to draw and point his service pistol towards Garcia.  Garcia attempted to drive away with Trooper Brown holding on to the sunroof of the vehicle.  Trooper Brown jumped inside the vehicle through the sunroof and became involved in a physical altercation with Garcia.  Garcia struck a second vehicle and became disabled due to the accident.  Garcia was removed from the vehicle by Trooper Brown, arrested and handcuffed.  Trooper Brown was treated at Holy Spirit Hospital and Garcia at Harrisburg Hospital and released.  After treatment, both parties returned to the West Shore Regional Police Department and met with Officer Strayer."

As you summarized in your letter to me of September 22, 2000, you had concerns as to Corporal Brown's ability to continue in his present position. As you stated, "in response for his present actions, Corporal Brown advised his commanding officer that he hasn't 'been the same since I hit my head' and 'is unable to put the brakes on.' Corporal Brown is referring to a February 4, 1999 on-duty incident while attempting to arrest a suspect for driving under the influence of alcohol. The suspect fled in his vehicle dragging Corporal Brown for approximately 15 feet and throwing him to the ground. Corporal Brown required a 15-day absence from work and then returned to full duty . . ." "A review of Corporal Brown's files reveal inappropriate actions taken by Corporal Brown in on- and off-duty situations prior to the February 4, 1999 incident. In summary, Corporal Brown was charged one leave day for an incident in August, 1997 for violations of 'courtesy' and 'unbecoming conduct.' Corporal Brown used foul, loud and threatening language while investigating an incident. He also received a written reprimand for 'unbecoming conduct' for touching the shoulders of a female co-worker on April 9, 1998 . . ."

Presumably from the cumulative impact of these incidents, rather than any single incident in and of itself, it was felt appropriate to request a psychiatric evaluation for clarification of Corporal Brown's mental status as well as his capabilities to maintain his position.

During my evaluation of Corporal Brown, he disclosed to me that he had had prior evaluations and treatment by a number of clinicians over the last four or five years. With that in mind, I requested those reports and a synopsis of them are as follows:

Additional information was provided to this office by Larry Walker, Ph.D., a clinical psychologist who saw Corporal Brown, as well as his wife, from 1995 to 1999. In fact, Dr. Walker saw Corporal Brown from November 30, 1995 to February 12, 1999 for 33 sessions. He also saw Mrs. Donna Brown, Scott's wife, for 4 sessions between June 24, 1996 and May 8, 1997.

It appears that the focus of Dr. Walker's therapy appeared to be stress management and dealing with his "frustrations." A sample of his notes is as follows:

"11/30/95: Patient is feeling quite overwhelmed with some job strains. He seems quite outspoken, which may cause him some problems. Has had several BPR's.

5/30/96: Patient quite aggravated and angry this week because of stresses at work and with daughter and wife. Encouraged how to express his anger.

9/27/96:  Patient is currently on disability leave as a result of work-related accident.  Patient looks overwhelmed and washed out.

10/5/96:  Patient started Prozac (20 mg.) last week.  He appears much more relaxed.  He is out on Workmen's Compensation due to a work-related accident.  Talked with patient about some concerns about his 15-month-old child and his newborn.

10/25/96:  Patient continues to appear more relaxed and calm.  Affect improved.  Talked about how he can adjust to the side effects.  There has been some increase in stresses with his two children causing problems between he and his wife.

2/21/97:  Patient is doing okay.  Had an interview with his CO this afternoon concerning disciplinary action.  Sounds as if it went fairly well.  Patient put card in for transfer to Troop R.  He seems quite frustrated with events but coping okay.

8/5/97:  Patient is quite upset with some problems at work.  He was suspended for 10 days as a result of the accident in Lemoyne.  Since going to Jonestown, things have not gotten any better.  Things at home have been extremely stressful.  Daughter has recently gotten braces on her legs.  Considering all things that are going on in his life, he is currently handling it fairly well.  Talked about these issues.

10/8/97:  Patient continues to 'hold it together.'  He is looking for specialized positions within PA State Police.  Patient's attitude is optimistic . . .

12/2/97:  Patient is angry because of some disciplinary action with the job.  Talked with him about how he is coping with his anger and frustration . . .

4/15/98:  Patient had a very rough week.  On Friday, patient was accused of touching a female police officer.  Talked with him about this situation and his options.  Patient is very upset.  Patient is feeling like handing in his resignation.  Encouraged him to contact Member's Assistance.  Patient is very uptight.

5/12/98:  No show.

2/12/99:  Things are going fairly well.  He received a settlement for his MVA, which was helpful.  Patient was involved in an incident at work where he was assaulted . . . "

As it relates to Donna Brown, Dr. Walker noted on 9/10/96: "Patient is concerned about her husband's increasing anger. Talked about she can effectively cope with her husband's anger."

Subsequent to the formal evaluation conducted on September 29, 2000, I was furnished with additional historical information, i.e., specifically a neuropsychological consultation conducted on August 9, 10, and 11, 2000 by Richard E. Dowell, Jr., Ph.D., a neuropsychologist in the Williamsport area. Dr. Dowell, over that three-day period, administered the Denham Neuropsychology Scale (selective subtests), the Wechsler Memory Scale 3 (selective subtests), the Wechsler Adult Intelligence Scale-3, Composite Hamilton Depression and Anxiety Scales, and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2).

As it related to background information, Dr. Dowell noted that "Mr. Brown is married. He describes his marriage as being unstable at present secondary to symptoms/problems related to the February 1999 trauma. He apparently was separated from his spouse for a period of time, but is currently seeking some type of reconciliation . . . Medical history is remarkable for a concussion (Grade II) secondary to a scholastic football collision. In relation to this concussion, Mr. Brown reports short-term retrograde amnesia (i.e., the loss of recall of events for about one day prior to the concussion) with post-traumatic amnesia/mental confusion for an estimated one week. He denies experiencing long-term residual effects on cognition secondary to this concussion. However, he does identify a possible post-traumatic increase in aggressive behaviors . . . Current medications include Paxil. He reports no benefits related to this treatment." As it relates to behavioral observations, Dr. Dowell noted "he exhibited somewhat diminished social style including use of obscenities when discussing frustrating situations."

As it related to the formal test results and interpretation, Dr. Dowell noted the following: As it related to "general adaptative abilities, findings on the Wechsler Memory Scale-3 (full scale IQ equals 116) appear within the average range with no evidence of focal deficits. Level of performance appears consistent with estimates of abilities (estimated score equals 100+) based on educational and socioeconomic factors. As it related to verbal and language abilities, expressive language skills are characterized by satisfactory articulation, repetition, use of syntax and fluency. Abstract reasoning (score equals 125), social judgment/reasoning (score equals 120). Vocabulary (score equals 125) and general fund of knowledge (score equals 115) appear within the high average to superior range . . . Overall verbal abilities appear within the high average range (verbal IQ equals 118). As it relates to perceptual motor skills, the primary motor skills, including strength and fine motor coordination, appear satisfactory. Visual perceptual abilities, as reflected by performance on visual matching and discrimination tasks (score equals 120), also appear within the average range. With the integration of motor and perceptual components (perceptual motor), performance remains satisfactory with visual motor

construction (score equals 110), non-verbal reasoning (score equals 120) and matrix reasoning/problem solving (score equals 120) falling within the high average range.  Sequential problem solving (score equals 95) appears within the average range, but represents an area of relative weakness.  Overall, perceptual motor abilities appear within the high average range (performance IQ – 110).  As it related to his lower level executive functions, including attention/concentration (score equals 90-100), psychomotor speed (score equals 91), working memory/mental control (score equals 97), and performance under distracter conditions (score equals 86), appear within the average range.  However, this level of performance falls significantly (16-30 points) below expectations based on other measures of abilities (FSIQ equals 116) . . . As it relates to memory and analysis of individual memory components, indicates evidence of satisfactory short-term memory capacity/immediate memory for digits (score equals 100) and words (score equals 100).  Recall from routine memory appear within the average range with adequate retrieval of information regarding personal and general (semantic score equals 115) information.  Learning/information storage also appear satisfactory across measures of verbal (scores equal 110 – 125) and nonverbal/visual (scores equal 120-125) learning . . ."

    Dr. Dowell also administered a number of psychological adjustment instruments.  Included was the Hamilton Anxiety and Depressive Scales.  "Findings on the Hamilton-Anxiety (score equals 28) and Depression (score equals 17) Scales indicate evidence of severe distress with primary symptoms/complaints of weakness, "fuzzy" vision, dizziness upon change in position, balance problems, diminished level of energy, rapid fatigue, backaches, shortness of breath, reflux, diarrhea, difficulties falling asleep, early awakening, awakening with fatigue, worrying, irritability, tension/restlessness, guilt feelings, depressed mood, negative thoughts, (i.e., "Why can't anything go my way?"), feeling like crying, emotional lability, feeling overwhelmed and concentration problems."

