ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY,                          :
    **Plaintiff**                  :
                                 :     No. 1:01-CV-0206
    v.                           :
                                 :     (Judge Kane)
SCOTT BROWN, PAUL EVANKO,              :
BERON F. STEAGER, AND BARRY L.         :
BRINSER, et al.,                       :
    **Defendants**                :

FILED
HARRISBURG, P

NOV 2 7 2002

MARY E. D'ANDREA, C
Per _____ Deputy Clerk

## EXHIBITS IN SUPPORT OF
## DEFENDANT EVANKO'S MOTION
## FOR SUMMARY JUDGMENT

**D. MICHAEL FISHER**
**Attorney General**

**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

OFFICE OF ATTORNEY GENERAL
15th Floor, Strawberry Square
Harrisburg, PA   17120
717-787-8106

Date: November 27, 2002

## Table of Contents

**Exhibit**

Transcript of Proceedings, Guilty Plea,
    Com. v. Yordy, No. 685 C.D. 1999
    (February 15, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Complaint (February 1, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

Answer (October 5, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

Transcript of Deposition of
    Paul J. Evanko (November 1, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

```
COMMONWEALTH OF PENNSYLVANIA :  IN THE COURT OF COMMON PLEAS
                              :              OF
                              :  DAUPHIN COUNTY, PENNSYLVANIA
                              :
                  VS.         :  Agg. Asslt; DUI; Recklessly
                              :  Endangering; Resisting
                              :  Arrest
                              :
                              :
RANDY ADAM YORDY             :  NO. 685 C.D. 1999
```

## TRANSCRIPT OF PROCEEDINGS

### GUILTY PLEA

```
    BEFORE:    THE HONORABLE JOSEPH H. KLEINFELTER, P.J.

    DATE:      TUESDAY, FEBRUARY 15, 2000
               2:11 O'CLOCK P.M.

    PLACE:     COURTROOM NO. 1
               DAUPHIN COUNTY COURTHOUSE
               HARRISBURG, PENNSYLVANIA
```

A P P E A R A N C E S:

```
    MICHAEL L. ROZMAN, ESQUIRE
    Chief Deputy District Attorney
       For - Commonwealth
```



COMMONWEALTH'S
EXHIBIT
4

```
    JOSHUA D. LOCK, ESQUIRE
       For - Defendant
```



COPY

1          <u>TUESDAY, FEBRUARY 15, 2000</u>

2

3          (The following proceedings occur at 2:11 p.m.:)

4

5          MR. ROZMAN:  Good afternoon, Your Honor.

6          THE COURT:  Good afternoon.

7          MR. ROZMAN:  Commonwealth calls the case docketed to

8  685 C.D. 1999, the Commonwealth v. Randy Adam Yordy.

9          The Defendant is present in the courtroom, along

10 with his counsel, Mr. Lock.

11          Defendant is presently charged with criminal attempt

12 homicide, aggravated assault, driving under the influence,

13 recklessly endangering another person, and two counts of

14 resisting arrest.

15          There is a proposed plea agreement in this case,

16 Your Honor.  The plea agreement is as follows:  The

17 Commonwealth would ask the Court to dismiss the criminal

18 attempt homicide.  The aggravated assault which is presently

19 graded as a Felony II and is at Section 2702(a)(2) will be

20 amended to a Felony II aggravated assault, 2702(a)(3).  He

21 will plead guilty to the 2702(a)(3) aggravated assault and the

22 rest of the charges, the driving under the influence,

23 recklessly endangering and resisting arrest.

24          The record should reflect that the trooper that was

25 involved in this is present in the courtroom, Trooper Scott

1  Brown, and I would ask Trooper Brown to rise.

2         Trooper, you heard me outline the plea agreement to

3  the Judge.

4         Do you agree with the plea agreement?

5         TROOPER BROWN:  Yes, sir.

6         MR. ROZMAN:  Does the Court have any questions of

7  the trooper?

8         THE COURT:  No.

9         MR. ROZMAN:  Again, Mr. Yordy, I am going to go

10 through some of your rights with you.

11        You must answer my questions loudly enough so that

12 the court reporter can hear you and record your answers.

13        How old are you?

14        THE DEFENDANT:  I'm 42.

15        MR. ROZMAN:  How far did you go in school?

16        THE DEFENDANT:  I'm a graduate.

17        MR. ROZMAN:  So you read, write, and understand the

18 English language?

19        THE DEFENDANT:  Yes, I do.

20        MR. ROZMAN:  Are you presently under the influence

21 of any alcohol or drugs or anything that would prevent you

22 from understanding what's going on here today?

23        THE DEFENDANT:  No.

24        MR. ROZMAN:  If at any point you don't understand

25 something I say, please stop me, and I will try and explain it

1  and maybe Mr. Lock will also try and explain it.

2          Okay?

3

4          (The Defendant nods head up and down.)

5

6          MR. ROZMAN:  I want you to understand that any time

7  you're charged with a crime in Pennsylvania, you have a right

8  to a trial by jury.

9          In a trial by jury, 12 people from Dauphin County

10 sit and listen to all the evidence in the case.  They would

11 decide the case based on that evidence.  Their verdict would

12 have to be unanimous.  All 12 of them would have to say that

13 you're guilty for you to be found guilty, or all 12 of them

14 have to say you're not guilty for you have to be found not

15 guilty.

16          You, along with your attorney and the

17 district attorney assigned to the case, would pick these 12

18 people.

19          Do you understand your right to a trial by jury?

20          THE DEFENDANT:  Yes.

21          MR. ROZMAN:  Do you understand that once you plead

22 guilty, you give up your right to a trial by jury?

23          THE DEFENDANT:  Yes.

24          MR. ROZMAN:  You also have a right to a nonjury or

25 bench trial.  A bench trial is the same as a trial by jury

1 except a judge would take the place of a jury and listen to
2 all the evidence and decide whether you are guilty or not
3 guilty based on that.

4        Do you understand your right to have a nonjury or
5 bench trial?

6        THE DEFENDANT:  Yes, I do.

7        MR. ROZMAN:  Do you understand, again, that you are
8 giving up your right to a nonjury or bench trial?

9        THE DEFENDANT:  Yes.

10        MR. ROZMAN:  In either a jury or nonjury trial, you
11 have certain rights.

12        First of all, you are presumed innocent.  The
13 Commonwealth must prove you guilty of each charge beyond a
14 reasonable doubt.

15        You have a right to cross-examine all the
16 Commonwealth witnesses through your attorney.  You have the
17 right to present your own witnesses.  You have the right to
18 take the stand and testify in your own behalf, but if you
19 choose to not take the stand, you cannot be forced to take the
20 stand and testify and that cannot be held against you.

21        Do you understand all those things?

22        THE DEFENDANT:  I understand, yes.

23        MR. ROZMAN:  You understand when you plead guilty,
24 you limit your appeal rights to specific areas.  First, the
25 voluntariness of your plea; whether you're doing this of your

1  own free will.

2        Second is the jurisdiction of this Court in

3  accepting the plea, and so long as the crime occurred in

4  Dauphin County, this Court has jurisdiction.

5        And the third would be the legality of the sentence

6  that the Judge would impose.  If he were to give you an

7  illegal sentence, you could challenge that.  If the sentence

8  he gave you was legal, you couldn't challenge that.

9        Do you understand all those things?

10       THE DEFENDANT:  I understand.

11       MR. ROZMAN:  Now, sir, you understand that

12  aggravated assault, 2702(a)(3), which is what you're pleading

13  guilty to is a felony of the second degree?

14

15       (The Defendant nods head up and down.)

16

17       MR. ROZMAN:  The maximum you could receive -- I'm

18  not saying this is what you're going to get -- but the maximum

19  you could receive is up to 20 years in prison.

20       Do you understand that?

21       THE DEFENDANT:  Yes.

22       MR. ROZMAN:  Driving under the influence is a

23  misdemeanor of the second degree as is recklessly endangering

24  another person as is resisting arrest.

25       The maximum you could receive for each one of those

1  charges is up to 2 years in prison.

2          Do you understand that?

3          THE DEFENDANT:  Yes.

4          MR. ROZMAN:  Now, sir, the first count is the

5  attempted homicide, and we're asking that the Court dismiss

6  that.

7          The second count is aggravated assault.  And the

8  aggravated assault, it's charged that on or about February 4,

9  1999, that you did cause or attempt to cause bodily injury to

10 a police officer, which is Trooper Scott Brown of the

11 Pennsylvania State Police, and what you did is you got into a

12 fight with Trooper Brown about the time of the arrest.  And at

13 some point right before the two of you parted company, he was

14 dragged by you in your car for some number of feet.

