79
2-10-03
sc

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY,  :
    Plaintiff
                     :
    v.  :  CIVIL ACTION NO. 01-CV-206
                     :  (Judge Kane)
SCOTT BROWN, individually and
in his official capacity as  :
an employee and agent of the
Pennsylvania State Police;  :
PAUL EVANKO, individually and
in his official capacity as  :
an employee and agent of the
Pennsylvania State Police;  :
BERON F. STEAGER, individually
and in his official capacity  :
as an employee and agent of
the Pennsylvania State Police;  :
BARRY L. BRINSER, individually
and in his official capacity  :
as an employee and agent of the
Pennsylvania State Police,  :
et al.,
    Defendants

FILED
HARRISBURG, PA
FEB 7 2003
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
TESTIMONY OF SCOTT ALLEN BROWN

Before:  Hon. Yvette Kane, Judge
         and a Jury
Date:    January 6, 2003

Place:   Courtroom No. 4
         Federal Building
         Harrisburg, Pa.

COUNSEL PRESENT:

    SPERO T. LAPPAS, Esquire
        For - Plaintiff

    GREGORY R. NEUHAUSER, Esquire
        For - Defendants

Monica L. Zamiska, RPR
Official Court Reporter

```
 1                    INDEX TO WITNESS

 2                        Direct   Cross   Redirect   Recross

 3   For the Plaintiff:

 4   Scott Allen Brown         3       11        13        15

 5

 6                    INDEX TO EXHIBITS

 7                                     Identified   Admitted

 8   For the Plaintiff:

 9   P X  2 (7-9-02 Scott Allen Brown's          5
            deposition)
10   P X 40 (photograph of Randy Yordy)          4

11   P X 42 (photograph of Scott Allen Brown)    3
```

1              MR. LAPPAS:  Call Scott Brown.

2              SCOTT ALLEN BROWN, called as a witness, being duly

3   sworn or affirmed, testified as follows:

4              THE CLERK:  Please be seated and state your full

5   name for the record.

6              THE WITNESS:  My full name is Scott Allen Brown.

7                          DIRECT EXAMINATION

8   BY MR. LAPPAS:

9   Q     Mr. Brown, you acknowledge, I take it, that you are the

10  person depicted in Plaintiff's Exhibit 42?

11  A     Yes, sir, that is me.

12  Q     And this photograph was taken after the events of

13  February 4, 1999?

14  A     Yes, sir, they were.

15  Q     How long after was it taken?

16  A     I do not recall, it was the next morning.

17  Q     And the mark that I'm pointing to (Indicating) on

18  Plaintiff's Exhibit 42, a small red circular or oval mark, do

19  you contend that that is an injury that you sustained during

20  the events of February 4, 1999?

21  A     Yes, sir, it's an abrasion.

22  Q     An abrasion, and you'd agree that this photograph

23  doesn't show any other facial injuries at all.  Correct?

24  A     No, none that I can see.

25  Q     Would you further acknowledge for me that Plaintiff's

4

1  Exhibit 40, being a photograph of Randy Yordy, accurately
2  depicts how he looked after the events of February 4?
3  A    I apologize, sir, I cannot say that because I didn't
4  see him afterwards. Not only that, I don't recall what
5  happened after I was taken to the hospital.
6  Q    I'm interested in the time being about the events that
7  transpired before you were taken to the hospital. Is that
8  how Mr. Yordy looked after you and he parted company on
9  February 4, 1999?
10 A    No, he did not.
11 Q    He did not?
12 A    No, would you like me to describe it?
13 Q    I would like you to tell me in what way you feel he
14 looked differently than as depicted on that photograph.
15 A    Bruising takes a while. So obviously that looks later
16 on, does not appear when it happened. When it happened, he
17 had a cut on his forehead due to the fight that we had had.
18 I had broken his nose, and he had been bleeding not only from
19 the nose, but he was also bleeding from the head.
20 Q    So you acknowledge breaking his nose?
21 A    Yes, sir, I do.
22 Q    Would it be accurate to state that as of February 4,
23 1999 you considered yourself to be, and I'm quoting now, a
24 tough son of a bitch?
25 A    I was a strong person, yes, and I was quoting -- you're

