

(81)
2-10-03

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3  RANDY YORDY,                       :
              Plaintiff

4                                     :

       v.                            CIVIL ACTION NO. 01-CV-206
5                                   : (Judge Kane)

   SCOTT BROWN, individually and
6  in his official capacity as       :
   an employee and agent of the
7  Pennsylvania State Police;        :
   PAUL EVANKO, individually and
8  in his official capacity as       :
   an employee and agent of the
9  Pennsylvania State Police;        :
   BERON F. STEAGER, individually
10 and in his official capacity      :
   as an employee and agent of
11 the Pennsylvania State Police; :
   BARRY L. BRINSER, individually
12 and in his official capacity   : :
   as an employee and agent of
13 the Pennsylvania State Police, :
   et al.,
14           Defendants              :

15          TRANSCRIPT OF PROCEEDINGS
                 JURY TRIAL
16       TESTIMONY OF SCOTT ALLEN BROWN

17       Before:  Hon. Yvette Kane, Judge
                  and a Jury
18       Date:    January 7, 2003

19       Place:   Courtroom No. 4
                  Federal Building
20                Harrisburg, Pa.

21 COUNSEL PRESENT:

22     SPERO T. LAPPAS, Esquire
           For - Plaintiff
23
       GREGORY R. NEUHAUSER, Esquire
24         For - Defendant

                       Monica L. Zamiska, RPR
25                     Official Court Reporter

FILED
HARRISBURG, PA
FEB  7 2003
MARY E. D'ANDREA, CLERK
Per                  Deputy Clerk

2

1                          INDEX TO WITNESS

2                                  Direct   Cross   Redirect   Recross

3       For the Defendants:

4       Scott Allen Brown                3        24

5        (recalled)

6

7                          INDEX TO EXHIBITS

8                                          Identified   Admitted

9       For the Plaintiff:

10      P X 11 (4-9-99 Pa. State Police general        41

11              investigation report with

12              attachments)

13      P X 13 (Penn State Geisinger medical           26

14              records for Scott Allen Brown)

15      P X 23 (5-9-97 Pa. State Police general        43

16              investigation report)

17      P X 26 (arbitration opinion and award)         46

18

19

20

21

22

23

24

25

3

1          MR. NEUHAUSER:  Defendant calls Scott Brown.

2          SCOTT ALLEN BROWN, called as a witness, being duly

3    sworn or affirmed, testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. NEUHAUSER:

6    Q    Sir, I know we discussed yesterday briefly the incident

7    involving Mr. Yordy, but we didn't get to discuss the

8    entirety and some of the other related issues or questions

9    that I'd like to ask, so let me start by asking you were you

10   on duty February 4, 1999 as a state trooper?

11   A    Yes, sir, I was.

12   Q    Where were you stationed?

13   A    I was stationed out of the Jonestown barracks, which is

14   in Lebanon County, right off of Route 72.

15   Q    And in the early evening hours what were your duties

16   and responsibilities at that time?

17   A    Well, I was a patrolman.  I was assigned by my corporal

18   to work the western part of Lebanon County, which would be

19   the Hanovers, what we call the Hanovers, north, south, east

20   and west.

21   Q    When did you first come upon Mr. Yordy that evening?

22   A    Well, I was running radar out on Jonestown Road or 22,

23   and being a trooper in the area for so long, there is areas

24   that you make loops on, and you pull out, you get a violator,

25   you pull out, pull them over, and then you work your way back

4

1    to where you were sitting prior to.  Well, part of that was

2    going on a section of T-601, which is what everybody has been

3    referring to as Old Jonestown Road.

4    Q     Is that the road that goes past the Thoroughbred Bar

5    that we have heard testimony about?

6    A     Yes, sir, it is, and I go to 743, which was previously

7    testified, and work my way back.

8    Q     Did you have an occasion to go in the vicinity of the

9    Thoroughbred Bar that evening?

10    A     Yes, sir, I did.

11    Q     What did you observe?

12    A     Well, as I was passing the Thoroughbred Bar, a black

13    pickup truck cut me off and headed towards the Harrisburg

14    area, towards Dauphin County.

15    Q     Pulled out in front of you in other words?

16    A     Yes, sir, pulled out in front of me so much so I

17    slammed on my brakes.  I could not believe he did not see a

18    fully marked state car.

19    Q     How far in front of your vehicle was he when he pulled

20    out in front approximately?

21    A     Two car lengths.

22    Q     What did you do at that point?

23    A     I observed his driving, he was all over the road.

24    Q     Can you describe how he was all over the road?

25    A     Well, he was weaving.  He went over the center of the

5

1    roadway, came back, hit the berm.  I think he went over the

2    center about three times and over onto the berm twice.

3    Q    What did you do in response to that?

4    A    I immediately put on my lights.  There was no response

5    to the operator of the vehicle.  I hit my siren.  I still had

6    no response, did not pull over.  A half a mile after I

7    started my lights and siren, we had gone from Lebanon County

8    into Dauphin County, and he finally pulled over once we were

9    through the town of Grantville.  So I basically was behind

10   him the whole time with the lights and siren.

11   Q    You were present in court when we showed the video of

12   the traffic stop.  Correct?

13   A    Yes, sir.

14   Q    And that video camera was placed on your cruiser.  Is

15   that right?

16   A    Yes, sir, I'm trained on that.

17   Q    Okay, where was the video camera placed on your

18   cruiser?  Where in --

19   A    Oh, it's mounted -- it's mounted inside.  Essentially

20   you have to take the mirror off.  They take the mirror off

21   where the mirror is, and they mount it right there where your

22   rear view mirror would be to, so it takes the view, the shot

23   of the center, from the center out.

24   Q    Now according to the scene that we saw in the video the

25   camera was slightly off center.  Do you recall that?

6

1    A    Yes, sir.  That's --

2    Q    What is the reason for that?

3    A    Well, that's a tactical thing.  What we're taught in

4    the academy is you off center the vehicle to the vehicle in

5    front of you to the left.  What that does is it protects you

6    from possibly anybody else who comes down, sees the lights,

7    at least they'll hit the cruiser first and give you a chance

8    to jump.  That's what I was taught how to do it.  Plus

9    it's --

10   Q    Your vehicle -- let me interrupt you there -- your

11   vehicle is placed slightly to the left of the vehicle --

12   A    Left of center, yes, sir.

13   Q    Left of center, and that's to prevent someone from

14   coming -- you have to get out of your vehicle and walk

15   alongside the car along the road, that would prevent someone

16   from clipping you.  Is that right?

17   A    Yes, it would give you some minimal protection.  It's

18   what I was taught in the academy.  Also it's a tactical thing

19   where what you do is you turn your wheel and in case you get

20   into say a shootout or something, it makes it so you have

21   some protection that you can get back to your car and the car

22   is off center.  If you were straight on, you'd have no

23   protection, but being off center you do.

24   Q    Now we saw on the video that you exited your cruiser

25   and went up and spoke to Mr. Yordy in the pickup truck.

7

1    Right?

2    A    Yes, sir.

3    Q    Did he cooperate with you in giving you his

4    information?

5    A    Absolutely.

6    Q    What did you observe of him at that particular time?

7    A    I observed that he had bloodshot, glassy eyes.  They

8    were a little yellowish in color.  He spoke with a slur, had

9    a strong odor of an alcoholic beverage emitting from his

10    person, basically smelled like alcohol or like a beer or

11    something.

12    Q    What did you decide to do at that point?

13    A    I was going to do a field sobriety test based on his

14    driving, based on his, you know, his manual dexterity, the

15    way he was fumbling, he kept fumbling with his cards.  That

16    gave me reason to believe that he was drunk.

17    Q    We saw in the video that you took the cards and went

18    back to your car.  Correct?

19    A    Yes, sir.

20    Q    Do you recall that?

21    A    Yes, sir.

22    Q    What was the reason for that?

23    A    That's another tactical thing.  You pull back so you

24    can have room to do the field sobriety test.

25    Q    Well, before you moved the car back, I mean, you

8

1   stepped away from Mr. Yordy's pickup truck and went back to

2   your car with his cards.  Right?

3   A     Uh-huh.

4   Q     What were you doing with --

5   A     Well, you call it in.  You call in his 27 and his 28.

6   What that is is you call in his driver's record and his --

7   the tag number, and you tell the dispatch that, "I have a

8   possible DUI.  I'm going to be doing a field sobriety test on

9   the individual," and they run him in the computer.

10  Q     And what are they checking for?

11  A     Warrants, wants, stuff like that.

12  Q     Okay, now you mentioned that you backed up your

13  vehicle, we saw that on the video.

14  A     Yes, sir.

15  Q     What was the reason for that?

16  A     Give room, I needed room to do the field sobriety test.

17  On the walk and turn you go nine steps one way and nine steps

18  back.  You need at least two car lengths.  It's preferably

19  tactically on a traffic stop to be within one car length, but

20  once you do field sobriety, you have got to back the car up

21  because there is just not enough room between the front of

22  your car and the back of their car.

