1

RB2/11

1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3   RANDY YORDY,                    :
            Plaintiff

4                                   :

        v.                          :       CIVIL ACTION NO. 01-CV-206
5                                   :       (Judge Kane)
    SCOTT BROWN, individually and
6   in his official capacity as     :
    an employee and agent of the
7   Pennsylvania State Police;      :
    PAUL EVANKO, individually and
8   in his official capacity as     :
    an employee and agent of the
9   Pennsylvania State Police;      :
    BERON F. STEAGER, individually
10  and in his official capacity    :
    as an employee and agent of
11  the Pennsylvania State Police;  :
    BARRY L. BRINSER, individually
12  and in his official capacity    :
    as an employee and agent of the
13  Pennsylvania State Police,      :
    et al,
14          Defendants              :

15          TRANSCRIPT OF PROCEEDINGS
                 JURY TRIAL
16         TESTIMONY OF RANDY YORDY

17       Before:  Hon. Yvette kane, Judge
                  and a Jury
18        Date:   January 6, 2003

19        Place:  Courtroom No. 4
                  Federal Building
20                Harrisburg, Pa.

21  COUNSEL PRESENT:

22      SPERO T. LAPPAS, Esquire
            For - Plaintiff
23
        GREGORY R. NEUHAUSER, Esquire
24          For - Defendants

                           Monica L. Zamiska, RPR
25                         Official Court Reporter

FILED
HARRISBURG, PA

FEB 1 0 2003

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

2

INDEX TO WITNESS

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Randy Yordy | 3 | 35 | 53 | 54 |


INDEX TO EXHIBITS

|  | Identified | Admitted |
|---|---|---|
| For the Plaintiff: | | |
| P X 14 (Hershey Medical Center records) | 33 | 33 |
| P X 15A-J (photographs of Randy Yordy) | 29 | 35 |
| P X 40 (photograph of Randy Yordy) | 26 | 35 |

3

1          MR. LAPPAS:  May I call my first witness, Your

2     Honor?

3          THE COURT:  Miss Kennedy, are you all set there?

4          THE CLERK:  Yes.

5          THE COURT:  All right, thank you.  Mr. Lappas, your

6     first witness please.

7          MR. LAPPAS:  Randy Yordy.

8          THE COURT:  Mr. Yordy, would you come forward

9     please and be sworn.

10          RANDY YORDY, called as a witness, being duly sworn

11     or affirmed, testified as follows:

12          THE CLERK:  Please be seated and state your full

13     name for the record.

14          THE WITNESS:  My name is Randy Yordy.

15          MR. LAPPAS:  May I proceed, Your Honor?

16          THE COURT:  Uh-huh.

17          MR. LAPPAS:  Thank you.

18                    DIRECT EXAMINATION

19     BY MR. LAPPAS:

20     Q    Mr. Yordy, you have given the jury your name.  Would

21     you tell us how old you are please.

22     A    I'm 44.

23     Q    Where do you currently reside?

24     A    10373 Allentown Boulevard, Grantville.

25     Q    On February 4, 1999 where did you live?

4

1    A    I lived at 9310 Mountain Road in Grantville.

2    Q    And again on February 4, 1999 with whom did you live at

3    that address?

4    A    Vicki Smith.

5    Q    What was your relationship with Vicki Smith?

6    A    She is a girlfriend plus a business partner.

7    Q    What kind of work do you do?

8    A    I'm a general contractor.

9    Q    And what does that mean?  What does your work consist

10   of?

11   A    I do a lot of roofing.  We own the company, and we do

12   additions, drywall in the wintertime, anything to do with

13   construction.

14   Q    How long have you been in that business?

15   A    Seventeen years.

16   Q    And do you work for yourself or do you work for another

17   company or --

18   A    I work for myself.

19   Q    Were you working for yourself on February 4, 1999?

20   A    Yes, I was.

21   Q    Can you tell us what you did on February 4, 1999 during

22   the daytime hours?

23   A    During the daytime hours I had actually two jobs that

24   were side-by-side on 29th Street in the city.

25   Q    City of Harrisburg?

5

1    A    City of Harrisburg, and we were painting, which was an

2    insurance job, and the other house had a leak also, and we

3    were running back and forth painting the two rooms, doing

4    drywall, which we quit around 6:00-6:30.

5    Q    Now you say we, did you have a crew or employees that

6    were working with you?  How was that going?

7    A    That day I had I think my brother and a guy named

8    Rodney, I don't remember his last name, it's been a while.

9    Q    So you say you quit about 6:00 or 6:30?

10   A    Yes.

11   Q    What did you do after that?

12   A    I left there, and I went to the Thoroughbred in

13   Grantville.

14   Q    What is the Thoroughbred?

15   A    It's a bar.

16   Q    Where is it?

17   A    It's on Old Route 22 about one mile off 743.

18   Q    All right, did you go there by yourself?  Did you have

19   other people with you?

20   A    I went there by myself.  I believe Rodney stopped.  He

21   was there for a small while, which he came separate, he was

22   separate, I drove there by myself.

23   Q    Rodney being one of your workers?

24   A    Yeah.

25   Q    When you got to the Thoroughbred, can you tell us about

6

1    what time it was?

2    A    At least probably around 7:00-7:30, I'm not exactly

3    sure, but I just estimate from the time I left that job.

4    Q    Did you go anywhere between the time you left your job

5    to the time you went to the Thoroughbred, had you gone

6    anywhere else?

7    A    No.

8    Q    Now what did you do at the Thoroughbred?

9    A    I drank about four or five beers and ate a

10    cheeseburger.

11    Q    Okay, and what did you do after leaving the

12    Thoroughbred?

13    A    I left the Thoroughbred and got pulled over by Trooper

14    Brown.

15    Q    Do you know what road he pulled you over on?

16    A    It's called Old 22.

17    Q    About how far from the Thoroughbred were you when he

18    pulled you over?

19    A    Approximately half a mile.

20    Q    So you had essentially just left?

21    A    Yeah.

22    Q    When he pulled you over, what's the first thing that

23    you remember happening?

24    A    I remember him coming up and asking me for my license

25    and registration.

7

1   Q     Did you give it to him?

2   A     Yes.

3   Q     Did he say anything else that you recall at the very

4   beginning?

5   A     No, nothing else.

6   Q     Now have you seen the videotape that we're about to

7   show the jury that was taken from Trooper Brown's patrol car?

8   A     Yes, I have.

9   Q     And to the best of your recollection does it accurately

10  show the things that happened directly in front of the camera

11  on February 4, 1999?

12  A     Yes, it does.

13        MR. LAPPAS:  Your Honor, with the Court's

14  permission we would now play that.

15        THE COURT:  Uh-huh.

16        (The videotape started.)

17  BY MR. LAPPAS:

18  Q     Now we're at I think this is 21:07.  Is that your

19  vehicle, your truck, that we see on the video camera?

20  A     Okay, I got to look this way.

21        MR. LAPPAS:  Your Honor, is it all right if he

22  stands up so he can see the monitor?

23        THE COURT:  Sure.

24        THE WITNESS:  I can see it from here.

25  BY MR. LAPPAS:

8

1   Q     Is that your truck?

2   A     Yeah, that's my truck.

3   Q     And is that Trooper Brown that just came into the

4   picture?

5   A     That's Trooper Brown.

6   Q     Is this where he's asking you for your driver's

7   license?

8   A     Yes.

9   Q     Okay, now we're at 21:08, and it appears that Mr. Brown

10  is still at the side of your car.  Had there been any problem

11  between the two of you up to this point?