    As it related to the Minnesota Multiphasic Personality-2 Inventory that was administered by Dr. Dowell prior to our appointment on September 29, 2000 (i.e., in August 2000), "the MMPI-2 is suggestive of a valid response set . . . The clinical scale profile (Welsh Code/New equals 21436 + 7-095) is a typical with a 4-8 (Pt-Sc) scales tends to be associated with an aggressive and punitive style, impulsiveness, unpredictable behavior and anger.  A combination of this style with high expectations of others tends to result in dissatisfaction with others and low empathy for others/victims . . .  It is likely that this portion of the MMPI profile represents long-standing personality traits and may account for an aggressive and confrontive style.  Second, elevation of the 2-1-3 (Hs-D-Hy) scales is suggestive of a generalized distress syndrome with features of both somatic and psychological distress.  Individuals with similar profiles often exhibit depression, tension/restlessness and anxiety plus multiple somatic complaints.  It is likely that his portion of the MMPI profile is transient in nature and related to the February 1999 trauma.

> Dr. Dowell's summary is annotated to contain the following: "Neuropsychological presentation is remarkable for presenting symptoms/complaints including insomnia, headaches, reduced attention/concentration, irritability, mood swings and disinhibition of behaviors. Subsequent neuropsychological testing findings indicate high average range performance across measures of general adaptive, verbal, perceptual-motor, high level reasoning and memory/learning abilities. In contrast, relative deficits are observed across measures of lower level executive functioning with most outstanding difficulties on tasks that require simultaneous information processing, rapidly shifting mental sets, mental flexibility and inhibition of distracters. This pattern of symptoms and test profile (above), in association with the known history of blunt head trauma, is consistent with the post-concussional syndrome (PCS)."

The psychological presentation was remarkable for "the psychological history characterized by onset of symptoms, complaints including insomnia (sleeps 5-6 hours), depressive ideation, anxiety, irritability, mood swings, and disinhibition of premorbid behaviors (i.e., aggression) following a February 1999 assault and head trauma. This cluster of symptoms, in association with a history of exposure to life-threatening events, is consistent with a post-traumatic stress disorder (PTSD). Recent studies support the use of PTSD diagnosis in association with PCS since head trauma, by its very definition, represents potentially 'life threatening' event."

As it related to recovery and his clinical psychologist's assessment of recovery and/or prognosis, he stated, "The majority of studies among individuals with PCS indicate resolution of symptoms within about six to twelve months. Persistence of symptoms beyond that timeframe tends to be associated with the presence of a pre-existing history of head trauma, the presence of ongoing litigation/legal issues and/or the presence of a psychiatric condition. In the present case, Mr. Brown presents with all three complicating factors, including a previous Grade II concussion, ongoing Workmen's Compensation, and the presence of PTSD. It is likely that this combination of factors has resulted in a slowed recovery."

Based upon Dr. Dowell's evaluation, his diagnosis was "post-concussional syndrome; prolonged post-traumatic stress disorder." As it related to his recommendations, Dr. Dowell stated the following: "Referral to counseling to assist Mr. Brown in coping with anger and aggressive impulses . . . Referral to psychiatry for evaluation and possible treatment . . . Given his reports of clinically significant benefits following Prozac therapy, consideration may be given to a retrial on this medication. Medications addressing sleep and anger/aggression may also be considered . . . Individuals with similar profiles tend to show some

improvements in response to environmental interventions that reduce stress levels. Reduction of stress levels tend to lower 'fighter flight responses.' Given this information, consideration may be given to occupational placement in positions with somewhat lower stress levels."

With that information in mind, I did conduct the psychiatric interview. As you know, Corporal Scott Brown is a 32-year-old married man (Donna, age 35) who has two children, ages 5 and 4. He lives in Williamsport, PA with his wife and children. Corporal Brown has been a corporal for the last one and a half years, being employed by the PA State Police for a total period of time of nine years. His duties include working out of the Montoursville Barracks as a "patrol supervisor." He also acts in the capacity of a "CPR and a first aid instructor" as well as a "firearms instructor." Corporal Brown describes himself as being on "active duty," although he does state that in the last two weeks, by "mutual agreement," I do not go out as much, but it's not limited duty." In referring to the letter of September 22, 2000 from your office, it is your understanding that "pending the outcome of this evaluation, Corporal Brown has been assigned administrative duties." Corporal Brown tells me that he still, as an active duty officer, is permitted to carry his firearm.

When asked as to his chief complaint, Corporal Brown stated, "I hit my head. It hasn't been right since. All I want is help." When I specifically asked him why he thought he was here today, he stated, "liability. It's the departments covering their ass. Am I able to carry a gun and do my job? I don't have the control I once had."

Obtaining the history and present illness as well as the balance of the psychiatric interview was made difficult not so much due to the lack of cooperation of Corporal Brown but his tangentiality, intenseness as well as his expansiveness. In fact, the formal interview lasted approximately 2 hours and 45 minutes.

Corporal Brown initially stated that his problems began in February, 1999 when "I struck my head. I got dragged by a car that was driven by a guy who was drunk. He grabbed my arm. I shot out his tire, and he let my arm go and I hit my head." In describing this incident, Corporal Brown relates that when he approached the car, he clearly saw that the occupant was intoxicated and proceeded to ask, as was per regulations, for his license and registration. The occupant of the car obviously refused and was attempting to drive off when Corporal Brown, at that time a patrolman, attempted to intervene. The driver of the car grabbed his arm, at which point he accelerated the car and started to drag him along the road. Corporal Brown unholstered his firearm and shot out the left rear tire of the car. When that did not stop the car, he pointed the gun at the driver's head and "it was my full intention to kill him but I short stopped my gun." As he did this, the occupant of the vehicle let his arm go, at which point Corporal Brown fell to the ground, hitting his head and becoming unconscious for "at least a minute." "He let me go, I fell and hit the back of my head. I was out

for 1 minute. It was all on videotape." He eventually regained consciousness and drove himself to a private residence where he called in his concerns. He was eventually taken to Hershey Medical Center where a CAT scan of the brain revealed "small petechial hemorrhages, a concussion." He was placed in the hospital overnight for "observation." Corporal Brown notes that he felt "like a caged animal. The walls were closing in on me. I was so pumped up with adrenaline I couldn't sleep. I felt physically exhausted. My thoughts were racing. It was unreal. I was hyped up for the next month." Corporal Brown felt that this was an unusual deviation from his previous feelings and abilities even though he was able to state that he had had some of those feelings in the past.

As Corporal Brown was rendering this narrative to me, he stated that the perpetrator eventually, although charged with criminal intent to murder, eventually plead guilty to aggravated assault, receiving a 16-month to 5-year sentence. He stated that he recently learned that he was released on "work release" after six months of his sentence. He interjected at this time, "I'm very cynical. I used to be optimistic when I started but not anymore. I'm a man of action and if something needs to be done, I'll get it done. I'll tell it like it is. I'm brutally honest. Don't blow smoke up my ass. It's probably my downfall. I've always tried to do the best job that I can. They sometimes don't trust my judgment."

After that incident, he was allowed two weeks of leave from his position. In returning to work, I asked him if he had noticed any changes and he was quick to say, "I have zero patience." He notes that he is sometimes impulsive but feels that his judgment is good. He further went on to state, "I do some things before I really think them through." As an example, he noted that an incident in "June or July of this year, I had a hostage situation. It was Code 2, which means you go as fast as you can, but I stepped it up to a Code 3, which means lights and sirens, but it is my prerogative to step it up as the supervising corporal." He noted that the difficulty in doing so was that in going to a Code 3, he went off the brim of the road, came back on the road and kicked up stones that broke the car window that was behind him. "They felt that I could have handled it better. They felt that I should have handled it over the radio, but I'm a hands-on guy. I want to make a difference. That's why I jump in with both feet." He spontaneously stated at that point, "Most of my problems are personality clashes. I need more tact."

In describing the "Garcia incident," he noted that it occurred somewhere between "1996 and 1997." Prior to describing the incident, he stated that he was under a great deal of stress secondary to his daughter's diagnosis of tetrasomy 18P as well as some marital distress. He also noted that he was approximately $30,000 in debt pursuing that diagnosis for his daughter. "To say I was under stress is an understatement." Corporal Brown went on to state that "Garcia ran into the back of my new car. I'm obliged to take action. I can't turn off that I'm a police officer . . . They said I escalated the incident . . . They said I should have

let it go but he had hurt my family." He noted that later on he found out that Mr. Garcia had had five warrants for his arrest. He did receive a 10-day suspension for "conduct unbecoming, use of unauthorized force." He was somewhat proud that this was later reversed through the grievance process. When I asked Corporal Brown as to why he would take such a vigorous pursuit of a situation such as this, particularly when his family was with him and also in the middle of a bustling municipality, he noted that he felt that it was appropriate to do so based upon the fact that "other than physically grabbing this guy, it would have been a hit and run that would never have been solved." He based this conclusion on the fact that when he looked at the license plate of this particular car, the "tag was a truck tag so I knew it was not going to be a match up and also the inspection was bogus." At this time in the evaluation, Corporal Brown stated "In hindsight, it was not worth all the aggravation I went through . . . I'm not a pushover if I think it's right . . ." He spontaneously stated at this point that "90% of my reputation is bullshit. It's made up. The Paul Bunyan syndrome. Now I'm bigger than life." ". . . My biggest problem is that I'm not afraid to fight the hierarchy . . . 80% of the time I'm the winner."