15         Do you understand that?

16         THE DEFENDANT:  Yes.

17         MR. ROZMAN:  How do you plead?  Guilty or not

18 guilty?

19         THE DEFENDANT:  You're asking me for attempted

20 homicide?

21         MR. ROZMAN:  No, aggravated assault.

22         THE DEFENDANT:  Aggravated assault, guilty.

23         MR. ROZMAN:  The third count is driving under the

24 influence.

25         It's charged that you did drive, operate, or were in

1  actual physical control of the movement of a motor vehicle

2  while you were under the influence of alcohol to such a degree

3  that you were rendered incapable of safe driving.

4         Do you understand that charge, sir?

5         THE DEFENDANT:  Yes.

6         MR. ROZMAN:  How do you plead?  Guilty or not

7  guilty?

8         THE DEFENDANT:  Guilty.

9         MR. ROZMAN:  The fourth count is recklessly

10  endangering another person.

11         You are charged with recklessly engaging in conduct

12  which placed or may have placed another person in danger of

13  death or serious bodily injury.

14         Again, that's Trooper Brown, and it all has to do

15  with the fight and dragging him with the pickup truck.

16         Do you understand that charge, sir?

17         THE DEFENDANT:  Yes.

18         MR. ROZMAN:  How do you plead?  Guilty or not

19  guilty?

20         THE DEFENDANT:  Guilty.

21         MR. ROZMAN:  The fifth count is resisting arrest.

22         It's charged that you were being arrested for

23  driving under the influence and you ended up fighting with

24  Trooper Brown.

25         Do you understand that charge?

A-8

9

1    A    Yes.

2    Q    How do you plead?  Guilty or not guilty?

3         THE DEFENDANT:  Guilty.

4         MR. ROZMAN:  The sixth count is resisting arrest.

5    At the time Troopers Barry Brinser and Beron Steager of the

6    Pennsylvania State Police were arresting you for the incident

7    involving Trooper Brown, and you had a fight with them too.

8         Do you understand that?

9         THE DEFENDANT:  Yes.

10        MR. ROZMAN:  How do you plead?  Guilty or not

11   guilty?

12        THE DEFENDANT:  Guilty.

13        MR. ROZMAN:  Will the Court accept the plea?

14        THE COURT:  Yes.

15        Mr. Lock, I understand from our prior conversation

16   that you wish a pre-sentence investigation in this case?

17        MR. LOCK:  Yes, sir.

18        THE COURT:  All right.

19        Well, we will accept the plea agreement and we

20   accept the guilty plea .

21        I guess I should ask you, Mr. Lock, are you

22   satisfied that your client is entering a voluntary,

23   intelligent, and knowing plea of guilty?

24        MR. LOCK:  Yes, he is.

25        It's reluctant, but it's both knowing, voluntary,

1  and intelligent.  It is all of those things, yes.

2          THE COURT:  And, Mr. Yordy, are you satisfied with

3  the representation you've received from Mr. Lock?

4          THE DEFENDANT:  Yes, very much so.

5          THE COURT:  Do you have any questions at all about

6  what you're doing here today and the consequences that may

7  flow from your pleas of guilty?

8          THE DEFENDANT:  No.  My attorney was good.  He

9  advised me.

10          THE COURT:  Well, then we will defer sentencing

11  pending the receipt of a county pre-sentence investigation to

12  Thursday, March 23, 2000, at 11:30 in the morning.

13          Now, sir, do you have a driver's license right now?

14          THE DEFENDANT:  Yes, I do.  I don't have it with me.

15  Actually,  I left my wallet in the car.

16          THE COURT:  I see.  Well, I was going to direct that

17  as a condition of continuing bail that you not drive since, as

18  you know, your license will be suspended.

19          MR. LOCK:  If Your Honor wishes, I can make

20  arrangements to have that surrendered to the Clerk perhaps

21  tomorrow -- not perhaps.

22          If it is acceptable to the Court, tomorrow.

23          THE COURT:  We'll ask you to do that, please, and is

24  there anything further we have to do today then?

25          MR. ROZMAN:  Nothing on behalf of the Commonwealth,

1  Your Honor.

2      MR. LOCK:  No.  Thank you, very much.

3      THE COURT:  All right.

4      Mr. Yordy, where do you live?

5      THE DEFENDANT:  In Grantville.

6      THE COURT:  Do you own a home there?

7      THE DEFENDANT:  Yeah.  We own a whole apartment

8  building, yeah.

9      THE COURT:  Should you move between today and

10  March 23rd for any reason, you'd be obligated to notify both

11  the District Attorney and the Clerk of Courts of any change of

12  address.

13      All right?

14      THE DEFENDANT:  Yes.

15      MR. LOCK:  Thank you, Your Honor.

16      THE COURT:  See you back here on the 23rd.

17

18      (The proceedings are concluded at 2:31 p.m.)

19

20                  --oOo--

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3        I hereby certify that the proceedings and evidence

4   are contained fully and accurately in the notes taken by me on

5   the guilty plea of the above cause, and that this is a correct

6   transcript of the same.

7

8                                   _Bart VanSomeren, RPR-CP_

9                                   Official Court Reporter

10

11

12                          **COPY**

13

14

15

16        The foregoing record of the proceedings upon the

17   guilty plea of the above cause is hereby approved and directed

18   to be filed.

19

20

21                          _____

22                          Joseph H. Kleinfelter, P.J.

23

24                          _____

25                                      Date

The Law Offices of SPERO T. LAPPAS
205 State Street
Post Office Box 808
Harrisburg, Pennsylvania  17108-0808
(717) 238-4286
        By:  SPERO T. LAPPAS, Esquire
             Pa. Supreme Court identification no. 25745
ATTORNEY FOR PLAINTIFF

```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
```

RANDY YORDY,
     PLAINTIFF
     v.                                  1:CV-01-0801

SCOTT BROWN,                          :  CIVIL ACTION
individually                          :
and in his official capacity          :  JURY TRIAL DEMANDED
as an employee and agent of           :
the PENNSYLVANIA STATE POLICE         :  JUDGE
     Defendant                        :
                                      :
PAUL EVANKO,                          :
individually                          :
and in his official capacity          :
as an employee and agent of           :
the PENNSYLVANIA STATE POLICE         :
     Defendant                        :
                                      :
BERON F. STEAGER,                     :
individually                          :
and in his official capacity          :
as an employee and agent of           :
the PENNSYLVANIA STATE POLICE         :
     Defendant                        :
                                      :
BARRY L. BRINSER,                     :
individually                          :
and in his official capacity          :
as an employee and agent of           :
the PENNSYLVANIA STATE POLICE         :
     Defendant                        :
                                      :
JOHN DOE 1,                           :
individually                          :
and in his official capacity          :
as an employee and agent of           :
the PENNSYLVANIA STATE POLICE         :
     Defendant                        :
                                      :
JOHN DOE 2,                           :
individually                          :
and in his official capacity          :
as an employee and agent of           :

FILED
HARRISBURG

FEB 1  2001

MARY E. D'ANDREA, CLERK
Per_____
        DEPUTY CLERK

DEFENDANT'S
EXHIBIT
B

the *PENNSYLVANIA STATE POLICE*          :
    *Defendant*                                    :
                                 :

*JOHN DOE 3,*                               :
*individually*                              :
*and in his official capacity*              :
*as an employee and agent of*               :
the *PENNSYLVANIA STATE POLICE*          :
    *Defendant*                                    :
                                 :

*JOHN DOE 4,*                               :
*individually*                              :
*and in his official capacity*              :
*as an employee and agent of*               :
the *PENNSYLVANIA STATE POLICE*          :
    *Defendant*                                    :

## COMPLAINT

       *AND NOW comes the PLAINTIFF by and through The Law Offices of SPERO T. LAPPAS, and makes this COMPLAINT against the above named Defendants.*

                        *RESPECTFULLY SUBMITTED,*

                        *The Law Offices of SPERO T. LAPPAS*

*By:* _____
               *SPERO T. LAPPAS, Esquire*
               *ATTORNEYS FOR THE PLAINTIFF*

## COMPLAINT

AND NOW comes the PLAINTIFF by and through The Law Offices of SPERO T. LAPPAS, and makes this AMENDED COMPLAINT against the above named Defendants, respectfully representing as follows:

### PRELIMINARY AVERMENTS

1.    PLAINTIFF RANDY YORDY is an adult individual residing within the Middle District of Pennsylvania.

2.    DEFENDANT SCOTT BROWN is an adult individual who was at all times material to this cause of action an employee. agent, servant and officer of the PENNSYLVANIA STATE POLICE.