1   misquoting me, sir.  What it was quoted as was the fact that
2   internally I was a tough son of a bitch.
3   Q    What I'm doing now is simply asking you if you
4   acknowledge that that's the way you looked at yourself on and
5   before February 4, 1999.  Is that accurate or not?
6   A    It's accurate.
7   Q    In fact I want you to look, since you brought up the
8   issue of quotation, I want you to look please at Plaintiff's
9   Exhibit Binder No. 1 which should be directly in front of
10  you.
11  A    Yes, sir.
12  Q    Turn please to Exhibit Tab No. 2.  Do you recognize
13  Exhibit No. 2 to be the transcript of a deposition which you
14  gave on February -- I'm sorry, on July 9, 2002?
15  A    It's possible.  I don't recall the dates.  I don't
16  recall -- I do recall giving a statement and giving a
17  deposition.
18  Q    Do you recall giving a deposition at the office of
19  Attorneys Schmidt, Ronca & Kramer?
20  A    Yes, sir, I do.
21  Q    209 State Street, Harrisburg, Pennsylvania.
22  A    Yes, sir, I do, but I do not recall the exact date.
23  Q    Turn please to page 131.  Look at lines 2 and 3.
24  Reading now it says -- and this is your testimony.  Correct?
25  You acknowledge this to be your testimony?

1   A   I don't know, sir, it says A.  If A is me, then I would
2   assume, yes.
3   Q   "I mean before, yeah, I was a tough son of a bitch."
4   Do you see that answer?
5   A   Yes, sir.
6   Q   Now I want you to look at the bottom of that same page
7   131 to lines -- to specifically line 20.
8   A   Yes, sir.
9   Q   Nineteen and 20.
10  A   Yes, sir.
11  Q   Your answer to a question is:  "But I'll admit I was a
12  strong -- out in the animal world they call it the alpha
13  male."  Do you acknowledge that testimony to have been your
14  testimony on this date?
15  A   Yes, sir.  It also goes on to say I was a dominant
16  leader, I am.
17  Q   A dominant leader, an alpha male and a tough son of a
18  bitch, that's the way you saw yourself on or before February
19  4, 1999?
20  A   Yes, sir.  You have to be when you are a state trooper
21  to encounter people like your client.
22  Q   I see.  Do you agree that during the episode that took
23  place off camera on February 4, 1999 you told Mr. Yordy, "I'm
24  going to shoot you, you fuck"?
25  A   I do not recall saying that at that specific time, no.

1  Q   Do you acknowledge that you said it at sometime?
2  A   Yes, sir, I do, but I don't believe it was at that
3  particular moment.  I was in a fight for my life, sir.  I
4  wanted to get home to my wife and children.
5  Q   I'd like you to wait until I finish asking a question
6  before you answer.
7  A   Yes, sir.
8  Q   The question on the floor is did you tell him, "I'm
9  going to shoot you, you fuck"?
10 A   Yes, sir, when I was being dragged down the highway.
11 Q   I want you to turn to page 56 of Exhibit 2.  Starting
12 at line 22 of your testimony, I'll read it, you tell me if
13 I'm reading it correctly:  "At one point he had -- he was on
14 top of me, and I told him I'm going to shoot you, you fuck."
15 Now was he on top of you as he was, to use your language,
16 dragging you down the highway?
17 A   No.
18 Q   So the only time he would have ever been, according to
19 your claims, on top of you, would have been during the tussle
20 off camera?
21 A   You're right, sir.
22 Q   So it was at that time you said this to him?
23 A   I believe so, that's what I testified to, but again I
24 do not recall.
25 Q   It was the same time -- this is your previous

1  testimony?

2  A    Yes, sir, it is.

3  Q    Under oath?

4  A    Yes, sir.

5  Q    Sworn testimony?

6  A    Yes, sir, I am just -- I have done this six times for

7  this thing in different cases, and it's been over three

8  years. I apologize that I don't have a photographic memory.

9  Q    Getting to the question of your memory, do you have any

10 difficulty remembering the events of February 4, 1999?

11 A    Only after I struck my head on the concrete. After

12 that it's pretty fuzzy.

13 Q    Haven't you claimed in other proceedings that by

14 hitting your head that night you suffered psychiatric

15 injuries which cause you to have a bad memory?

16 A    Not a bad memory, sir, but, yes, I have psychiatric

17 problems. I do seek help as a result of what your client did

18 to me.

19 Q    Your testimony under oath is that you have never

20 claimed to have had a bad memory as a result of psychiatric

21 problems?

22 A    I'm sorry, sir, I don't recall, it's possible.

23 Q    Is your memory so bad you can't remember if you have a

24 bad memory?