23  Q     What do you recall was the first test that you

24  administered to Mr. Yordy?

25  A     I believe it was the one-legged stand.

9

1    Q    And what is he supposed to do in the one-legged stand?

2    A    On the one-legged stand just -- I have a routine.  I

3    was taught when I first came on the job by --

4    Q    What is he supposed to do on the one-legged stand in

5    order for you to assess --

6    A    Oh, he -- basically you explain to him, "Sir, I'm going

7    to do a field sobriety test on you.  What we're going to do

8    is I want you to listen to me, I want you to watch me.  Do

9    not do anything until I tell you to do it."  It's part of the

10   test, following directions.  "First thing, sir, I'm going to

11   ask you to pick a leg and pick it up off the ground standing

12   at the position of attention.  I want you to keep your leg

13   approximately 6 inches off the ground, knee straight.  I want

14   you to count 1,001, 1,002, 1,003, 1,004, 1,005 all the way up

15   to -- all the way up to 1,030.  If at any time you lose your

16   balance or you put your foot down, please continue the test,

17   bring your foot back up, and then we'll continue the test."

18   Q    Did Mr. Yordy comply with your directions?

19   A    He tried to start early, which is an indicator.  Every

20   time something is done not the way you're supposed to do it

21   or the way you observe it, that's a point.

22   Q    Okay.

23   A    Once you get so high on the point scale, that would

24   determine what his intox- -- how much you would have for

25   probable cause.

10

1   Q    In your opinion did he pass or fail the one-legged

2   stance?

3   A    He failed it miserably.

4   Q    Did you administer any other test to him?

5   A    He tried to do the walk and turn, he also failed that.

6   Would you like me to explain the walk and turn?

7   Q    Well, I think we saw it on the video, but you described

8   that he needs to take nine steps.

9   A    Nine steps forward, then what you do is on the ninth

10  step, you keep that foot there, then what you do is you plant

11  your other foot out and you pivot, you make three small turns

12  pivoting until you are back facing in the opposite direction.

13  At that time you walk nine steps heel to toe backwards or

14  back to where I'm -- where I am.

15  Q    Could Mr. Yordy perform that test?

16  A    No, sir, he could not.

17  Q    At that point in time what was your decision or your

18  intention when he failed those two tests?

19  A    He was going to be taken to Hershey Medical Center for

20  blood.  He was under arrest for DUI.  He was going to be

21  taken to the Hershey Medical Center for blood.  Once the

22  blood test was over, he was going home.  Pennsylvania has a

23  law that says, it's Rule 102 I think under Rules of Criminal

24  Procedure, he goes home, and then he gets charged later on.

25  Q    Okay, did you ever inform Mr. Yordy that he was under

11

1    arrest for DUI?

2    A    Absolutely.

3    Q    When did you inform him of that?

4    A    I told him -- well, you got to understand Miss Smith

5    arrived after the one-legged stand.

6    Q    I understand, and you asked her to stand off to the

7    side?

8    A    I asked her to step aside, and then I turned my -- I

9    said, "All right, Mr. Yordy, why don't you just stand over

10   there, okay, I'm going to do some field sobriety tests on

11   Miss Smith."  And I told him he was under arrest when they

12   were both together.  Towards the end there they were both

13   together, and I pulled out my handcuffs, and I had my

14   handcuffs in my hand, and I said, "Mr. Yordy, you're under

15   arrest for DUI."

16   Q    What was your concern about Miss Smith being there at

17   that time while you were administering the field sobriety

18   test?

19   A    It's dangerous.  You can't keep your eyes on two people

20   at once.  Backup, my backup was 20 minutes away, so it's not

21   like I had a choice on having somebody there, I didn't.

22   Q    Now we saw in the video that Mr. Yordy went to the

23   front of the truck.

24   A    Yes, sir.

25   Q    I think he testified to retrieve his jacket.

12

1    A    Yes, sir.

2    Q    Do you recall that happening?

3    A    I allowed him to do that because he was cold, and I

4    wanted to keep the -- I wanted to keep the situation as

5    friendly as possible.  I did not want it to go where it went.

6    The idea was I kept him in my sight.  I could see him.  I

7    mean, you know.

8    Q    Now when you -- after you informed Mr. Yordy that he

9    was under arrest, what did you attempt to do?

10    A    Handcuff him.

11    Q    And can you describe for us how you attempted to

12    handcuff him?

13    A    Well, I had had my handcuffs out, and he was standing

14    there with Miss Smith, and I told him he was under arrest,

15    and I turned around to get around him, and that's when she

16    left, she started to leave, and kind of pushed off his chest.

17    Kind of just went like that to him (Indicating) because they

18    were arguing back and forth.  And what I did was I put my --

19    Q    Let me stop you there, your testimony is that Miss

20    Smith pushed off Mr. Yordy?

21    A    Yes, very lightly, very lightly.  You know, it was more

22    of a, you know.  (Indicating.)

23    Q    Okay.

24    A    She was doing that to me, too.  She kept -- she kept --

25    for some reason she just kept touching me every time she

13

1   talked.  She made me nervous.  She kept trying to get to my

2   side and behind me, and I didn't know what her intentions

3   were, so I kept backing up.  You can see it on video.  I just

4   kept backing up and backing up and changing my position

5   because she would come in where -- she would come in and

6   interfere with me.

7   Q    Now you're attempting to place Mr. Yordy in handcuffs?

8   A    Yes, sir.

9   Q    And you were describing for us how that took place.

10  A    Well, she did that and started to leave, and when she

11  started to leave, I went like this.  (Indicating.)  I had my

12  handcuffs in my right hand.  Mr. Yordy saw my handcuffs.

13  Q    Did he say anything to you at that point?

14  A    No.  I said, "Sir, you're under arrest.  We're just

15  going for blood.  Don't let this escalate."  Because they had

16  gotten into an argument.  They were arguing.

17  Q    Okay.

18  A    And when she did that, then she left.

19  Q    What happened when you attempted to place the handcuffs

20  on Mr. Yordy?

21  A    Well, I grabbed -- I grabbed his wrist because that's

22  where the handcuffs go, and he started pulling away.  So I

23  tried to turn his wrists so he couldn't -- so he couldn't

24  pull away.

25  Q    And what happened?

14

1   A     I tried to put the handcuff on his wrist.

2   Q     Did he say anything to you at that point?

3   A     Yes, sir, he did.  I didn't know at the time but he

4   said, "I'm not letting you fuckers do this to me again."

5   Q     Okay, were you able to put the handcuffs on Mr. Yordy?

6   A     I'm sorry, I misquoted, "I'm not letting you fucking

7   staties do this to me again."

8   Q     Were you able to put the handcuffs on Mr. Yordy?

9   A     No, sir, I was not.

10  Q     Why was that?

11  A     He kept resisting arrest.  You know, I tried to pin him

12  up against the back of the pickup truck, and I tried to --

13  I'm giving verbal commands.  In the use of force that we went

14  into before, verbal commands are essential to the use of

15  force.

16  Q     What are these verbal commands that you're giving to

17  Mr. Yordy?

18  A     Relax, knock it off, don't let this escalate, don't be

19  an asshole, I swore.

20  Q     Did he desist?

21  A     No, he kept resisting arrest.

22  Q     Now we saw in the video at some point that you --

23  A     I was trying to wrestle with him --

24  Q     I understand.

25  A     -- until he punched me.

1    Q    When did he punch you?

2    A    He punched me at the back of the truck when we were

3    just about to go down, and he essentially -- I don't know if

4    we tripped or he tripped me or what, but we went down, and he

5    --

6    Q    And how did you land on the ground?

7    A    Me on the bottom, him on the top, and he was in a rage.

8    I mean, he was just --

9    Q    Okay, hang on a second, that's what happened off to the

10   side of the truck on the video.  Right?

11   A    Yes, sir.

12   Q    The two of you were on the ground?

13   A    Yes, sir.

14   Q    Can you describe what was going on at that point in

15   time when you were on the ground?

16   A    I, you know, I called him an f'ing asshole.  He's --

17   he's growling.  The man was out of control.  He was growling

18   like an animal at me.

19   Q    What did you do in response to his behavior?

20   A    I tried to get up, I tried to get off because we were

21   fighting.  He's throwing punches, and I was taught by my dad

22   to -- my dad took some boxing when he was in the navy.  There

23   is a maneuver called, and he taught it to me, it's called the

24   turtle maneuver.  Okay.

25   Q    Can you describe what you did in this maneuver?

1    A    Well, what you do is they can hit you on the top of the

2    head and they're not going to hurt your head because of this

3    big bone, so you basically go down like this.  (Indicating.)

4    You protect your face.  So he was punching me in the sides.

5    He was punching me here, (Indicating) you know, and I was

6    protecting my head, and when I got the opportunity, that's

7    when I (Indicating) and broke his nose.  And that was the

8    time that I was able to, once I punched him in the nose, I

9    kicked him in the groin and spun him, and we just wrestled

10   around.  I mean, we wrestled, we fought.