12  A     No, at the time it probably took me a while to get the

13  papers out of the glove compartment because I had to reach

14  over, and there is a lot of papers.

15  Q     Since you're standing away from the microphone just

16  remember to keep your voice up.

17  A     Okay.

18  Q     Had there been harsh words exchanged or any kind of bad

19  conduct?

20  A     No, no, not at all.

21  Q     Now it appears that Trooper Brown is leaving your

22  vehicle.  I'm going to pause it right here.  It -- can you

23  just explain to the jury and for the record tell us what part

24  of your truck is shown on the videotape?

25  A     Okay, it's the left rear.

9

1    Q    And where are you -- are you stopped right in the

2    middle of the lane of traffic or are you stopped on the side

3    or what?

4    A    I'm on the side of the road.

5    Q    All right, so what we see on the video is from your

6    left --

7    A    Half rear of the truck.

8    Q    -- left rear of the truck to slightly beyond the

9    license plate.  Is that accurate?

10   A    That's accurate.

11   Q    All right, I'm going to start the tape again.  Now did

12   the image change at all?  Can you still see the same portion

13   of your truck or --

14   A    You can still see the same portion.

15   Q    All right, okay, now we're still at 21:10, we're at

16   21:10, has Trooper Brown entered the frame of the picture at

17   all?

18   A    Yes, he backed his vehicle up.

19   Q    I mean, do you see his -- has he entered the picture?

20   Can you see him?

21   A    No.

22   Q    All right, now you started to say the image has

23   expanded somewhat.

24   A    Yes.

25   Q    Do you know why that is?

10

1    A    The trooper backed his vehicle up to get it in view.

2    Q    Okay, now there is a person is entering the image now

3    at 21:10:39, who is that?

4    A    That is Mr. Brown.

5    Q    Okay, now who is that that just is walking towards the

6    back of the truck 21:11:12?

7    A    That's me.

8    Q    All right, now it appears that you are standing behind

9    the truck, and Mr. Brown is slightly to your right.

10    A    Yes, and ah --

11    Q    Do you remember what's going on at this point in time?

12    A    Yeah, he's asking me to take a sobriety test, field

13    sobriety.

14    Q    Now he's just walked around to your other side, and

15    just as the tape progresses, tell -- explain to the jury what

16    you remember to be happening?

17    A    Okay, Trooper Brown is showing me how to do the stand

18    on one leg, and I'm trying to do it shortly, and I don't

19    quite make it.  And I believe I said I couldn't do it, that's

20    the best I could do.

21    Q    Keep your voice up a little bit.

22    A    I believe I said that's the best I could do at that

23    point.

24    Q    All right, now who is the other person that just

25    entered the picture?

1   A    Vicki Smith just approached the picture.  She came and

2   started talking to Mr. Brown.  I believe she is saying, "May

3   I take him home," or just discussing something.  Okay, Mr.

4   Brown comes back to -- he's going to make me walk a straight

5   line.

6   Q    All right, now at this point is Mr. Brown the only

7   police officer at that location?

8   A    Yes, he is.  He's explaining to me about walking the

9   line.

10  Q    All right, now it appears that you are standing there,

11  you have got your hands in your pocket, something like that?

12  A    Yeah.

13  Q    Has there been any trouble whatsoever up to this point?

14  A    None whatsoever, it's been a friendly conversation.

15  Everybody was very polite.  At this point I believe he shined

16  his light in Vicki's eyes.  I asked to get my coat.  He let

17  me go to get my coat out of the truck.

18  Q    Why did you need to get your coat?

19  A    It was very cold, it was February.

20  Q    And you say you asked him if you could go?

21  A    I asked him if I could go to the truck to get my coat,

22  and he said okay.

23  Q    Now could you see Vicki Smith in the picture?

24  A    I can see Vicki.  He's going to give her a field

25  sobriety test, and I believe she's explaining to him she was

12

1    in an accident when she was younger, and her equilibrium in

2    her head is off, and she can't stand on one foot.

3    Q    So that's what Vicki was explaining to him?

4    A    That's what Vicki was explaining to him.

5    Q    Vicki, I'm sorry, Miss Smith.

6    A    Miss Smith.

7    Q    All right, who is that person over on the left?

8    A    Okay, that's me, I stepped out of the way for him to

9    talk to Vicki.

10   Q    All right, now I'm going to pause the image here at

11   21:16:52.  The two people that are over by your left, the

12   rear quarter of the truck, who is that?

13   A    That's Vicki Smith and Scott Brown.

14   Q    Can you see yourself in this image now?

15   A    I can see myself right in the -- all the way to the

16   corner of the TV if you're facing it on the right.

17   Q    Okay, starting the tape again.  The person that just

18   made the gestures with the hands, who is that?

19   A    Vicki Smith, she's explaining why she can't stand on

20   one foot.  I was trying to show her how to do it, and she was

21   also explaining to me why she couldn't do it.

22   Q    All right, now up until this point, and I'm going to

23   pause it so you can answer this question, up to this point

24   had there been any kind of hostility whatsoever?

25   A    None at all.  As a matter of fact, there was probably a

13

1    few jokes thrown at the time.

2    Q    Was there any sign of anybody, to use Mr. Neuhauser's

3    phrase, getting in somebody's face or being belligerent at

4    all?

5    A    Not at all, not at all, it was very friendly.

6    Q    All right, starting the tape now.  Just tell us what's

7    happening as the tape progresses.

8    A    Okay, Vicki and I are talking.  She's explaining why

9    she couldn't do her thing, do you understand, that's what

10   she's saying.

11   Q    Where is Mr. Brown?

12   A    Mr. Brown is in back, there he is.  He tells Vicki to

13   leave.

14   Q    Does she leave?

15   A    Yeah, she leaves, and he grabs me there, throws --

16   Q    Okay, stop.  We're at 21:18:32.  What's happening right

17   now?

18   A    He grabs me by the arm, bends me up and throws me

19   against the truck.

20   Q    Had you done anything --

21   A    I haven't done anything.

22   Q    -- hostile?

23   A    Not at all.

24   Q    Did he give you any verbal warning he was going to do

25   that?

14

1   A    No verbal warning.  I mean, I was totally surprised and

2   shocked.

3   Q    All right, I'm going to start the tape.  Now what's

4   going on now?

5   A    Okay, now he's taking me from the back of the truck,

6   dragging me off to the side of the road.

7   Q    All right, now it appeared that one person had the

8   other person and was sort of spinning him around.  Who was

9   doing that to who?

10  A    Mr. Brown spun me into the back of the truck, which it

11  was painful, and grabbed me and took me from the back of the

12  truck to the side of the road.

13  Q    All right, we're going to start the tape now.

14  A    And if you see from the side of the road, if you see

15  the light clothing, that's me laying there on my back, and --

16  Q    Whose feet or whose legs are those sticking out?

17  A    Those are Vicki's.  She came back to ask when she

18  should pick me up.

19  Q    Now what's going on?  We can't see what's going on at

20  the side of the road.

21  A    She lifts her leg.

22  Q    What's happening there?

23  A    She lifts her leg because a hand -- to miss a hand that

24  went by.  And there I'm trying to drag -- I'm in plain

25  clothes trying to get back on the road, and Mr. Brown is

15

1    actually -- keeps on punching me and punching me and calling

2    me names and --

3    Q    Who is that walking away?

4    A    And that's Vicki.  She goes and leaves.

5    Q    Now can you see you and Mr. Brown?

6    A    No.

7    Q    All right, we're at 21:19 and 30 seconds.

8    A    There you see a little corner, if it's light colored,

9    it's me.  I had lighter clothing on than Mr. Brown.