In asking him as to what precipitated his most recent transfer to administrative duties, he was somewhat befuddled by the question other than to state that he had gone to his commanding officer and made him aware of his recent evaluation and treatment by a primary care physician and a neuropsychologist. In asking if there was any other recent incidents that could have caused his commanding officer concern, he noted that approximately two months ago he responded to "a robbery in progress." At that time, he was on his station in the barracks when the call came in over a 911 scanner and when he went out to join patrol, he said that "Lt. said to me 'Go Brownie, go.' I jumped into the back seat of a patrolman's car and made our way to the scene. When we arrived, we found out that there were two cars involved, but the Montoursville Borough Police Department and another state police corporal had already stopped the car at gunpoint. He stated that he assisted the chief and his fellow state policemen to apprehend these two men and handcuffed them at which point he states that "I was instructed by the chief to go pull the blue car over. I jumped into the first car I found (the corporal's car) and pursued them." Contrary to what was stated in Capt. McDonough's statement of September 19, 2000, Corporal Brown stated that he was the first car to pursue the second vehicle and was the first car to arrive on the scene. Shortly thereafter, his understanding was that the police chief pulled up to the second vehicle in question and another state police car also arrived as well. He stated that he pulled his firearm out of its holster and pointed it at the two occupants of the second automobile, stating to them, "On the ground." When he repeated this command two times with no response from the perpetrator, he stated, "Get the fuck on the ground." In relating this incident, Corporal Brown stated this was an example of "verbal judo" where you escalate the verbiage if you don't get a response. He notes that "because of my reputation, it was a problem. Everything I do is second guessed. You fuck up once and they look at you forever."

In pursuing the evaluation to determine whether or not Corporal Brown is suffering from depression, he noted that "I'm worried about my daughter and my relationship with my wife." He has been feeling this way for quite a period of time and, in fact, that is why he pursued care from his primary care physician, Dr. Ellis. He notes that at present his appetite "varies." He notes that when he is depressed, he has a tendency to overeat and, in fact, he has gained 30 pounds in the last two years. He notes that currently his sleep is "fitful" with difficulty getting to sleep. "My ass is dragging." He denies suicidal ideation, stating "what doesn't kill us makes us stronger." He does note that he is tearful "once in a while" but does not cry without a reason. He notes that his libido is decreased but ascribes that to the medication that was prescribed by Dr. Ellis, i.e., Paxil 20 mg. per day. When asking whether or not he has ever had a "panic attack," he stated "yes, once, this spring. I had taken a cold pill and I hadn't eaten, so that combination probably did it." In attempting to discern whether or not Corporal Brown had any of the symptomatology of a bipolar, i.e., manic depressive, disorder, he did state, "My mind will be going faster than my mouth can get it out. Sometimes my thoughts are fuzzy." He did not give any other symptom that would be suggestive of a bipolar disorder, i.e., inappropriate spending, inappropriate sexuality, etc. He denied perceptual impairments, i.e., psychotic symptomatology.

In reviewing the family history, he noted that his father "was an alcoholic." When asked to describe his father's symptomatology, he noted that he was "aggressive without alcohol as a young man, but the alcohol made it worse. Now he's much more mellow even though he's returned to alcohol." He also has a maternal uncle who was "bitten by a tse tse fly, had a high fever, brain damage and resulted in epilepsy and mental retardation." He notes that his mother and sister, secondary to what he believes was an automobile accident, have become depressed and are also being treated with Paxil. He denies family history of psychosis and/or organic impairment, including dementia.

Review of the personal history reveals that Corporal Brown was born in Redbark, New Jersey, having one older sister, one younger brother, and one younger sister. He described his childhood as being "decent . . . I don't remember anything before kindergarten." He does remember that his father worked very hard when he was growing up, "having three jobs even though he was an alcoholic." The family moved to Ohio when he was in the 7th grade, and he worked on a farm, stating "This was the best time of my life." Attending school, he obtained "C's and B's without studying. I was on the sports varsity team, I wrestled at 126 pounds." After high school, secondary to his family not being able to "afford college," he enlisted in the Air Force hopefully training as a computer specialist. Midway through basic training, they informed him that he was going to be "a military policeman." He stayed in the Air Force for approximately two and a half years in that capacity. After his honorable discharge, he attended Penn State University "on my own." Between his military

correspondence courses and his attendance of three semesters at Penn State University, he achieved approximately 70 to 75 credits.  At that time, he applied for a state police position and was appointed to the academy.  "I loved the job but I hate the people working it.  I hate what I had to go through."  He further went on to state, "I love being a state trooper but there are a lot of clicks, a lot of back stabbing."

He met his wife after his discharge from the military "on a blind date."  He describes his relationship as "rocky with ups and downs.  When I'm having state police trouble, our marriage is okay.  When I'm not having problems with the state police, our relationship suffers."  In attempting to understand that, he explained that if he is doing well in his position, he "works too hard" and that detracts from his family time.  In describing his wife, she is noted to be "beautiful, smart, strong, my soul mate, my best friend, the one person I can count on."  In describing himself, he notes that he is "motivated, dedicated, loyal, tired, wanting (things to go right), optimistic but realistic, brutally honest."

On psychiatric evaluation, Corporal Brown came to the office accompanied by his wife who then took the automobile and left her husband to the evaluation.  He was on time for his evaluation, and he was cooperative with the process.  He was dressed casually but neatly and exhibited good hygiene.  Somewhat surprisingly, he did have a firearm on his person when he entered the office.  When it was explained to him that that was not our standard procedure, he was somewhat taken aback.  We did request that place his firearm in the office safe during the evaluation, and he did so.  Corporal Brown's speech was quick, somewhat staccato and intense.  There were also times that he was tangential in relation to the question being asked.  His speech was coherent.  He often noted that he had trouble saying what he wished to say because his thoughts were "quicker than I am able to talk."  His intensity was at times so profound that he would sit on the edge of his seat and even when directed to sit back, he had difficulty doing so.  In fact, I did this on a number of occasions and eventually pointed out to him, at the end of the evaluation, that how he was appearing was somewhat intimidating.  That, in fact, was surprising to him.  Throughout the interview, which I felt was inappropriate to the situation, Corporal Brown would often use vulgarities.  He did admit to being depressed but denied being suicidal.  He did not admit to having perceptual impairments including illusions, hallucinations and/or delusions.  He denied homicidal ideation.  He denied the use of alcohol and/or drugs.  When asked as to his level of self esteem on a scale of 1-10 with 1 being very low and 10 being very high, he stated that he has always been "a number 2.  I've always doubted myself."

Corporal Brown was administered the MMPI-2 by our clinical psychologist, Michael Greevy, Ph.D., in a blind manner.  Dr. Greevy's interpretation of the results are as follows:

"The validity indices of this MMPI-2 indicate that it is a valid profile. He has apparently answered these items in an open, honest, genuine and revealing fashion. There is a mild elevation on Scale 2 – Depression and a lesser one on Scale 6 – Paranoia. This suggests that there may be a component of depression or low mood, possibly of a reactive nature. This can be associated with a narrowing of interest, poor morale and discouragement. A dysthymic component can not be discounted. An underlying hostility and history of interpersonal difficulties and rejection with this. Sensitivity, resentfulness and aggressiveness are also suggested. His feelings may be easily hurt or he could quickly feel he is being treated unfairly. Jealousy is a possible component of this. All other clinical scales are within expected range.

In view of the history, as correlated with the MMPI-2, we subjected the MMPI-2 results to further analysis using "the Minnesota Report Revised Personnel System" which is designed to help individuals who may be emotionally unsuited for high risk, high stress positions. It is noted that the Revised Personnel System reports for the MMPI-2 can help clinicians evaluate personality attributes that may contribute to unsafe, irresponsible or ineffective on-the-job behavior. The interpretations specifically address positions involving public safety or the well being of other people."

The results of the reinterpretation of the MMPI-2 using the Revised Personnel System are as follows:

"This applicant's approach to the Minnesota Personality Interpretive Report was open and cooperative. The resulting profile is valid and is probably a good function of his present level of personality functioning. This suggests that he is able to follow instructions and to respond appropriately to the task, and this may be viewed as a positive indication of his involvement with the evaluation."