3.    DEFENDANT BERON STEAGER is an adult individual who was at all times material to this cause of action an employee. agent, servant and officer of the PENNSYLVANIA STATE POLICE.

4.    DEFENDANT BARRY BRINSER is an adult individual who was at all times material to this cause of action an employee. agent, servant and officer of the PENNSYLVANIA STATE POLICE.

5.    DEFENDANT PAUL EVANKO is an adult individual who was at all times material to this cause of action an employee, agent, servant and officer of the PENNSYLVANIA STATE POLICE. At such relevant times, he was the commissioner of the pennsylvania state police. In that office he had authority and control of all facets of the operation of the PSP including personnel and disciplinary matters.

6.  All actions described in this Complaint as being taken by the individual defendants were taken in the course and scope of their employment as members of the PENNSYlVANIA STATE POLICE.

7.  All of the Defendant's actions described within this Complaint either _infra_ or _supra_, were intentional, malicious and taken in bad faith; in the alternative, those actions were reckless; in the alternative, those actions were negligent. None of those actions were privileged, or in the alternative, any privilege which would have otherwise attached was lost through abuse of a conditionally privileged occasion.

8.  All of the Defendant's actions described within this Complaint either _infra_ or _supra_, were taken under color of state law.

9.  All harms, damages, and injuries suffered by the PLAINTIFF were the direct, legal and proximate results of the wrongful acts of the DEFENDANTS as described in this Complaint.

10.  The causes of action brought in this Complaint are brought pursuant to _inter alia_ Title 42, United States Code, sections 1983, 1985 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the Civil Rights laws of the United States.

11.  Jurisdiction is founded upon 28 USC § 1331 and 1341 and the aforementioned statutory and constitutional provisions.

12.  Plaintiff further invokes the pendent jurisdiction of this Court to hear and decide claims arising under State Law.

13.    This court has jurisdiction over this case.

*FACTS*

14.    On February 4, 1999 the Plaintiff was driving his motor vehicle in the County of Dauphin, Middle District of Pennsylvania.

15.    At that date, time, and place, DEFENDANT BROWN, who was then and there employed as a police officer with the PSP, stopped the vehicle for the purported reason of investigating a possible driving under the influence offense.

16.    During the course of that stop, DEFENDANT BROWN became violent, and assaulted the PLAINTIFF.

17.    DEFENDANT BROWN's assault upon the PLAINTIFF caused the PLAINTIFF to suffer the following injuries, and losses, <u>inter alia</u>:

a.    he suffered the loss of income;

b.    He was deprived of his liberty;

c.    He suffered great humiliation, embarrassment, mortification, and distress;

d.    He was subjected to unlawful, illegal and unreasonable and unconstitutional use of force;

e.    He was subjected to unlawful, illegal and unreasonable and unconstitutional arrest, detention, confinement, and inconvenience;

f.    He was deprived of his liberty in violation of the Constitutions of the United States of Pennsylvania and further in violation of state and federal law;

g.    He was put in fear of his well-being;

---

h.   He suffered the loss of valuable federally protected rights.

i.   The Plaintiff sustained physical injuries, damages, and losses, including physical and mental pain and suffering;

j.   The Plaintiff incurred medical expenses and other expenses related to the incident;

k.   The Plaintiff has lost earnings and/or earning capacity;

l.   The Plaintiff was required to undergo medical care;

m.   The Plaintiff was required to incur costs and/or to expend money on medical care, health care, and incidental expenses;

n.   The Plaintiff was for a time partially disabled;

o.   The Plaintiff has suffered grave and severe physical injuries;

p.   The Plaintiff has suffered great and severe physical and emotional pain, suffering and upset;

q.   The Plaintiff has been prevented from taking part in and performing the activities of employment, home life, personal life and social and recreational activities;

r.   The Plaintiff has been forced to undergo great and substantial inconvenience, aggravation, and loss of life's pleasures.

18. The PLAINTIFF narrowly escaped the aforementioned assault with his life, and in fact, DEFENDANT BROWN unlawfully and

unconstitutionally discharged his firearm at the PLAINTIFF and PLAINTIFF'S vehicle as the PLAINTIFF was fleeing.

19.  PLAINTIFF then returned to his home whereupon several other PSP officers, some of whom are know to PLAINTIFF as DEFENDANTS STEAGER and BRINSER, and others of whom are unknown and are denominated JOHN DOE defendants in this action pending their identification through discovery and investigations, came to PLAINTIFF's home and assaulted him viciously, perhaps in unlawful retaliation for PLAINTIFF's supposed prior confrontation with DEFENDANT BROWN.

20.  This assault upon PLAINTIFF at PLAINTIFF'S home aggravated the PLAINTIFF'S previous injuries and furthermore caused the following injuries, and losses, _inter alia_:

a.    he suffered the loss of income;

b.    He was deprived of his liberty;

c.    He suffered great humiliation, embarrassment, mortification, and distress;

d.    He was subjected to unlawful, illegal and unreasonable and unconstitutional use of force;

e.    He was subjected to unlawful, illegal and unreasonable and unconstitutional arrest, detention, confinement, and inconvenience;

f.    He was deprived of his liberty in violation of the Constitutions of the United States of Pennsylvania and further in violation of state and federal law;

g.   He was put in fear of his well-being;

h.   He suffered the loss of valuable federally protected rights.

i.   The Plaintiff sustained physical injuries, damages, and losses, including physical and mental pain and suffering;

j.   The Plaintiff incurred medical expenses and other expenses related to the incident;

k.   The Plaintiff has lost earnings and/or earning capacity;

l.   The Plaintiff was required to undergo medical care;

m.   The Plaintiff was required to incur costs and/or to expend money on medical care, health care, and incidental expenses;

n.   The Plaintiff was for a time partially disabled;

o.   The Plaintiff has suffered grave and severe physical injuries;

p.   The Plaintiff has suffered great and severe physical and emotional pain, suffering and upset;

q.   The Plaintiff has been prevented from taking part in and performing the activities of employment, home life, personal life and social and recreational activities;

r.   The Plaintiff has been forced to undergo great and substantial inconvenience, aggravation, and loss of life's pleasures.

21.  At all relevant times, DEFENDANT BROWN's personality,

character, proclivities and record with the PSP was such as to disqualify him from continued employment as a police officer. His personality, character, proclivities and record, and/or his record of prior citizen assaults, disciplinary charges, and official misconducts identified him as one who was illsuited to continued employment, and revealed him as a hazard to the citizens of this Commonwealth.

22.   DEFENDANT BROWN's record would have revealed that disciplinary action, removal from duty, or reassignment was appropriate and that he should not be allowed to continue in police employment, or at least that he not be allowed to interact with members of the public in such a fashion as to allow his dangerous proclivities to present a menace to the public.

23.   In spite of these facts, DEFENDANT EVANKO:

   a.   failed and refused to exercise proper disciplinary control and supervision over DEFENDANT BROWN;

   b.   failed to remove DEFENDANT BROWN from patrol duties;

   c.   failed to take adequate and sufficient steps to protect the public in general and this PLAINTIFF in particular from DEFENDANT BROWN's dangerous proclivities.

   d.   failed to institute such procedures within PSP practices as would lead to BROWN's removal, reassignment, effective discipline or dismissal.

24. DEFENDANT EVANKO'S failures and actions as described in this complaint are the proximate cause, or one proximate cause, of the PLAINTIFF'S injuries, losses and harms.

COUNT 1
*PLAINTIFF V. BROWN*
*VIOLATION OF FEDERAL CIVIL RIGHTS*

25. All other paragraphs of this Complaint are incorporated into this count by reference thereto.

26. WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

COUNT 2
*PLAINTIFF V. EVANKO*
*VIOLATION OF FEDERAL CIVIL RIGHTS*

27. All other paragraphs of this Complaint are incorporated into this count by reference thereto.

28. WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

COUNT 3
*PLAINTIFF V. BERON F. STEAGER*
*VIOLATION OF FEDERAL CIVIL RIGHTS*

29. All other paragraphs of this Complaint are incorporated into this count by reference thereto.

30. WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

### COUNT 4
### PLAINTIFF V. BARRY L. BRINSER
### VIOLATION OF FEDERAL CIVIL RIGHTS

31.  All other paragraphs of this Complaint are incorporated into this count by reference thereto.

32.  WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

### COUNT 5
### PLAINTIFF V. JOHN DOE 1
### VIOLATION OF FEDERAL CIVIL RIGHTS

33.  All other paragraphs of this Complaint are incorporated into this count by reference thereto.

34.  WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

### COUNT 6
### PLAINTIFF V. JOHN DOE 2
### VIOLATION OF FEDERAL CIVIL RIGHTS

35.  All other paragraphs of this Complaint are incorporated into this count by reference thereto.

36.  WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

### COUNT 7
### PLAINTIFF V. JOHN DOE 3
### VIOLATION OF FEDERAL CIVIL RIGHTS

37.  All other paragraphs of this Complaint are incorporated into this count by reference thereto.

38. WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

### COUNT 8
### PLAINTIFF V. JOHN DOE 4
### VIOLATION OF FEDERAL CIVIL RIGHTS

39. All other paragraphs of this Complaint are incorporated into this count by reference thereto.

40. WHEREFORE, the PLAINTIFF demands judgment against this Defendant for compensatory and punitive damages plus costs of litigation and attorneys' fees.