25 A    No, sir.

```
1   Q    Turn to page 128 of that exhibit please.
2   A    I do remember stating that I can't remember certain
    facts like I delivered both my children --
4   Q    Turn to page 128 of that exhibit please.
5   A    Yes, sir.
6   Q    We're going to start with line 3.
7   A    Yes, sir.
8   Q    The question put to you was:  "Has your memory been
    affected since the incident?"  And what was your answer?
10  A    "Absolutely."
11  Q    And the question was:  "You said you were
    scatterbrained I think was your testimony?"  And you answered
    it by saying:  "I can't remember what I had for dinner last
    night, but I'll tell you what, what's really weird, really
    weird is I remember shit that happened ten years ago."  Was
    that your sworn testimony?
17  A    Yes, sir, and that is true.
18  Q    Well, let's talk about what happened three years ago.
    Is it your testimony that you do or do not claim to have a
    clear recollection of the events of February 4, 1999?
21  A    I have a very good recollection of what happened.
22  Q    So you don't remember what you had for dinner last
    night, but you remember what happened on February 4, 1999?
24  A    Yes, I do, sir.
25  Q    How many times would you acknowledge striking Randy
```

Case 1:01-cv-00208-YK    Document 79    Filed 02/07/2003    Page 10 of 16

10

```
1    Yordy when you were fighting with him off camera?
2    A    Probably five or six ballpark.  I was pretty strong.  I
3    was lifting at the time.
4    Q    Uh-huh, how many punches do you think it took you to
5    break his nose?
6    A    One, that was the initial hit that I had made.
7    Q    You acknowledge that you took a full can of mace and
8    sprayed it in his face?
9    A    Absolutely, sir.
10   Q    And emptied it out?
11   A    Yes, sir, I did.
12   Q    Taking special care to make sure you got it in his
13   eyes?
14   A    As I am taught.
15   Q    You acknowledge that at the side of the truck you drew
16   your service weapon and shot out one of his tires?
17   A    I was in fear for my life.
18   Q    While he was in the car?
19   A    Yes, sir, I was in fear for my life.  I was being
20   dragged down the highway.
21   Q    And I believe you have previously testified that the
22   one and only thing that you regret about the events of
23   February 4, 1999 is not, quoting, blowing his head off.  Is
24   that accurate?
25   A    That would be accurate, sir, and I was upset.
```

MR. LAPPAS: Those are my only questions of the witness at this time.

THE COURT: All right, thank you. Mr. Neuhauser.

MR. NEUHAUSER: Just a few at this time, Your Honor.

CROSS EXAMINATION

BY MR. NEUHAUSER:

Q  Trooper Brown, when you say you were in fear for your life, can you describe why you felt that at that particular time?

A  Mr. Yordy was in a rage. I couldn't control him. I have never encountered an individual like that before.

Q  Did you ever have the occasion to use your pepper spray --

A  Yes, sir.

Q  -- before that?

A  And it had worked every time. I have used it at least four times, five times prior to, and it's worked every time.

Q  But in this occasion it did not. Correct?

A  No, sir, had no affect on the man.

Q  What was the reason that you attempted to pull Mr. Yordy out of the truck, to keep him from going back into the truck?

A  I didn't want him to drive into a busload of kids or somebody's mother. I mean, it's very important that you

1  keep, you know, people who drive intoxicated off the road.

2  Q    And why did you feel you needed to use -- to fire your

3  service weapon at the wheel of his truck?

4  A    I have never been in a situation like that, sir,

5  before.  The only thing going through my mind was I want to

6  go home to my kids, to my wife.  I know tires make the

7  vehicle go, so I shot the tire out hoping it would stop, and

8  then when it didn't, I had no other choice but to go further.

9  It's called the use of force continuum.

10 Q    Had you tried what you thought were levels of force

11 consistent with bringing Mr. Yordy into control, under

12 control, before you used your service weapon?

13 A    Absolutely, I tried everything, every tool at my

14 command.  I used verbal commands.  I shouted at him, yeah, I

15 swore at him.  I had to get his attention somehow.  The man

16 was just -- he was just going off.  He was just, you know,

17 like this, and -- I told him to stop, you know, "Don't be an

18 asshole, knock it off.  You're under arrest."  I don't know

19 how many times I had said that, and it had no affect on him.