11   Q    And what was your intention, what was your purpose in

12   using the force that you used on Mr. Yordy on the ground?

13   A    My God, to survive.  The man was out of control.  I

14   didn't know -- I couldn't control him.  I wanted to get home

15   to my wife and my kids, and that's the only thing I was

16   thinking about.

17   Q    Now there came a point in time when, as we saw in the

18   video, where Mr. Yordy got up and went back to the driver's

19   side of his truck.  Right?

20   A    Yes, sir.

21   Q    What did you do when you saw Mr. Yordy get up?

22   A    Well, during the wrestling match, fight, I had gotten

23   on top of Mr. Yordy, and we were basically he was facing me,

24   I was facing him, and I had -- I wrestled in high school.  I

25   got my legs locked into his legs and sprawled him out.  And

17

1   I'm trying to grab his arms, and the man is a strong man.

2   Q    Okay, but what did you do when he started to get up?

3   A    Well, he started to get the better of me again, and I

4   was exhausted.  At that point I was just totally exhausted.

5   I pushed off of him.  I made the decision to push off of him

6   and go down a level to pepper spray.  I have seen that pepper

7   spray work on people before.  You hit them with the pepper

8   spray, it's over.

9   Q    Okay.

10  A    It's over.

11  Q    When you say you went down a level, what do you mean by

12  that?

13  A    Well, the use of force continuum has several levels,

14  going the least amount of force to deadly force, and I had

15  gone from this use of force of telling him you're under

16  arrest, and he escalated it to fisticuffs, which is up here,

17  (Indicating) to basically what I said in the testimony, an

18  ass-kicking contest.  That's what it was.  He was trying to

19  beat the hell out of me, and I wasn't about to let it happen.

20  Q    Okay.

21  A    But I decided below the fisticuffs is pepper spray.

22  Usually what happens is you go from verbal command to pepper

23  spray to physical wrestling with the individual or fighting.

24  Q    Right.

25  A    And then from there you go to the asp baton and then

18

1    you go -- which is a big metal stick, to use of deadly force,

2    which is your weapon.

3    Q    When you took it back to the use of the pepper spray,

4    what was your intention at that point?

5    A    To stop, to just stop his action, to stop it and get

6    him handcuffed, take him in and in three hours go home at the

7    end of my shift.

8    Q    When you saw him moving towards the driver's side of

9    his pickup truck, we saw in the video that you were spraying

10   him with pepper spray, what was your intent at that point?

11   A    To get him to stop and keep him from driving.  That's a

12   4,000 pound vehicle.

13   Q    We saw he was able to get into the truck despite your

14   pulling him, and what happened at that point?

15   A    Um, I tried to keep him out of the truck.  There were

16   two dogs in there.  They kind of looked like Huskies, but

17   they weren't, they were a smaller breed, but they kind of

18   looked like Huskies.  And when I had gotten in to pull him

19   out, one of the dogs grabbed a hold of my jacket, didn't bite

20   me, just grabbed my jacket to let me know it was there.

21   That's when I stepped back and Mr. Yordy got totally in the

22   vehicle.  Well, I reached in with my left hand, I had my

23   right hand in there, you know, and I started -- I finished

24   the pepper spray on him as I was turning the key off.  I went

25   -- I went between where the steering wheel is and the

19

1    dashboard, and I went between there and reached up over and

2    shut the vehicle off.  I tried to pull the keys out, but the

3    keys wouldn't come.  It has one of those -- it's one of the

4    newer cars that has the lock, the key lock.  I don't have a

5    Ford, I don't know -- I didn't know how to take it.

6    Q    So you couldn't get the key out of the ignition.

7    A    I could not get the key out of the ignition.  If I had

8    the key out of the ignition, I would have backed off.

9    Q    What did Mr. Yordy do at that point?

10   A    What's that?

11   Q    What did Mr. Yordy do at that point when you turned the

12   car off?

13   A    He turned it back on and took off, and he was holding

14   onto my arm.  He had my arm pinned inside the vehicle.

15   Q    What did you do at that point?

16   A    At that point I decided I got to get this vehicle

17   stopped, I wanted to live.

18   Q    What did you do?

19   A    Pulled my service weapon, I shot out the back tire.  I

20   didn't know it at the time, I was told later on, I had made

21   contact with it.

22   Q    Did that stop Mr. Yordy's truck?

23   A    No, it did not stop him.  I then decided to take his

24   life.

25   Q    You pulled your weapon up towards Mr. Yordy?

20

1 A Yes, sir, I did.

2 Q What did he do at that point?

3 A He saw the gun, he looked right at me, and he let go of

4 me.

5 Q And is that the point that you fell off the truck onto

6 the pavement?

7 A Yes, sir, I did.

8 Q Now we saw in the video that there was a period of time

9 where you were on the pavement and not moving.  Do you recall

10 that at all?

11 A No, sir.  The only -- after I hit my head I don't

12 recall very much.  I remember being in the ambulance briefly.

13 I really don't remember the hospital other than the

14 commissioner coming to visit me the next morning, and then I

15 went home.

16 Q Okay, up until the point that you attempted to place

17 Mr. Yordy under arrest had there been any bad words between

18 the two of you, any kind of altercation up until that point?

19 A Before what, before I tried to put handcuffs on him?

20 Q Yes.

21 A No, it was cordial.  I had absolutely no reason up

22 until that point to even suspect he would have resisted

23 arrest.

24 Q Okay, so up until that point in time everything was

25 cordial?

21

1    A    Everything was fine.

2    Q    Courteous?

3    A    Absolutely.

4    Q    The point that you had told him that you were placing

5    him under arrest was when he began to resist?

6    A    Yes, sir.

7         MR. NEUHAUSER:  Nothing further at this time, Your

8    Honor.

9         THE COURT:  All right, thank you, Mr. Neuhauser.

10        Jurors we're going to take a short break here for

11   our court reporter and come back at twelve o'clock and then

12   we'll go until our regular lunch hour.

13        Miss Kennedy, would you escort the jury please.

14        (The jury left the courtroom at 11:49 a.m.)

15        THE COURT:  We'll be in recess until twelve

16   o'clock.

17        (A recess began at 11:50 a.m. and the case

18   continued at 12:00 p.m. in chambers.)

19        THE COURT:  A new issue for you gentlemen, so sit

20   down.  I don't have any familiarity with any of the parties

21   in this case, but it occurred to me last night after I went

22   home to check what is on my kitchen table as a pending

23   traffic ticket involving my daughter, and it turns out that

24   one of the defendants has written that ticket, and it is

25   pending.  It was interesting to me, I don't -- her father is

22

1    handling it for me, so I haven't paid much attention to it,

2    but we got a notice in the mail or she got a notice in the

3    mail the other day continuing it, and I called him and said,

4    "Why is this getting continued?  How are these things

5    happening?"  He said, "Well, I'll look at it.  It's usually

6    the officer continues it."

7           MR. NEUHAUSER:  You called who?

8           THE COURT:  I beg your pardon?

9           MR. NEUHAUSER:  You called who?

10          THE COURT:  The child's father --

11          MR. NEUHAUSER:  Okay.

12          THE COURT:  -- who has done some defense work, so

13    he's handling it.

14          MR. NEUHAUSER:  I understand.

15          THE COURT:  But, in any event, when I looked at it

16    last night, it sort of came together that the case got

17    continued by one of the officers because he's here, so I

18    wanted you to know about that.

19          MR. LAPPAS:  Which officer was it?

20          THE COURT:  It's Officer Steager.

21          Now, I don't expect you to answer now because it's

22    not fair to put you in that position, I think when there is

23    -- the law requires that the judge disclose any information

24    that could lead to -- lead a reasonable person to believe

25    that he or she is biased or prejudiced in the case and then

23

1  give the parties an opportunity to request recusal of the

2  judge and to do it without the judge knowing which one has

3  requested that.  So I'll give you an opportunity to do that.

4        In the normal course these things occur not in the

5  middle of trial, and we --

6        MR. NEUHAUSER:  This is a first.

7        THE COURT:  Actually this is the second.  We had

8  been trying a case a few weeks ago involving a lawyer who's

9  now associated with a lawyer who's suing me in federal court,

10  and I recuse on all of his cases, but I didn't know until we

11  were in the middle of picking a jury of that association.  So

12  I gave the lawyers an opportunity to discreetly exercise

13  their options, and one of them did opt to ask that I be

14  removed from the case.  Conflict or potential conflict was

15  not waived.

16        So just to keep things moving, what I will do here

17  is go ahead and finish up with Trooper Brown, and then I will

18  -- Miss Kennedy will give you a written disqualification form

19  which you will execute and return to the clerk's office.  She

20  does not even see them, only Gary Hollinger, the deputy

21  clerk, receives those, and then we'll know where we are.  But

22  I wanted you to know about this.

23        MR. NEUHAUSER:  Thank you.

24        MR. LAPPAS:  Well, good luck to your daughter on

25  the traffic violation.