10   Q    Now what's going on off to the side of the road

11   where --

12   A    Off to the side I'm like -- Mr. Brown is holding on

13   punching.

14   Q    Did he punch you one time or more than one time?

15   A    He punched me a few times.  I actually had him in a

16   bear hug at one time when he pulled me off --

17   Q    Okay, stop, I'm going to pause the tape right now.  You

18   started to stay you had him in a bear hug.

19   A    At one time to try to stop him from punching me, and he

20   was like saying, "You fucking asshole.  You fucking asshole."

21   Q    Who said that?

22   A    Mr. Brown.  Continuously foul language from the time he

23   grabbed me to throw me against the truck after he thought

24   Vicki left, after he told her to leave, he said, "Now you

25   fucking asshole," and he just went crazy.  It was unreal.

16

1    Q    Did you fight back at all?

2    A    No, I never touched Mr. Brown once, not a one time.

3    Q    Do you ever wear any rings?

4    A    No, I don't.  I never wore a ring in my life.

5    Q    Were you wearing a ring on February 4, 1999?

6    A    No.

7    Q    All right, at some point were you able to get away from

8    Mr. Brown?

9    A    I was getting away from Mr. Brown.  I got away from Mr.

10   Brown, as you see, I pulled myself up from the truck away

11   from him, the side of the road, and then I came around the

12   truck.  And at the point where he threw me against the truck

13   and drug me to the side of the road and started beating me

14   and then just saying, "You fucking asshole," now, you know,

15   it was like the man has snapped, and I felt I had to get away

16   from him.  I mean, even though he was a police officer, and I

17   respect a police officer, I had to get way from him, the man

18   went crazy.  He did say, "I'm going to fucking kill you,

19   too."

20   Q    Okay, we're going to start the tape.  It's now

21   21:20:02.  What's happening there?

22   A    There I'm trying to get into my truck.

23   Q    Now you see -- is that still your legs that appear to

24   be more light in color?

25   A    Yeah, yes.

17

1    Q      There is somebody behind you?

2    A      Yes.

3    Q      That's Mr. Brown?

4    A      Yes, Mr. Brown, he's in the truck.  He actually got a

5    hold of me, he might have pulled the key, he might have

6    turned the key off.

7    Q      Now it appeared that your truck started to move a

8    little bit.

9    A      It moved.

10   Q      Why is that?

11   A      He might from turned the key off.  At the time my eyes

12   were burning.  Coming around the truck he sprayed me with

13   pepper spray in my eyes, and I spent most of my time like

14   with one hand trying to wipe my eyes and trying to get away

15   with the other hand.  Starting the truck back up and putting

16   it in gear and put it out of gear, as you see, it goes into

17   gear, and I did, I tried to get away.  I felt that I could

18   not -- I wouldn't survive if I didn't get away, that's how I

19   felt.

20   Q      Why did you feel that way?

21   A      Because he just wouldn't quit.  He had ample

22   opportunity, and I would not have resisted arrest.  He could

23   have handcuffed me from the beginning.  He didn't seem like

24   he was interested in handcuffing or securing me, he was more

25   interested in just beating the crap out of me.

18

1    Q    We're going to start up the tape.  Now it's 21:20 and

2    25 seconds.  Tell us what's going on now?

3    A    Okay, he drops the pepper spray.  He takes it back.  He

4    pulls his gun before the truck goes.

5    Q    I'm going to rewind it for a moment.  All right, we're

6    back at 21:20 and 10 seconds.  You're getting in the truck

7    now.

8    A    I'm getting in the truck.

9    Q    What's Mr. Brown doing?

10   A    He throws his pepper spray down, pulls his gun.  He's

11   choking me, and, you know, there is a possibility his hand

12   could have got caught inside, I really don't know.  I was

13   blinded by pepper spray, rubbing my eyes, but I had no

14   intentions did I grab his arm to hold him.

15   Q    Now it's 21:20 and 40 seconds.

16   A    I was trying to get away from him.

17   Q    And you drive away.  Is that correct?

18   A    That's correct.

19   Q    All right.

20            (The videotape concluded.)

21            THE COURT:  Mr. Lappas, this might be a good

22   breaking point.

23            MR. LAPPAS:  Certainly, Your Honor.

24            THE COURT:  We'll take the noon recess until 1:30.

25            Jurors, before you leave I want to advise you of a

19

1     few things.  Of course, you're not going to be required to

2     remain together while the court is not in session, but it's

3     very important that you keep an open mind throughout the

4     trial.  In order for you to be able to do that it's important

5     that you not discuss the case either among yourselves or with

6     anybody else during the course of the trial.  If anybody

7     would try to discuss the case with you, it's important that

8     you bring that fact to my attention right away without

9     disclosing it to your fellow jurors.

10          It's also important and very likely in a case of

11    this type that there will be newspaper accounts of this trial

12    and that you ignore those accounts.  If you hear anything

13    about the trial on the radio or television or you see

14    something in the newspaper that looks to be about this trial,

15    it would be very important that you put that newspaper away

16    or turn off the television or radio.

17          The other thing, jurors, as you come and go from

18    the courtroom you're going to see people involved in the

19    trial out in the hallways and maybe even in the lobby of the

20    building.  Do not have any discussion at all, any

21    conversation at all, with any of the lawyers, the parties or

22    the witnesses in the case.  Don't even talk to them to greet

23    them good morning.  It's really important that everybody

24    involved in the case feel that you have an open mind and that

25    you not have any contact with anybody, so not even to greet

20

1    them in the hallways of the courthouse should you address the

2    lawyers, the parties or witnesses.

3            Miss Kennedy is going to escort you now.  You will

4    come back at 1:30.

5            (The jury left the courtroom at 12:20 p.m.)

6            THE COURT:  We'll be in recess until 1:30.

7            (A recess began at 12:21 p.m. and the case

8    continued at 1:30 p.m.)

9            THE COURT:  Mr. Lappas, ready to proceed?

10           MR. LAPPAS:  Yes, Your Honor.

11           (Randy Yordy continued as the witness on direct

12   examination.)

13   BY MR. LAPPAS:

14   Q    Mr. Yordy, before the luncheon recess we had just

15   finished looking at the videotape and you had explained to us

16   what was happening on that tape.  Now after you left the

17   location that was being videotaped, after you left the

18   location that was being videotaped, where did you go?

19   A    I went to my residence, 9310 Mountain Road.

20   Q    And about how far away was that from the spot that was

21   shown on the video?

22   A    I would say approximately two miles.

23   Q    Did you make it home without accident or incident?

24   A    I passed the driveway on the way home, and I had to

25   turn around, and I actually went into the ditch at the side

21

1    of the road turning around, and I lost my tire in the rear of

2    the vehicle, and I made it halfway up the driveway.

3    Q    Was that the tire that had been shot out by Mr. Brown?

4    A    Yes.

5    Q    You testified before lunch that as you were getting

6    into your truck your eyes were sore and blinded by the mace

7    or the pepper spray.  Right?

8    A    Yes.

9    Q    How did that -- did that condition last for a while or

10   did that clear itself up?

11   A    It lasted for a while is why I missed the driveway

12   because I couldn't really see very good.  I was rubbing my

13   eyes and trying to get the vision, and I realized after I

14   passed it that I passed it.