"Possible employment problems: This MMPI-2 profile pattern for law enforcement applicants suggests low self esteem, lack of confidence and lack of assertiveness, which make the applicant an unlikely candidate for police officer positions. He should be carefully evaluated. Individuals with this profile might frequently appear unhappy and may be particularly moody under stress. They may be more prone to morale problems than other applicants. Their somewhat passive, introverted lifestyle may make them more suitable for less stressful occupations. In his response content, this applicant expressed a number of personnel problems or attitudes towards work that have been shown to interfere with

work adjustment. The possibility that he has had work-related problems in the past should be investigated through background and reference checks. He endorsed some items that indicate Type A behavior characteristics. The extent to which his work-related attitudes adversely affect his behaviors should be evaluated.

The content themes from the MMPI-2 Personnel Interpretive Report were highlighted as follows:

1.   He may have low self esteem that interferes with his taking on new tasks.
2.   He may be mistrustful of others, which may cause interpersonal friction at times.
3.   He may feel alienated.
4.   He may harbor resentment or hostility towards others.
5.   He may have trouble controlling his temper.
6.   He may have some unconventional beliefs or attitudes that affect the way he gets along with supervisors.
7.   He may have irresponsible attitudes.
8.   He may sometimes disregard rules when it suits him.
9.   He may be prone to feeling anxious at times.
10.  He may show low energy or lack of enthusiasm.
11.  He may be inappropriately aggressive at times.
12.  He has a cynical attitude towards life that may cause him motivational problems at times.
13.  He may have problems adapting to work situations.

The Personnel Interpretive Report also provided supplementary score reports with a T score for each significant area. The mean T score would be defined as 50 with 65 or above being one and a half standard deviations above norm, while a score of 70 would indicate two standard deviations above the norm. As it related to a brooding in the depression subscale, he scored a 68. In the psychopathic deviate subscales, he scored 71 on social alienation and 67 on self alienation. In the paranoia subscales, he scored the highest of all of the subscales at a 94. In the schizophrenia subscales, he scored 78 in lack of ego mastery, cognitive and 71 in lack of ego mastery, conative. In the hypomania scales, he scored 69 in ego inflation. On the anger subscales, he scored a 71 on explosive behavior.

As it relates to interpersonal relations, it was noted 'his low moods may cause him to feel hesitant or isolated socially. He is likely to be somewhat passive in interpersonal situations. The content of this applicant's MMPI-2 Personnel Interpretive Report responses suggest the following additional information concerning

his interpersonal relations. He appears to be an individual who has rather cynical view about life. Any work involving cooperative effort may be affected by his negativism. He may view relationships with others as threatening and harmful. He feels intensely angry, hostile and resentful of others, and he would like to get back at them. He is competitive, uncooperative, and very critical. He may be viewed as irritable and competitive. He may experience some interpersonal problems at times because of his aggressiveness."

**DIAGNOSTIC IMPRESSION**:

Based upon this evaluation, the diagnosis according to the DSM-V is as follows:

Axis I: Intermittent Explosive Disorder 312.34

Axis II: Paranoid Personality Traits

Axis III: No Diagnosis.

**DIAGNOSTIC INTERPRETATION**:

The criteria for the above diagnosis appears to be met by a review of the history, MMPI, and the Minnesota Report Revised Personnel System Review. In addition, review of the previous evaluations by the two psychologists that Corporal Brown sought help from in the past also appears to reinforce that diagnosis.

The diagnostic criteria for an imminent explosive disorder is as follows:

a. several discrete episodes of failure to resist aggressive impulses that result in assaultive acts or destruction of property

b. the degree of aggressiveness expressed during the episodes is grossly out of proportion to any precipitating psychological stressors

c. the aggressive episodes are not better accounted for by another mental disorder (e.g., antisocial personality disorder, borderline personality disorder, a psychotic disorder, a manic episode, conduct disorder, or attention deficit/hyperactivity disorder) and are not due to the direct physiologic effects of a substance (e.g., a drug of abuse, a medication) or general medical condition (e.g., head trauma, Alzheimer's disease)

In addition, the criteria for paranoid personality traits rather than a discrete disorder is apparently met as well as outlined again by the history and reinforced by his subjective answers to the MMPI. These traits only appear to be reinforced by his impaired self esteem.

**RECOMMENDATIONS:**

In view of the above evaluation and diagnostic impression, I would make the following recommendations:

1. It does appear that Corporal Brown's current state of mind, although not overtly depressed and/or psychotic, is representative of an intermittent explosive disorder, i.e., an impulse control disorder that apparently has not served him well in his role as a police officer. Based upon that information, I would suggest that Corporal Brown be afforded the opportunity to be involved in an extensive period of counseling both for his personality style as well as his anger management. In fact, this was recommended to him by his independent psychologist who did some prior testing. I would suggest this period of counseling be done at a minimum over a six-month period and ideally over a 12-month period as it has been my experience that that kind of insight-oriented psychotherapy and support would take a period of time to change this type of significantly aberrant behavior. If, during this period of time, Corporal Brown should exhibit similar aberrant behaviors, then consideration should be given to terminating his employment or offering him disability retirement.

2. Based upon my Recommendation #1, I would not suggest that Corporal Brown not be afforded the opportunity to be a supervisor on patrol or in fact be on patrol himself. Ideally, while he is undergoing this type of counseling, ongoing observation and supervision by his superior officers could lead to further conclusions as to whether or not Corporal Brown was beginning to control his intermittent explosive behaviors.

3. While it is impossible to predict "dangerousness," it would appear to me that Corporal Brown should be allowed to hold and possess a firearm while on active duty in that type of restricted position. It should also be made clear to Corporal Brown that while he is undergoing therapy and the department has not been assured that his anger management counseling has been successful, he should not be allowed to take his firearm out of the barracks for either on-duty or off-duty purposes.

4. Once Corporal Brown has achieved a level of success in his counseling that he and his therapist believe would merit reevaluation, I would be available to do just that to assess whether his restricted status could be lifted at that time.

I appreciated the opportunity to evaluate Corporal Brown and would look forward to doing so again in the future if you felt it was appropriate.

Sincerely,

Roger J. Cadieux, MD

Roger J. Cadieux, MD

RJC/lld

000159

Reviewed 11/2/00

PRECEDENTIAL

Filed October 9, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-3496 and 00-3656

MARY A. COLEMAN

v.

HOME DEPOT, INC.

Mary A. Coleman, Appellant in No. 00-3496
Home Depot U.S.A., Inc.,*Appellant in No. 00-3656

*Pursuant to FRAP 12(a)

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 98-cv-02022)
District Judge: Honorable Mary Little Cooper

Argued: April 25, 2002

Before: BECKER, Chief Judge, SCIRICA and RENDELL, Circuit Judges.

(Filed: October 9, 2002)

DAVID A. KRENKEL, ESQUIRE
(ARGUED)
Arbus, Krenkel & Monaghan, LLC
1001 Deal Road
Ocean, NJ 07712

Counsel for Appellant/Cross-Appellee
Mary Coleman

PATRICK G. BRADY, ESQUIRE
(ARGUED)
JOHN M. O'CONNOR, ESQUIRE
CLARA H. RHO, ESQUIRE
Carpenter, Bennett & Morrissey
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102

Counsel for Appellee/Cross-Appellant
Home Depot U.S.A., Inc.

OPINION OF THE COURT

BECKER, Chief Judge.



Plaintiff Mary Coleman, an African American female, who claims that defendant Home Depot discriminated against her on the basis of race, gender and age when it refused to give her a job in sales and when it terminated her from her position as a cashier, brought suit against Home Depot in the District Court for the District of New Jersey, alleging employment discrimination. The jury found for Home Depot. Coleman's appeal from the judgment of the District Court entered on the jury verdict turns on the District Court's exclusion from evidence of an EEOC Letter of Determination in which the Agency concluded that reasonable cause existed to believe that Home Depot had discriminated against Coleman because of her sex and race in connection with her hiring, request for transfer, and discharge. The District Court excluded the evidence, which was otherwise admissible pursuant to Fed. R. Evid. 803(8)(C), primarily because it found that its probative value was low and that any such value was outweighed by confusion and unfair prejudice. See Fed. R. Evid. 403. Coleman contends that this ruling was an abuse of discretion.