### COUNT 9
### PLAINTIFF V. ALL DEFENDANTS
### VIOLATION OF FEDERAL CIVIL RIGHTS

41. All other paragraphs of this Complaint are incorporated into this count by reference thereto.

42. WHEREFORE, the PLAINTIFF demands judgment against these Defendants jointly and severally for monetary damages, plus costs of litigation and attorneys' fees.

*RESPECTFULLY SUBMITTED,*

*The Law Offices of SPERO T. LAPPAS*

*By:* _____

*SPERO T. LAPPAS, Esquire*
*Pa. Supreme Ct. ID no. 25745*
*205 State Street*
*P.O. Box 808*
*Harrisburg, PA 17108-0808*
*(717) 238-4286*
*ATTORNEY FOR THE PLAINTIFF*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY,                          :
      Plaintiff              :
                        :    No. 1:01-CV-0206
    v.                              :
                        :    (Judge Kane)
SCOTT BROWN, PAUL EVANKO,             :
BERON F. STEAGER, AND BARRY L.        :
BRINSER, et al.,                      :
      Defendants             :

### ANSWER

Defendants, Scott Brown, Paul Evanko, Beron Steager and Barry Brinser,
by their counsel, hereby submit this answer to the complaint.

### FIRST DEFENSE

The numbered allegations are answered as follows:

1.    ADMITTED.

2.    ADMITTED in part; DENIED in part. ADMITTED that, at all
material times, Scott Brown was an employee of the Pennsylvania State Police.
The remainder of this numbered paragraph contains conclusions of law to which
NO RESPONSE is required; to the extent they are deemed factual, they are
DENIED.

3.    ADMITTED in part; DENIED in part. ADMITTED that, at all
material times, Beron Steager was an employee of the Pennsylvania State Police.

DEFENDAN
EXHIBIT

The remainder of this numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

4.    ADMITTED in part; DENIED in part. ADMITTED that, at all material times, Barry Brinser was an employee of the Pennsylvania State Police. The remainder of this numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

5.    ADMITTED in part; DENIED in part. ADMITTED that, at all material times, Paul Evanko was an employee of the Pennsylvania State Police and held the position of Commissioner. The remainder of this numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

6.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are ADMITTED.

7.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

8.     This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are ADMITTED.

9.     This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

10.     This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

11.     This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

12.     This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

13.     This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

14.     ADMITTED.

15.     ADMITTED in part; DENIED in part. DENIED that the reason for the traffic stop was "purported." The remainder of this numbered paragraph is ADMITTED.

16.     DENIED.

17.     DENIED.

3

a.    DENIED.

b.    DENIED.

c.    DENIED.

d.    DENIED.

e.    DENIED.

f.    DENIED.

g.    DENIED.

h.    DENIED.

i.    DENIED.

j.    DENIED.

k.    DENIED.

l.    DENIED.

m.    DENIED.

n.    DENIED.

o.    DENIED.

p.    DENIED.

q.    DENIED.

r.    DENIED.

18.     ADMITTED in part; DENIED in part. ADMITTED that Brown discharged his firearm. The remainder of this numbered paragraph is DENIED.

19.     ADMITTED in part; DENIED in part. ADMITTED that Steager and Brinser came to plaintiff's home. The remainder of this numbered paragraph is DENIED.

20.     DENIED.

     a.     DENIED.

     b.     DENIED.

     c.     DENIED.

     d.     DENIED.

     e.     DENIED.

     f.     DENIED.

     g.     DENIED.

     h.     DENIED.

     i.     DENIED.

     j.     DENIED.

     k.     DENIED.

     l.     DENIED.

     m.     DENIED.

n.    DENIED.

o.    DENIED.

p.    DENIED.

q.    DENIED.

r.    DENIED.

21.    DENIED.

22.    DENIED.

23.    DENIED.

a.    DENIED.

b.    DENIED.

c.    DENIED.

d.    DENIED.

24.    This numbered paragraph contains conclusions of law to which NO

RESPONSE is required; to the extent they are deemed factual, they are DENIED.

25.    This numbered paragraph contains conclusions of law to which NO

RESPONSE is required; to the extent they are deemed factual, they are DENIED.

26.    This numbered paragraph contains conclusions of law to which NO

RESPONSE is required; to the extent they are deemed factual, they are DENIED.

27.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

28.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

29.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

30.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

31.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

32.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

33.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

34.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

35.    This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

36.   This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

37.   This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

38.   This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

39.   This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

40.   This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

41.   This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

42.   This numbered paragraph contains conclusions of law to which NO RESPONSE is required; to the extent they are deemed factual, they are DENIED.

## SECOND DEFENSE

The complaint fails to state a claim upon which relief may be granted.

### THIRD DEFENSE

At no time did defendant, either individually or in concert with others, deprive or seek to deprive plaintiff of any rights, privileges or immunities secured to him by the Constitution or laws of the United States.

### FOURTH DEFENSE

At all material times, defendant acted with a reasonable good faith belief in the lawfulness of his actions and is entitled to immunity therefor.

### FIFTH DEFENSE

Any harm occurring to plaintiff, which harm is specifically denied, was the proximate result of actions or inactions of persons other than answering defendant.

### SIXTH DEFENSE

Any harm occurring to plaintiff, which harm is specifically denied, was the proximate result of actions or inactions of plaintiff himself.

### SEVENTH DEFENSE

The Court lacks subject matter jurisdiction.

### EIGHTH DEFENSE

Plaintiff is estopped to litigate his claims against defendant.

### NINTH DEFENSE

Defendant is immune from suit.

## TENTH DEFENSE

The complaint is meritless, frivolous or vexatious warranting an award of

attorney's fees against plaintiff.

Wherefore, judgment should be entered in favor of defendants, together

with costs and attorney's fees.

Respectfully submitted,

**D. MICHAEL FISHER**
**Attorney General**

By: _____

**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Litigation Section**

**OFFICE OF ATTORNEY GENERAL**
**15th Floor, Strawberry Square**
**Harrisburg, PA   17120**
**717-787-8106**

**DATE:  October 5, 2001**

**EVANKO, PAUL**
11/1/2002

**YORDY VS**
**BROWN, ET AL**

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3

     RANDY YORDY,                        :
 4                    PLAINTIFF          :
                                         :
 5            VS.                        : NO. 1:01-CV-0206
                                         :
 6   SCOTT BROWN, INDIVIDUALLY AND IN    :
     HIS OFFICIAL CAPACITY AS AN         : JUDGE KANE
 7   EMPLOYEE AND AGENT OF THE           :
     PENNSYLVANIA STATE POLICE,          :
 8                    DEFENDANT          :
                                         :
 9   PAUL EVANKO, INDIVIDUALLY AND IN    :
     HIS OFFICIAL CAPACITY AS AN         :
10   EMPLOYEE AND AGENT OF THE           :
     PENNSYLVANIA STATE POLICE,          :
11                DEFENDANT, ET ALII     :

12

13

14

15

16

               DEPOSITION OF:   PAUL J. EVANKO
17

               TAKEN BY:        PLAINTIFF
18

               BEFORE:          LISA A. HANSELL, REPORTER
19                              NOTARY PUBLIC

20   DATE:                      NOVEMBER 1, 2002, 10:00 A.M.

21   PLACE:                     PENNSYLVANIA STATE POLICE
                                1800 ELMERTON AVENUE
22                              HARRISBURG, PENNSYLVANIA

23

24

25
```

DEFENDANT
EXHIBIT
D
PENGAD-Bayonne, N.J.

**EVANKO, PAUL**
**11/1/2002**

**YORDY VS**
**BROWN, ET AL**

---

**Page 2**