20 I then, you know, I tried to bear hug him and hold him.  I

21 tried wrestling with him, and he just seemed to keep coming

22 and coming and moving and moving, and there is nothing I

23 could do, and all I wanted to do was get home.  I wanted to

24 end my shift.

25         MR. NEUHAUSER:  That's all I have at this time,

1  Your Honor.

2      THE COURT: All right, thank you. Anything else
3  for this witness, counsel?

4      MR. LAPPAS: Just a few on redirect, Your Honor.

5                   REDIRECT EXAMINATION

6  BY MR. LAPPAS:

7  Q    When you said -- Mr. Neuhauser asked you why you shot
8  out the tire, and your answer was, "I have never been in a
9  situation like this before."

10 A    Uh-huh.

11 Q    What kind of a situation is it that you have never been
12 in before?

13 A    Being in a fist fight and then being dragged down the
14 highway by my arm while somebody is holding onto it.

15 Q    The four or five people you had maced before Mr. Yordy,
16 did any of them have broken noses and severe facial injuries
17 caused by you?

18 A    No, sir.

19 Q    And with respect to this use of force continuum that
20 you have testified to, --

21 A    Yes, sir.

22 Q    -- does the use of force continuum describe -- the use
23 of force continuum is a phrase that describes the progressive
24 application of physical force during police work. Correct?

25 A    Yes, sir, it is.

1    Q    And you feel that in this particular case you utilized
2    the use of force continuum. Is that correct?
3    A    Yes, sir, I did, sir. I even backed off going from the
4    fisticuffs to the pepper spray.
5    Q    Does the use of force continuum include something
6    referred to as an ass-kicking contest?
7    A    No, sir, that would be slang terms.
8    Q    Turn to page 57 of Exhibit 2, the same deposition you
9    spoke of a moment ago.
10    A    Yes, sir.
11    Q    On page 7 you're talking -- I'm sorry, line 7 you're
12    talking about the use of force continuum, and then you stated
13    quote, "Then it goes to an ass-kicking contest where you
14    fight," close quote.
15    A    Yes, sir, that would be fisticuffs.
16    Q    Which is what happened in this case. Correct?
17    A    Yes, sir, it does.
18    Q    So your testimony is that you've never experienced
19    anybody that kept coming and coming and coming like Randy
20    Yordy, and because of this you were in fear for your life?
21    A    Yes, sir.
22    Q    You broke his nose --
23    A    It had no affect.
24    Q    -- one punch, first punch. Hit him, by your testimony,
25    five or six times more. Maced him with a full can of pepper

1   spray and after this ass-kicking contest you ended up looking
2   like this, Exhibit 42.  Correct?
3   A     Yes, sir.
4   Q     And you were in fear for your life?
5   A     Absolutely, sir.
6           MR. LAPPAS:  No questions.
7           THE COURT:  All right.
8                    RECROSS EXAMINATION
9   BY MR. NEUHAUSER:
10  Q     Those weren't the only injuries you sustained.
11  Correct?
12  A     Correct.
13  Q     There were other injuries that you were treated for at
14  the Hershey Medical Center?
15  A     Yes, sir.  Although I'm not bruised, my nose did hurt,
16  he did make contact with my nose, but he didn't hit me hard
17  enough.  But I -- as far as the -- what the doctors say I had
18  is I have a closed head injury.
19          MR. LAPPAS:  Objection, Your Honor.  This is
20  hearsay.
21          THE COURT:  Sustained.
22  A     I have a closed head injury.
23  BY MR. NEUHAUSER:
24  Q     What is the understanding of the nature of your
25  injuries as a result of the incident of February 4, 1999?

1  A    My understanding is that I have a closed head injury,
2  post-traumatic stress disorder, post-concussion syndrome.
3  Q    Did you sustain any injuries to your shoulders and neck
4  area as a result of the incident?
5  A    Yes, yes, I did.  They were very sore, nothing broken,
6  but I was very sore.
7           MR. NEUHAUSER:  That's all I have, Your Honor.
8           THE COURT:  Thank you.  You may step down.
9           THE WITNESS:  Thank you, ma'am.
10          (The testimony of Scott Allen Brown concluded.)
11
12          I hereby certify that the proceedings and evidence
13 of the court are contained fully and accurately in the notes
14 taken by me on the testimony of Scott Allen Brown from the
15 jury trial of the within cause and that this is a correct
16 transcript of the same.

                                    *Monica L. Zamiska*
                                    _____
                                    Monica L. Zamiska, RPR
                                    Official Court Reporter