1          THE COURT:  This is a first in our family.  I got

2     one the other day for an expired inspection sticker, but this

3     is our first speeding violation, so --

4          MR. LAPPAS:  Okay, very well.

5          MR. NEUHAUSER:  Thank you, Your Honor.

6          (The discussion in chambers concluded at 12:04 p.m.

7     and the case continued in the courtroom at 12:08 p.m.)

8          THE COURT:  Mr. Lappas.

9          MR. LAPPAS:  Thank you, Your Honor.

10          (Scott Allen Brown continued as the witness.)

11                    CROSS EXAMINATION

12     BY MR. LAPPAS:

13     Q     Mr. Brown, is there any medical or psychiatric reason

14     why you feel you're not able to testify or testify truthfully

15     today?

16     A     Not that I know of.

17     Q     Would you acknowledge that as of February 4, 1999 you

18     had a violent temper?

19     A     Since when?

20     Q     On February 4, 1999 that you had a violent temper?

21     A     No.

22     Q     That's your testimony?

23     A     Yes, sir.

24     Q     You have filed a -- you contend that as a result of

25     hitting your head on February 4, 1999 you suffered mental

25

1    injuries.  Correct?

2    A    Yes, sir.

3    Q    You told Mr. Neuhauser yesterday that it was your

4    belief that you had a closed head injury.  Correct?

5    A    Yes, sir.

6    Q    And is it your belief that this closed head injury

7    causes violent mood swings in your behavior?

8    A    Not violent, sir, but mood swings, yes.

9    Q    Mood swings, and it also affects your memory, does it

10   not?

11   A    Yes, sir, it does.

12   Q    And because of these closed head injuries that you

13   claim to have sustained, you are taking various kinds of

14   medication.  Correct?

15   A    Yes, sir, I am.

16   Q    Do any of those medications interfere with your ability

17   to either control yourself or to testify properly?

18   A    If I understand your question correctly, it's no.

19   Q    Well, I'll break it down, do any of these medications

20   that you are taking now prevent you from being able to

21   control yourself, not -- specifically your anger?

22   A    No.

23   Q    Do any of these medications prevent you from being able

24   to testify appropriately?

25   A    No.

26

Q    Were you taking any kind of psychiatric medication on February 4, 1999?

A    No.

Q    That is not true, is it?

A    No, it's not.  It is true I don't --

Q    It is true?

A    I was not taking any medication at the time.

Q    All right, what I would like you to do is open the binder that contains your medical records.  I'm going to give you the number in a moment.  It is Binder No. 3, Plaintiff's Binder No. 3, and I want you to turn to Exhibit Tab 13.  Have you found that?

A    Yes, sir.

Q    And do you recognize that these are documents which purport to be your medical records from an admission at the Hershey Medical Center?

A    Yes, sir, they do.

MR. LAPPAS:  Your Honor, may I approach the witness to point to a particular page?

THE COURT:  You may.

MR. LAPPAS:  I apologize, Your Honor, these should have been numbered.

BY MR. LAPPAS:

Q    Mr. Brown, I'm going to show it to you in another binder in which I can easily find it, and then I will find it

1    for you in this one.  When you went to the hospital, you

2    spoke to nurses as you were being admitted.  Do you remember

3    that?

4    A    I don't remember anything about the hospital, sir.

5         MR. NEUHAUSER:  Excuse me, Your Honor, may I have a

6    reference?

7         MR. LAPPAS:  Oh, I'm sorry, I apologize.

8         (Mr. Lappas and Mr. Neuhauser spoke off the

9    record.)

10   BY MR. LAPPAS:

11   Q    Do you remember telling the people at the Hershey

12   Medical Center on February 4, 1999 that you were taking

13   Prozac and had taken it on February 4, 1999?

14   A    Sorry, I don't recall that.  I don't recall anything

15   that happened at the hospital.

16   Q    Is it true that you were taking Prozac on February 4,

17   1999?

18   A    I don't believe so.  I have taken it in the past, but I

19   don't believe it was during that time frame.  My wife would

20   be better to tell you.

21   Q    Well, in light of your testimony a moment ago that you

22   were not taking any sort of psychiatric medication --

23   A    To my knowledge.  I took it in the past for depression.

24   Q    I understand.  I'm going to show you a nursing note,

25   admission nursing assessment, --

1    A    Yes, sir.

2    Q    -- for February 4, 1999, time 23:50 hours, Scott Brown.

3    A    Where do you see that?

4    Q    (Indicating.)

5    A    Oh, up here.

6    Q    Okay, it indicates Prozac dosage 30 milligrams.

7    Frequency OD and then last taken 2-4-99.  Do you see that?

8    A    Yes, sir, I do see that.

9    Q    Do you remember giving that information to the people

10   at the hospital?

11   A    No, sir.  I told you again, I don't remember anything

12   from the hospital.

13   Q    And you don't remember whether or not you were in fact

14   taking Prozac or any other psychiatric medication on February

15   4, 1999?

16   A    I do not recall, I'd have to refer to my wife.

17   Q    From 1996 into 1999 were you being treated for any

18   anger management problems?

19   A    No, depression due to marital problems and my daughter.

20   My daughter was born with a disability, I had a hard time

21   dealing with that.

22   Q    I'm specifically asking you about anger management

23   problems.  Were you seeing a psychologist for anger

24   management problems?

25   A    I was seeing a psychologist, yes, but not for anger.

1   Q    And that was a Dr. Walker?

2   A    Yes, sir.

3   Q    And when you saw Dr. Walker, did you frequently tell

4   him that you were having problems with handling your anger

5   because of work related matters?

6   A    No, not having problems handling my anger.  I had

7   depression due to my job.

8   Q    So you would deny that between '96 and '99 you reported

9   to Dr. Walker that you were having anger related problems due

10  to work matters?

11  A    No, not to my knowledge.  I saw him again for marital

12  situations.

13  Q    Specifically on December 2, 1997, for example, did you

14  tell Dr. Walker that you were angry because of some action at

15  work?

16       MR. NEUHAUSER:  Your Honor, I'm going to object at

17  this point, relevance, two years before the incident.

18       THE COURT:  Sustained.

19       MR. LAPPAS:  I'm sorry, did you say sustained?

20       THE COURT:  Sustained.

21  BY MR. LAPPAS:

22  Q    Well, then closer in time to the incident, closer in

23  time to February 4, 1999, did you consult with Dr. Walker or

24  any other practitioner relative to problems with your anger

25  management?

30

1  A    No, sir, at that point I had stopped seeing Dr. Walker

2  due to his affiliation with the state police.

3  Q    You continued to see him until February 12, 1999, did

4  you not?

5  A    I don't recall the dates.

6  Q    With respect to the incidents of February 4, 1999 I

7  want to direct your attention to that part of your testimony

8  that deals with what happened when you went to the side of

9  the pickup truck after Mr. Yordy had reentered and after you

10 sprayed him with pepper spray.  Do you remember that part of

11 your testimony?

12 A    Yes, sir.

13 Q    Now you stated that you reached into the truck, if I

14 understand you correctly, you reached into the truck to pull

15 him out and your sleeve was nipped at by one or more dogs?

16 A    Yes, sir.

17 Q    And where were these dogs?

18 A    In the cab.

19 Q    Does that truck have a super cab with a front and back

20 seat?

21 A    No, it has, if I remember correctly, just a regular

22 cab.

23 Q    And the ignition would be on the right side, the

24 ignition key lock would be on the right side of the steering

25 column?

1    A    Yes, sir.

2    Q    All right, so your testimony is you reached in with one

3    of your hands to pull Mr. Yordy out and was -- you were

4    nipped at by these dogs.  Is that correct?

5    A    No, sir, I think you have that backwards.  First, we

6    had wrestled at the side.  I was pulling his jacket.  He got

7    in, I -- that's when I tried to grab him out and the dog

8    nipped me.

9    Q    All right, let's --

10   A    I then retreated, and he got in, and that's when I

11   reached in through the window.

12   Q    Let's talk about the biting dogs again.

13   A    Yes.

14   Q    At what time were you -- what were you doing when the

15   dogs bit you?

16   A    Wrestling with Mr. Yordy, trying to pull him out of the

17   cab.

18   Q    So he was in the cab, you reached in to pull him out,

19   and the dogs bit you?

20   A    We were both kind of half in the cab, I mean, we were

21   right at the door.

22   Q    The dogs never came out of the truck?

23   A    No.

24   Q    And there were two of them --

25   A    If I recall correctly, yes.

32

1    Q    -- on the front seat of a regular pickup truck, and the
2    pickup truck had no back seat?
3    A    Yes, sir.  They were small dogs.  Like I had testified,
4    they were like Huskies but they weren't, they were small.
5    Q    And then you reached in with your left hand to reach
6    for the key, --
7    A    Yes, sir.
8    Q    -- ignition key?  How did you know the key was still
9    there?
10   A    I just assumed it.  I saw -- actually, no, I'm sorry, I
11   take that back.
12   Q    I don't want you to assume.  I want you to tell me how
13   you knew the key was there.
14   A    He had tried to start it, and started it, and the
15   vehicle jumped, and that's when I shut it off and tried to
16   pull it out.
17   Q    So your testimony is that he had started -- the car was
18   turned off, you're standing by the side of the car, he starts
19   it up, and only then did you reach in for the key?
20   A    No, simultaneously as he was trying to start it.  The
21   keys were in the ignition.
22   Q    My question is how did you know that?
23   A    I don't recall, I just know they were.
24   Q    Well, you hadn't seen them.
25   A    I just know they were.