15   Q    Now when you got back to your home, what did you do?

16   A    I went immediately into the rear of the house, and I

17   went in, I was going to look for Vicki, which she was laying

18   on the couch.

19   Q    She was home when you got home?

20   A    She was home.  She was laying on the couch.

21   Q    In what room?

22   A    In the living room.

23   Q    Okay.

24   A    No sooner than that happened where Trooper Brinser and

25   Steager were outside yelling for me to come out.

1    Q    Had you ever met either one of them before?

2    A    Yeah, I met Steager, Mr. Steager, he was at my

3    residence before.

4    Q    Had you ever had any problems with him or any

5    difficulties with him?

6    A    Not at all, never.

7    Q    Okay, so what, you said they were yelling for you to

8    come out of your residence.

9    A    Yeah, and I -- yes.

10    Q    What happened then?

11    A    I was at the front patio door, which is a double glass

12    door where you see directly in, and, as I remember, I

13    remember when I got in, I was thinking, "Who can I call?"  I

14    remember looking at the phone.  And then I said, "Well, I got

15    to go out."

16    Q    Why did you want to call -- who did you want to call?

17    What kind of people did you want to call?

18    A    I had no idea.  I was thinking of calling the police,

19    which would have been -- which was ironic at the time to do

20    such a thing.

21    Q    For what purpose did you want to call somebody?

22    A    Because I was just beaten by a police officer, which

23    was Mr. Brown, and I was scared, I was in fear.

24    Q    So then after you heard Mr. Steager and Mr. Brinser

25    calling to you, what did you do?

1    A    I went -- you don't go in and out of our patio door,

2    it's a real hard door to open and close, you walk to the left

3    and then to the right to a doorway and come out like a pantry

4    door, it's a mudroom I think they would call it, and that's

5    what I did, I exited the house.

6    Q    What happened then?

7    A    As soon as I opened the door to get out, I guess Mr.

8    Brinser ran up and whacked me with a gun, and I was knocked

9    unconscious.  I have not much recollection after that other

10   than --

11   Q    When you say he came up and whacked you with a gun,

12   describe that in more detail?  What exactly did he do?

13   A    I had a 9 inch cut on my -- nine stitches put in my

14   eye, above my eye, and that's all I remember is feeling the

15   pain there, seeing him run up, he had his gun in his hand,

16   and swing, and I just came unconscious.

17   Q    And which one of the troopers was that?

18   A    That was Mr. Brinser.

19   Q    Did you actually lose consciousness in the sense that

20   you were asleep after that?

21   A    I, yeah, I don't have a recollection other than coming

22   in and out of being conscious once in the driveway with, ah,

23   you know, I was laying on my back and looking up, and I

24   became conscious, and there was just people punching me in

25   the face.  Constantly it was police officer punching me in

24

1    the face.

2    Q    And where were you located at that time?

3    A    I was at the end of the driveway.  I remember it was

4    really cold, and probably that's what woke me up is I was

5    laying in a cold mud puddle on my back with my handcuffs on

6    my back.

7    Q    When Trooper Brinser ran up to you and hit you in the

8    head with the gun, had you done anything hostile or

9    aggressive to him whatsoever?

10    A    No, I didn't.

11    Q    Had you said anything verbally that was aggressive?

12    A    I didn't get a chance to say anything.

13    Q    How about even before you left the house, had you

14    called out anything as you were inside calling to them

15    outside?

16    A    No, I remember in the house I just when they were

17    calling to come out, I remember looking at the phone thinking

18    who could I even possibly call, "I'm going to go out," and

19    that's what I did.

20    Q    All right, now after you testified you lost

21    consciousness, you were in and out of consciousness at the

22    end of the driveway, you remember people striking you, what's

23    the next thing you remember?

24    A    I remember being in the hospital just for about a

25    minute.  Actually what I remember is I was -- I went in my

25

1    pants either during the beating or during the -- at the

2    hospital.

3    Q    Was that the Hershey Medical Center?

4    A    Yes.

5    Q    Do you know how long you were in the hospital?

6    A    My next time of recollection was in front of Judge

7    Bridges being arraigned I believe you call it.

8    Q    That's District Justice Roy Bridges?

9    A    Roy Bridges, yes.

10    Q    Was that the same day or was that the next day?

11    A    That was the next day, it was morning, and I remember

12    news cameras, there was all kind of news cameras, and then I

13    remember walking in the prison.

14    Q    So were you at the medical center overnight the night

15    of the 4th, February 4?

16    A    Yeah, yes.

17    Q    Now after that took place when you were at District

18    Justice Bridges' office, that was in connection with a

19    criminal complaint, criminal charges that were filed against

20    you.  Correct?

21    A    Yes.

22    Q    Do you remember what you were charged with?

23    A    Attempted homicide I believe was the charge that I

24    remembered.

25    Q    Now were you then taken to prison?

26

1    A    Yes.

2         MR. LAPPAS:  Your Honor, may I display the same

3    photograph we used in the opening?

4         THE COURT:  Yes.

5    BY MR. LAPPAS:

6    Q    Now I'm holding up --

7         THE COURT:  Miss Kennedy, you might want to move

8    that cart down from the jury box.

9         THE CLERK:  Certainly.

10   BY MR. LAPPAS:

11   Q    I have displayed on the easel a document that's been

12   marked as Plaintiff's Exhibit No. 40.  Do you recognize that

13   as a photograph of yourself?

14   A    Yes.

15   Q    Do you remember where that was taken?

16   A    It was taken the next day in prison I believe.

17   Q    Dauphin County Prison?

18   A    Dauphin County Prison.

19   Q    And is this an accurate depiction of the way you looked

20   that day?

21   A    Yes.

22   Q    Had you -- before you encountered Mr. Brown on the

23   evening of February 4 did you have any of these injuries that

24   are shown in this photograph?

25   A    No.

27

1    Q    Did you have any bruising of your eyes or bandages,

2    cuts on the head, any of that?

3    A    No.

4    Q    Were you wearing a cast on your arm when you met Mr.

5    Brown on February 4?

6    A    No.

7    Q    Why did you have a cast on your arm in this photograph?

8    A    I have a broken elbow, a chipped elbow.

9    Q    And you didn't have that before you met Mr. Brown?

10   A    No.

11   Q    Can you swear with any definite specificity at what

12   moment that elbow became broken during the events of February

13   4?

14   A    I can't swear.  I was -- I can't swear when it got

15   broken.  I was beaten pretty bad, and fear was a lot of my

16   feeling.

17   Q    Now when you testified about Mr. Brinser, Trooper

18   Brinser, hitting you in the head with a gun, you said that

19   you had stitches from that.  Correct?

20   A    Yeah.

21   Q    I'm pointing to a part of your face where there is a

22   bandage.  (Indicating.)  Is that where the stitches were?

23   A    Yes.

24   Q    And right sort of between your eyes and a little bit

25   towards the center of your left eye.  Correct?

1    A    Yes.

2    Q    The photograph seems to show your eyes and nose as

3    being -- eyes especially and nose to a somewhat lesser degree

4    being bruised.  Do you know what kind of injuries you

5    sustained to that part of your face?

6    A    I had a broken nose.  My eyes are black and blue.  I

7    could barely see out of them.  I have a few scrapes on the

8    side of my face.  I actually -- I can't swear to when they

9    happened because coming to from being unconscious, I just

10   remember being hit, and I imagine that's where the black eyes

11   were coming from.