This appeal presents the question whether an EEOC Letter of Determination, which is presumptively probative when not challenged as untrustworthy under Rule 803(8)(C), can nonetheless be excluded due to the

considerations identified in Rule 403. See id. (listing the considerations as "unfair prejudice, confusion of the issues, or misleading the jury, or consideration of undue delay, waste of time, or needless presentation of cumulative evidence"). Although the Circuits are divided on the issue, we conclude that an EEOC Letter of Determination is not per se admissible under Rule 403, and that, like other probative evidence, it may be excluded if the countervailing 403 factors substantially outweigh its probative value. While the District Court found that the letter should be excluded because of the risk of unfair prejudice and confusion, instead we find that other Rule 403 factors -- undue delay and waste of time -- are sufficient on the record to tip the scales in favor of finding that the District Court did not abuse its discretion when it excluded the letter. The judgment of the District Court will therefore be affirmed.

I. Background Facts

Coleman applied for a position with Home Depot's Lakewood, New Jersey store on July 15, 1996. On her application, she stated that she was applying for"any" position, and represented that she had prior work experience/skills on a cash register, in hardware, plumbing, lumber, paint, and electrical. [SA491]. Within a week of submitting her application, Home Depot called Coleman to its Lakewood store for an interview. Vincent Kobera, the Store Manager, conducted the hiring interview. [SA96].

During the interview, Coleman stated that she was most interested in a sales position, but was told that there was only an opening as a cashier. [A47-48]. She was also told that she would have the opportunity down the line to transfer into a different department. [A48]. Kobera testified that his goal, as an employer, was to "try to put people in where they're going to be most comfortable. I mean when customers come in, they want to deal with someone in electrical who has some working knowledge or some point of reference for that. So, part of the interview process is to try to find that person's -- call it niche, if you like, and where they are going to fit with us. And that's why during

the interview, we talk about everything that's on the application." [SA185-186]. During the interview Kobera questioned Coleman about her experience in electrical, plumbing, and hardware as indicated on her application form. [SA97-98].

At the end of the interview, Kobera decided not to offer Coleman a position in sales, but offered her a position as a cashier instead. His decision with respect to sales was based on the fact that during the interview, Mary was "polite, courteous . . . [but] when I questioned her about [hardware], she couldn't answer the questions and even told me that she didn't have a lot of knowledge on that, so that was part of it." [SA184]. In this regard, Kobera testified that the hardware department at Home Depot "is really hand tools, power tools, stationary tools in that very specialized area," but when he asked Mary "if a customer came in and wanted to buy a power tool for a gift and they wanted to buy one of the most versatile tools they could buy, what would she suggest. And Mary said she did not know. And then I asked her the same thing with hand tools . . . and she told me that when she worked at the hardware store, she really didn't get in to the power tool part of the business . . . . she said it was more of a small family business. They carried like nuts and bolts and did like pots and pans type -- like a little mom and pop hardware store." [SA 227-228]. Thus, at the end of the interview, Kobera offered Coleman a position as a part-time cashier, which she accepted on the spot. [SA99-100].

Coleman began working at Home Depot on July 31, 1996. Before actually beginning work, she received training on the use of the cash register system, including the operation of function keys, paperwork associated with certain types of transactions, and procedures on the use of the register drawer and counting to close the register. [SA127; see also Cashier Training Checklist, SA492]. Notwithstanding the training, Coleman received several warnings about her poor job performance as a cashier with respect to handling monies (shortages and overages in her register at the end of the day). [SA102]. Indeed, Coleman received at least nine separate written warnings about her performance in her six month career with Home Depot.

[SA133-134; 135; 136-137; 137-138; 138-139; 147; 142; 145; 150-151]. These performance warnings indicated that future problems with her cash transactions would result in more written warnings, and possibly termination.

Despite her poor performance on the cash register, Coleman asked for a transfer from the cashier position into the Hardware Association position. [SA131-132]. This request was denied. The Assistant Store Manager, Kevin McCann, testified that Home Depot does not transfer employees having performance problems from one department to another:

> [W]e do not transfer associates from area to area if they have performance issues . . . . [H]aving a performance problem, and in her case, a basic skill such as cash handling, which really relates to paying attention to detail and, you know, basic math skills, that could be a problem on the sales floor, as well.

[SA303]. Kobera testified to the same:

> Q: And during the time that you were the floor manager at [the] Lakewood [store], did you ever transfer an individual from a department who was having performance problems as the solution to that problem by putting them in another department?
>
> A: No . . . . it doesn't solve the problem, you don't get to the root of it, you're just moving the problem and letting someone else deal with it.

[SA221].

Home Depot's employee handbook states that after three counseling sessions for the same performance warning, the employee could be terminated. [SA224]. In addition to her six-month performance review, which indicated that Coleman needed improvement, she also received additional training and assistance on the cash register on four or five separate occasions by Jean Amato, an employee at the Lakewood store. [SA158]. Moreover, Anne O'Neil, the Store Customer Service Manager, worked with Coleman to remedy her accuracy problems [SA154-155], as did the head cashier, Sue Gibberson. [SA158]. Despite all this help,

Coleman's performance continued to fall short and she continued to receive written warnings. Ultimately, after a customer called the store to complain that Coleman had short-changed him $10.00, Coleman received her last warning and was terminated. [SA151]. With respect to her discharge, Kobera testified:

> We had had like -- by now it was nine or ten write-ups. And we have given her lots of counseling. She had lots of training . . . . We had done that, and [her performance] was affecting the customers. I mean when customers start calling the store and saying I'm not happy . . . there comes a point where we looked at -- I looked at Mary -- Kevin and I, we talked about it. But ultimately it was my decision to look at Mary's performance and say I didn't see that it was going to get any better, giving her another chance wasn't going to correct the problem.

[SA230-231].

II. Procedural History

A. Agency Level

On May 28, 1997, Coleman filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). She claimed that Home Depot discriminated against her on the basis of her sex, race, and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. S 2000(e), et seq., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. S 621, et seq. by: (i) hiring her as a cashier instead of as a sales associate in the Hardware Department; (ii) refusing to transfer her to a sales associate position within the Hardware Department; and (iii) terminating her employment. [A28]. Following an investigation, the EEOC issued a Letter of Determination on January 26, 1998, in which it concluded that reasonable cause existed to believe that Home Depot had discriminated against Coleman because of her sex and race in connection

with Coleman's hiring, request for transfer, and discharge. We rescribe the letter in the margin.1 [A30-32].

The EEOC concluded that there were no facts to substantiate plaintiff 's claim that Home Depot discriminated against her based on her age.

---

1. The letter states, in relevant part:

> Evidence reveals that after Charging Party was hired as a cashier, she constantly requested to be transferred to hardware or another sales position in areas in which she was highly experienced. During the same period that she was requesting to be transferred, males with less experience were being hired directly into sales positions. Some of the male applicants had indicated on their employment application that they were applying for available positions and were hired directly into sales positions.
>
> Since Charging Party was hired as a cashier rather than a sales associate, she experienced performance problems. As a result of not being allowed to transfer to a position she was qualified to perform,

Charging Party's employment was affected when her employment was terminated effective February 13, 1997 for not being able to perform the cashier's job.

Evidence reveals that Charging Party had received and [sic] overall rating of "3" on December 15, 1996. In addition, evidence reveals that a similarly situated white employee, who had received warnings for shorting and/or overage, was allowed to transfer to another department.

The evidence as a whole makes it reasonable to conclude that Charging Party was discriminated against because of her sex (Female) and race (Black) with respect to Charging Party's hiring, transfer and/or job assignment and discharge allegation.

* * *

During the course of the investigation, the Commission has uncovered evidence which indicates that Respondent has discriminated against females with respect to hiring and other terms and conditions of employment, i.e., wages and transfers and/or job assignments into sales positions.

Evidence reveals that females were being hired as cashiers at a starting salary of $8.00 regardless of their prior experience. When females applied for an open position, they were placed in the cashier department while males who applied for open positions with no experience in sales were placed in sales jobs at a higher salary.

B. The District Court Suit and the Court's Rationale for Excluding the Evidence

Coleman's civil action alleged that Home Depot had discriminated against her on the basis of her gender and race in violation of Title VII by: (i) hiring her on July 31, 1996 as a cashier instead of as a sales associate and failing thereafter to transfer her from a cashier to sales associate position in the Hardware Department; and (ii) terminating her employment on February 13, 1997.

On June 23, 2000, after the close of discovery and shortly before trial was scheduled, Home Depot moved in limine to preclude Coleman from introducing into evidence at trial the EEOC's determination letter. Home Depot argued that the record did not support the EEOC's findings, which failed to reference any specific evidence, and that, as a result, the probative value of the Determination Letter was outweighed by its prejudicial effect. At the in limine hearing, the District Court delayed ruling on the motion to exclude the report, deciding instead to:

> listen to the evidence very carefully, the evidence that is adduced on the plaintiff 's case in chief, and I will make a ruling on this before the plaintiff has to rest. So that if all or any part of this EEOC determination is admitted, it's admitted after the Court has had an

> Evidence further reveals that males hired as cashiers were subsequently transferred into sales positions. However, the females hired as cashiers who were transferred, were being transferred either to the service desk or refund department, not to sales positions.
>
> Females have systematically been placed in cashiers' position and not given the opportunity to advance into sales positions.
>
> Based on the evidence of record, there is reasonable cause to believe that sex (Female) were [sic] motivating factors in Respondent's decision not to hire and/or transfer qualified females into sales positions at a higher rate of pay.