```
 1   APPEARANCES:
 2     SERRATELLI, SCHIFFMAN, BROWN & CALHOON, P.C.
       BY: SPERO T. LAPPAS, ESQUIRE
 3         FOR - PLAINTIFF
 4     OFFICE OF THE ATTORNEY GENERAL
       BY: GREGORY NEUHAUSER, ESQUIRE
 5         FOR - DEFENDANTS
 6     PENNSYLVANIA STATE POLICE
       OFFICE OF CHIEF COUNSEL
 7     BY: THOMAS F. JAKUBIAK, ESQUIRE
           FOR - DEFENDANTS
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

TABLE OF CONTENTS

WITNESS

FOR PLAINTIFF          DIRECT     CROSS
Paul J. Evanko            4

---

**Page 4**

```
 1        PAUL J. EVANKO, called as a witness, being
 2   sworn, testified as follows:
 3
 4                DIRECT EXAMINATION
 5
 6   BY MR. LAPPAS:
 7     Q     Commissioner Evanko, as you know, my name is
 8   Spero Lappas, and I've asked you to be here today to give a
 9   deposition in a case that was filed by my client, Randy
10   Yordy, against you, Scott Brown and certain other people in
11   connection with an incident that took place involving Scott
12   Brown and some of the other troopers of the Pennsylvania
13   State Police on February 4, 1999.
14        Obviously, I know that you've taken
15   depositions before, but just let me remind you not to begin
16   answering a question until I've completed it and to confirm
17   for you that if at any time during the course of the
18   deposition you want to consult with either of the attorneys
19   who are present here on your behalf you certainly may do so
20   simply by asking.
21        Now, for the purposes of this record, would
22   you tell us, please, how long you've been the Commissioner
23   of the Pennsylvania State Police?
24     A     Since February of 1995.
25     Q     And what are your duties as Commissioner of
```

---

**Page 5**

```
 1   the Pennsylvania State Police?
 2     A     I'm responsible for the overall administration
 3   and command of the Department and the budget.
 4     Q     What responsibilities do you have with respect
 5   to discipline of members of the Pennsylvania State Police?
 6     A     I designate those duties to be done by the
 7   Deputy Commissioner of Operations through the Department
 8   Disciplinary Officer.
 9     Q     Do you have any supervisory authority over
10   disciplinary matters?
11     A     In so much as I can dismiss troopers and
12   impose significant discipline based upon the recommendation
13   of the disciplinary officer.
14     Q     Is there one member that's designated
15   disciplinary officer?
16     A     There is a disciplinary officer and an
17   assistant disciplinary officer.
18     Q     Who is the disciplinary officer today, for
19   example?
20     A     Captain Barry Titler, and the assistant is
21   Lieutenant Carl Harrison.
22     Q     Do you know offhand how long Captain Titler
23   has been the disciplinary officer?
24     A     A couple of years, but I don't know the
25   specific time.
```

---

2 (Pages 2 to 5)

EVANKO, PAUL
11/1/2002

YORDY VS
BROWN, ET AL

6

1    Q    Do you know who was the disciplinary officer
2    before he was?
3    A    I believe it was Captain Dave Points.
4    Q    Now, as you probably know, one of the issues
5    involved in this case is the disciplinary record of a
6    Trooper Scott Brown. I'm going to be showing you certain
7    exhibits during the course of the deposition, but in general
8    terms do you know anything about Trooper Brown's
9    disciplinary record?
10   A    No, I don't.
11   Q    Do you know what his current status is with
12   the Pennsylvania State Police?
13   A    No, I don't.
14   Q    As I was being escorted into the conference
15   room here, I noticed there was a posting out in the lobby of
16   this office that indicated he was currently on suspension
17   without pay. Do you know anything about that?
18   A    No, I don't.
19       MR. LAPPAS: Off the record.
20       (Discussion held off the record.)
21   BY MR. LAPPAS:
22   Q    Now, Commissioner Evanko, the packet of
23   materials that I've just handed you consists of a number of
24   exhibits, and although we're not going to discuss all of
25   them, we are going to discuss some of them, but there are

7

1    eleven of them in total. The first document is marked as
2    Exhibit 1, and it is a memorandum dated June 25, 1997. It's
3    a one-page memorandum that deals with Trooper Scott Brown.
4    Have you ever seen this document before?
5    A    No, sir.
6    Q    Would you take a moment and read it, please?
7    A    Yes, sir.
8    Q    Okay. Now, Paragraph 2 -- and, just for the
9    record, this is a memorandum from Captain Larry Williams,
10   who identifies himself as the disciplinary officer as of
11   June 25, 1997.
12       Paragraph 2 reads that "A review of Trooper
13   Scott A. Brown's personnel record reveals repeated
14   violations of Department rules and regulations. These
15   recurrent infractions raise serious questions as to Trooper
16   Brown's willingness to conform to acceptable standards of
17   behavior as established by the Department." Were you ever
18   made aware of this opinion or this conclusion of Captain
19   Williams?
20   A    Not that I recall.
21   Q    Is this the sort of matter -- this sort of
22   opinion expressed by a disciplinary officer, would this
23   normally reach your attention?
24   A    It would depend what the discipline was
25   imposed for whatever the infraction was here.

8

1    Q    I see. Turn, please, then to the next page,
2    which begins Exhibit 2. Exhibit 2 relates -- I'm sure your
3    counsel would confirm this -- to a disciplinary -- a
4    grievance filed by Scott Brown with respect to the
5    allegation that he had engaged in an unwelcome and
6    unnecessary touching of a civilian officer, who is
7    identified here as Christine Kosh. Were you ever made aware
8    of the fact that Trooper Brown had been found to have
9    engaged in the unwelcome and unnecessary touching of
10   Christine Kosh?
11   A    Not that I recall, no.
12   Q    And according to this opinion of the
13   arbitrator, Mr. Brown was given a one-day suspension. I
14   believe the actual infraction was conduct unbecoming but --
15   yes, conduct unbecoming and performance of duty. I take it
16   you were not ever made aware of this particular infraction?
17       MR. NEUHAUSER: I'm going to object, Counsel.
18   I don't think the decision was a one-day suspension. The
19   last page says a written reprimand. So to the extent that
20   it's --
21       MR. LAPPAS: Okay. Well, evidently --
22       MR. NEUHAUSER: I object to the form.
23       MR. LAPPAS: You're correct, the original
24   discipline imposed was a one-day suspension, and then by
25   virtue of this order it was reduced to a one-day reprimand.

9

1    BY MR. LAPPAS:
2    Q    Would I be correct in stating that you were
3    not made aware of this particular infraction?
4    A    That is correct. I don't recall knowing about
5    that.
6    Q    Now, the next exhibit, which is Exhibit 3,
7    deals with a disciplinary action report indicating that on
8    August 2, 1997 Trooper Brown used foul language, yelled,
9    threatened and lost composure while interacting with the
10   family of a Brian Plasterer, and this is signed by Captain
11   Marcantino. Were you ever made aware of this particular
12   infraction?
13   A    No, sir, not that I recall.
14   Q    As a result of the information reported in
15   Exhibit 3, Trooper Brown apparently was cited for violations
16   of the requirement to have courtesy and also cited for
17   committing unbecoming conduct. Exhibit 3 has three pages to
18   it, and then it's followed by a memorandum from Trooper
19   Brown, which is marked as Exhibit 4. Would you look at that
20   memorandum, please? Take a moment. It's relatively short,
21   a page and a half. Take a moment, please, to review it.
22   A    I've read it. Let me read Paragraphs 5, 6
23   and 7.
24   Q    Certainly.
25   A    I've read it.

3 (Pages 6 to 9)

EVANKO, PAUL
11/1/2002

YORDY VS
BROWN, ET AL

10

1    Q    In Exhibit 4, Trooper Brown presents evidence
2   which he asks to be considered in mitigation of his penalty,
3   and he indicates, for example, at Paragraph 5 that at the
4   time of this threatening and abusive conduct -- I'm sorry --
5   foul language, yelling, threatening, and loss of composure
6   he was being treated for strep throat by a licensed
7   physician. Would you, as the Commissioner of the State
8   Police, believe that a strep throat would be a factor to
9   mitigate the use of foul language, threatening, and yelling
10  at civilians?
11   A    No, sir.
12   Q    The next paragraph indicates -- again in
13  mitigation of the penalty or in explanation of his behavior,
14  I'm not sure which one -- that Trooper Brown indicates that
15  on the day that he engaged in this yelling, threatening, and
16  loss of composure it was humid and it was -- the temperature
17  was 85 degrees. Would you feel that was evidence in
18  mitigation of this kind of behavior?
19   A    No, sir.
20   Q    Now, I don't believe it's in these particular
21  documents, but the specific language that Trooper Brown used
22  is cited elsewhere in the record as being, I believe, that
23  he referred to these people as assholes. Trooper Brown
24  indicates in Paragraph 7 that he did so in order to, to use
25  his language, provide a positive influence on the juvenile.