1    Q     You hadn't seen them there, had you?

2    A     I don't recall, I just remember knowing that they were

3    there.

4    Q     But you can't tell us how you knew that?

5    A     Possibly I saw them, I don't recall.

6    Q     Have you ever -- in all of the testimony, you said

7    yesterday you have testified over the years in very many

8    cases, have you ever testified to your knowledge that you saw

9    the keys in the ignition?

10   A     I don't recall.

11   Q     Do you remember telling the nurse the information that

12   we elicited from Trooper Caruso that your true reason in

13   reaching into the Yordy vehicle was to grab or restrain Mr.

14   Yordy?

15   A     That's part of what I was doing, sir.

16   Q     Well, but --

17   A     I was trying to restrain him and keep him from driving

18   away.

19   Q     Well, but were you trying -- you had your left hand on

20   the keys and your right hand on your gun.

21   A     No, I had my right hand on Mr. Yordy.

22   Q     You had your right hand on Mr. Yordy?

23   A     Well, first I had it on the pepper spray, and when that

24   -- when that exhausted, that's when I threw it down.

25   Q     Right.

34

1    A    And I came back in to hold on him,--

2    Q    Uh-huh.

3    A    -- and that's -- at that point when he got started

4    again is when I went for my weapon.  But he had started it

5    for the second time when I went for my weapon.

6    Q    I see, so it's your testimony that instead of -- as he

7    was grabbing at you to pull you down the road, instead of

8    grabbing your right hand which is right on him --

9    A    No, it was on my gun at that point.

10    Q    Well, you said you had your right hand on him and your

11    left hand on the keys.

12    A    Yes.

13    Q    Instead of grabbing your right hand, which is actually

14    right on him, he decided to reach around the steering wheel,

15    grab at your left hand.  Is that your testimony?

16    A    He didn't reach around, no, that's not my testimony,

17    sir.  What my testimony is is I had started to reach for my

18    weapon when I saw that he -- it started.  It was a split

19    second.  I saw him start the car.  I knew he was going to

20    start it again.

21    Q    You knew he was --

22    A    He had -- as he was --

23    Q    You knew he was going to start it.  How could you know

24    he was going to start it?

25    A    Because I observed his right hand going back for the

35

1    keys.

2    Q    You testified you didn't know the keys were there until

3    his hand moved towards the ignition switch.

4    A    That's not what I testified to, sir, you need to go to

5    the court reporter.  What I testified to was that he had

6    started the vehicle already once.  You can assume that the

7    keys were in it if he had started the vehicle once.

8    Q    He started the vehicle once and then --

9    A    And I shut off the keys, I shut off the ignition.  With

10   the key in the ignition he had started it.  The key was in

11   the ignition when I shut it off.

12   Q    So the reason the keys --

13   A    I tried to pull --

14   Q    Go on.

15   A    I tried to pull the keys out, the keys were locked in

16   the ignition.  I could not pull them out.

17   Q    The reason you knew the keys were in the ignition was

18   because you had seen him start the car once before?

19   A    Yes, that's when I reached in.

20   Q    I see.

21   A    You can review the videotape if you watch it.

22   Q    You don't honestly believe that the videotape shows you

23   reaching for keys to the car.

24   A    No, I think the videotape shows the transition.  It

25   shows the time line that you're trying to --

1    Q    You --

2    A    -- that you're trying to put forth.

3    Q    Do you believe that the videotape shows your hand in

4    the car reaching for the keys?

5    A    Not in the car, it shows where my position was at the

6    time.

7    Q    So --

8    A    It shows me throwing the pepper spray down.

9    Q    -- your testimony is that you reached your left hand in

10   the car --

11   A    Uh-huh.

12   Q    -- between the steering wheel and the dashboard.

13   Correct?

14   A    Yes, sir.

15   Q    Then down over the steering column and back to where

16   the ignition switch is.  Is that correct?

17   A    It's more like just over, like that.  (Indicating.)

18   Q    Okay, that's your left hand.  Your right hand is

19   restraining Mr. Yordy?

20   A    I had him by the jacket I believe.

21   Q    And then when you saw him --

22   A    But this is through the window, sir, this is through

23   the window.

24   Q    Oh, I know, the door is closed.  When you saw him turn

25   the ignition, you released your hold on him and went for the

1    gun.  Is that your testimony?

2    A    The second time he started the vehicle, not the first

3    time.

4    Q    You're reaching over the steering column.

5    A    Uh-huh.

6    Q    You're reaching for the keys.

7    A    Yes, sir.

8    Q    In fact you actually had your hands on the keys because

9    you knew that they were locked in the ignition lock.

10   A    Yes, sir.

11   Q    You have your right hand on Mr. Yordy.

12   A    I had the pepper spray at first, then dropped the

13   pepper spray, grabbed him, grabbed him.

14   Q    Okay, and then Mr. Yordy turns the ignition key from

15   off to on.  Right?

16   A    For the first or second time, sir?

17   Q    At the time that you had him by the jacket, at the time

18   that you reached in -- your testimony, as I understand it, is

19   that you reached in because you knew the keys were there.

20   The reason you knew the keys were there was because he had

21   already turned the car on the first time.

22   A    Yes, sir, so now you're talking about the second time.

23   Q    You grab him by the jacket?

24   A    Yes, sir.

25   Q    One hand on the ignition?

1    A    Because I had shut it off.

2    Q    One hand on the jacket.  Right?

3    A    Yes, sir.

4    Q    Did you say you shut it off?

5    A    The first time he started it and the vehicle jumped,

6    yes, I shut the vehicle off.  That's why it jumped.

7    Q    So then did he put his hand -- you had a hold of the

8    keys in order to shut them off?

9    A    Yes.

10    Q    Because he put his hand on top of yours to reignite it?

11    A    Yes, sir.

12    Q    He did?

13    A    And when he started it for the second time, he had it

14    on, and I -- that's when I tried to get out, and I went for

15    my weapon.

16    Q    You released his coat?

17    A    I released his coat.  He had -- he had the ignition.  I

18    reached for my weapon and tried to pull my arm out, and

19    that's when he pinned it with his left arm.  (Indicating.)

20    Q    Which arm did he pin, you're demonstrating your left

21    arm.

22    A    Yes, sir.  With his left arm, (Indicating) pinned it

23    right on the armrest of the door and pinned it there and took

24    off.  And at the same time, at the same time --

25    Q    Excuse me, we're getting away from my question.

39

1    A    Okay.

2    Q    At one point you've got your left hand on the ignition

3    switch, you have got your right hand on Mr. Yordy.  Right?

4    A    Yes, sir.

5    Q    What were the dogs doing?

6    A    I don't know.

7    Q    You have two dogs in the truck that nip at you because

8    you come to the door, and your testimony is you're leaning

9    with both arms and hands in the truck, your left hand way

10   past the steering column on the ignition, your right hand

11   grabbing their master, and these dogs are just doing nothing.

12   Is that your testimony?

13   A    That's not my testimony.

14   Q    Okay.

15   A    I'm sure the dogs were doing something, sir, but I was

16   more interested in what was going on --

17   Q    Were the dogs attacking you was the question.

18   A    -- with Mr. Yordy.  What's that?

19   Q    Were the dogs attacking you at this point is the

20   question.

21   A    I don't recall.

22   Q    You don't recall?

23   A    No, sir, I don't recall.  I don't think they were.  I

24   don't think they were.

25   Q    Is the reason you don't --

40

1    A    Mr. Yordy was sitting in the seat.

2    Q    Is the reason you don't recall because of the memory

3    problems you have been having?

4    A    No, sir, I was concentrating on Mr. Yordy and making

5    sure I got Mr. Yordy under arrest.

6    Q    You were concentrating on Mr. Yordy to the extent that

7    you would not remember whether or not you were attacked by

8    two dogs?

9    A    I was wearing a heavy jacket.  All I remember is that

10   the dogs were small, they were just like Huskies but they

11   were smaller, and only once did I realize that they were even

12   in there when they were rip -- they had grabbed a hold of my

13   jacket and tugged at my jacket, that's why I retreated.

14   Q    You started to say they ripped your jacket.  Isn't that

15   what they did the first time?

16   A    I don't recall.

17   Q    Well, because you don't recall I'm going to ask you to

18   turn to a statement that you made to a Corporal Mrgich and a

19   Trooper -- I believe his name is Trooper Oberdorf.  Do you

20   remember speaking to those gentlemen on March 23, 1999?

21   A    Internal affairs, is that what you're talking about?

22   Q    I didn't ask you to identify their work assignment.  I

23   asked you if you remember speaking to them on that date.