12   Q    Mr. Yordy, I'm going to ask you to turn in our Exhibit

13   Binder No. 3 to Exhibit Tab 15.

14   A    Okay.

15   Q    Exhibit 15 consists of a series of photographs.  I'm

16   going to ask you to look at them while you're on the witness

17   stand and tell me after you're done looking at them if they

18   accurately depict the way you appeared shortly after the

19   event of February 4, 1999?

20   A    Yes.  Yes.  Here is one where the bandage is pulled up

21   and you can see the stitches.

22          MR. LAPPAS:  May I approach the witness, Your

23   Honor, to --

24          THE COURT:  You may.

25          MR. LAPPAS:  Your Honor, I'm going to request to

29

1    publish some of these, not all of them, to the jury.  May I

2    have the witness remove them from the binder for that

3    purpose?

4              THE COURT:  Yes, but you should individually mark

5    them.  As I see, they are all marked as Plaintiff's Exhibit

6    --

7              MR. LAPPAS:  They are all collectively marked as

8    15.  I'll mark them 15A --

9              THE WITNESS:  Do you want them all?

10             MR. LAPPAS:  Take them all out.

11             Your Honor, I have marked them 15A through J in the

12   same order as they appear in the Court's binder.  I have

13   marked them on the back.  I'll attach new exhibit stickers to

14   them.

15             THE COURT:  Which ones are you wishing to publish?

16   Can you show them to Mr. Neuhauser.

17             MR. LAPPAS:  I wish to publish to the jury, Your

18   Honor, 15E, which would be the fifth one; the next one which

19   is F; and the second to the last one, which is I.

20             THE COURT:  All right, Mr. Neuhauser, --

21             MR. NEUHAUSER:  No objection.

22             THE COURT:  -- any objection to those photos, E, F,

23   G and I?

24             MR. LAPPAS:  Your Honor, they are E, F and I.

25             THE COURT:  Thank you.  Very well, Miss Kennedy.

1          (P X 15E, F and I were passed to the jury.)

2          THE COURT:  Mr. Lappas, the document that's here on

3    the easel, what number is that?

4          MR. LAPPAS:  Your Honor, that is Plaintiff's

5    Exhibit 40.

6          THE COURT:  Forty, okay, for the record, Exhibit

7    40.

8    BY MR. LAPPAS:

9    Q    Mr. Yordy, how long did that cast remain on your arm?

10   A    For approximately six weeks.

11   Q    Now you told us at the time that -- strike that.  You

12   told us that at this time, February 4, '99, you were a

13   self-employed construction and roofing contractor?

14   A    Yes.

15   Q    Were you able to work for that six weeks?

16   A    No.

17   Q    For some of the time we have established that you were

18   at the Dauphin County jail.  How long did you remain in jail?

19   A    I believe I was there two days.

20   Q    And then you posted bail?

21   A    Yeah, a lady from the neighborhood came and post bail.

22   Q    So after you were released from jail, you were still

23   unable to work?

24   A    Yes.

25   Q    For about how long were you unable to work at your

31

 1    normal occupation?

 2    A    Approximately three, three months.

 3    Q    Why was that, that you were unable to work?  What

 4    prevented you from working?

 5    A    Well, I was healing, No. 1.  I was not only in

 6    construction do I do the work, but I also see the customers,

 7    and I was embarrassed, my bruises, black eyes.  I mean, I

 8    didn't look like a person that should be walking up to

 9    somebody to work, much less feeling I was depressed and not

10    in a good mental state.

11    Q    How long did it take for your facial injuries to heal?

12    A    Approximately two, three months.

13    Q    Do you still have any scars from these injuries?

14    A    Yeah.

15    Q    Where are you scarred?

16    A    I have a scar above my left eye where the nine stitches

17    were.  My nose is a little more crooked than it used to be.

18    Pretty much every once in a while I get a pain in my elbow

19    from the chipped bone.  The arthritis probably, I'm getting

20    older.  Other than that, other than that for physical

21    injuries, that's all.

22    Q    Other than physical injuries after this happened did

23    you suffer any kind of psychological or emotional pain?

24    A    Even, even today or last week I had a nightmare.  I'm a

25    little more depressed.  I'm embarrassed, and I feel like I

32

1    really have been abused, and it was considered okay.

2    Q    What kind of nightmares did you have?

3    A    I have like waking up sweating, feeling very unsafe as

4    if somebody is going to come and beat me.

5    Q    Did you have that condition before this?

6    A    No.  No.

7    Q    Now when you were unable to work for did you say two or

8    three months?

9    A    Yeah.

10   Q    For two or three months, did your business carry on in

11   your absence?

12   A    No, it didn't.

13   Q    Have you been able to estimate what you lost in terms

14   of income for being shut down for that period of time?

15   A    I would estimate just for jobs being done close to 45

16   to 60,000, and then to pick business back up I can't give an

17   accurate estimation right now for the customers I didn't go

18   see or --

19   Q    The 45 to 60 thousand dollar amount is what you

20   actually lost for gross receipts for that period of time?

21   A    Yes.

22   Q    I'm going to ask you to turn in that same binder,

23   Plaintiff's Exhibit Binder No. 3, to Exhibit Tab 14.  Exhibit

24   Tab 14 consists of several pages of your medical bills.  Is

25   that correct?

33

1    A    Yes.

2    Q    These are your medical bills from the Hershey Medical

3    Center?

4    A    Yes.

5    Q    Did you pay all of these bills?

6    A    Yes.

7    Q    You paid them yourself?

8    A    I paid myself.  I'm not -- I'm not -- I don't have

9    insurance, I can't get insurance, I'm a diabetic and they

10   won't allow me to have insurance.

11        MR. LAPPAS:  Your Honor, I believe that the parties

12   will stipulate that that Exhibit 14, being medical bills, can

13   be admitted without any further testimony from an official of

14   the Hershey Medical Center.

15        MR. NEUHAUSER:  That's correct, Your Honor.

16        THE COURT:  They will be admitted.  Exhibit 14

17   admitted.

18   BY MR. LAPPAS:

19   Q    Now, Mr. Yordy, what became of the criminal charges

20   that were filed against you as a result of the allegations of

21   February 4?

22   A    I was offered a plea bargain to reduce the charges to

23   aggravated assault in the second degree, two resisting

24   arrests and a DUI for one to two years in the work release

25   center in Steelton where I could keep going to work.

34

1    Q      And did you accept that plea bargain?

2    A      I accepted that plea bargain.

3    Q      Why?

4    A      Because they said if I would lose in court, I --

5    Q      Who is they?

6    A      The district attorney said through my criminal attorney

7    that if I would lose, I would do 18 years with no eligible

8    parole because it was an assault against a police officer.

9    Q      You said that when you were originally arrested you

10   were charged with attempted homicide.  Was that charge

11   dismissed?

12   A      Yes.

13   Q      So then you accepted the plea bargain that you were

14   offered?

15   A      I accepted, I made -- I actually didn't make decisions,

16   that's why I had an attorney to make the decisions.

17   Q      Who was the attorney that represented you in connection

18   with the criminal case?

19   A      Joshua Lock.

20          MR. LAPPAS:  I believe those are the only questions

21   I have, Your Honor, thank you.

22          THE COURT:  Thank you.

23          MR. LAPPAS:  Your Honor, would you prefer that we

24   move exhibits as they are identified or at the conclusion of

25   the plaintiff's case?

1              THE COURT:  At the conclusion of each witness.  Now

2      would be a good time.

3              MR. LAPPAS:  Well, then, Your Honor, I would move

4      for the admission of the photographs that Mr. -- I'm sorry.