[A31-32].

> opportunity to see what reliable evidence there is, to support what the EEOC said.
>
> * * *
>
> I won't exclude the report on the basis that I can't see what evidence the EEOC relied on, but I will test that report against the evidence which is adduced by the plaintiff at trial, not to see whether I am persuaded (that's not my job), not to see whether I am persuaded in the direction that the EEOC determined, but to see whether there is reliable evidence upon which the EEOC determination could reasonably have rested.

[SA9-11].

After considering the testimony and other evidence submitted by Coleman, the District Court granted Home Depot's motion and precluded Coleman from submitting the EEOC Letter of Determination. The District Court reasoned as follows:

> Let me give the legal basis for the evidence evaluation first. The law that applies to this determination is straightforward. The United States Supreme Court decided in a 1976 ruling, Chandler v. Roudebush , that EEOC findings are admissible under the hearsay rules -- that is specifically Rule 803(8)(C) -- in a federal trial. The Supreme Court in Chandler did not limit the discretion of the trial judge to consider whether despite the hearsay admissibility of the report itself, the report, nevertheless, should be excluded, "If sufficient negative factors are present." That is a quote from the notes of the Advisory Committee on the proposed rules under Rule 803(8)(C).
>
> Thereupon arose a split of authority in the Circuits, but the Third Circuit, as always, clearly held that it is within the discretion of the District Court to admit or

to refuse to admit the EEOC's findings of fact and its determination on the merits of the charges. That was the Third Circuit decision in Walton v. Eaton Corporation . . . .

* * *

[T]his is a case-by-case determination that must be made. In the jurisprudence that has arisen around the country which has been cited in the parties' briefs, the factors that the Court should consider have emerged and those include whether the report itself presents a danger of unfair prejudice to the defendant, whether time spent during the trial will be unduly lengthened if the report is admitted and the defendant must introduce evidence to expose the weaknesses in the report, thus unduly adding to the length of the trial, what factual basis is stated in the report for both the findings and the conclusions in the EEOC report and whether those factual supports are borne out by the record before the EEOC, and whether the report is conclusory in nature or reflects ample detail and a fair summary of the detail of relevant facts pertaining to the charge. Those are some of the factors that the Courts have weighed in making this case-by-case determination.

The EEOC report in this case does not contain any footnotes or references to exactly what evidence is being relied upon. It simply states, "evidence reveals" or "evidence as a whole" or "based on the evidence of record." I have reviewed the report line by line in order to determine whether it should be excluded or admitted in whole or in part. I conclude that it must be excluded in whole, that it cannot be redacted or admitted in its entirety without creating the very danger of unfair prejudice and confusion which Rule 403 requires the Court to avoid in making discretionary evidentiary rulings.

At the heart of my ruling is the core finding of the EEOC report that -- and here I quote from Page 2-- "Evidence reveals that after the charging party was hired as a cashier, she constantly requested to be transferred to hardware or another sales position in areas where she was highly experienced. During the same period that she was requesting to be transferred, males with less experience were being hired directly into sales positions."

One of the bases for that "highly experienced" conclusion is stated above in the EEOC letter. It says, "During her interview, the charging party informed the respondent that she had experience in several areas

such as plumbing, hardware, electrical, paint and lumber. The charging party has more than 15 years sales experience."

There is no indication in the EEOC determination where this factual basis comes from. The Court has now had the opportunity to review the application form which is in evidence, P-15, and it shows that these areas were checked off. However, the countervailing accounts of what was testified to in the interview are not nearly as strong in the trial as stated in the EEOC letter.

Also, the statement that she has more than 15 years sales experience found in the EEOC letter, is not supported even by the application form, P-15 in evidence. If we were to assume it to be truthful and accurate, there is approximately 13 years of experience at the family hardware store listed there. Also, the testimony concerning whether males who had less sales experience were being hired directly into the sales department, is one which is sharply in issue here in the course of the trial and it will be open to each party to argue to this jury whether these males had more or less experience than Ms. Coleman indicated during her application and interview.

The finding of the EEOC Commission is that the evidence as a whole makes it reasonable to conclude that the charging party was discriminated against because of her sex (female) and race (black) with respect to the charging party's hiring, transfer and/or job assignment and discharge. It makes additional findings such as, "Has uncovered evidence which indicates that respondent has discriminated against females with respect to hiring and other terms and conditions of employment, i.e., wages and transfers and other job assignments into sales positions."

* * *

All of these findings are not supported by the evidence that has been presented by plaintiff, except for the raw numerical data, as to which I have had to give the jury a limiting instruction as I have admitted that into evidence.

The conclusion of this Court is that substantial evidence has been presented to the jury on the claims brought forward by plaintiff in this case, but it differs from the assertions which are the findings in the EEOC report. For that reason, I find there is little probative value in the EEOC's conclusory statements regarding the same record.

I further find that those conclusory statements regarding the evidence are expressly stated to be the

basis of the EEOC's determination and to admit the determinations without revealing that they are based upon findings that are supported by the evidence in this case, would be, I believe, an erroneous ruling in the sound exercise of this Court's discretion.

This jury would, in effect, be receiving an EEOC determination in the nature of an expert opinion on conclusions which this lay jury is as equipped to reach from the evidence and its own experience and instructions in the law where this jury will have had the opportunity to view all of the evidence and will have the ability to draw its own conclusions from the evidence presented regarding whether Ms. Coleman was or was not subjected to disparate treatment in her assignments and in her termination in this case.

[A5-11] (emphasis added).

The jury returned a verdict in favor of Home Depot. Coleman appeals, arguing that the District Court abused its discretion in excluding the EEOC determination letter from trial.2 The District Court had jurisdiction pursuant to 28

---

2. We note that Home Depot is also a cross-appellant in this case; it appealed the District Court's order precluding Home Depot from presenting evidence relating to Coleman's alleged misrepresentations about her employment history. Since the parties did not brief the issue in the present appeal, and, at all events, in light of our holding that the District Court did not abuse its discretion by excluding the EEOC Letter of Determination, Home Depot's appeal is essentially moot.

12

U.S.C. S 1331. We have appellate jurisdiction based on 28 U.S.C. S 1291.

We review the admissibility of evidence for abuse of discretion. See Abrams v. Lightolier, Inc., 50 F.3d 1204, 1213 (3d Cir. 1995). "An abuse of discretion is a'clear error of judgment,' and not simply a different result which can arguably be obtained when applying the law to the facts of the case." SEC v. Infinity Group Co., 212 F.3d 180, 195 (3d Cir. 2000) (quoting In re Tutu Well Contamination Litig., 120 F.3d 368, 387 (3d Cir. 1997)). This standard applies to Rule 803(8)(C) and EEOC determination letters. Walton v. Eaton Corp., 563 F.2d 66, 75 (3d Cir. 1977).

III. Discussion

A. Rule 803(8)(C)

Fed. R. Evid. 803(8)(C) provides:

The following are not excluded by the hearsay rule, even though the declarant is not available as a witness . . . . (8) Records, reports, statements or data compilations, in any form, of public offices or agencies,

> setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The rationale of Rule 803(8)(C) is explicated in the advisory committee's note as being grounded on a presumption of reliability of government records. The note explains that it is "assum[ed] that a public official will perform his duty properly." Fed. R. Evid. 803(8)(C) advisory committee's note. As was explained in Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 505 F. Supp. 1125, 1145 (E.D.Pa. 1980), "the drafters of 803(8)(C) were motivated by a variation on the theme underlying all hearsay exceptions -- that circumstantial guarantees of trustworthiness are provided by the presumption that governmental officials will perform their duties faithfully. Accordingly, they were agreeable to the receipt into evidence of governmental agency findings."[3]

---

3. See also Melville v. Am. Home Assurance Co., 443 F. Supp. 1064, 1112 (E.D.Pa. 1977) ("The conceptual underpinning for this exception, similar

With respect to EEOC determinations in particular, the United States Supreme Court itself has held that prior administrative findings made with respect to an employment discrimination claim may be admitted, as of course, pursuant to Fed. R. Evid. 803(8)(C) as evidence at a "federal-sector trial de novo." Chandler v. Roudebush, 425 U.S. 840, 863 n. 39 (1976).

The principal basis on which government records and reports may be excluded is the Rule 803(8)(C) trustworthiness proviso. As the Rule itself states, the findings are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). The advisory committee's note explains:

> Factors which may be of assistance in passing upon the admissibility of evaluative reports include: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which conducted; (4) possible motivation problems . . . . Others no doubt could be added.