11

1   Would you agree that that's a good way to provide a positive
2   influence on a juvenile?
3           MR. NEUHAUSER: I'm going to object in the
4   sense that the question has assumptions in it that this
5   witness may not be prepared to accept.
6   BY MR. LAPPAS:
7    Q    For the purposes of my question, assume that
8   during the course of the behavior that's relevant to
9   Exhibits 3 and 4 Trooper Brown used the word asshole. Would
10  you think that was an appropriate way to provide a positive
11  influence?
12          MR. NEUHAUSER: With those assumptions, you
13  can answer.
14   A    With the assumptions that he has done so with
15  a juvenile involved in what was it, the theft of a bicycle?
16  BY MR. LAPPAS:
17   Q    Right.
18   A    My answer would be no.
19   Q    Now, the next exhibit, which is Exhibit 5,
20  deals with an incident that's alleged to have taken place on
21  April 10, 1996 in the Borough of Lemoyne in Cumberland
22  County. This, again, involves Trooper Brown, and the
23  memorandum is prepared by Lieutenant Grolemund. I hope I'm
24  pronouncing his name correctly. Are you aware of this
25  incident, Commissioner Evanko?

12

1    A    No, sir.
2    Q    Well, then please take a moment and read
3   Exhibit 5 as to the typewritten pages.
4    A    I've read it.
5    Q    Now that you've read it, would it continue to
6   be your testimony that you're not familiar with this
7   incident until just today?
8    A    The only thing I'm familiar with is -- if this
9   is the one where there was a window rolled up on his arm and
10  he was drug, if that's the same incident, I was aware that
11  there was a trooper involved in something like this, but I
12  don't know if this is the same --
13   Q    It doesn't sound like the same incident to
14  me.
15   A    Then my answer is no, I don't recall ever
16  seeing this.
17   Q    Assuming that the facts of the underlying
18  incident are consistent with the facts as reported in this
19  memo by Lieutenant Grolemund, would you agree that Trooper
20  Brown committed a number of infractions of your misconduct
21  regulations?
22   A    Yes, I would.
23   Q    Now, the next exhibit, Exhibit 6, deals with
24  the investigation of the Lemoyne Borough incident, the
25  investigation of the incident described in Exhibit 5, and

13

1   I'm going to ask you to take a moment to read Exhibit 6. It
2   consists only of this one page.
3    A    I've read it.
4    Q    Now, the second to the last paragraph in
5   Exhibit 6 -- I'm sorry. The second full paragraph in the
6   section called details indicates towards the end of that
7   paragraph that during a disciplinary meeting -- actually, I
8   think it's described as a pre-disciplinary conference --
9   between Trooper Brown and Lieutenant Grolemund Trooper Brown
10  made statements to Lieutenant Grolemund which he
11  acknowledged to be, in the Lieutenant's words, untruthful
12  and a lie, and then the lieutenant summarizes this by saying
13  Brown stated he lied to avoid getting into trouble. Would
14  it be considered in your understanding a disciplinary
15  infraction for a trooper to lie to a matter -- lie to a
16  superior officer concerning a matter under investigation?
17   A    Yes, sir.
18   Q    The second to the last paragraph of this
19  exhibit states that -- and I'm not reading it in full, but
20  it states that Trooper Brown's admission of a deliberate and
21  intentional lie to the investigating officer casts doubt on
22  Brown's credibility on all relevant parts of this
23  investigation in which he is contradicted by evidence or
24  other testimony. Would you agree that that is an
25  appropriate conclusion for Trooper Grolemund to have reached

EVANKO, PAUL
11/1/2002

YORDY VS
BROWN, ET AL

14

1　under these circumstances?
2　　　A　　I think it is.
3　　　　MR. NEUHAUSER:  Again, with the continuing
4　objection that the question has assumptions and all the
5　Commissioner's been aware of is what you presented to him.
6　　　　MR. LAPPAS:  Right.  That assumes, of course,
7　that the facts concerning this pre-disciplinary conference
8　are consistent with the way they were reported by Lieutenant
9　Grolemund in Exhibit 6.
10　　　　Now, the next exhibit, which is Exhibit 7,
11　consists of a cover page and then two typewritten pages, and
12　I'm going to ask that you review this exhibit, please.  Take
13　as much time as you want.
14　　　　While you're doing that, let me just state for
15　the record that the exhibits that I'm discussing with the
16　witness are identical to the exhibits that were attached to
17　the plaintiff's brief in opposition to the defendant's
18　motion in limine which was filed with the court on October
19　24th of 2002, and because of that I don't propose to attach
20　them to the transcript.
21　　　　MR. NEUHAUSER:  Okay.  Let's note for the
22　record that the witness has left the room in order to answer
23　a telephone call.
24　　　　(Recess.)
25　　　A　　I've read it.

15

1　BY MR. LAPPAS:
2　　　Q　　Now, towards the end of this exhibit, the
3　bottom of the second page of the exhibit, Trooper Brown
4　indicates that he has taken proactive steps to correct his
5　shortcomings.  He states that he's currently receiving
6　prescribed medication for attention deficit hyperactivity
7　disorder, and he is seeing Department Psychologist Larry
8　Walker.  He has come to terms with his family situation.
9　　　　If a trooper under your command is receiving
10　psychological treatment, do you have the right to request
11　that his treatment records be opened to his superior
12　officers in the Pennsylvania State Police?
13　　　A　　I'd have to --
14　　　Q　　Do you understand the question?
15　　　A　　I understand, and I'd have to ask the Deputy
16　of Administration because I'm not sure.
17　　　Q　　Okay.  Do you remember any situation in which
18　you have asked for treatment records for a trooper who
19　acknowledged that he was having psychological problems?
20　　　A　　I can't remember that I have asked that, no.
21　　　Q　　Are you aware of any cases where other State
22　Police officials have asked for that information?
23　　　A　　I'm not personally aware of that, no.
24　　　　MR. NEUHAUSER:  Counsel, just for
25　clarification, was the question limited to department

16

1　psychological staff or any treatment or doesn't it matter to
2　you?
3　　　　MR. LAPPAS:  Let's ask the question with
4　respect to any kind of psychological or mental health
5　treatment.
6　BY MR. LAPPAS:
7　　　Q　　If a trooper had indicated to the Pennsylvania
8　State Police that he was receiving mental health treatment
9　for an acknowledged psychological or mental health problem,
10　would the Department have the authority to request that
11　those treatment records be opened and be delivered to
12　departmental personnel for review?
13　　　A　　I'd have to check with the Deputy of
14　Administration to see if we have authority to do that.
15　　　Q　　And would your answers be the same that you
16　don't have any specific recollection of having done that
17　either personally or through your subordinates on any other
18　occasions?
19　　　A　　That is correct.
20　　　Q　　The next document, which is marked as
21　Exhibit 8, is an opinion and award of an arbitrator, who's
22　identified as Lynne M. Mountz.  I'm not going to ask you to
23　read this entire document, although if you'd like to you
24　certainly may.
25　　　　I will summarize it by telling you that this

17

1　deals with a grievance which Trooper Brown filed after
2　receiving a discipline concerning the Garcia matter, which
3　is the incident that was described in exhibits -- I guess
4　they were 6 and 7 -- 5, 6 and 7.  Again, I will tell you,
5　and ask you to assume -- and your counsel can correct me if
6　I'm wrong -- that the Department imposed a discipline on
7　Trooper Brown.  He grieved it alleging, among other things,
8　that the discipline had not been filed in a timely fashion
9　and that he asked that it be rescinded based upon what is
10　described here as a violation of the Statute of Limitations.
11　　　　Now, I take it you're familiar with the fact
12　that the Collective Bargaining Agreement and perhaps other
13　regulations of the State Police require that disciplinary
14　charges are filed within a certain period of time; is that
15　accurate?
16　　　A　　Yes, sir.
17　　　Q　　And it's my understanding from reading this
18　document -- and tell me if this is consistent with your
19　understanding -- that if the charges are not filed within
20　the appropriate time the member who is affected by those
21　charges can ask that they be dismissed or rescinded?
22　　　A　　He can propose that argument to the
23　arbitrator.
24　　　Q　　Right.  He has a right to file a grievance,
25　and then it goes to arbitration, and he can seek dismissal

5 (Pages 14 to 17)