24   A    I remember speaking to two individuals, state policemen

25   who were internal affairs, which I assume you were speaking

1    of.  I don't know their -- I don't recall their names.

2    Q    All right, look at Yordy' Binder No. 3, Exhibit 11.

3    Have you found that?

4    A    Yes, sir.

5    Q    Exhibit 11 has a number of attachments to it.  They are

6    numbered.  I want you to turn to page 87 of Exhibit 11, which

7    is part of attachment No. 10.

8    A    Okay, wait a minute, you want me to go to a different

9    attachment now?

10             MR. LAPPAS:  May I, Your Honor?

11             THE COURT:  Please.

12             THE WITNESS:  You want me to go back to attachment

13    11?

14             THE COURT:  He will assist you.

15             THE WITNESS:  Thank you.

16    BY MR. LAPPAS:

17    Q    Now if you need to turn back a few pages, please do.  I

18    want you to acquaint yourself with this exhibit and determine

19    that this is a transcript of a statement which you gave to

20    Corporal Robert Mrgich and Trooper Jerry Oberdorf on March

21    23, 1999.

22    A    Yes, sir, it is.

23    Q    All right, and again without saying why you spoke to

24    them, would you agree that the subject of conversation was

25    the events that took place on February 4, 1999 between you

42

1   and Mr. Yordy?

2   A    Yes, sir.  Yes, sir.

3   Q    All right, now turn to page -- it's page 4 of this

4   statement.  There is also an inked number at the bottom that

5   says 000087.

6   A    Uh-huh.

7   Q    Have you found that page?

8   A    Yes, sir, I did.

9   Q    All right, now almost exactly halfway down the page

10  there is a line that starts with the word uh, u-h.  Please

11  find that.

12  A    Have it.

13  Q    This statement reports that you said -- we're going to

14  start about halfway through this line:  "I remember grabbing

15  him, I remember the dog coming at me and actually grabbing my

16  uh, my jacket and uh, I should have brought my jacket but

17  there is a hole in my jacket ..."  Do you see that?

18  A    Yes, sir.

19  Q    All right, so does that refresh your recollection as to

20  whether this dog tore your jacket?

21  A    Yes, sir.

22  Q    It did tear your jacket?

23  A    It put a hole in it.

24  Q    With its teeth?

25  A    Yes, it was a small hole.

43

1    Q    So this dog that put a hole, large or small, in your

2    jacket by biting at you a moment ago is now doing nothing

3    that you can remember while you have both hands in the car,

4    one on the ignition and one on its master.  Is that really

5    the testimony you'd like to leave with this jury today?

6    A    Yes, sir, I was fighting.  There was a lot going on.

7    Q    Right, do you know an individual by the name of

8    Lieutenant Francis H. Grolemund?

9    A    No.

10   Q    You do not know an individual by the name of --

11   A    Maybe by sight but I don't recall the name Francis.

12   If I knew what he looked like, I might know him.  There is

13   over 4,000 of us.

14         MR. LAPPAS:  Your Honor, this relates to the matter

15   which we discussed with the Court earlier and requires me to

16   distribute Exhibit Binder 4.

17         THE COURT:  Thank you.

18         THE WITNESS:  Thank you.

19   BY MR. LAPPAS:

20   Q    I want you to turn to Exhibit 23 in this exhibit

21   binder, review it silently and tell me if this refreshes your

22   recollection as to whether you know Lieutenant Francis H.

23   Grolemund, Jr. from Troop "S", Milesburg of the Pennsylvania

24   State Police.

25   A    Oh, yes, it did.  It does, it does refresh my memory.

44

1    This was prior to the interstate being dissolved.  At the

2    time I was a patrolman on the interstate in York.

3    Q     Your testimony is --

4    A     That troop is no longer around.

5    Q     You did not immediately recognize the name Lieutenant

6    Grolemund because of the reorganization of Troop "S"?

7    A     Yes, sir.  Yes, sir, he was the last commander of Troop

8    "S".

9    Q     I see, and one of his duties, I take it, was to speak

10   to you on May 8, 1997 relative to an investigation that he

11   was conducting.  Correct?

12   A     Yes, sir.

13   Q     And on that -- during that investigation he asked you

14   to provide certain information concerning a matter that he

15   was investigating, a matter that involved you.  Correct?

16   A     He wasn't investigating, sir.  He was the disciplinary.

17   Q     You could call it an investigation, an inquiry, an

18   examination, he was doing something which required him to

19   obtain information from you involving a matter that related

20   to you.  Correct?

21   A     No, sir.

22   Q     No.

23   A     He was the basic -- he was my commanding officer.  It

24   wasn't his job to do the investigation.  I believe, I'm not

25   really sure who did this investigation, but I know it wasn't

45

1    him.  He's -- he was the commanding officer.  It wasn't his

2    job to do the investigating.

3    Q    Still with Exhibit 23, is there an officer listed in

4    block 3, in the top right-hand corner, an officer who

5    indicated he was, quoting here, the investigating officer?

6    A    Yes, Lieutenant Francis Grolemund, Jr.

7    Q    All right, so let's talk about investigating officer

8    Lieutenant Francis Grolemund.  Isn't it true that during the

9    course of his investigation involving an incident relating to

10   you --

11   A    Uh-huh.

12   Q    -- you provided him with intentionally false

13   information?

14   A    Not that I recall.

15   Q    You do not recall telling him, quoting from this

16   report --

17   A    May I read it?

18   Q    Oh, I thought you had.  You may certainly read this

19   entire report, yes, sir.

20   A    Thank you.  (Witness reading.)  I now remember this

21   incident.

22   Q    Do you now remember that during the course of

23   Lieutenant Grolemund's investigation of you and your conduct

24   you provided him, intentionally provided him, you lied to

25   him, you intentionally gave him false information?

1    A    Yes, sir, I did.

2    Q    And do you now remember that you stated to Lieutenant

3    Grolemund that the reason you lied about an investigation

4    into your affairs was to avoid getting into trouble?

5    A    I don't recall using that language, no.

6    Q    Do you remember that that is the reason you lied to

7    him?

8    A    I lied to him because I didn't want to get disciplined

9    for swearing.  I used foul language.

10    Q    You lied to him to avoid being disciplined?

11    A    Yes, sir.

12    Q    Is that what you just said?

13    A    Yes, sir.

14    Q    Do you know whether or not the Pennsylvania State

15    Police regulations allow you to lie to senior officers --

16    A    No.

17    Q    -- if you choose to do so?

18    A    You're not allowed to, and I was disciplined for it.

19    Q    I want you to look in that same binder, Binder No. 4,

20    at Exhibit 26.  Now I do not want you to identify this, I

21    just want you to look at it.  I don't want you to say out

22    loud what it is at this point.

23    A    Okay.

24    Q    I would just like you to look at it and tell me if you

25    know what it is.

47

1    A    Please give me a second to read it.

2    Q    Certainly.

3    A    (Witness reading.)  Yes, sir, it's relative to what you

4    just told me before, the previous thing we talked about.

5    Q    The previous matter that we discussed concerning your

6    lie to Lieutenant Grolemund?

7    A    Where I fibbed, yes.

8    Q    Fibbed?

9    A    Yes, that's what it was, omission, fib.  It wasn't an

10   out and out lie, it was an omission.

11   Q    It was an omission?

12   A    It was an omission, I didn't tell him, and I should

13   have said that I called the person a mother fucker.

14   Q    Lieutenant Grolemund states that you told him that you

15   intentionally and deliberately lied in order to stay out of

16   trouble.  Is that true or not?

17   A    That's not true, I omitted telling him the truth.

18   Q    I see.  Well, now that you have examined Exhibit No.

19   26, you recognize it, you know what it is?

20   A    Yes, sir, I do, sir.

21   Q    All right, do you remember that you gave a sworn

22   deposition in this case, testimony under oath, at my office

23   on January 18, 2002?

24   A    I do remember us meeting, yes.  I don't recall the

25   exact date but --

1    Q    Do you remember that we did more than meet, that you

2    were asked questions under oath and you gave sworn testimony?

3    A    Oh, yeah.  Yes, sir.

4    Q    And do you remember that at the time of that deposition

5    we discussed the matters contained in Exhibit 26?

6    A    I believe we did touch on that, yes, sir.

7    Q    Yes, now I want you to look at Exhibit Binder No. 1.

8    Please keep that one open to Exhibit 26.

9    A    This one right here.

10   Q    No. 4, please keep that one open.

11   A    Okay.

12   Q    Then open Binder No. 1 to Exhibit 1.

13   A    Okay.

14   Q    Do you recognize that as a transcript of your sworn

15   testimony on the day of January 18, 2002?

16   A    That's what it does look like, sir, yes.

17   Q    Turn to page 19.

18   A    Yes, sir.

19   Q    At the top of page 19 starting with the word however,

20   read that paragraph to yourself.

21   A    Just the top one?

22   Q    Yeah.

23   A    (Witness reading.)  Yes, sir.

24   Q    All right, will you agree that at that point at your

25   deposition that you were testifying about the decision that I

49

1    directed your attention to a moment ago, Exhibit 26?