5              THE COURT:  Plaintiff's 15.

6              MR. LAPPAS:  Exhibit 15 and also I believe the

7      Court has already admitted the hospital bills.

8              THE COURT:  Uh-huh.

9              MR. LAPPAS:  And I move for the admission of

10     Exhibit 40.

11             THE COURT:  All right, Mr. Neuhauser, any

12     objection?

13             MR. NEUHAUSER:  Only the previous one, Your Honor,

14     that we discussed earlier, but otherwise no objection.

15             THE COURT:  Plaintiff's Exhibits 15 and 40 will be

16     admitted.

17             MR. LAPPAS:  Thank you, Your Honor.

18             MR. NEUHAUSER:  May I cross examine, Your Honor.

19                       CROSS EXAMINATION

20     MR. NEUHAUSER:

21     Q    Mr. Yordy, let me see if I can understand a couple of

22     things that you testified to today.  Is it your testimony

23     that Trooper Brown gave you no verbal warning whatsoever that

24     you were under arrest?

25     A    Yes.

36

1    Q    He didn't say anything to you about --

2    A    He did not say, "You're under arrest," no.

3    Q    And it's your testimony that he punched you a few

4    times.  Is that what you said?

5    A    Yeah.

6    Q    And you tried to get away.  Right?

7    A    I tried to get away.

8    Q    Now there is no dispute, is there, that you were

9    drinking at the Thoroughbred Bar?  Right?

10   A    No, there is no dispute.

11   Q    And they were four to five beers within an hour, an

12   hour and a half time?

13   A    Yes.

14   Q    And you pled guilty to driving under the influence of

15   alcohol.  Correct?

16   A    Yes, I did.

17   Q    So that part of the guilty plea you have no dispute

18   about, right, you admit that you were driving under the

19   influence?

20   A    Correct.  Correct.

21   Q    When Trooper Brown stopped you along side the road, you

22   knew the reason why, didn't you?

23   A    I assumed, yes.

24   Q    What did you assume?

25   A    I assumed he was pulling me over for leaving the bar.

1    Q    For leaving the bar?

2    A    Yeah.

3    Q    Not for driving under the influence but just for

4    leaving the bar?

5    A    Well, if you were leaving the bar, you would assume

6    somebody was drinking in the bar, yeah.

7    Q    But there is no dispute now, is there, that you were

8    intoxicated at the time?  Right?

9    A    No, there is no dispute.

10    Q    You acknowledge that?

11    A    I take responsibility for that, yes.

12    Q    And you saw the video just like we did, and there is no

13    dispute from you, is there, that you couldn't perform the

14    one-legged stand or the heel to toe?  Right?

15    A    Right.

16    Q    You couldn't do that?

17    A    Right.

18    Q    Now if Vicki Smith were to testify that you were on top

19    of Trooper Brown on the ground along side the car, you don't

20    dispute that, do you?

21    A    That I was -- no.

22    Q    That's accurate.  Right?

23    A    That would be accurate.

24    Q    You were on top of Trooper Brown?

25    A    Yes, I tripped.

38

1    Q    Oh, you tripped?

2    A    Pulling me to the side he tripped, which made me fall

3    on Mr. Brown.

4    Q    But if she were to testify that she saw you on top of

5    him and punches were being thrown, is that accurate?

6    A    I don't believe it would be.

7    Q    Okay, now you say that Trooper Brown didn't give you

8    any warning that you were being placed under arrest.  Is that

9    right?

10    A    Right.

11    Q    Okay, but you do recall that he was putting your arm

12    behind you.  Right?

13    A    Mr. Brown put his arm behind me.

14    Q    He put his arm behind you?

15    A    He put my arm behind me, and he just kept going.  It

16    wasn't like, "I'm putting your arm behind you and putting

17    handcuffs on."

18    Q    Well, didn't you pull your arm away when he put his arm

19    -- your arm --

20    A    He surprised me, and my reaction was to jerk.

21    Q    Okay, so you jerked your arm away.  Right?

22    A    Yes.

23    Q    Okay, and when Mr. -- when Trooper Brown put you up

24    against the back of the pickup truck, you bounced off of that

25    truck, right, and bounced into the trooper?

39

1    A    Exactly.

2    Q    But you claim you never saw any handcuffs --

3    A    I --

4    Q    -- and you didn't know -- let me finish my question.

5    A    Go ahead.

6    Q    You claim you didn't see any handcuffs and didn't know

7    that you were being placed under arrest.  Isn't that right?

8    A    No, I would assume I was being placed under arrest, but

9    it didn't stop.  It was he had ample opportunity to handcuff

10   me.  If he would have stopped and said, "You're being placed

11   under arrest.  You're getting handcuffs on," or stopped.  He

12   just kept on with a continuous --

13   Q    When you say --

14   A    -- assault.

15   Q    When you say that you assume that you were being placed

16   under arrest, doesn't that mean that knew you were being

17   placed under arrest?

18   A    Does that mean I knew I -- actually it would assume I

19   was being placed under arrest, but it didn't stop.

20   Q    Okay.

21   A    It didn't -- there was no time to stop.

22   Q    Okay, but you pled guilty to resisting arrest.  Right?

23   A    To accept the plea bargain.

24   Q    Well, I understand you had your reasons, but my

25   question is you pled guilty to resisting arrest when Trooper

1    Brown was attempting to arrest you?

2    A    Yes.

3    Q    Now you knew his arm was caught inside the truck when

4    you tried to pull away, didn't you?

5    A    No, I didn't.

6    Q    You didn't know that?

7    A    I didn't know.  He was -- actually I was beaten a bit.

8    I was rubbing my eyes.  I was trying -- his arm was inside

9    the truck caught.  I didn't know.

10   Q    Well, you knew he was along side the truck.  Right?

11   A    I knew he was along side the truck.

12   Q    And I think you testified earlier that you knew his arm

13   was inside the truck attempting to turn the ignition off.

14   Right?

15   A    It could, yes.

16   Q    Is that yes?

17   A    Yes.

18   Q    And that's when you hit the gas.  Right?

19   A    I believe that he might have turned it off, and I had

20   to turn it back on, and then I hit the gas.

21   Q    Okay, so the vehicle -- the truck had been turned off

22   and you turned it back on and then hit the gas?

23   A    Yes.

24   Q    Okay, now I understand from your previous testimony

25   that it took you or your home was about two miles from the

41

1    scene of this traffic stop.  Right?

2    A    Yes.

3    Q    And you drove home from that stop rubbing your eyes.

4    Right?

5    A    Yes.

6    Q    And did you have to rub your eyes the whole time that

7    you drove home?

8    A    Pretty much so.  It was really -- it was burning.

9    Q    Okay, and you missed the driveway because you were

10   rubbing your eyes so much?

11   A    Yeah, my vision was hurting.

12   Q    You don't know whether the injuries that you described

13   from the photographs that Mr. Lappas showed you, you don't

14   know whether they came from punches or rubbing your eyes from

15   pepper spray, do you, because you were unconscious?  Right?

16   A    Right.

17   Q    You don't know where they came from?

18   A    The injuries that -- I don't know where they came from?

19   What injuries occurred -- the injuries that occurred I know

20   the period of time they came from but not exactly which one

21   and where.

22   Q    Because you were unconscious as you testified?

23   A    Exactly, yes.

24   Q    You didn't know what was going on during that period of

25   time?

42

1    A    Right.

2    Q    Now you said you couldn't get insurance to cover the

3    medical bills because you had diabetes.