Fed. R. Evid. 803(8)(C) advisory committee's note (internal citations omitted). Case law has added to the list of trustworthiness considerations.[4]

---

to that upon which other hearsay exceptions are based . . . is that public records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial.").

4. In Zenith Radio Corp., for example, the court developed an additional seven factors addressing the adequacy of the investigative/evaluative process of agency determinations:

(1) The finality of the agency findings, i.e. , the state of the proceedings at which the findings were made (whether they are subject to subsequent proceedings or de novo review), and the likelihood of modification or reversal of the findings.

(2) The extent to which the agency findings are based upon or are the product of proceedings pervaded by receipts of substantial amounts of material which would not be admissible in evidence

Most notably, a report may be untrustworthy "if the report appears to have been made subject to a suspect motivation. For example, if the public official or body who prepared the report has an institutional or political bias, and the final report is consistent with that bias." Federal Rules of Evidence Manual 1688-89 (Stephen A. Saltzburg et al. eds., 7th ed. 1998); see also Pearce v. E.F. Hutton Group, Inc., 653 F.Supp. 810, 814 (D.D.C. 1987) (excluding findings made in a congressional report because,"[g]iven the obviously political nature of Congress, it is questionable whether any report by a committee or subcommittee of that body could be admitted under rule 803(8)(C) against a private party. There would appear to be too great a danger that political considerations might affect the findings of such a report"). An EEOC report might also be untrustworthy where it is made in contemplation of litigation. See Harris v. Birmingham Bd. of Educ., 537 F. Supp. 716, 721-22 (N.D. Ala. 1982), aff'd in part & rev'd in part, 712 F.2d 1377 (11th Cir. 1983) (finding that an EEOC determination was not trustworthy where it was made six

---

(e.g., hearsay, confidential communications, ex parte evidence), and the extent to which such material is supplied by persons with an interest in the outcome of the proceeding.

(3) If the findings are products of hearings, the extent to which appropriate safeguards were used (Administrative Procedure Act, Due Process), and the extent to which the investigation complied with all applicable agency regulations and procedures.

(4) The extent to which there is an ascertainable record on which the findings are based.

(5) The extent to which the findings are a function of an executive, administrative, or legislative policy judgment (as opposed to a factual adjudication) or represent an implementation of policy.

(6) The extent to which the findings are based upon findings of another investigative body or tribunal which is itself vulnerable as a result of trustworthiness evaluation.

(7) Where the public report purports to offer expert opinion, the

> extent to which the facts or data upon which the opinion is based are of a type reasonably relied upon by experts in a particular field.

Zenith Radio Corp., 505 F. Supp. at 1147.

months after litigation had been filed and that"[t]he trustworthiness of the determination is further eroded by the obvious disregard of the affidavits submitted by the defendant to the EEOC. The court is appalled by the numerous erroneous and obviously slanted statements contained in the determination, the list of which is too lengthy to set out").

While the District Court was skeptical about whether the EEOC had the proper factual basis to come to the conclusions that it did in the EEOC Letter of Determination, none of the aforementioned trustworthiness considerations have been invoked in this case, either here or in the District Court. We assume therefore that the EEOC determinations were trustworthy and review the District Court's decision to exclude the EEOC Letter of Determination only under Rule 403.

B. Rule 403

Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. Rule 403 is an "umbrella rule" spanning the whole of the Federal Rules of Evidence. See Federal Rules of Evidence Manual 251 (Stephen A. Saltzburg et al. eds., 7th ed. 1998) ("[T]he Trial Judge must apply [Rule 403] in tandem with other Federal Rules under which evidence would be admissible."). Accordingly, it is generally applied to evidence otherwise admissible under Rule 803(8)(C).[5] See, e.g., Zenith Radio Corp., 505 F. Supp. at

---

5. The Fifth Circuit has noted that it is possible to confuse "the test for admissibility under Rule 803(8)(C) with that for excluding otherwise admissible evidence under Rule 403." Cortes v. Maxus Exploration Co., 977 F.2d 195, 201 (5th Cir. 1992). As that Court has explained:

> Under Rule 803(8)(C), investigative reports made by government agencies are removed from the rule against hearsay unless

1146 ("[W]here the probative value of [evidence admissible pursuant to Rule 803(8)(C)] is outweighed by the danger of

unfair prejudice . . . or needless presentation of cumulative evidence attendant upon the opponents' efforts to establish untrustworthiness of the report, the court may exclude the report under F.R.E. 403.").

Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility. That is, evidence may be excluded if its probative value is not worth the problems that its admission may cause, e.g. unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence.6 However, there is a strong presumption that relevant evidence should be admitted, and thus for exclusion under Rule 403 to be justified, the probative value of evidence must be "substantially outweighed" by the problems in admitting it. As a result, evidence that is highly probative is exceptionally difficult to

---

> circumstances indicate untrustworthiness. Because of this presumption that agency reports are not to be excluded under the hearsay rule, this court has held that the party opposing the admission of the report under Rule 803(8)(C) must prove the report's untrustworthiness. . . . Rule 403 gives trial courts the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . ." This court, on several occasions, has found investigative reports and files of the EEOC to be highly probative. We also warned . . . that Rule 403 should not be misused in such a way that "would end the presumption that evaluative reports are admissible hearsay under Rule 803(8)(C)." None of these decisions should be read as leaving district courts without discretion under Rule 403 to exclude such reports if their probative value is substantially outweighed by prejudicial effect or other considerations enumerated in the rule.

Id. (internal citations omitted).

6. It is worth stressing that the term "unfair prejudice" as a factor against which the probative value of evidence is weighed under Rule 403 is often misstated as mere prejudice. Indeed, any evidence that tends to harm a party's case could be said to be prejudicial. Thus, the prejudicial effect of admitting the evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403.

exclude. See, e.g., United States v. Krenzelok, 874 F.2d 480, 482 (7th Cir. 1989) ("Its probative value was . .. great. Its prejudicial effect may well have been great too. But when the trial judge is in doubt, Rule 403 requires admission (this is the force of "substantially outweighed") . . . .).7

Rule 403 necessarily requires that the District Court engage in balancing to determine whether the probative value of the evidence is "substantially outweighed" by the negative factors listed in Rule 403. See United States v. Long, 574 F.2d 761, 766 (3d Cir. 1978) (noting that even if

the District Court does not invoke Rule 403, "the trial judge's balancing will be subsumed in his ruling"). In balancing, "the proper equation places on one side the maximum reasonable probative force for the offered evidence," while "the other side of the equation should include the likely prejudicial impact of the evidence." Federal Rules of Evidence Manual 242 (Stephen A. Saltzburg et al. eds., 7th ed. 1998). The balancing test in Rule 403 ensures that juries are not presented with evidence that is far less probative than it is prejudicial.

Coleman submits that EEOC reports are necessarily of high probative value, especially given the expertise and long experience of the Agency in employment discrimination matters. She finds support for this view in federal appellate case law. Smith v. Universal Services, Inc., 454 F.2d 154, 157 (5th Cir. 1972); Plummer v. Western Int'l Hotels Co., 656 F.2d 502, 505 (9th Cir. 1981). The Smith Court intimated that the probative value of EEOC determinations almost always outweighs any prejudicial impact:

> [T]o ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its field investigators in the area of discriminatory employment practices would be wasteful and unnecessary.

---

7. An interesting hypothetical question as to the meaning of Rule 403 is posed by positing a report or other evidence whose probative value on the scale of values was 100%. It would appear that, as such, it could not properly be excluded under Rule 403 because it could not be "substantially outweighed" by the countervailing factors.

> The fact that an investigator, trained and experienced in the area of discriminatory practices and various methods by which they can be secreted, has found that it is likely that such an unlawful practice has occurred, is highly probative of the ultimate issue involved in such cases. Its probative value, we believe, at least outweighs any possible prejudice to defendant. "Prejudicial" cannot be equated with "harmful" in all cases; rather it connotes "harmful," plus"non-probative."

454 F.2d at 157.8

Although we decline to hold that EEOC reports are per se admissible as more probative than prejudicial, the argument that EEOC reports that are not challenged as untrustworthy are presumptively probative is not without force. But the other Rule 403 factors -- especially considerations of undue delay, waste of time, or needless presentation of cumulative evidence, which are often necessary to counter an EEOC report -- could "kick-in" and control, especially where the report could be shown to be of low probative value. The weight of the case law holds that

Rule 403 may operate on an EEOC report, and that the decision of whether or not an EEOC Letter of Determination is more probative than prejudicial is within the discretion of the trial court, and to be determined on a case-by-case basis. Hines v. Brandon Steel Decks, Inc., 886 F.2d 299, 302 (11th Cir. 1989); United States v. MacDonald , 688 F.2d 224, 229-30 (4th Cir. 1982); Johnson, 734 F.2d at 1309; Cortes, 977 F.2d at 201-02.