EVANKO, PAUL
11/1/2002

YORDY VS
BROWN, ET AL

**18**

1  of the charges on the basis that they were too late?
2      **A**    **I think that is correct, yes, sir.**
3      Q    And then it's up to the arbitrator to make the
4  final decision under those circumstances?
5      **A**    **Yes, it is.**
6      Q    Now, is reassignment from one job duty within
7  the Department to another job duty a disciplinary matter
8  that a trooper can grieve?
9      **A**    **I don't think that's grievable.**
10     Q    So, hypothetically, when Trooper Brown was
11 found to have violated departmental regulations in
12 connection with the Garcia matter and his disciplinary
13 suspension was rescinded by Arbitrator Mountz, could he have
14 been reassigned from patrol duty, for example, to desk duty?
15     MR. NEUHAUSER: For any reason or based on the
16 arbitration decision?
17     MR. LAPPAS: For any reason.
18     MR. NEUHAUSER: Whether it's related to the
19 arbitration or not?
20     MR. LAPPAS: Right.
21 BY MR. LAPPAS:
22     Q    My question is basically this: does the
23 Commissioner or anyone acting subordinate to the
24 Commissioner have the authority to reassign a trooper from
25 one job duty to another without that transfer or

**19**

1  reassignment being a disciplinary, grievable matter?
2      **A**    **Consistent with any provisions that might be**
3  **contrary to the Collective Bargaining Agreement, I think the**
4  **troop commander does have that authority.**
5      Q    Okay. Do you know what kind of provisions
6  would make such a reassignment contrary to the Collective
7  Bargaining Agreement?
8      **A**    **I think there's some provisions in there that**
9  **have to do with seniority in positions and the need to take**
10 **the less senior person in some circumstances if you're going**
11 **to change duty positions. I'd have to sit down with the**
12 **Deputy of Administration and get that clarified.**
13     Q    I understand. Well, let's use the Trooper
14 Brown situation as the focus of our discussion. As of April
15 of 1998 when Arbitrator Mountz rescinded his discipline, he
16 had been involved in the matter with a juvenile, a bicycle
17 theft case in which he was disciplined for being threatening
18 and abusive, using foul language, etcetera. He had received
19 a previous discipline for unwanted and unwelcome, I think is
20 the term, inappropriate touching of Ms. Kosh.
21     Captain Williams had filed a memorandum
22 indicating that Trooper Brown's recurrent infractions raised
23 serious questions as to his willingness to conform to
24 acceptable standards of behavior. He had been found by I
25 think it was Lieutenant Grolemund to have engaged in a

**20**

1  deliberate lie on a matter during an investigation, and now
2  we have the Garcia incident which involves drawing a gun and
3  engaging in other kinds of conduct which led to a ten-day
4  suspension. That ten-day suspension was then rescinded on a
5  technicality of the Statute of Limitations violation.
6      Now, I know this is a long question, and those
7  are the introductory remarks. Once this happens and the
8  discipline is rescinded, was there any reason that you're
9  aware of that Trooper Brown couldn't have been moved from
10 patrol duties, where he would come into day-to-day contact
11 with the general public, to say desk duty or something that
12 would be slightly less, to use my term, dangerous?
13     MR. NEUHAUSER: For the record, I'm going to
14 object on the foundation. I'm not going to instruct him not
15 to answer, but, just for the record, assuming that all the
16 facts, the chronology and everything that you just said in
17 your prefatory statement is correct, I'll allow him to
18 answer, but we're not conceding that that is accurate.
19     MR. LAPPAS: I acknowledge that.
20     MR. NEUHAUSER: Do you understand?
21     **A**    **And the question is could he have --**
22 BY MR. LAPPAS:
23     Q    In light of all the things we've discussed,
24 could he have been reassigned from patrol duty to something
25 that wouldn't put him in such close contact with the public,

**21**

1  desk duty or dispatch or -- I don't know what else is
2  available or what would have been available. Could he have
3  been transferred to something else?
4      MR. NEUHAUSER: Assuming no other violations
5  of the Collective Bargaining Agreement, which he's already
6  testified to, and -- with all those assumptions, could he be
7  transferred?
8      MR. LAPPAS: Correct.
9      **A**    **I'd have to really confer with the Deputy of**
10 **Administration to make sure of my answer.**
11 BY MR. LAPPAS:
12     Q    Who would that be that you would confer with?
13     **A**    **Lieutenant Colonel Hawthorne Conley.**
14     Q    I understand that you need to consult with
15 Lieutenant Colonel Conley, but as a general proposition
16 would it be true that troopers are assigned at the
17 discretion of the administration and can be reassigned to
18 positions where their particular qualifications best suit
19 them?
20     **A**    **Consistent, again, with the articles of the**
21 **contract, the Collective Bargaining Agreement.**
22     Q    Okay. Now, the next document in this packet
23 is Exhibit 9. Now, Exhibit 9 is the deposition of Trooper
24 Brown in this particular case, and I'm confident that you
25 have not -- I do not expect that you would have seen this

6 (Pages 18 to 21)

22

1  before today. Is it accurate that you've not seen it before
2  today?
3      A      That is accurate.
4      Q      Now, I've told you that the arbitrator's
5  decision concerning the suspension that is dealt with in
6  Exhibit 8, Arbitrator Mountz's decision in April of 1998,
7  reversed or rescinded Trooper Brown's ten-day suspension
8  because of a Statute of Limitations problem.
9          Now, in Trooper Brown's deposition,
10  specifically at Pages 18 and 19, I discussed with him the
11  reasons for Arbitrator Mountz's decision, and at Page 18,
12  which is in the bottom left-hand corner of that sheet,
13  starting at Line 16, he indicates that that suspension was
14  completely revoked, taken out of my file, and dismissed. I
15  asked him on what grounds, and he states that the grounds
16  were that it wasn't justified. Then we continued to discuss
17  this onto Page 19, and he states beginning at Line 1 he,
18  referring to the arbitrator, felt that I -- in his
19  statements, his findings, he found that I not only complied
20  with Pennsylvania State Police regulations, I also complied
21  with the current law in the Commonwealth of Pennsylvania and
22  was justified in doing what I did.
23          Now, let's assume for the purposes of this
24  question that the documents that you have in front of you
25  are accurate and that the arbitrator based her decision on a

23

1  Statute of Limitations timeliness problem and that she never
2  at all found that Trooper Brown had complied with State
3  Police regulations, that he had complied with the current
4  law of the Commonwealth, and further she never found that he
5  was justified in doing what he did. Let's further assume
6  for the purpose of my question that Trooper Brown had been
7  made aware of the reasons for the arbitrator's decision.
8          Would it be considered a violation of State
9  Police policy for him to have given -- not policy, but the
10  regulations which govern the conduct of troopers -- for him
11  to have given false testimony while under oath at his
12  deposition?
13      A      I guess it depends what his understanding of
14  the arbitrator's decision was based on.
15      Q      Right. Okay. I understand that. If it could
16  be determined that he understood that the decision was a
17  Statute of Limitations decision, that she had specifically
18  refused to deal with the merits of the case, and then he had
19  testified that she found that everything was fine and he was
20  cleared, would that kind of false testimony be a violation
21  of State Police regulations?
22      A      If that's what was his understanding, yes,
23  sir.
24      Q      Okay. Now, the next document, which is
25  Exhibit 10, is a multiple page memorandum from a Dr. Roger

24

1  Cadieux, and it's addressed to Michael S. Marrone, M.D.,
2  State Police Medical Officer at this address, 1800 Elmerton
3  Avenue, Harrisburg, Pennsylvania. And, for the record, this
4  is Exhibit 10, and the date of this exhibit is November 17,
5  2000.
6          MR. NEUHAUSER: Just for the record, we'll
7  note that this was after the incident about which plaintiff
8  complains in this case.
9          MR. LAPPAS: Right. The date of this document
10  is some year and a few months after the February '99
11  incident.
12  BY MR. LAPPAS:
13      Q      First of all, do you know anything about the
14  circumstances by which Trooper Brown was asked to be
15  evaluated by Dr. Cadieux?
16      A      No, sir.
17      Q      Do you know Michael S. Marrone, M.D.?
18      A      Yes, I do.
19      Q      And he's identified here as State Police
20  Medical Officer. Is that, in fact, his position?
21      A      Yes, sir.
22      Q      Is he a full-time employee of the Pennsylvania
23  State Police, or is he a consultant? What exactly is his
24  affiliation with the Department?
25      A      I think he works part time for the Department.