2    A    Oh, no.

3    Q    Oh, no?

4    A    No, sir.

5    Q    You will not agree to that?

6    A    No, I will not agree to that.  There was three

7    arbitrations, and --

8    Q    Turn back --

9    A    -- I was referring to the other one, the heart and lung

10    issue.

11    Q    Excuse me, I want you to turn back to page 17 where we

12    start talking about what you have now said to be an

13    arbitration decision.

14    A    Seventeen.

15    Q    Now again I don't want you to give any details about

16    what the incident involved or --

17    A    Okay, okay.

18    Q    -- what was involved, but I want you to look at page 17

19    or really at any other page of this deposition transcript

20    that you need to in order to identify the matter that we were

21    discussing at page 19.

22    A    I'm fully aware of the incident in which we talked.

23    Q    All right, starting about two-thirds of the -- well,

24    actually on line 20 of page 17 there is an individual's name.

25    Without telling me what that name is, does that help you

50

1    recognize --

2    A    Absolutely, sir, but there were three arbitrations that

3    arose from this one incident.

4    Q    Turn to --

5    A    You're twisting it around.

6    Q    Am I?

7    A    Yes, sir, I was referring to the heart and lung issue,

8    not this one right here.

9    Q    Heart and lung is a kind of workers' compensation

10   program that covers Pennsylvania State Police troopers, is

11   that correct, and other --

12   A    Yes, sir, when we get hurt --

13   Q    -- and other police officers?

14   A    -- on duty.

15   Q    And heart and lung is something that applies without

16   regard to who's at fault for a particular incident.  Correct?

17   A    I don't know, I'm not a lawyer.

18       MR. LAPPAS:  Your Honor, it actually might take

19   some time to go through this with the witness, would you like

20   to break for lunch now?  May I ask that the witness over the

21   lunch hour examine his deposition testimony and the exhibit

22   that I have referred him to to facilitate the continued cross

23   examination.

24       THE COURT:  I invite you to do that.

25       THE WITNESS:  Yes, ma'am, I will.

51

1          THE COURT:  Thank you.

2          All right, jurors, we're going to break now for

3     lunch.  I'm sure you are all getting hungry, I know our court

4     reporter is.  We'll be back at two o'clock.

5          Miss Kennedy, would you escort the jury please.

6          (The jury left the courtroom at 12:50 p.m.)

7          THE COURT:  Mr. Lappas, if you will stay close by,

8     I have a document to give to counsel --

9          MR. LAPPAS:  Absolutely, Your Honor, I will not

10    leave the courtroom.

11         THE COURT:  -- forthcoming.

12         We'll be in recess.

13         (A recess began at 12:51 p.m. and the case

14    continued at 2:10 p.m.)

15         THE COURT:  Mr. Lappas.

16         MR. LAPPAS:  Thank you, Your Honor.

17         (Scott Allen Brown continued as the witness on

18    cross examination.)

19    BY MR. LAPPAS:

20    Q    Mr. Brown, do you still have those two exhibits

21    available to you?

22    A    Yes, sir, I do.

23    Q    All right, I want you to turn to Exhibit 25.

24    A    Which book?

25    Q    I'm sorry, 26, it's in Binder 4.

52

1    A    Okay, I'm there.

2    Q    And I want you to read to yourself silently the second

3    to the last paragraph on page 4 of that exhibit starting --

4    it starts with the word on April 30.

5    A    Got it.  (Witness reading.)  Yes, sir.

6    Q    All right, does that help you identify the issues that

7    this particular report dealt with?

8    A    Yeah, I do.

9    Q    All right, and you're familiar with those issues.

10    Correct?

11    A    Yes, sir.

12    Q    And with the incident that was involved?

13    A    Oh, yeah.

14    Q    All right, now I'm going to ask you to turn to Exhibit

15    1, which is your deposition.  It's in Binder No. 1.

16    A    Okay.

17    Q    And turn to page 18 of that exhibit, --

18    A    Have it.

19    Q    -- line 15.  The question is -- starts with the word

20    so.  I want you to read that question and answer to yourself

21    silently.

22    A    Yes, sir, got it.

23    Q    All right, now that being the case, will you now

24    acknowledge that both of these exhibits deal with the same

25    incident and the same matter?

53

1    A    I already said that, but it's not -- you wanted me to

2    say that I was referring to that in my testimony.  I was not

3    referring to that, I was referring to the other arbitration.

4    Q    All right.

5    A    But they are -- I understand what you just said

6    connects, but it --

7    Q    Both deal generally with the subject involving 10 days.

8    Correct?

9    A    Yes, sir.

10    Q    All right, both deal with a decision that someone made.

11    Correct?

12    A    No, this one deals with a decision, that one doesn't,

13    that was my testimony.  One is my testimony; one is a

14    decision.

15    Q    Do you acknowledge that in your testimony in Exhibit 1,

16    specifically at pages 18 and 19, you are attempting to

17    describe the decision that appears as Exhibit 26?

18    A    No, I was not.

19    Q    You were not.

20    A    If you look in here, it says he felt, his findings, he

21    found, and if you look at the beginning, the name of the

22    arbitrator was a woman.

23    Q    I know that.

24    A    If I was referring to this specific decision, would it

25    not have said she, her?  I was not referring to this

54

1    decision.

2    Q    So your testimony is there is a separate decision that

3    deals with this same issue, --

4    A    Yes.

5    Q    -- that deals with the same 10 day matter --

6    A    There is three of them.

7    Q    Let me finish please.  There is another decision that

8    deals with the same matter, with the same 10 day issue that

9    was decided by a male arbitrator?

10   A    Yes, it was all the same subject, all the same

11   incident, it was just different decisions for different

12   things.  One was for heart and lung, one was for this and the

13   third one was a county court case.  I can't remember, that

14   was about the attorney.

15   Q    Did the heart and lung issue have anything to do with a

16   10 day time period?

17   A    The heart and lung had to do with me being hurt.

18   Q    Did it have anything to do with a 10 day time period?

19   A    No, I don't believe so.

20   Q    All right.

21   A    If I'm on the same page as you are, I'm trying to

22   answer you as truthfully as I can, and you got me confused.

23   You got me going to three different things here.  I'm just

24   making sure I gave you the right answer.

25   Q    Did the heart and lung case have anything to do with a

1    10 day time period?

2    A    No.

3    Q    All right, the decision of this female arbitrator that

4    you told us about does deal with a 10 day time period.

5    Correct?

6    A    Yes, it does.

7    Q    Your testimony at page 18 and 19 of your deposition

8    deals with a 10 day time period.  Correct?

9    A    Yes, it does.

10    Q    Did the county court case that you referred to have

11    anything to do with a 10 day time period?

12    A    Yes, it did.

13    Q    It did?

14    A    Yes, it did.

15    Q    Was that handled by an arbitrator in Dauphin County

16    Court?

17    A    No, I think it was handled by a judge, an actual judge,

18    county court judge.

19    Q    So at page 18 of your deposition transcript again at

20    Exhibit 1 when I say to you at line 20 that was the decision

21    of an arbitrator, what was your answer?

22    A    All right, --

23    Q    Line 20, page 18.

24    A    Please give me your question again.

25    Q    At line 20, page 18 of your deposition --

1    A    Hold on, I'm still back on 20 where you had me, page

2    18.

3    Q    Line 20.

4    A    Line 20.

5    Q    I say to you was that the decision of an arbitrator,

6    what was your answer?

7    A    "Yes, sir."

8    Q    So we know that the county court matter that you say

9    dealt with a 10 day issue was not the decision of an

10   arbitrator, that was a judge.  Correct?

11   A    I believe so.

12   Q    Were there any other cases that arose out of this

13   particular incident that dealt with a 10 day time period that

14   were the subject matter of a decision by an arbitrator?

15   A    There were two.

16   Q    Were there any other cases --

17   A    Any other cases.

18   Q    -- involving this particular incident --

19   A    Okay.

20   Q    -- that dealt with a 10 day time period that resulted

21   in the decision by an arbitrator?

22   A    Sir, I apologize, but I don't know what the heck you're

23   getting at.  I'm trying -- I want to give you a right answer

24   here, but you got me confused.

25   Q    What I'm getting at is this, Mr. Brown, Exhibit 26,

57

1    which is a certain arbitration award, deals with a 10 day

2    situation.

3    A    Yes, it does.

4    Q    You were one of the parties to that matter.  Correct?

5    A    Yes, I was.

6    Q    You prevailed in that case because the state police had

7    missed a time deadline.

8          MR. NEUHAUSER:  Your Honor, I'm going to object at

9    this point, well beyond the scope of the Court's ruling on

10   this issue.

11         MR. LAPPAS:  I'm simply trying to identify this in

12   such a way that the witness is compelled to admit that we're

13   dealing with the same thing.