4    A    Right, I tried to get insurance already, medical

5    insurance.

6    Q    But you didn't discover -- you didn't find out that you

7    had diabetes until you went into prison, did you?

8    A    Right, Hershey Medical Center.

9    Q    So beforehand when you incurred these medical bills,

10   the reason for not having insurance didn't have anything to

11   do with having diabetes, did it?

12   A    You're right, you're right, it doesn't, it doesn't.

13   This was just previous I was trying to get insurance, so I'm

14   just --

15   Q    Now you testified I believe that part of the reason for

16   the plea bargain was to be able to go out on work release.

17   Right?

18   A    Correct.

19   Q    Instead of spending the whole sentence in the county

20   jail, you took the plea bargain so that you could spend it on

21   work release.  Right?

22   A    Right.

23   Q    And that was to go out and work and do your job.

24   Right?

25   A    Right.

43

1    Q    Were you satisfied with Attorney Lock's representation

2    of you during the criminal case?

3    A    I trust Joshua's judgment, yes.

4    Q    Were you satisfied with his representation?

5    A    His reputation, it was making a plea bargain.

6    Q    Were you satisfied with his representation?

7    A    I was very unhappy that I had to plead guilty, but --

8    Q    Mr. Yordy, were you satisfied with Mr. Lock's

9    representation of you?

10   A    Yes.

11   Q    Did he do okay by you?  Were you okay with his

12   representation?

13   A    Yes.

14   Q    So he fully advised you what charges you were facing

15   and what the potential liability could be and what the best

16   situation was for you to do.  Right?

17   A    Yes.

18   Q    And you stood up in front of Judge Kleinfelter in the

19   Common Pleas Court and accepted responsibility for your

20   action.  Right?

21   A    Exactly.

22   Q    You pled guilty to aggravated assault?

23   A    Exactly.

24   Q    You pled guilty to resisting arrest?

25   A    Exactly.

1    Q    And you pled guilty to driving under the influence?

2    A    Yes.

3         MR. NEUHAUSER:  Your Honor, I'd like to show part

4    of the video again if I may.

5         THE COURT:  Uh-huh.

6         MR. NEUHAUSER:  It will just be a moment, Your

7    Honor, until it's rewound.

8         THE COURT:  Sure.

9         (Pause.)

10        MR. NEUHAUSER:  With the Court's permission, Your

11   Honor, I'll fast forward through some of this.

12        THE COURT:  Sure.

13   BY MR. NEUHAUSER:

14   Q    By the way, Mr. Yordy, you had pled guilty to driving

15   under the influence a couple years before this incident.

16   Right?

17   A    Yes, in 1995.

18        (The videotape started.)

19   Q    Is that Miss Smith's car that's passing there that

20   pulls in front?

21   A    I didn't really see.

22   Q    Is that her car that pulls over in front of your truck,

23   --

24   A    Yes.

25   Q    -- Mr. Yordy?

45

1    A    Yes.

2    Q    Now you acknowledge that you couldn't perform the

3    one-legged stand.  Right?

4    A    Correct.

5    Q    And you couldn't do the heel to toe walk either.

6    Right?

7    A    Correct.

8    Q    So you don't dispute that there was a legitimate reason

9    for the trooper to take you into custody for driving under

10    the influence.  Right?

11    A    No, I wouldn't, I wouldn't dispute that, no.

12    Q    Now Miss Smith was getting in the trooper's face a

13    little bit here, right, she was touching him and interfering

14    with his conversation with you?

15    A    She was being friendly.

16    Q    She was being friendly?

17    A    Yeah, she wasn't, you know, she wasn't getting in his

18    face.  I mean, that's an expression.

19    Q    Do you remember testifying previously in a deposition

20    in this case where you characterized Miss Smith's activities

21    as getting into the trooper's face?

22    A    I don't -- I don't remember.  I might have though.

23    Q    I'm sorry?

24    A    I might have.

25    Q    You might have testified to that you say?

1    A    I don't know if it would have been them exact words.

2    Q    And your testimony previously was that everything was

3    cordial up until the point that Trooper Brown took your arm

4    behind your back.  Was that right?

5    A    Correct.

6    Q    And he even let you go to the car to get your coat

7    because you were cold.  Right?

8    A    Correct.

9    Q    Now what's happening here, Mr. Yordy?

10    A    She was --

11    Q    What's Miss Smith doing?

12    A    Vicki, Vicki was talking to me about why she couldn't

13    do the one-legged stand.

14    Q    Okay, and then she walked around the side of the truck.

15    Right?

16    A    Yeah.

17    Q    Okay.

18    A    I think Mr. Brown, is that where he told her to leave?

19    Q    I'm sorry?

20    A    I think Mr. Brown told her to leave.

21    Q    Okay, now if we stop it right there, I know it's a

22    little fuzzy, but you're looking at Trooper Brown at this

23    point.  Right?  You're facing Trooper Brown.  Right?  You're

24    not looking at the truck or looking to the right, you're

25    facing Trooper Brown?

1    A    I'm facing Trooper Brown.

2    Q    And he has his arm extended.  Right?

3    A    It looks so.

4    Q    Okay, now at this point he's taken a hold of your left

5    arm?

6    A    He's taken a hold of my left arm.

7    Q    Is it your testimony that you didn't know what he was

8    doing at this point?

9    A    At this point, okay, your still picture -- at this

10   point he grabbed.  I know he grabbed me, yes.

11   Q    He took your left arm.  Right?

12   A    He took my arm.

13   Q    Your left arm.  Correct?

14   A    Correct.

15   Q    Okay.

16   A    And there he just keeps going.

17   Q    And he's putting it behind -- trying to put it behind

18   your back.  Right?

19   A    I guess, if that's what he's trying to do.

20   Q    It's your testimony you didn't know what he was trying

21   to do?

22   A    No, no, if he put it behind my back and grabbed my

23   other arm, he would have put me in handcuffs.

24   Q    And you didn't see any handcuffs?

25   A    I didn't see any handcuffs.  I personally didn't see

48

1    any handcuffs, but I'm not going to '-- I'm not going to say

2    that that's not what he's doing, but he just put so much pain

3    and stress on my arm and kept going.

4    Q    Okay, let me see if I understand what you just told us,

5    you're not going to dispute that he was trying to handcuff

6    you?

7    A    I'm not going to dispute -- what I'm disputing is that

8    he kept moving.  It wasn't -- he could have put handcuffs on

9    me, if that's what he wanted to do.

10   Q    He could have put handcuffs on you if that's what he

11   wanted to do?

12   A    If that's what he was doing, yes.

13   Q    Now what is Miss Smith doing along side the truck there

14   while you and Trooper Brown are on the ground?

15   A    She's standing there.

16   Q    She's just standing there?

17   A    It look like she's standing there, yes.

18   Q    You don't remember what she was doing?

19   A    No, I don't.

20   Q    Those are her legs in the light colored pants to the

21   right of the truck.  Right?

22   A    Right.

23   Q    And then she leaves?

24   A    Yes.

25   Q    And that's you getting up.  Right?

49

1    A    That's me getting up.

2    Q    Okay, now at this point you're going back to the

3    driver's side of the truck.  Correct?

4    A    Correct.

5    Q    It's your intent to get into the truck and leave the

6    scene.  Right?

7    A    Exactly.

8    Q    And Trooper Brown is spraying you with pepper spray?

9    A    Yes.

10   Q    But you don't stop, you continue getting in this truck?

11   A    No, I wouldn't stop.

12   Q    Now at that point you're trying to get into the truck

13   and Trooper Brown is trying to prevent you from getting into

14   the truck.  Right?