---

8. We note that the Fifth and Ninth Circuits take the minority view that agency reports are per se admissible as the probative value necessarily outweighs the negative factors in Rule 403. The majority view, on the other hand, gives less deference to the probative value of agency reports, refusing to categorically require admission of agency findings. See e.g., Paolitto v. Crawford, 151 F.3d 60, 65 (2nd Cir. 1998) (adopting the majority position that leaves "the question of whether to admit EEOC . . . findings to the sound discretion of the district court"); Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309 (8th Cir. 1984) ("While EEOC reports may contain information that would be useful to the jury, their probative value may be outweighed by problems that would result from their admission.").

This view is apparently the law of this Circuit, based upon a terse discussion in Walton. 563 F.2d at 75. At all events, we think that Walton reflects the better view, and we take this opportunity to endorse the majority position in Walton and to clarify that a District Court has the discretion to exclude probative EEOC Letters of Determination where the negative factors listed in Rule 403 substantially outweigh the probative value of the EEOC determinations. In other words, we decline Coleman's invitation to conclude that, based on the presumption of admissibility under Rule 803(8)(C), EEOC Letters of Determination are per se more probative than prejudicial under Rule 403, and will review the District Court's exclusion of the EEOC letter based on the principles discussed supra.

We note in this regard that the assessment of probative value under Rule 403 should take into consideration the proof value of the particular report as and when offered at trial. Here that proof value could be said to be low, given the fact that it would have been introduced to the jury after all the evidence had been offered (which evidence was at odds with the EEOC report), and was more conclusory than factual in nature. See, e.g., Paolitto , 151 F.3d at 65; see also Johnson, 734 F.2d at 1309. Further its value is not increased based on the agency's expertise, as the District Court seemed to think, because it is not an "expert report." Evaluative public records and reports, admissible under Article VIII of the Federal Rules of Evidence, are distinct from expert opinion evidence, identified in Article VII. They are subject to entirely different standards of admissibility, et alia.

C. Application to This Case

As we have explained, the District Court delayed ruling on the motion to exclude the Letter of Determination at the in limine hearing. Rather, the Court allowed Coleman to present her case-in-chief at trial before making a decision. Referencing Walton, the District Court concluded that the risk of unfair prejudice and confusion substantially outweighed the probative value of the EEOC Letter of Determination. The District Court found that the probative

value of the document was particularly low since the evidence presented at trial differed from the findings of the EEOC in a critical respect -- the EEOC's finding that Coleman was "highly experienced" in sales was clearly undermined by the testimony presented at trial, even by Coleman herself.

We disagree with the District Court's general approach to the Rule 403 calculus. The District Court in effect charged the plaintiff with replicating the record before the EEOC and then evaluated the record produced by plaintiff to see if it justified the report. But neither the plaintiff nor the District Court had access to the whole EEOC record. 9 What the District Court had was: (1) A letter from Home Depot to the EEOC about a consent decree entered in a class action case against Home Depot; (2) A response from Home Depot to the EEOC; (3) Coleman's EEOC charge questionnaire, filled out by Coleman herself. It does not appear, however, that the District Court knew how the EEOC came to its determination or that it had access to all the information upon which the EEOC relied. In particular we do not know if the EEOC had any evidence upon which to base its conclusion that a white employee with evaluations as poor as Coleman's was allowed to transfer to another department or that women were systematically hired as cashiers irrespective of their experience and never transferred to sales positions, unlike the male cashiers. See supra.

On the other hand, the District Court was clearly correct about the low probative value of the most critical facet of the EEOC report: that Coleman was not hired as a sales associate despite being a "highly experienced" candidate. Coleman's experience in hardware sales, so central to the Home Depot modus operandi, was exposed by her own testimony to be gossamer.10 That is a matter within her own

---

9. The EEOC does not appear to have clear standards for how it gathers information. The Federal Laws Prohibiting Job Discrimination: Questions and Answers, available at http://www.eeoc.gov/task/pch-lit.html, states that "[i]n investigating a charge, EEOC may make written requests for information, interview people, review documents, and, as needed, visit the facility where the alleged discrimination occurred."

10. Kobera, the Store Manager at the Home Depot where Coleman worked, testified that Home Depot attempts to place employees in sales

ken. Yet had the EEOC report been admitted, a great deal
of time would have had to have been consumed to counter
the report's conclusion about the fate of other employees,
male and female. Because the EEOC Letter of
Determination concluded that Home Depot had
systematically discriminated against female and minority
employees, in order to rebut these expansive allegations,
Home Depot would have had to present evidence showing
that it did not discriminate when it placed former
employees in cashier positions or fired them. This would
certainly have involved a great deal of testimony-- a trial
within a trial in fact -- about the employment histories of
a large number of former employees.11

The District Court opined that the EEOC Letter of
Determination would be unfairly prejudicial or confusing,
but we find the argument that the evidence would have

---

positions who have a "working knowledge or some point of reference" in
the particular area so that they can best assist customers. For example,
Home Depot wanted employees in the hardware department to be able to
recommend a versatile power tool to customers. See discussion supra.

11. A number of cases have considered the amount of time that it would
take to counter a trustworthiness challenge as a consumption of time
factor cognizable under Rule 403. See McShain v. Cessna Aircraft Co.,
563 F.2d 632, 636 (3d Cir. 1977) (holding that the District Court did not
abuse its discretion by excluding an NTSB report because the "reception
of such reports into evidence would have involved a lengthy . . . inquiry
into the 'circumstances bearing on the trustworthiness' of the
investigators' conclusions. Thus, it may well have been that, in the
course of the eighteen-day trial, the additional probative value of the
excluded reports was substantially outweighed by the opportunity to
avoid undue delay of waste of time"); see also Zenith Radio Corp., 505 F.
Supp. at 1146 ("[W]here the probative value of [evidence admissible
pursuant to 803(8)(C)] is outweighed by . . . needless presentation of
cumulative evidence attendant upon the opponents' efforts to establish
untrustworthiness of the report, the court may exclude the report under
F.R.E. 403."). The trustworthiness challenge will generally be disposed of
at the in limine hearing stage, but not always. Moreover, a finding of
trustworthiness by the judge does not preclude a trustworthiness
challenge by the objecting party at trial. Therefore since trustworthiness
can also become an issue at trial itself, it can bear upon the time-related
factors in Rule 403.

created the potential risk of undue delay and waste of time
to be stronger. Weighing undue delay and waste of time
against the low probative value of the EEOC determination,
it appears that the District Court acted properly. We are
satisfied that the EEOC Letter of Determination wrongly
classified Coleman as "highly experienced"-- the evidence
demonstrated that Coleman knew little about hand and

power tools and had only worked in a "mom and pop" hardware stare, see discussion supra-- and that it was of such low probative value that the Court could have found that it was "substantially outweighed" by the fact that Home Depot would have had to rebut the EEOC's finding that the company engaged in a pattern of race and gender discrimination by presenting information about numerous former Home Depot employees.

In sum, we conclude that the District Court did not abuse its discretion in deciding that the probative value of the EEOC Letter of Determination was "substantially outweighed" by the problems created by its introduction. Although the District Court did not know the full extent of the evidence relied upon by the EEOC to conclude that Home Depot had wrongly: (1) hired Coleman as a cashier; (2) refused to transfer her to a sales position; and (3) terminated her, considering that the EEOC clearly was mistaken in the critical conclusion that Coleman was a "highly experienced" employee, the District Court did not abuse its discretion in finding that the EEOC Letter of Determination had such a low probative value that the undue delay that would have been involved in the rebuttal of the allegations of systematic discrimination contained in the EEOC determination "substantially outweighed" that low probative value. The judgment of the District Court will therefore be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*
*2080 Linglestown Road*
*Suite 201*
*Harrisburg, Pennsylvania 17110-9670*
*Telephone (717) 540-9170*
*Fax (717) 540-5481*
*By: SPERO T. LAPPAS, Esquire*
*Pa. Supreme Court ID no. 25745*
*slappas@ssbc-law.com*

CERTIFICATE OF SERVICE

I hereby certify that on this date I served a true copy of the attached document upon the person(s) named below by mailing a copy addressed as follows, postage pre-paid, deposited into the U. S. Mail at Harrisburg, Pa.

GREGORY NEUHAUSER, ESQUIRE
OFFICE OF ATTORNEY GENERAL
LITIGATION SECTION
15TH FLOOR, STRAWBERRY SQUARE
HARRISBURG, PA. 17120

*RESPECTFULLY SUBMITTED,*

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*

*By:* ____________________________
*SPERO T. LAPPAS, Esquire*
*Pa. Supreme Ct. ID no. 25745*
*2080 Linglestown Road*
*Suite 201*
*Harrisburg, PA 17110-9670*
*(717) 540-9170*