25

1      Q      Now, I understand that you've testified that
2  you're not familiar with the circumstances by which Corporal
3  Brown was asked to see Dr. Cadieux, but are you familiar
4  with whether or not the State Police can require members to
5  submit to psychiatric evaluations?
6      A      I know that we have the authority to order an
7  independent psychiatric evaluation.
8      Q      And has that authority been in place as long
9  as you've been the Commissioner?
10      A      I believe that it has been, yes, sir.
11      Q      Generally, who within the Department has that
12  authority to require an independent psychiatric evaluation?
13      A      I believe the Deputy Commissioner of
14  Administration has that authority.
15      Q      And could you also order it by your own
16  authority?
17      A      I could, if it got to my level.
18      Q      And does the Department have the authority to
19  either suspend or reassign or otherwise take a member out of
20  service based upon evidence that is revealed during the
21  independent psychiatric examination?
22      A      I would think that we would.
23      Q      Okay. Now, from your own experience as -- and
24  I don't mean as the Commissioner -- an officer of the
25  Pennsylvania State Police -- and I understand you've held a

EVANKO, PAUL
11/1/2002

YORDY VS
BROWN, ET AL

---

26

1  great many positions within the Department -- what would be
2  the criteria that you feel would be important in deciding
3  whether to order an independent psychiatric examination of a
4  trooper?
5      A      There are provisions in the policy that spell
6  out what they are, and without looking at them I'm going to
7  be speculating.
8      Q      Are you telling me that there are certain
9  regulations that provide for the criteria for having that
10 sort of evaluation done?
11     A      I think they are either in policy or practice.
12     Q      Are they written down somewhere?
13     A      I think they are.
14         MR. LAPPAS:  Can we ask to have a copy of
15 those regulations or whatever the proper terminology would
16 be provided to us?
17         MR. NEUHAUSER:  Sure.  We'll look for it.
18         MR. LAPPAS:  All right.
19 BY MR. LAPPAS:
20     Q      Now, Commissioner Evanko, when we began the
21 deposition, you indicated that, if I understood you
22 correctly, you have ultimate disciplinary authority within
23 the Department, but you have designated that authority to
24 some of your subordinate officers.  Would that be accurate?
25     A      That is accurate.

---

27

1      Q      And as you have made this designation, have
2  you imposed any requirements on the subordinate officers
3  that certain kinds of cases be brought to your attention?
4      A      There are provisions, and, again, I would have
5  to sit down with the Deputy of Administration to specify
6  exactly which of those come to me for final penalty and
7  disposition.  For example, dismissals would come to me.
8      Q      Instead of concentrating on the ultimate
9  disposition of a case, my question was I guess directed more
10 towards the kind of misconduct that might or might not be
11 committed by a member.  Are there certain kinds of
12 misconduct cases that you require that you be made aware
13 of?  If a trooper shoots somebody are you supposed to be
14 made aware of that, or commits a felony?
15     A      Yes.  I'm to be made aware of significant
16 violations of Department regulations, but I don't -- in
17 those cases where I am made aware of those, I get a synopsis
18 of where it occurred, what trooper, what bureau, but without
19 a name.
20     Q      Without a name?
21     A      Without a name.
22     Q      Why is that?
23     A      Because if the individual chooses a
24 court-martial, I'm not supposed to have background
25 information that might prejudice my decision in a

---

28

1  court-martial proceeding.
2      Q      You have ultimate court-martial authority?
3      A      Yes, I do.
4      Q      If I remember anything about the court-martial
5  procedure, there's a panel of officers that conducts the
6  court-martial hearing; is that correct?
7      A      I've never had to do one, but my understanding
8  is that there's a panel of officers that I preside over.
9      Q      You, yourself, preside over the actual
10 hearing?
11     A      I think that's the case, but I've never had to
12 do one.
13     Q      I see.  The court-martial regulations, I
14 guess, are spelled out somewhere in a regulatory handbook or
15 someplace?
16     A      They're spelled out somewhere.
17     Q      Okay.  Just to summarize, we've discussed a
18 number of disciplinary problems that Trooper Brown had
19 experienced from I think the first date we talked about was
20 sometime in 1996 up throughout the course of the next few
21 years.  If I understand your testimony correctly, none of
22 these matters had ever been brought to your attention before
23 today.  Am I correct in that?
24     A      Did we discuss the one where he had a window
25 rolled up on his arm and was drug?

---

29

1      Q      I do not believe that is one of the ones that
2  we've talked about today.
3      A      That's the only case that I would have been
4  aware of.  I don't recall any of these other ones.
5      Q      The one that you remember, having the window
6  rolled up, was he disciplined in any fashion on that
7  occasion?
8      A      I don't know.
9      Q      I know that you have a large department, but
10 had you ever been made aware of Trooper Brown for any reason
11 whatsoever?
12     A      Not that I recall, no.
13     Q      Now, during the course of the deposition
14 today, we've referenced the fact that there are regulations
15 in place that govern the operation of the State Police, and
16 I think we discussed disciplinary type regulations,
17 regulations that deal with other matters.  As the Chief
18 Executive Officer of the Pennsylvania State Police, do you
19 have ultimate responsibility for producing those
20 regulations?
21         MR. NEUHAUSER:  Tell me what you mean by
22 producing them.
23 BY MR. LAPPAS:
24     Q      Well, I don't expect that you write them all
25 yourself, but you institute the regulations -- the

---

8 (Pages 26 to 29)

EVANKO, PAUL
11/1/2002

YORDY VS
BROWN, ET AL

---

30

1 regulations of the Department are in place by your
2 authority; is that accurate?
3    A    By virtue of me signing off on the final draft
4 of the regulation, yes, sir.
5    Q    And if you perceive there to be a need for
6 changes in departmental policy or regulations, do you have
7 the authority to implement such changes?
8    A    Yes, I do.
9        MR. LAPPAS: Those are the only questions I
10 have. I'm going to request that -- and this is a request
11 made more to your counsel than to you, Commissioner. If you
12 could please find out the answers to those questions that
13 you said you needed to confer with Lieutenant Colonel Conley
14 about and then make your counsel aware of them, and if you
15 could just send me a letter or a memo if you wouldn't mind
16 doing that. We don't need to reconvene the deposition for
17 that. Would you be in agreement with that?
18        MR. NEUHAUSER: And specifically they were
19 what, or should we rely on the transcript?
20        MR. LAPPAS: I'm sorry?
21        MR. JAKUBIAK: Can we get the transcript
22 before?
23        MR. LAPPAS: Absolutely. The one that occurs
24 to me deals with reassignment and the type of cases that the
25 Commissioner would be made aware of disciplinary-wise.

---

31

1        MR. NEUHAUSER: Okay.
2        MR. LAPPAS: There may be others, but those
3 are the ones that occur to me right now.
4        (The deposition was concluded at 10:55 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

32

1 STATE OF PENNSYLVANIA  :
                          : ss
2 COUNTY OF YORK         :
3
4        I, Lisa A. Hansell, a Reporter Notary-Public,
5 authorized to administer oaths within and for the
6 Commonwealth of Pennsylvania and take depositions in the
7 trial of causes, do hereby certify that the foregoing is the
8 testimony of PAUL J. EVANKO.
9        I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically by
12 the said reporter, Lisa A. Hansell, a Reporter
13 Notary-Public, approved and agreed to, and afterwards
14 reduced to typewriting under the direction of the said
15 Reporter.
16        I further certify that the proceedings and
17 evidence contained fully and accurately in the notes by me
18 on the within deposition, and that this copy is a correct
19 transcript of the same.
20        In testimony whereof, I have hereunto
21 subscribed my hand this 21st day of November, 2002.
22
23        _____
          Lisa A. Hansell, Reporter
24        Notary Public
25 My commission expires:
   May 20, 2004

---

9 (Pages 30 to 32)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RANDY YORDY,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:01-CV-0206** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **SCOTT BROWN, PAUL EVANKO,** | : | |
| **BERON F. STEAGER, AND BARRY L.** | : | |
| **BRINSER,** <u>et</u> <u>al.</u>, | : | |
| **Defendants** | : | |

## <u>CERTIFICATE OF SERVICE</u>

I, **GREGORY R. NEUHAUSER,** Senior Deputy Attorney General

for the Commonwealth of Pennsylvania, Office of Attorney General, hereby

certify that on **November 27, 2002**, I caused to be served a true and correct copy

of the foregoing document **Exhibits in Support of Defendant Evanko's Motion**

**for Summary Judgment** by depositing it in the United States mail, first-class

postage prepaid to the following:

Spero T. Lappas, Esquire
Serratelli, Schiffman, Brown & Calhoon, P.C.
2080 Linglestown Road, Suite 201
Harrisburg, PA 17110

_____
**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**