14         THE COURT:  I don't think you're getting there, Mr.

15   Lappas.  I think he's explained his answer as best he can.

16   There is nowhere else to go with this.  Let's move on.

17         MR. LAPPAS:  All right.

18   BY MR. LAPPAS:

19   Q    Now with respect to the events of February 4, 1999, do

20   you contend that Vicki Smith attacked you in any way?

21   A    Yes.

22   Q    At what point during these events do you contend that

23   she attacked you?

24   A    Um, when we were on the ground, she kicked me.  To be

25   honest with you, the only reason I know that is I watched the

1    video.

2    Q    So your testimony is you did not know it when she

3    kicked you, but then you saw it in the video?

4    A    She was hovering over us, and I went like this,

5    (Indicating) you know, trying to, as we were fighting, just

6    swinging so she would stay back, but as far as kicking me,

7    no, I had to watch the video for that.

8    Q    Did you feel her kick you on the night of February 4?

9    A    Sir, I was on the ground with a probably 200 pound man

10   on top of me.  I was only interested in getting out from

11   under.

12   Q    Is that a no?

13   A    I would assume so, yes.

14   Q    Turn to page 60 of Exhibit 2 in Binder 1.  This is

15   another deposition.

16   A    Binder 1?

17   Q    Yes.  Have you found that page?

18   A    Yes, sir.

19   Q    Now this was sworn testimony that you gave at a law

20   firm in Harrisburg on July 9, 2002.  Is that correct?

21   A    I cannot confirm the date, I don't have my date book

22   with me, but, yes, I did give testimony there.

23   Q    Now on page 60 you describe the alleged kicking by

24   Vicki Smith, correct, starting at line 2 --

25   A    Hold on, I got to get there.  At line --

1    Q    Two.

2    A    Yes, sir.

3    Q    Would you read how you describe that kicking incident.

4         MR. NEUHAUSER:  Your Honor, I'm going to object.

5    This isn't proper cross examination.  He's acknowledged

6    previous questioning.  The answer that Mr. Lappas is seeking

7    now he's trying to introduce testimony that is not

8    inconsistent.

9         THE COURT:  Sustained.

10   BY MR. LAPPAS:

11   Q    You testified I believe earlier today that you do not

12   presently have a problem with violent mood swings.  Is that

13   accurate?

14   A    That's true, due to medication.  Medication helps me.

15   Q    But you will acknowledge, would you not, that you have

16   a great deal of anger?

17   A    Yes.

18   Q    That anger is at least in part directed to my client?

19   A    Yes, for what I have been through, but I'm dealing with

20   it.  I'm seeing a psychiatrist.  I'm getting help.

21   Eventually I'll lay this down.

22   Q    On February 4 when Vicki Smith first approached you,

23   your testimony is she was friendly and cordial towards you.

24   Correct?

25   A    Yes, she was.  She was overly friendly, touching me to

1    the point that it made me nervous, but I just figured she was

2    just a happy drunk.

3    Q    She was pleading with you, was she not?

4    A    At one point she was, yes, sir.  I know she did not

5    want me to arrest him.  She wanted me to release him to her.

6    Q    And Randy, I'm sorry, Mr. Yordy, was also cordial and

7    friendly with you at the beginning according to your

8    testimony?

9    A    Yes, sir.  Yes, sir.

10   Q    And this situation went from being cordial and friendly

11   to a situation where they both assaulted and attacked you.

12   Is that your testimony?

13   A    Yes, sir, it is.

14   Q    Now you acknowledged yesterday that you broke Randy

15   Yordy's nose with your first punch.  Correct?

16   A    Yes, sir, I did.

17   Q    And will you acknowledge that you fell to the ground

18   hard enough to the side of the road to cause him to break his

19   arm?

20   A    I don't know when that happened, sir, but we fell but

21   I'd say no because he hit me.  I mean, I cushioned his blow,

22   he was on top of me.  Maybe if he was on the bottom, I'd say

23   yes, but, no, I cannot say when it happened.

24   Q    Please turn to your Deposition Exhibit No. 1.  It's in

25   Binder 1, Exhibit 1.

61

1    A    Yes, sir.

2    Q    Page 71.

3    A    Yes, sir.

4    Q    The question that begins on line 23:  "Did you do

5    anything during the course of this incident which could have,

6    in your judgment, resulted in a broken arm to him?"  Do you

7    see that question?

8    A    Uh-huh.  Yes, sir.

9    Q    And what was your answer at the top of page 72?

10    A    "Yeah, we went down hard, and I landed on top of him."

11    Q    You landed on top of him, keep going.

12    A    "You know, like I said, we lost our footing, and 200

13    pounds came -- and 200 pounds coming down on you.  And it was

14    all rock.  It wasn't any -- it wasn't any dirt.  It was all

15    gravel and rock in the area."

16    Q    All right, now does that change your testimony as to

17    whether anything happened between you and him that could have

18    caused him to break his arm?

19    A    It's possible, but I don't remember testifying --

20    saying that.  I don't remember saying that I landed on top of

21    him because he landed on top of me.

22    Q    Do you dispute the accuracy of this transcript?

23    A    Yes, I may have misspoke.  That's all I'm saying.  I

24    may have misspoken.

25    Q    You may have said the wrong thing?

62

1    A    Yes.

2    Q    But you're not saying this transcript is itself

3    incorrect?

4    A    Oh, no, I'm human, I make mistakes.

5    Q    When you said:  "You know, like I said, we lost our

6    footing, and 200 pounds coming down on you," you were

7    referring to your weight, 200 pounds coming down on Randy

8    Yordy.

9    A    No, I was referring to him.  He was a pretty strong,

10   pretty stocky man.

11   Q    So when you said, "... I landed on top of him.  You

12   know, ... 200 pounds coming down on you."

13   A    I weighed 180 pounds at the time.  I now weigh 200.  At

14   the time I weighed 180.

15   Q    During your interview with Corporal Mrgich did you tell

16   him when you were on the ground with Randy Yordy you

17   threatened to blow his head off?

18   A    I don't recall.  Do you have that?  May I read that?

19   Q    It is Attachment 10.  To read it, Mr. Brown, you're

20   going to need Plaintiff's Exhibit Binder 3.

21   A    Got it.

22   Q    You're going to need to turn to Exhibit 11.

23   A    Got it.

24   Q    And you're going to need to find Attachment 10.  Each

25   of the attachments is numbered at the bottom right-hand

63

1    corner.

2    A     I have Attachment 10 but it's this.  (Indicating.)

3    Q     Perhaps we're not looking at the same document.

4    A     Binder 3.

5    Q     What you're looking at is Attachment 2.

6    A     Oh, I'm sorry, I just saw the numbers on the bottom.

7    Okay.

8    Q     Have you got the right exhibit?

9    A     Thank you.  Calm down, you're under arrest, stop

10   fighting me.  It doesn't appear so.

11   Q     All right, one final point.  I want you to turn to

12   Binder No. 3, Exhibit No. 3, I'm sorry, Exhibit No. 13,

13   Binder No. 3.

14   A     Oh, that's more like it.  Penn State Geisinger?

15   Q     Yes.

16   A     Okay.  Do you want me to keep my hand on the other one?

17   Q     Not necessary.  Approximately the third or maybe fourth

18   page there is a document called Emergency Department Note.

19   Date of February 4, 1999.

20   A     Okay.

21   Q     Have you found that?

22   A     Yes, I found that.

23   Q     The second paragraph of that note indicates, quoting,

24   "The patient's medications are Prozac."  Do you see that?

25   A     Yes, sir.  I told you I don't recall anything about the

64

1    hospital.  I had previously been on Prozac because, well,

2    quite frankly, my daughter is disabled.  She was born that

3    way.  I had a hard time dealing with it.

4    Q    Well, this note relates to information that the

5    hospital personnel received on February 4, 1999.  Did you

6    tell them that or did you not?

7    A    I don't recall anything that happened in the hospital.

8    They could have pulled it from my records, I don't know.

9    Q    Was your wife with you at the hospital?

10   A    Nobody was with me.

11   Q    Well, you told us earlier today that your wife would

12   have better information.

13   A    Yes, she would have the time frames of when I was, when

14   I was taking them.

15   Q    She was not at the hospital to advise the doctor, the

16   personnel, of your Prozac taking?

17   A    No, no.

18        MR. LAPPAS:  Thank you.  I have no further

19   questions of this witness.

20        THE COURT:  Thank you.  Mr. Neuhauser.

21        MR. NEUHAUSER:  May I have a moment, Your Honor?

22        THE COURT:  Please.

23        (Pause.)

24        MR. NEUHAUSER:  I have no redirect, Your Honor.

25        THE COURT:  All right, thank you.

1          Trooper, thank you.  You may step down.

2          THE WITNESS:  Thank you.

3          (The testimony of Scott Allen Brown concluded.)

4

5          I hereby certify that the proceedings and evidence

6    of the court are contained fully and accurately in the notes

7    taken by me on the testimony of Scott Allen Brown from the

8    jury trial of the within cause and that this is a correct

9    transcript of the same.

10                              *Monica L. Zamiska*

11                              Monica L. Zamiska, RPR

12                              Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25