15   A    Correct.

16   Q    And you didn't stop, did you?

17   A    No, I didn't stop.

18   Q    You kept on getting into the truck?

19   A    Exactly.

20   Q    At that point he's pulling on your coat to try to keep

21   you from getting into the truck.  Right?

22   A    Exactly.

23   Q    And you're still trying to get away?

24   A    Exactly, I'm afraid for my life at that point.

25   Q    Now at that point the trooper reaches into the truck to

1    turn off the ignition.  Right?

2    A     Correct.

3    Q     And it's your previous testimony that the ignition was

4    turned off and you restarted it?

5    A     I believe so.  I believe so.

6    Q     And now the truck is pulling away.  Right?

7    A     Yes.

8    Q     And it's your testimony at that point you didn't know

9    that Trooper Brown was on the side of the truck with his arm

10   still in it?

11   A     Not -- I didn't know.  I actually didn't know.

12   Q     But nonetheless you continued to drive away.  Right?

13   A     I continuously, yes.

14   Q     Did you know that Trooper Brown had fallen off the

15   truck and was on the highway?

16   A     I didn't know.

17   Q     But you didn't stop, did you, you kept ongoing?

18   A     Yes.

19         (The videotape concluded.)

20   Q     Do you remember whether Miss Smith was asleep or awake

21   when you got back to the house?

22   A     I believe she was sleeping.  It was only a second that

23   I got to look in the living room.

24   Q     And your testimony is that you came out of the house

25   and were immediately hit by a gun?

51

1     A     Yes.

2     Q     And the next thing you remember is that you're down at

3     the bottom of the driveway when approximately six officers

4     are punching you.  Is that right?

5     A     Yes.

6     Q     Do you have any reason to dispute the medical records

7     of Hershey Medical Center when they say that you were

8     uncooperative and combative in the emergency room that night?

9           MR. LAPPAS:  Your Honor, it's not appropriate.  I

10    object, I don't believe it's appropriate to cross examine

11    this witness with the statement of another person, certainly

12    unless that other person testifies or makes the statement a

13    part of the record.

14          MR. NEUHAUSER:  Your Honor, it's cross examination

15    as to his demeanor and his action that night, and, secondly,

16    we already have a stipulation on the admissibility of the

17    medical records.

18          THE COURT:  Overruled.

19    BY MR. NEUHAUSER:

20    Q     Do you have any reason to dispute the medical records

21    when they say that you were combative and uncooperative in

22    the emergency room?

23    A     No, I don't.

24    Q     Even though you don't remember what happened in the

25    emergency room?

52

1   A     I don't remember what happened.

2   Q     Do you remember being questioned by anyone in the

3   emergency room?

4   A     No.

5   Q     And the injuries that you have described were the

6   facial injuries and the chipped bone in the elbow.  Correct?

7   A     Yes.

8   Q     But it's your testimony that you don't know how any of

9   those injuries occurred?

10  A     I know from Trooper Brown did occur some of the

11  injuries.  To which ones, I don't know.  There are so many of

12  them, I couldn't tell which one was which.  And I know I was

13  being hit coming out the door of the house, and I know I was

14  laying on my back in a mud puddle with handcuffs with six

15  police officers punching me, and that's the only during those

16  courses of time.

17  Q     So during the course of the evening when you were in

18  and out of consciousness, those are the three things that you

19  remember clearly today.  Was that right?

20  A     Yes.

21          MR. NEUHAUSER:  That's all I have at this time,

22  Your Honor.

23          THE COURT:  All right, thank you.  Mr. Lappas.

24          MR. LAPPAS:  Thank you, Your Honor.

25                    REDIRECT EXAMINATION

53

BY MR. LAPPAS:

1

2    Q    Mr. Yordy, Mr. Neuhauser asked you if you thought you

3    could have gotten any of your injuries by rubbing your eyes

4    to get the pepper spray out.  Do you remember that question?

5    A    Yeah.

6    Q    Do you feel you broke your arm by rubbing your eyes?

7    A    No, I didn't break my arm by rubbing my eyes.

8    Q    Do you feel that you were rubbing your eyes so hard

9    that you broke your own nose?

10   A    No.

11   Q    Do you feel that you were rubbing your eyes so hard

12   that you ripped your forehead requiring nine stitches to heal

13   it up?

14   A    No.

15   Q    And you were also asked a series of questions about the

16   fact that when Mr. Brown came to the side of your car, you

17   didn't stop.  Do you remember that series of questions?  He

18   showed you the video.  He's pulling on your hand, you didn't

19   stop.

20   A    Yes.

21   Q    Do you remember previous to this before you got in the

22   car Mr. Brown had said to you that he was going to shoot you?

23   A    No, he was going to blow my fucking head off, right.

24   Q    And then as he was standing right by the car, did he

25   have his gun out?

54

1    A    When he was standing by the car?

2    Q    By the truck, did he have his gun out at any time?

3    A    Yeah, he did.

4    Q    All right, did you feel that it would have been the

5    smart thing to do, a fellow says, "I'm going to shoot your

6    f'ing head off," then he's got a gun out, did you think that

7    was a good time to stop?

8    A    I wasn't going to stay to find out if I could help it.

9    Q    You were also asked questions about whether any

10    particular injury took place at any particular time.  When

11    you were with Mr. Brown off camera, did he at any time hit

12    you in the face?

13    A    Yes.

14    Q    Did he at any time hit you in the face around your nose

15    area?

16    A    Yes.

17            MR. LAPPAS:  That's all, thank you.

18                RECROSS EXAMINATION

19    BY MR. NEUHAUSER:

20    Q    But you didn't throw any punches at all.  Is that your

21    testimony?

22    A    No, I didn't throw any punches.

23    Q    You were totally cooperative the entire time?

24    A    Not cooperative, I tried to get away.  From the time

25    that he got me to the side of the road and started punching

55

1    and the use of foul language I just I was trying to get away

2    by pulling, not by punching, by pulling.

3    Q     And you didn't throw any punches at the trooper?

4    A     I did not throw a punch at the trooper.

5    Q     Do you recall the medical staff at Hershey attempting

6    to take X-rays of your face and you not cooperating with

7    them?

8          MR. LAPPAS:  We object.  This is beyond the scope

9    of redirect.

10         MR. NEUHAUSER:  Your Honor, he asked about injuries

11   to the nose and face.

12         THE COURT:  Overruled.

13   A     No, I don't, I don't recall the Hershey Medical Center

14   other than one time sitting on the table and realizing that I

15   went in my pants, and that was it.

16   BY MR. NEUHAUSER:

17   Q     So you don't remember anything about what they were

18   trying to do for you --

19   A     I don't, no.

20   Q     -- or not cooperating with them?

21   A     No, I don't.

22         MR. NEUHAUSER:  That's all I have, Your Honor.

23         THE COURT:  Is that all for this witness then?

24         MR. LAPPAS:  We have nothing further, Your Honor,

25   thank you.

56

1          THE COURT:   Thank you.   You may step down.

2          (The testimony of Randy Yordy concluded.)

3

4          I hereby certify that the proceedings and evidence

5     of the court are contained fully and accurately in the notes

6     taken by me on the testimony of Randy Yordy from the jury

7     trial of the within cause and that this is a correct

8     transcript of the same.

9                              _Monica L. Zamiska_

10                               Monica L. Zamiska, RPR

11                               Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25