SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.
2080 Linglestown Road
Suite 201
Harrisburg, Pennsylvania  17110-9670
Telephone (717) 540-9170
Fax (717) 540-5481
By:   SPERO T. LAPPAS, Esquire

FILED
HARRISBURG, PA

FEB 1 8 2003

MARY E. D'ANDREA, CLERK
Per _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY,
    PLAINTIFF
    v.

       : *CIVIL ACTION 1:01-cv-0206*

SCOTT BROWN,
*individually*
*and in his official capacity*
*as an employee and agent of*
*the PENNSYLVANIA STATE POLICE*
    *Defendant, et alii*

:
:
:
:
: *JURY TRIAL DEMANDED*
:
:
:
:
: *JUDGE KANE*
:

---

### PLAINTIFF'S BRIEF IN SUPPORT
### OF MOTION AND SUPPLEMENTAL MOTION FOR A NEW TRIAL

---

RESPECTFULLY SUBMITTED,

SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.

By: _____
SPERO T. LAPPAS, Esquire
Pa. Supreme Ct. ID no. 25745
2080 Linglestown Road, Suite 201
Harrisburg, PA  17110-9670
ATTORNEYS FOR THE PLAINTIFF

-1-

## I.  STATEMENT OF THE CASE

On February 4, 1999 the Plaintiff was driving his motor vehicle when Defendant Scott Brown stopped the vehicle for the purported reason of investigating a possible driving under the influence offense.  During the course of that stop, Brown became violent and assaulted the Plaintiff.  Randy Yordy narrowly escaped with his life, and in fact Brown shot at the Plaintiff while he was fleeing the assault.

Randy Yordy sued Scott Brown for assaulting him, two other State Troopers for continuing the assault later that same night, and Commissioner Paul Evanko for failure to exercise proper disciplinary control and supervision over Brown, failure to remove Brown from patrol duties, failure to take adequate steps to protect the public in general and the Plaintiff in particular from Brown's known dangerous proclivities, and failure to institute procedures to effect Brown's reassignment, effective discipline or dismissal.

The Defendants filed a Motion in Limine seeking to have evidence of Brown's extensive and serious pre-1999 disciplinary history excluded on the argued theories that (1) it is irrelevant, or (2) if relevant it is too prejudicial.  The court granted the Motion, as orally amended, and excluded Brown's pre-1999 and post-1999 disciplinary history.

By the time of trial, Brown's proclivities had caught up with him and he had been terminated for a lunatic outburst at the video image of one of his presumed enemies, state police general counsel Barbara Christie.  A summary of this incident is included in the disciplinary memorandum attached to the Motion for a New Trial as Exhibit 8.  At the time of trial, according to his counsel, Brown was on

suspended-without-pay status and thus (by state police regulations) he was qualified and forbidden to be referred to as a member of the Pennsylvania State Police. However, throughout the trial his counsel referred to him as "Trooper Brown" and he (Brown) allowed the reference. In fact, when Plaintiff's counsel objected to this practice and suggested that the record now required that the jury be properly informed that Brown was not a "Trooper," defense counsel explained that "he's allowed to call himself a trooper as long as he's a member of the state police no matter what duty status he may be in." Transcript of chambers conference of January 7, 2003, Exhibit 1 hereto, page 3. The source of defense counsel's knowledge was, apparently, Brown himself. "My client tells me he's allowed to call himself a trooper." Id.

The defendant's assurance, it turns out, was fraudulent. The state police regulations clearly disqualified Brown from calling himself "trooper." Pennsylvania State Police Field Regulations FR 3-3 (effective 3/3/99) clearly speaks to this issue and requires unambiguously that while on suspension without pay (Brown's status during trial) members are not to "represent themselves as a Pennsylvania State Police Officer in any manner." A copy of FR 3-3 is attached to the supplemental post-trial motion as Exhibit A.

## II. ISSUES

The Plaintiff has moved for a new trial against defendant Brown on the grounds that:

      a.     The court erred by excluding his disciplinary history;

b.    the court should have allowed the plaintiff to prove to the jury that Brown's reference to himself, and his counsel's reference to him, as a "trooper" was inaccurate and false;

c.    the after discovered evidence of Brown's misrepresentation justifies a new trial;

d.    the defense reference to Brown as Trooper was improper conduct during the trial unfairly influenced the trial and the jury's deliberative process.

## III. ARGUMENT

### 1. DISCUSSION OF BROWN'S PRE-1999 DISCIPLINARY RECORD

Defendant Brown's checkered disciplinary record prior to his assault on Randy Yordy, as detailed in the Plaintiff's Brief in Opposition to the Defendants' Motion in Limine and the exhibits thereto, all of which is incorporated into this Brief by reference thereto, caused one State Police disciplinary officer to comment (as early as June 25, 1997) that

> "A review of Trooper Scott A. Brown's personnel record reveals repeated violations of Department rules and regulations. <u>These recurrent infractions raise serious questions as to Trooper Brown's willingness to conform to acceptable standards of behavior as established by the Department.</u>"

These recurrent serious violations include the following:

On or about April 9, 1998, while Defendant Brown was assigned to "desk duties" he engaged in an act of "unwelcomed" and "unnecessary" touching of a female civilian State Police employee named Christine Kosh. He was suspended for

one day, but his suspension was reduced to a written reprimand by a labor relations arbitrator.  The arbitrator ruled that the Defendant's actions were "inappropriate" and that his testimony (that his assault on Ms. Kosh was the result of accidently tripping and catching himself by grabbing hold of her shoulders) was "implausible" especially because Ms. Kosh testified that he had touched her twice.  Brown's further defenses consisted of the arguments that he was the victim of a State Police "conspiracy", that he was the target of "entrap[ment]" and that the State Police investigation of his misconduct constituted the wrongful "turning on `on of their own'."

On August 2, 1997, the Defendant was investigating an alleged case of bicycle theft by a juvenile.  During that investigation the defendant engaged in such behavior with the juvenile's family that a State Police official Disciplinary Report found him to have "used foul language, yelled, threatened and lost composure." Although his discipline for this misconduct was sustained, Brown thought that the whole thing was "exaggerated" and that his bad conduct was (as hard as it may be for us to understand the cause-and-effect relationship which seems to make sense to the Defendant) the result of "strep throat," clinical depression, and the fact that his misconduct took place on a "hot and humid day."

By far the most serious (and most relevant to this case) is an incident on April 10, 1996.  The defendant was driving through the Borough of Lemoyne with his wife and infant child when his car was rear-ended by one Rodelio Garcia in a traffic jam.  There were no injuries.  The defendant was off duty and in civilian clothes. The Defendant pursued Garcia in traffic, got out of his car, jumped through Garcia's

sun roof and (in the words of the State Police officer who investigated this incident) started "pistol whipping him" while Garcia was still driving. Brown's actions risked a second, more serious traffic accident. An impartial eyewitness reported that Brown was pointing his handgun at Garcia and "roughing him up pretty good." During this incident, Brown never told Garcia that he was under arrest, and he subjected him to a barrage of obscenity as well as the physical assaults.

When questioned about this incident, Brown denied that he had done anything wrong. He later admitted to Lt. Grolemund that his denial was "untruthful and a lie." Brown "stated that he lied to avoid getting into trouble." Lt. Grolemund concluded that:

> "The inconsistent statements made by Brown during this investigation and his admission of a deliberate and intentional lie to the investigating officer casts doubt on Brown's credibility on all relevant parts of this investigation in which he is contradicted by evidence or other testimony."

The State Police suspended Defendant Brown for ten days without pay for violations of regulations dealing with Unbecoming Conduct, Courtesy, Use of Firearms, Police Action Off Duty, and Use of Deadly Force. On May 8, 1997, Brown defended himself by stating that he called Garcia a "motherfucker," drew his weapon on Garcia, and climbed through the sun-roof after him. Brown stated that he "regret[s]" his "decision" in pursuing this course of action, but stated that he was taking "proactive steps to correct my shortcomings," that he has "grown and changed" since the Garcia incident, that he is no longer "the same man as [he] was" during the Garcia incident, and that he was taking psychiatric medication and therapy to address his apparent mental health problems and family issues.

Accordingly, as of his assault on Randy Yordy in February 1999, Scott
Brown had been repeatedly in serious trouble for assaultive and threatening
behavior, he regularly blamed others for the consequences of his own misconduct,
who blamed his disciplinary troubles inter alia on "conspiracies,"  "entrapment," and
the weather, he had a three year history of mental health treatment for inter alia
work stress and anger control difficulty, he was subject to "serious questions as to . .
. [his] willingness to conform to acceptable standards of behavior as established by
the Department,"  and his explosive anger had placed the public in jeopardy on at
least two previous occasions.

That evidence was admissible under FRE 404(b), especially with respect to
the Rogelio Garcia incident.  The similar facts of the Garcia and Yordy incidents --
motor vehicle stops which develop into civilian assaults and improper gunplay --
and their aftermaths -- lawsuits by Brown alleging that he suffered injuries during
the incidents -- create an prima facie case under FRE 404(b) that Brown's behavior
demonstrates his recurring motive to profit financially from his altercations with
members of the public.


### 2.  DISCUSSION OF BROWN'S POST-1999 DISCIPLINARY RECORD AND THE TITLE "TROOPER"

Perhaps emboldened by the pre-trial exclusion of his disciplinary record,
Brown presented himself at trial as a member in good standing of the Pennsylvania
State Police.  He and his counsel used and allowed the use of the title "trooper" as if
he were entitled to it.  In fact, not only was Brown not a "trooper" he was one
person who was legally disqualified to use that title.  Brown was, in that regard,

different than any other former state police officer.  A former officer may, as Attorney Neuhauser suggested to the court in this case, be entitled to the honorific use of his former title when he testifies about past events.  (Exhibit 2, page 3-4).  However, Brown's status was different.  He was not a former trooper who may or may not be entitled to the title.[1]  He was specifically forbidden, by the state police's own regulations to be called trooper.  The form of address which he authorized and accepted was purely fraudulent.

An analogous misrepresentation was held to justify the grant of a new trial in Bethel v. McAllister Brothers, Inc., 81 F.3d 376 (3d Cir. 1996) affirming Bethel v. McAllister Brothers, Inc., 1994 WL 328350 (E.D.Pa. 1994).[2]

The record is clear that Brown personally misrepresented his status.  The Plaintiff believes that at an evidentiary hearing he will be able to prove that Brown was aware that he was not a trooper and was not to call himself, or allowed himself to be called, "trooper."

Defense counsel's rationale for this misrepresentation, that he didn't know if Brown was a trooper or not and that he had no one to check with, is unconvincing.  Defense counsel had available to him the chief counsel of the state police (a member of that office attended defendant Evanko's deposition, see Exhibit 3 hereto) and he did, after all, represent the state police commissioner who should have known better.  Furthermore, one of the defendants' listed witnesses was the state police

---

[1]  We do not acknowledge that a former officer should ever be called "trooper."

[2]  The WestLaw version of the District Court opinion is attached hereto as Exhibit 2.

disciplinary officer, Captain Titler, who may be presumed to know the rules.[3]

To the extent that defense counsel should have avoided this false representation, it amounts to evidence that the defense's improper conduct during the trial unfairly influenced the trial and the jury's deliberative process. See, e.g., Wharf v. Burlington Northern R. Co., 60 F.3d 631 (9th Cir. 1995).

To the extent that defense counsel was blameless, the defendant is personally responsible for the fraud.

In either event, the information which the defense gave the court during this trial is flatly and unequivocally false.  This was a serious trial issue.  Not only did the defense falsely present Scott Brown -- a disgraced subject of imminent separation from service under disreputable circumstances -- as a member in good standing, entitled to all of the honor which the public (including our jurors) could reasonably be expected to feel for police officers, but it abused the protection of the court's order in limine (regarding post-February 4, 1999 discipline).  Brown glibly basked in the jury's respect, all the time  secure in the knowledge that the jury would never find out that he was one step away from forced retirement under disgrace.

The full consequences of Brown's abusive fraud were manifest in the circumstance that after the Defense assurance that such a form of address was proper the Court addressed defendant Brown as "Trooper."

Accordingly, the effect of FR 3-3, and the evidence of the defense fraud as to his status, amount to after discovered and new evidence which contradicts

---

[3]    At trial, the court indicated that Brown was "not responsible for Mr. Neuhauser's misstep, if it is one." Page 3 of Chambers conference transcript.

representations made to the court by the defense during trial.

## IV. CONCLUSION

WHEREFORE, the court should convene an evidentiary hearing on the Plaintiff's motions and thereafter grant a new trial.

*RESPECTFULLY SUBMITTED,*

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*

By: _____

*SPERO T. LAPPAS, Esquire*
*Pa. Supreme Ct. ID no. 25745*
*2080 Linglestown Road*
*Suite 201*
*Harrisburg, PA 17110-9670*
*(717) 540-9170*
*ATTORNEYS FOR THE PLAINTIFF*

February 18, 2003

1

1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3    RANDY YORDY,                        :
                 Plaintiff
4                                        :

                 v.                      :     CIVIL ACTION NO. 01-CV-206
5                                        :     (Judge Kane)
     SCOTT BROWN, individually and
6    in his official capacity as         :
     an employee and agent of the
7    Pennsylvania State Police;          :
     PAUL EVANKO, individually and
8    in his official capacity as         :
     an employee and agent of the
9    Pennsylvania State Police;          :
     BERON F. STEAGER, individually
10   and in his official capacity        :
     as an employee and agent of
11   the Pennsylvania State Police;      :
     BARRY L. BRINSER, individually
12   and in his official capacity        :
     as an employee and agent of the
13   Pennsylvania State Police,          :
     et al.,
14                 Defendants            :

15                     TRANSCRIPT OF PROCEEDINGS
                            JURY TRIAL
16            EXCERPT FROM IN CHAMBERS CONFERENCE

17               Before:   Hon. Yvette Kane, Judge
                           and a Jury
18               Date:     January 7, 2003

19               Place:    Judge's Chambers
                           Federal Building
20                         Harrisburg, Pa.

21   COUNSEL PRESENT:

22       SPERO T. LAPPAS, Esquire
             For - Plaintiff
23
         GREGORY R. NEUHAUSER, Esquire
24           For - Defen...

                              **PLAINTIFF'S**
                              **EXHIBIT**
                                              Monica L. Zamiska, RPR
25                                            Official Court Reporter

2

1          MR. LAPPAS:  The other matter, Your Honor, and the

2     second thing that I discussed with Mr. Neuhauser this morning

3     is this, during the course of this trial, both in openings,

4     in the examination of other witnesses and in specifically the

5     -- Mr. Neuhauser's examination of Scott Brown yesterday, he

6     has been referring, Mr. Neuhauser; that is, has been

7     referring to Scott Brown as Trooper Brown.  I have made it a

8     point consistently to refer to him as Mr. Brown.  It's my

9     understanding that Scott Brown's current status with the

10    Pennsylvania State Police is that he is suspended.  He's been

11    terminated subject to an arbitration proceeding.  His current

12    status is either terminated or suspended without pay.  In

13    either occasion it's my belief that he has been told, and

14    that the state police regulations provide, that he is not to

15    represent himself to be a member of the Pennsylvania State

16    Police and is not to refer to himself or allow others to

17    refer to him or address him as trooper.

18          The next time he testifies I would like to ask him

19    or propose to cross examine him on the question of whether he

20    is a trooper in the Pennsylvania State Police and whether

21    he's been instructed not to call himself trooper.  I think it

22    provides -- presents a false image to this jury to have this

23    man on the witness stand to be calling him trooper as if he's

24    still a member in good standing when in fact he is not.

25          THE COURT:  You may be right on that point, but he

3

1    hardly did anything to invite that.

2              MR. LAPPAS:  Well, he has --

3              THE COURT:  He's not responsible for Mr.

4    Neuhauser's misslip, if it is one.

5              MR. LAPPAS:  Well, whether he's responsible or not

6    I think it's a matter that the jury needs to -- the jury

7    should be allowed to receive corrected information.

8              THE COURT:  Mr. Neuhauser, what's his status?

9              MR. NEUHAUSER:  Well, first of all, I don't know

10   what the regulations provide because this was just given to

11   me this morning as an issue, and I haven't had a chance to

12   check it.

13             My client tells me that he's allowed to call

14   himself a trooper as long as he's a member of the state

15   police no matter what duty status he may be in.  I have no

16   reason to doubt that.  That's his explanation.

17             Secondly, he's recently been approved for a

18   disability retirement with the state employees retirement

19   system.  So once again if we're going to get into semantics

20   as to whether he is or isn't a full time trooper, we have to

21   have the opportunity to explain and go into the situation as

22   to having the retirement approved and its going into effect,

23   and once again we're delving into collateral matters.

24             I don't think it was a misstatement on my part to

25   call him a trooper when the event -- the only events in

4

1    question happened three years ago when he was a trooper.

2    What he is now, whether retired or he quit or he was let go

3    or whatever, I think questions or calls into question again

4    the Court's ruling on none of these post-incident situations

5    coming into evidence.

6            THE COURT:  Absolutely, we don't want to get near

7    that.  Can you find out from somebody whether he's still to

8    be called trooper, and if he's not, just call him Mr. Brown?

9            MR. NEUHAUSER:  Well, as I said, he has told me

10   just moments ago that he is allowed to do that.  I don't have

11   anyone in superior rank with me at the present time to be

12   able to find that out, but I can try in the meantime.

13           THE COURT:  Okay, all right.  I was under the

14   impression that he was no longer a trooper and he was not

15   entitled to be called trooper.  You didn't object.  I didn't

16   correct Mr. Neuhauser even though I may have been under the

17   wrong impression because I thought, as he did, at the time of

18   these events he was a trooper, and we were talking about

19   these events when he was addressed as such, so I don't think

20   it was a terrible problem, but it is a big problem, let's

21   clarify what he is.  If he's not a trooper, call him Mr.

22           MR. NEUHAUSER:  Okay.

23           (The excerpt concluded.)

24

25

5

1

2          I hereby certify that the proceedings and evidence

3     of the court are contained fully and accurately in the notes

4     taken by me on the excerpt from the jury trial of the within

5     cause and that this is a correct transcript of the same.

6                          *Monica L. Zamiska*

7                          Monica L. Zamiska, RPR

8                          Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1994 WL 328350
**(Cite as: 1994 WL 328350 (E.D.Pa.))**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Thomas BETHEL, as Administrator of the Estate of John Bethel,
v.
McALLISTER BROTHERS, INC., and Frank J. Huesser.

No. CIV.A. 91-2032.

July 11, 1994.

MEMORANDUM AND ORDER

BECHTLE

**\*1** Presently before the court are the motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b) of defendants McAllister Brothers, Inc., and Frank J. Huesser, the response of plaintiff Thomas Bethel, as Administrator of the Estate of John Bethel, and all replies thereto. Defendants' motion pursuant to Fed.R.Civ.P. 60(b) follows a jury trial based on a claim for special damages resulting from an alleged defamation of plaintiff by defendants. For the reasons set forth below, the court will grant defendants' motion under Fed.R.Civ.P. 60(b)(3). [FN1] Accordingly, the court will grant defendants' motion to vacate the judgment, entered by Order, dated April 12, 1994, in favor of plaintiff and against defendants, and will grant defendants' motion for a new trial.

*I. Background*

John Bethel ("Bethel" or "plaintiff") originally brought this action against his former employer, McAllister Brothers, Inc. ("McAllister"), and his former supervisor, Frank J. Huesser ("Huesser") (collectively "defendants"). Bethel's complaint alleged a variety of federal and state law causes of action arising out of the termination of his

employment at McAllister. After a four-day trial, from July 21 through July 27, 1992, during which evidence was presented in the form of live witnesses, depositions and exhibits, the court submitted Bethel's complaint alleging liability under the Jones Act, common law defamation, and punitive damages, to the jury for its consideration. The jury returned a verdict in favor of Bethel and against defendants on each count and awarded Bethel damages as follows: $15,000.00 for negligence under the Jones Act; $554,000.00 for defamation; and $250,000.00 in punitive damages. [FN2]

Following the jury verdict, the court, by Order and Memorandum, dated March 30, 1993, set aside the jury verdict on defendants' motion under Fed.R.Civ.P. 50. The court of appeals reversed the district court, restored the verdict, and directed the entry of judgment, with one judge dissenting. The court incorporates by reference the opinions of both the district court in *Bethel v. McAllister Bros., Inc.*, 1993 U.S. Dist. LEXIS 4243 (E.D. Pa. March 30, 1993), and *Bethel v. McAllister Bros., Inc.*, slip op., No. 93-1358 (3d Cir. February 4, 1994). [FN3] Defendants have now moved for a new trial or for entry of judgment in their favor as a matter of law pursuant to Fed.R.Civ.P. 60(b), alleging that plaintiff John Bethel committed perjury during his trial testimony. The facts, to the extent they were disclosed to the jury at the trial, are referred to in the above cited decisions and appear to have been understood by both courts to be essentially the same. A short synopsis of those facts follows.

*II. Facts*

McAllister provides tugboat services on that portion of the Delaware River which lies between Pennsylvania and New Jersey. Bethel was employed by McAllister as a river docking pilot from December 1987 until his termination in December 1990.


PLAINTIFF'S
EXHIBIT
2

**\*2** On the evening of December 17, 1990, after Bethel finished undocking a vessel, he boarded the tug THERESA MCALLISTER, owned and operated by McAllister, in order to be transported ashore and to deliver certain billing papers. While aboard the THERESA MCALLISTER, Bethel fell down a flight of stairs and sustained an injury to his back and legs. Bethel testified that he drove himself that evening to a nearby hospital. Bethel testified that when he later arrived home, he spoke on the telephone to Lou Kushner ("Kushner"), McAllister's dispatcher on duty, and told him that he would be unable to report to work the following day, December 18, 1990, because of his injuries.

On the morning of December 18, 1990, Kushner telephoned Bethel to inform him that he had to report to work to submit to a drug test which McAllister had scheduled for all of its river docking pilots at McAllister's offices on that day. Bethel claimed that he was unable to report for the test, and instructed Kushner to ask defendant Huesser, Bethel's supervisor, to call him. Thereafter, Huesser and Bethel spoke several times on the telephone to discuss Bethel's refusal to report for the drug test. The parties did not dispute that Huesser sought to have Bethel take the test on that day, and even offered to send someone to pick Bethel up at home and drive him to McAllister's office. Bethel and Huesser both testified that Huesser also offered to send a nurse to Bethel's home to administer the test, but that Bethel refused the offer.

Bethel later called Kushner on December 21, 1990, to report that he would be unable to work his next three-day shift, according to his physician's orders. During that conversation, Kushner informed Bethel that his employment with McAllister had been terminated.

On December 22, 1990, Bethel received a termination letter from Huesser which stated that he was fired for irresponsible conduct and violation of company rules. Upon receipt of the letter, Bethel telephoned Frank O'Neill ("O'Neill") and asked that O'Neill speak to Huesser to inquire about the reasons for his dismissal. [FN4]

Bethel testified that in the days which followed, he discovered that rumors were circulating among the maritime community on the Delaware River that Bethel had been fired because he was a drug user. O'Neill met with Don Stephens ("Stephens"), Vice President and General Manager of McAllister's Philadelphia operations. O'Neill asked Stephens to reconsider his decision to terminate Bethel's employment and to do something to quell the rumors that Bethel was dismissed because McAllister suspected him of being a drug user. Depending upon which party's version of events is to be believed, Stephens directed Huesser to contact the representatives of the other towing companies in the area, Moran Towing of Pennsylvania ("Moran") and Turecamo Coastal and Harbor Towing Corporation ("Turecamo"), and clarify the reasons for Bethel's dismissal. There was some dispute as to whether this was the first time Huesser contacted the other towing companies to state that Bethel was fired for refusing to take a drug test or whether Huesser had previously made that statement to representatives at Moran and Turecamo.

**\*3** Up until the time of trial, Bethel had not secured full time employment as a river docking pilot, and had been able to find only sporadic work in other maritime capacities, such a mate on a tugboat. In addition, for the period from March 25, 1992 until June 28, 1992, Bethel testified that he worked as a river boat captain for Riverbus, Inc. ("Riverbus"), a company that transports and ferries people between Camden and Philadelphia. However, Bethel testified that Riverbus fired him just three (3) weeks before the trial because they had done a background check, which Bethel understood to mean that Riverbus had talked with defendants who had repeated their defamatory statements. *See* Trial Transcript, July 21, 1992, at 64-65, and July 22, 1992, at 37-38. When Bethel was asked on direct examination why he was terminated from his position with Riverbus, he stated: "I was told that due to an unsatisfactory

background check that I would be discharged from that position." *See* Trial Transcript, July 21, 1992, at 64.

III. *Discussion*

In their motion, defendants request relief pursuant to subsections (2), (3), and (6) of Rule 60(b). However, for the reasons discussed below, the court will only consider defendants' request for relief pursuant to Rule 60(b)(3), and will deny relief pursuant to Rule 60(b)(2) and 60(b)(6).

A. *Timeliness Of Defendants' Rule 60(b) Motion*

In opposition to defendants' Rule 60(b) motion, plaintiff first argues that defendants' motion was untimely filed because it was filed more than a year after judgment was entered on August 3, 1992. The court disagrees. Defendants' Rule 60(b) motion was timely filed because defendants' Rule 50 and Rule 59 motions, which were themselves timely filed, tolled the one year time period applicable to Rule 60(b) motions. *See National Passenger R.R. Corp. v. Maylie*, 910 F.2d 1181, 1183 (3d Cir.1990); *Arnold v. Sullivan*, 131 F.R.D. 129 (N.D. Ind.1990).

Specifically, pursuant to Rule 60(b)(1-3), a party has one year from the entry of a *final* judgment to file its motion. The *Arnold* court held that the original judgment does not become final, however, until disposition of a Fed.R.Civ.P. Rule 59(e) post-trial motion. *Id.* at 131. Thus, when a party files a post-trial motion pursuant to Rule 59, the finality of the judgment is placed in suspense until the court rules on such motion. Once the court rules on the Rule 59 motion, the judgment then becomes final for the purposes of timely filing a Rule 60(b) motion. In this case, the court did not enter a final judgment order until March 22, 1993 when the court granted defendants' Rule 50 motion and denied defendants' Rule 59 motion. Thus, defendants' filing of its Rule 60(b) motion was timely inasmuch as it was filed on March 1, 1994, within one year of March 22, 1993.

B. *Standard For Rule 60(b)(3)*

Fed.R.Civ.P. 60(b)(3) allows a court to relieve a party from final judgment due to "fraud [either intrinsic or extrinsic], or other misconduct of an adverse party." [FN5] To reopen a judgment under Rule 60(b)(3), the moving party must show "(1) that the adverse party engaged in fraud or other misconduct, and (2) that this conduct prevented the moving party from fully and fairly presenting his case." *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir.1983). Such fraud must be demonstrated by "clear and convincing" evidence. *Brown v. Pennsylvania R.R. Co.*, 282 F.2d 522, 527 (3d Cir.1960), *cert. denied*, 365 U.S. 818 (1961). Moreover, the moving party must show that this fraud is attributable to the party or, at least, to counsel. *Stridiron*, 698 F.2d at 207; *Richardson v. National R.R. Passenger Corp.*, 150 F.R.D. 1, 8 (D.D.C.1993). *See also Harre v. A.H. Robins Co.*, 750 F.2d 1501, 1505 (11th Cir.1985), *vacated in part on other grounds*, 866 F.2d 1303 (11th Cir.1989). Although generally a Rule 60(b)(3) case involves instances of some purposeful behavior by a party, some courts have held that to satisfy misconduct under Rule 60(b)(3), a moving party need not prove nefarious intent or purpose as a prerequisite to redress. *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir.1988). Finally, the "due diligence" requirement of Rule 60(b)(2) is inapplicable to Rule 60(b)(3) motions based on allegations of fraud, misrepresentation or misconduct. *See Western Reserve Oil and Gas Co. v. Key Oil, Inc.*, 626 F.Supp. 948, 951 (S.D. W.Va.1986) (citing *Tas Internat'l Travel Serv., Inc. v. Pan Am. World Airways, Inc.*, 96 F.R.D. 205, 206 (S.D.N.Y.1982)).

C. *Defendants' Basis For Rule 60(b)(3) Relief*

*4 Defendants' primary basis for relief is their contention that plaintiff committed fraud during his trial testimony by failing to testify truthfully about all of the reasons he was given by Riverbus for his termination as a river boat captain. Defendants argue that this fraud was disclosed by plaintiff's testimony under oath at an arbitration hearing ten (10) months after the trial in this matter. The arbitration hearing concerned plaintiff's grievance against Riverbus regarding his discharge. Defendants argue that such

fraud taints the basis for the jury award of damages where the Third Circuit concluded that the jury's award could have been decided based upon plaintiff's testimony regarding his Riverbus firing. *See* Slip op. at 11. Accordingly, the court will review and compare the sources of damages as outlined by the Third Circuit's opinion with plaintiff's trial and arbitration testimony, and how they each relate to the issue of plaintiff's discharge by Riverbus.

### 1. *Plaintiff's Sources For Damages*

Plaintiff's claim for damages in his underlying trial was based solely on an alleged loss of past and/or future earnings. His past employment and potential future employment opportunities were based on his background and experience as a docking pilot on the river in the port of Philadelphia. Plaintiff's claim was that, following his discharge by McAllister for failure to take the drug test, other towing companies refused to hire him because they believed that the failure to take the drug test was tantamount to his being a drug user.

The evidence produced at the trial identified three possible sources from which plaintiff's claim for loss of past or future earnings could have been considered by the jury in rendering its verdict in favor of plaintiff. The first was Bethel's occupation as a docking pilot which is a relatively narrow discipline in the port of Philadelphia, as well as in other ports. Docking pilots normally work for a few companies and are employed as various ships come into port. They are members of an association, the Docking Pilots Association, and it is not unusual for them to know each other and, indeed, to know the few employers in the area. In the port of Philadelphia there were approximately fifteen (15) pilots available for employment in the pertinent period, and three (3) employers, defendant McAllister, Moran and Turecamo, engaging the pilots' services. The second source of damages was Bethel's loss of possible part-time employment as a replacement for other docking pilots who were either on vacation or out sick. Finally, the third source of damages was

Bethel's termination from his position with Riverbus.

With this background, the district court, in its Memorandum and Order, dated March 30, 1992, concluded that plaintiff had not proven that the first source of earnings loss, that is, the alleged refusal of Moran and Turecamo to hire him, caused any loss to plaintiff. The court concluded that the undisputed evidence demonstrated that economic conditions of the port were poor for employment of docking pilots; Moran and Turecamo had no open positions for docking pilots, either full time or part-time, in the period plaintiff claimed he could have worked there; and that alleged or inferred drug use was not a basis for Moran or Turecamo not to hire Bethel because Moran did employ him, after he was fired by McAllister, as a mate on its vessels. In addition, the court ruled that there was no evidence except plaintiff's own speculation as to why he was fired from Riverbus, which was insufficient evidence to support his defamation claim.

**\*5** In *Bethel v. McAllister Bros., Inc.,* slip op., No. 93-1358 (3d Cir. February 4, 1994), the Third Circuit reversed the district court. The court of appeals, by divided vote, found that plaintiff's evidence afforded the jury three sources of wages that could support plaintiff's claim for special damages. The first, as noted above, was plaintiff's claim that he was unable to secure employment with either Moran or Turecamo, following the defamatory statements allegedly made by defendants. Although the Third Circuit concluded that the jury could have considered this evidence as a potential source of employment that was denied to plaintiff, the court of appeals pointed out the weakness of this evidence:

[P]laintiffs' [sic] contention that defendants' statements caused Moran and Turecamo to not hire him is not a strong one, especially given the most significant of the points made by the district court--that Moran and Turecamo likely did not hire Bethel because of the adverse economic situation rather than because they believed he had used illegal drugs.

*Id.* at 9. The court of appeals stated further:

Despite Bethel's retorts, we still think that Bethel's evidence that defendants' defamation cost him a full time docking pilot job is weak.... Thus, there appears to have been little chance that Moran and Turecamo would have hired Bethel for a full time docking pilot job even if they each thought he had been fired for perfectly innocuous reasons.

*Id.*

The significance of the Third Circuit's decision is that it greatly diminishes the value of a full time docking pilot position as a source of damages.    By so doing, the Third Circuit placed the strength of plaintiff's case for special damages foresquare on the only other two sources of the wage loss claim.

The second source from which a claim for lost earnings could be based, and which the Third Circuit identified, was part-time docking pilot work.    During the trial, plaintiff testified that it was common for the other towing companies to need temporary short-term replacement docking pilots to fill in for other docking pilots either on vacation or out sick.    Plaintiff testified that he was unable to secure this type of temporary position as a result of defendants' defamation.    The evidence concerning part-time docking pilot work was either general or imprecise. Furthermore, even if it would have been precise, this source carried the same poor economic burden that full time docking work did.

Finally, the Third Circuit noted the existence of some evidence that defendants' statements caused plaintiff to be fired from a job as captain of a ferry boat owned and operated by Riverbus, a job which plaintiff obtained after being fired by McAllister.    Plaintiff had testified at the trial that he was fired by Riverbus, a position that paid $37,000.00 a year, because of defendants' remarks.

### 2. *Plaintiff's Testimony Regarding Riverbus Termination*

By their motion, defendants have

suggested that, at the very time plaintiff testified to the jury regarding the reasons for his discharge from Riverbus, plaintiff was aware of a material reason for his discharge that he knowingly concealed from the jury.    Defendants assert that plaintiff testified at trial on direct examination that the reason Riverbus said he was being fired was because of a bad background check, that is, that Riverbus had contacted defendants and defendants had told Riverbus that plaintiff had refused to take a drug test.    *See* Trial Transcript, July 21, 1992, at 64-65.

**\*6** Defendants contend, however, that only three (3) weeks before plaintiff testified to the jury, when he was fired by Riverbus, plaintiff was given other reasons for his discharge that had nothing to do with the drug test, yet he failed to testify about these reasons at the trial.    Defendants contend that this is tantamount to committing fraud and that the jury's award of compensatory and punitive damages must be vacated because the principal evidentiary source of damages underpinning the award was burdened by perjured testimony from plaintiff himself.

In addition, defendants assert that plaintiff, during the course of his appeal of the district court's Order, dated March 30, 1992, granting defendants' Rule 50 motion, briefed and argued to the Third Circuit the "half-truth" that his verdict should stand because he was fired from Riverbus because Riverbus had heard the defamatory statements of defendants. Defendants submit that the true reasons given for plaintiff's termination from Riverbus, as plaintiff understood them to be from Riverbus President, Edward von Bergen ("von Bergen"), were later revealed by plaintiff himself at a separate arbitration hearing on May 17, 1993, some ten (10) months after the jury trial, where plaintiff, under oath, testified as to several other reasons for his firing which were *unrelated* to defendants' defamatory statements.

Thus, by their motion, defendants raise a narrow issue for this court to examine and review;    that is, whether plaintiff committed Rule 60(b)(3) "fraud,

misrepresentation, or other misconduct" during his testimony before the jury by concealing the additional reasons he knew Riverbus' president, von Bergen, had used as grounds for his discharge three weeks earlier. The linchpin of defendants' argument is that the vast discrepancy between the two separate versions of Bethel's firing, presented at trial and at the arbitration hearing ten (10) months later, both under oath, establish that Bethel knowingly concealed crucial facts concerning his earnings loss from the jury and that this constituted the "fraud, misrepresentation or misconduct" intended to be governed by Rule 60(b)(3).

It is unnecessary to review all of the evidence produced at the trial, but the portions of testimony selected by plaintiff to support his claim for special damages are essential. The thrust of the motion, therefore, requires the court to focus on the evidence offered by plaintiff--and quite specifically, a comparison of his own testimony to the jury under oath and his own testimony during the later arbitration hearing under oath--concerning his firing by Riverbus on June 28, 1992, and, more specifically, the reasons he gave at both appearances for that discharge.

It is important to note at this juncture that the termination by Riverbus, including the giving of reasons by that employer for firing plaintiff, had only taken place less than a month before plaintiff's testimony to the jury. Plaintiff's testimony before the arbitration panel on this same topic was given ten (10) months after the trial. The extent to which it is alleged that the jury, the district court, and the court of appeals were misled by the trial testimony of plaintiff will be covered later in this opinion. Appropriate excerpts from plaintiff's trial and arbitration testimony on the crucial point of the reasons for his discharge from Riverbus follow, as does plaintiff's arguments presented to the United States Court of Appeals for the Third Circuit.

a. Riverbus Background

**\*7** Riverbus operated a commuter ferry service between Penn's Landing in Philadelphia and Camden, New Jersey, beginning April 1, 1992. Riverbus hired plaintiff on March 25, 1992, as a port captain for the company's ferry that transported people back and forth between New Jersey and Philadelphia. At the time plaintiff was hired, all discovery in this case had been completed, including the deposition of plaintiff himself. [FN6] Plaintiff remained in the employ of Riverbus for approximately three (3) months, until he was formally terminated by telephone on June 28, 1992, and by a termination letter received on July 5, 1992.

As noted above, plaintiff's termination from Riverbus, occurred just three (3) weeks prior to his jury trial.

b. Plaintiff's Trial Testimony

The thrust of defendants' motion centers primarily around plaintiff's testimony during trial. The following is a pertinent direct examination excerpt from this testimony:

Q. How long did you remain in [the Riverbus] job?

A. Up until June, I believe June 28 of this year.

Q. Of '92?

A. Yes.

Q. Several weeks ago?

A. Yes.

Q. Tell the jury what happened?

A. I had a meeting with the Coast Guard regarding the ferry, some safety issues involved there.

After that meeting with them I went to dock at Penn's landing, I met with--

Q. Let me see if I can cut you short. I apologize.

A. I'm sorry.

Q. Did you--were you terminated from that job [i.e., the position with Riverbus], did you resign from that job, if so why?

A. I was told that due to an unsatisfactory background check that I would be discharged from that position.

Q. By background check, what did you understand that to be?

A. That they called McAllister.

THE COURT: No. What was he told, what was expressed to him not what his belief is, that's not pertinent.

Q. What was expressed to you?

A. What was told to me, is that they had

called my previous employer and they had become aware that allegedly I refused to take a drug test.    Therefore they did not--they would not have me in their employ.

Q. What was your salary on the ferry for the river?

A. I would have probably made about $37,000.00 a year.

*See* Trial Transcript, July 21, 1992, at 64-65.    On cross-examination, plaintiff testified about his firing from Riverbus as follows:

Q. You were employed after March 2, 1992 by what company?

A. River Bus Incorporated.

* * *

Q. When did you--were you terminated from that job?

A. I believe it was the 28th of that month.

Q. And did you give as a reason, you were terminated was simply a background check?

A. That was the start of it, Mr. Young.

Q. And, you were hired in March, is that right?

A. That is correct.

Q. You were hired without a background check?

A. I don't know what they did in regard to that Mr. Young.    I really can't answer for the people that run the company.

Q. How do you know you were fired for a background check?

**8** A. I was given a letter to sign, stated due to unsatisfactory background check, that I was to be put on probation for the rest of my life. I was to sign that before I returned to work.    I refused to sign it.

Q. Now, that's a letter prepared by the ferry company?

A. By Ed von Bergen, president.

*See* Trial Transcript, July 22, 1992, at 37-38.

### c. Plaintiff's Arbitration Testimony

Plaintiff, upon his discharge from Riverbus, filed a grievance with the Seafarers International Union, Atlantic, Gulf, Lakes and Inland Waters District, AFL-CIO ("Union"), alleging improper and unjustified termination. An arbitration

hearing was conducted on May 17, 1993, ten (10) months after the jury trial between Riverbus and the Union.    Plaintiff was represented during the arbitration by a Union attorney, who was different than his trial and appellate counsel here.

At the arbitration hearing, plaintiff again had a chance to testify as to why he was fired from Riverbus, including what had been told to him regarding the reasons for his firing.    This is the same termination episode plaintiff testified about during his jury trial.    In brief, plaintiff testified that the reasons for his termination given by von Bergen were as follows:    (1) a bad background check, that included talking to McAllister, who told von Bergen that plaintiff refused to take a drug test;    (2) having been fired by former employers for being drunk;    (3) failing to draw up a schedule for crew assignments;    (4) reporting to work drunk;    (5) not conducting a fire drill; (6) being late for work;    (7) failure to get along with fellow employees;    and (8) improperly changing the logs.

Specifically, plaintiff's pertinent direct examination testimony at the arbitration proceeding is as follows:

Q. It's been stated that you were discharged on June 28th, 1992.

A. That's correct.

Q. And how were you informed of this?

A. Via telephone.

Q. Okay. Were you ever provided with a written notification pursuant to the collective bargaining agreement?

A. No. Not within the terms of the collective bargaining agreement, no.

* * *

Q. When did you receive the notice?

A. On or about July 5th, 1992.

Q. Let me show you what is to be marked as SIU Number 2....

Q. And can you identify that, please.

A. That's the envelope which I received my termination in.

Q. Okay. Did you ever receive a fax of the letter of discharge?

A. No, I did not.    I don't own a fax machine.

Q. From this notice were you able to determine the basis of your discharge?

A. No, I was not.

Q. Okay. Let's go back to the telephone conversation, then, of June 28. Can you recall what was said during that conversation?

A. He called me up and told me I was fired, and I said why. He said well, you refused to take a drug test in McAllister's and you didn't show up for work on the weekend.

Q. What did you say?

A. I said Ed, I'm going to file a grievance. And then he offered me a thousand dollars severance pay.

*9 Q. Did you say anything else to him?

A. I can't recall saying anything else.

Q. Okay. And then what did Mr. von Bergen say?

A. Do what you have to do.

Q. Did you file a grievance?

A. Yes, I did.

Q. And do you recall what you based your grievance on?

A. Wrongful termination.

* * *

Q. Drawing your attention to June 23rd, 1992, did you work that day?

A. Yes, I did. I worked--I had a meeting with the Coast Guard with regard to the tall ships on that date.

Q. Okay. Did you have a meeting with von Bergen that day?

* * *

Q. Okay. And can you relate to us your discussion with Mr. von Bergen?

A. Well, I started to give him the details of what transpired at the tall ships, and Mr. von Bergen stated that I'm going to have to let you go, John.

Q. What was your response to that?

A. I told him Ed, I said, you better have a good reason because I'll be filing a grievance. I don't think you have any basis for anything. I said I would like to know the accusations against me. Whatever they may be, there's two sides to every story.

Q. And what was von Bergen's response if any?

A. Well, he had a list that was on one of those yellow pads, and he started to go through the accusations. First of all, he said that he had done a background check on me involving my former employer, McAllister Brothers, and that he had found out that I had refused to take a drug test from them.

* * *

Q. Were any other allegations stated by von Bergen that day?

A. He stated that I had been fired from former employers for being drunk five times.

* * *

Q. And the other allegations that you're aware of in that conversation?

A. That I never had made up a schedule for the crews.

Q. What was your response to that?

A. I said you have one in writing that I made up. It was an easy schedule to follow, 7 days on, 7 days off.

Q. Any other accusations that you remember?

A. That I had come to the vessel drunk on one occasion.

* * *

Q. Anything else?

A. He said that I never ran a fire drill on the vessel.

Q. Okay. And what was your response to that?

A. I said you were there when I did it. He agreed that I had done it and that allegation had been trumped up.

Q. There was some testimony earlier about your being late. Was there any discussion about that day?

A. Yeah. I reminded him that on the day that the Riverbus had lost an engine, that it would have been very easy for me to shut down that vessel.....

* * *

Q. Any other late days that you and Mr. von Bergen had discussed?

A. I had mentioned to him there was one other time where I came out and my car wouldn't start, and I, as required by the Company, you know, I called the office and let them know I was going to be late.

Q. Were you ever disciplined for any of your late days?

A. No. It was never mentioned until that day on the dock.

Q. Okay. What else was discussed between you and Mr. von Bergen that day?

*10 A. He said that I couldn't get along with the crew on the vessel.

* * *

Q. What if anything else did you discuss that day?

A. After that Mr. von Bergen more or

less in his words--became very angry. He knew that I was a good captain; I had done my job well for him. And pardon the expression, ladies, but he said "you been fucked. You've been in the turkey shoot. I'm going to get to the bottom of this," he says. "I don't know what I'm going to do right now."

* * *

Q. Let me show what's been marked as Employer Exhibit 3. Do you recognize that?

A. Yes, I do.

Q. And what is it?

A. It's a letter trying to extend my probation, and it asks that I agree to it and sign it.

Q. Did you ever receive that?

A. I received that the day after I had been fired, which would have been June 29th.

Q. Where did you receive that?

A. I had gone to the Union hall to talk to somebody, you know, with regard to my firing, and James Malone, the safety director said that had been left on Dave's desk for me. Dave was on vacation at that time, had left for vacation.

Q. There were some general allegations as well as specific as to you changing the logs. Do you recall what they're referring to?

A. Yeah.....

*See* Arbitration Transcript, May 17, 1993, at 105-122. On cross-examination, Bethel likewise testified to his termination episode and his meeting with von Bergen:

Q. Now, you talked about a litigation, Mr. Bethel. What happened in that litigation after the jury award?

A. I received--the judge ruled on it as a matter of law, that in that defamation two items fell short of evidence. That will be filed Friday, the appeal to that at the Third Circuit Court of Appeals.

Q. In that litigation, didn't you make the same claim that you just made in your testimony here, that one of the reasons you were fired was for refusing to take a drug test when you were employed by McAllister?

A. Could you repeat that question, ma'am.

Q. Yes. That wasn't clear. Let me say that again. You testified that Mr. von Bergen gave you two reasons for

terminating you; is that correct?

A. Yes, that's correct.

Q. One of them was that you didn't come in, right?

A. Yes.

Q. And the other one was that you refused to take a drug test when you were employed by a former employer, McAllister?

A. That's correct.

Q. Didn't you make that same claim, the second claim, that Riverbus fired you because you failed to take a drug test while you were employed by McAllister? Didn't you raise that claim, make that claim in your litigation against McAllister?

A. Yes, ma'am.

*See* Arbitration Transcript, May 17, 1993, at 128-30.

### d. Plaintiff's Argument In Brief And Orally To The Court Of Appeals

Plaintiff, in his appeal of the district court's granting of defendants' Rule 50 motion, filed his brief to the United States Court of Appeals for the Third Circuit on June 7, 1993, less than two (2) months after the arbitration hearing. Plaintiff's attorney argued to the court of appeals on December 6, 1993, less than eight (8) months after the arbitration hearing. In the briefs and at oral argument, plaintiff's counsel strategically used plaintiff's testimony regarding his termination from Riverbus to support the claim that the verdict should be reinstated. Plaintiff's appellate brief stated:

**\*11** The owners of the ferry service that employed Bethel as a captain and quickly promoted him to port captain had not heard Huesser's defamatory statement when they hired him. However, despite Bethel's satisfactory performance of all his duties on the ferry service, Bethel was summarily discharged following an unsatisfactory "background check" (JAO269-71). At the time of his discharge, the owner of the ferry service told Bethel that he had just learned from McAllister that Bethel had been discharged for refusing to take a drug test (JAO271). What could be stronger evidence of the injurious

character of appellees' defamatory statements?

See Bethel v. McAllister Bros., Inc., No. 93-1358 (3d Cir. February 4, 1994), Brief For Appellant, at 27-28. In addition, plaintiff's reply brief stated in pertinent part:

There was also uncontroverted evidence that Bethel was immediately discharged from a full-time position as port captain for a ferry service when the owners learned, again from McAllister, that he had been fired from McAllister because he refused to take a drug test (JA0269-71). There was ample circumstantial evidence as to how appellees' statements were understood by the members of the Philadelphia maritime community. Under Pennsylvania law, this evidence was more than sufficient to support this element of Bethel's defamation claim.

See id., Reply Brief Of Appellant, at 19-20.

Moreover, the audiotape of the oral argument before the court of appeals shows that plaintiff's counsel argued on two separate occasions that a source of damages included plaintiff's firing from his Riverbus job:

COURT:    Where is it in the record, can you give us chapter and verse, that the other companies had to hire him on the water taxi and on the ferry boat, I assume that one goes over to the aquarium, because of his status in the Union hiring hall?

COUNSEL FOR PLAINTIFF:    No. The only evidence in the record is from John Bethel with respect to--he was hired as a mate on the other tug boat companies, Moran and Turecamo, out of the Union hiring hall.    His job as a ferry boat captain where he was terminated because of an unfavorable background check, there is direct evidence from Mr. Bethel that he was told by his employer that they called McAllister, and found out that he had refused to take a drug test-- and that is evidence again of a republication of the defamatory statement and as a result he lost his job as the ferry boat captain.

COURT:    So, your contention is that

even if he can't ascribe to the defendants' conduct his inability to get employment as a docking pilot, because apparently they weren't hiring docking pilots, the evidence of damage is in the record in view of his being fired as a ferry boat captain.

COUNSEL FOR PLAINTIFF:    That's one element.    And your honor, there was also evidence that there was docking pilot positions open....

* * *

COUNSEL FOR PLAINTIFF:The water taxi position was part-time.    It was not one subject to any sort of Coast Guard regulation or any sort of standards.    I think, with all due respect, that if I applied for the job and there was a need, you might have seen me piloting the water taxi.    The ferry situation is a different situation.    One has to, one had to qualify for that as John did. And the record reflects that he got a license which enabled him to transport people by virtue of the ferry to the Camden Aquarium.    That was a Coast Guard regulated position.    And that is the position from which he was terminated because of a background check.

*12 See id., Audiotape of Oral Argument, dated 12/6/93.

3. Merits Of Rule 60(b)(3) Motion

As noted above, defendants assert that plaintiff at the time of his jury trial withheld materially significant information as to the real reasons he was given by Riverbus for his discharge.    Defendants cite to the above arbitration testimony emphasizing that plaintiff's testimony was materially different at the hearing than it was previously to the jury.    Defendants contend that plaintiff's failure to reveal the other reasons for his termination by Riverbus from the jury constitutes grounds for new trial pursuant to Rule 60(b)(3). The court agrees.

The narrow issue before the court is whether the jury's verdict for special damages can stand in view of the present circumstances associated with issues raised in the Rule 60(b) motion.    Plaintiff argues that his testimony at trial and the

arbitration are consistent and, thus, no fraud was committed. The court is compelled to disagree. The reasons given to plaintiff by von Bergen of Riverbus for plaintiff's termination were obviously fresh in plaintiff's mind at the time he testified under oath before the jury. Indeed, there can be no doubt as to the freshness of the details of plaintiff's conversation with von Bergen when it is recalled that plaintiff testified in great detail regarding the conversation nearly ten (10) months later at the arbitration hearing.

The court now knows, because of plaintiff's later testimony at that arbitration hearing, that plaintiff's testimony given to the jury was patently misleading as to the reasons for his being discharged from Riverbus. A review of the versions of the testimony at both the trial and the arbitration discloses that plaintiff only told the jury one of the reasons given for his firing. This turned out to be the reason the Third Circuit would later cite as the strongest evidence of his damages, in an otherwise "weak" case. *See* Slip op. at 10.

At the arbitration hearing, plaintiff articulated at least eight (8) separate grounds that were given to him by Riverbus for his termination. However, plaintiff only gave one of these reasons to the jury at trial, that is, his refusal to take a drug test. The jury should have been told of the additional reasons for plaintiff's discharge, including that his former employers had fired him for being drunk on five occasions, that plaintiff never made up a crew schedule, that he arrived at the vessel drunk once, that he never conducted a fire drill, that he had been late on several occasions, that he could not get along with the crew, and, that plaintiff changed vessel logs on at least one occasion.

By plaintiff's own admission under oath at the arbitration hearing, these reasons were given to him by Riverbus. In addition, plaintiff's trial and arbitration testimony shows that he also received a letter intended to extend his probationary period which plaintiff told the arbitrators he refused to sign. This letter also referred to yet another pertinent reason for plaintiff's discharge other than the background

check, namely that plaintiff had a poor performance rating. [FN7] Whatever means this employer had of describing his dissatisfaction with plaintiff, it is clear that the jury could have concluded that plaintiff's failure to take the drug test for defendant McAllister had little or nothing to do with the equally or more substantial grounds advanced by Riverbus, but never disclosed by plaintiff to the jury. It is perfectly plain that plaintiff's differing versions of what Riverbus told him are not consistent as plaintiff asserts; rather, plaintiff knowingly concealed a material fact--indeed, seven material facts, being the undisclosed other grounds--for being discharged by Riverbus. [FN8]

**\*13** Plaintiff cites to several decisions to support his position that he did not commit fraud when he testified at the trial, regardless of whether his grievance arbitration testimony was consistent. First, plaintiff asserts simply that he was never directly asked whether there were any other reasons given to him for his discharge from Riverbus, and thus he was under no compulsion to proffer information that was beyond the scope of any question posed by defense counsel. *See* Plaintiff's Opposition To Defendants' Motion For Relief From Judgment Pursuant To Federal Rule Of Civil Procedure 60(b), at 12.

Second, plaintiff asserts that his statement on cross-examination that "[t]hat was the start of it," referring to the bad background check as a reason for his termination, was enough to place defendants on notice of other possible reasons for plaintiff's discharge. Thus, plaintiff argues that defendants did not cross-examine him and that that failure should insulate plaintiff from his decision to withhold the other incriminating reasons given to him for his discharge from Riverbus. The court strongly disagrees on both counts.

a. Scope Of Trial Testimony

Plaintiff asserts that his responses to questions during the trial testimony were appropriate and that he was under no compulsion to supply other unasked for information. In each of the decisions

cited by plaintiff to support this argument, the ultimate determination by the respective court of whether fraud was committed, pursuant to Rule 60(b)(3), involved a searching analysis of the *scope* of the question. That is, the courts' determination of fraud hinged undeniably on whether the response given by a witness to a question posed (be it an interrogatory, deposition question, or question posed at trial) was within the scope of the question asked. Plaintiff's cited case law ruled that the responding party did not commit fraud if the alleged "concealed" information was *outside* the scope of the question being asked.

For instance, in *Taylor v. Texgas Corp.*, 831 F.2d 255 (11th Cir.1987), a discharged employee brought suit under the Age Discrimination In Employment Act against his former employer. The court entered judgment in favor of the plaintiff, and the defendant moved for relief from judgment pursuant to Rule 60(b)(3) based on the employee's alleged fraud. The defendant asserted that the plaintiff, when questioned regarding the disability benefits he was receiving from the defendant at the time, had untruthfully withheld that he was receiving pension benefits. The defendant asserted that this amounted to fraud.

The *Taylor* court disagreed and found instead that the hearing wherein the plaintiff had testified dealt exclusively with plaintiff's disability benefits, not pension benefits. Moreover, the court ruled that, indeed, the questions themselves posed to the plaintiff were specifically directed to the issue of disability benefits, *not* pension benefits. For this reason, the *Taylor* court found that the plaintiff's answers were not fraudulent, but rather within the scope of the questions being asked. [FN9]

**\*14** Similarly, in *Rauenhorst v. United States*, 104 F.R.D. 588 (D. Minn.1985), the United States sought relief from a judgment entered against it in a wrongful death action in which an air traffic controller was found to have been negligent in guiding an aircraft through a storm. On a Rule 60(b) motion, the government alleged that plaintiff

Southwest Aircraft Leasing, Inc.'s counsel concealed a critical piece of evidence, a metal punch that was found in the plane's fuel cell. The government asserted that this new evidence could have provided an alternative theory for the crash. The government argued that the plaintiffs knowingly failed to produce the metal punch in discovery or produce the persons who had knowledge of such evidence, and that such failure amounted to fraud.

The *Rauenhorst* court disagreed finding that, although less than perfect, plaintiff's answers to interrogatories provided all the information needed to uncover the existence of the metal punch. The court stated that "the United States' failure to pursue that information or to request more detailed or additional responses weighs against a finding of misconduct under Rule 60(b)." *Id.* at 598. Indeed, the court found that plaintiff's responses to the government's discovery requests were narrowly tailored to the specific questions, offering all of the information asked for but no more information than was required to fully answer the question. *Id.* at 600 n. 18. The court determined that this could not constitute fraud or misconduct.

Likewise, in *Wilson v. Thompson*, 638 F.2d 801 (5th Cir.1981), the court affirmed a district court's finding that the moving party failed to prove fraud of an adverse party so as to merit relief under Rule 60(b)(3). In *Wilson*, after the district court denied the plaintiffs an injunction against state prosecution by the defendants, the plaintiffs moved the district court for reconsideration following the discovery of new evidence. The new evidence consisted of a "secretly recorded conversation between plaintiffs' attorney and the prosecuting officer [for the defendant] several weeks after the district court's denial of the injunction." *Id.* at 802.

The Fifth Circuit found that the district court's conclusion that the new evidence was "merely cumulative in its tendency to support the testimony" of one of the plaintiffs' witnesses was not clearly erroneous. *Id.* at 804. Specifically, the court of appeals found that the defendants' "statement in the recorded conversation

that 'the whole damned truth wasn't told' during the trial constitutes no more than admission that [defendant] acted on the advice of counsel in refusing to proffer testimony on matters outside the scope of his examination while on the witness stand." *Id.* (emphasis added). *See also USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 509 (7th Cir.1982) ("Fraud in responding to a discovery should mean a more active obstruction of the inquiry than simply putting opposing counsel to the burden of getting a discovery order."), *cert. denied,* 462 U.S. 1107 (1983); *Chrysler Corp. v. Superior Dodge, Inc.*, 83 F.R.D. 179, 195 (D. Md.1979) (finding no fraud where allegedly withheld documents were never specifically requested nor diligently sought).

**\*15** Finally, plaintiff also relies on *Harduvel v. General Dynamics Corp.*, 801 F.Supp. 597 (M.D. Fla.), *cert. denied,* 494 U.S. 1030 (1992), to support his proposed principle that the "failure to proffer information beyond the purview of the examination, even where such information is clearly within the witness' knowledge, will not trigger 60(b)(3) relief." *See* Plaintiff's Supplemental Opposition To Defendants' Motion For Relief From The Judgment Pursuant To Rule 60(b), at 26. In *Harduvel,* the plaintiff alleged that certain critical discovery requests were not properly responded to and particular witnesses for the defendant had falsely testified during the trial.

The facts of the case in *Harduvel* rested on highly technical details regarding the wiring systems of military aircraft manufactured by defendant General Dynamics. The crux of the discovery evidence and trial testimony at issue dealt with accidents that occurred due to malfunctioning wiring systems in certain critical sections of the aircraft. During discovery and the trial, the plaintiff asked the defendant for information relating to accidents caused by or within one specific area of such aircraft. As to this particular area, the court determined that defendant's discovery responses were properly within the scope of the requests and that the critical witness testified accurately.

What the plaintiff complained of in *Harduvel* was that the defendant and the witness had withheld critical information regarding malfunctioning of wire systems in *other* areas of the aircraft and knowingly failed to disclose such knowledge before and during the trial. The *Harduvel* court determined, however, that the witness had answered the questions narrowly and that defendant's failure to proffer any other information, beyond the scope of the questions, could not amount to testimonial misconduct. *Id.* at 608-09.

Moreover, the *Harduvel* court ruled that the plaintiff had also failed to show how the absence of documents prior to the trial had denied plaintiff the opportunity to "fully and fairly" present her case, a requirement under Rule 60(b)(3). *Id.* at 608. The *Harduvel* plaintiff had not shown how the access to this information "would have changed her strategy or emphasis" and would not have brought plaintiff "closer to explaining the cause of the fatal crash." *Id.* at 610.

The court finds that the cases cited by plaintiff are distinguishable and not controlling because, although the legal principle of these cases is sound, the application made in each instance is different than the application of that principle to the facts now before the court. Here, the concealed information was material, would have in all likelihood made a difference, and was squarely within the scope of plaintiff's counsel's question: "What was expressed to you?" At that point, plaintiff recounted only *one* of the eight reasons for his discharge that were told to him at the time.

**\*16** There can be no doubt that the withheld information was well within the scope of the question being asked, which foreclosed plaintiff's right to pick and choose those items of truth he preferred the jury to hear. *Cf. Rally Mfg., Inc. v. Mr. Gasket Co.*, 1992 U.S. Dist. LEXIS 20681, at *16-19 (S.D. Fla.1992) (party's failure to disclose a known bias of an opposing party's critical fact witness relating to witness's employment negotiations with said party constituted fraud, regardless of whether such information was ever

specifically requested in discovery); *Rosen v. Nichols Yacht Sales, Inc.*, 1990 U.S. Dist. LEXIS 5339, at *8 (S.D.N.Y.1990) ("[W]e refuse to read into Rule 60(b)(2) license for a party to profit from its failure to disclose information completely during discovery and to testify falsely at deposition and at trial."). The court finds that plaintiff's failure to answer the questions concerning his discharge from Riverbus fully and truthfully was a fraudulent misrepresentation of the facts to the jury. [FN10]

### b. *Failure To Cross-Examine Plaintiff During Trial*

Plaintiff next contends that defendants' Rule 60(b) motion must be denied because defendants have not shown how the discrepancies between plaintiff's arbitration and trial testimony prevented defendants from "fully and fairly" presenting their case before the jury. Plaintiff contends that defendants had plenty of opportunity to cross-examine him while he was on the witness stand. Thus, plaintiff argues that defense counsel's failure to cross-examine him on this critical area of testimony is fatal to defendants' motion. Plaintiff cites, in part, to *Paige v. Sandbulte*, 917 F.2d 1108 (8th Cir.1990), to support his position.

In *Paige*, the plaintiff recovered from the defendant loss of earnings and future earnings resulting from severe injuries the plaintiff sustained in a truck accident. Within one year from the date judgment was entered, the defendant filed a Rule 60(b) motion alleging that plaintiff had perjured himself regarding his testimony as to his ability to work. *Id.* at 1109. In support, the defendant offered subsequent ex parte deposition testimony of the plaintiff's estranged ex-wife in which she stated that the plaintiff was not "permanently disabled."

The *Paige* court concluded that the plaintiff's testimony at trial was *not* inconsistent with his ex-wife's later testimony. The court held that the plaintiff's testimony regarding his inability to undertake the basic duties of a truck driver was consistent with his ex-wife's contention that plaintiff was *not*

"permanently disabled." Moreover, the plaintiff's testimony regarding his inability to enjoy "most" of his former recreational activities was consistent with his ex-wife's testimony that the plaintiff continued to enjoy some recreational activities. Finally, the plaintiff's testimony regarding the use of a backbrace and his ex-wife's testimony regarding the fact that the plaintiff never actually wore the backbrace did not constitute fraud as liability was never at issue and the plaintiff had other extensive evidence regarding damages.

*17 The *Paige* court ruled that these discrepancies between the two bodies of testimonies did not rise to the level of fraud as understood by Rule 60(b)(3). Moreover, the *Paige* court reasoned that, even if such discrepancies were indeed fraudulent, the defendant nonetheless had ample opportunity to "cross-examine" the plaintiff into these critical areas of testimony that would have produced more illuminating testimony from the plaintiff. *Id.* at 1111. *See also E.F. Hutton & Co. v. Berns*, 757 F.2d 215, 217 (8th Cir.1985) (failure to cross-examine, in part, will deny relief to party who alleges that opposing party's witnesses committed fraud and prevented party from fully and fairly presenting its case).

The court does not agree that these decisions are controlling because the facts do not clearly demonstrate fraudulent conduct, or if they do, the rulings that permit fraudulent behavior to be shielded by the lack of diligence of opposing parties are contrary to other more convincing authority. *Cf. Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) (preservation of the integrity of the judicial process cannot always wait upon diligence of litigants), *overruled on other grounds sub nom., Standard Oil Co. v. United States*, 429 U.S. 17 (1976). In a somewhat similar situation, the Eleventh Circuit in *Harre v. A.H. Robins Co.*, 750 F.2d 1501 (11th Cir.1985), *vacated in part on other grounds*, 866 F.2d 1303 (11th Cir.1989), granted the plaintiff's motion under Rule 60(b)(3) because defense counsel knew or should have known that one of its expert witnesses had testified in an inaccurate and misleading manner as to the ultimate issue

of the case. It was alleged that the expert falsely claimed that the reports on which he was relying were based on Dalkon Shield experiments that he had personally conducted. [FN11]

In *Harre*, the plaintiffs were a married couple who alleged that defendant A.H. Robins' defective and unreasonably dangerous Dalkon Shield had caused Mrs. Harre to become sterile. The jury returned a verdict in favor of the defendants. During the trial, the defendants' expert witness testified that certain studies had been and were being conducted under his direction regarding defendant A.H. Robins' product and specifically regarding the manner in which the plaintiffs alleged Mrs. Harre had become sterile. In support of their Rule 60(b) motion, the plaintiffs submitted testimony of the defendants' expert in a separate trial that occurred eight (8) months after the first trial. In this second trial, the expert testified that he had *not* conducted any experiments relating to the Dalkon Shield.

The *Harre* court overruled the district court's denial of the plaintiffs' Rule 60(b) motion. The district court had stated that plaintiffs' counsel had an opportunity to cross-examine the witness and failure to do so adequately prevented the plaintiffs from now arguing that they were prevented from fully and fairly presenting their case. On appeal, the *Harre* court instead found that the differing testimonies constituted fraud. Moreover, the court of appeals also determined that the expert's inconsistent testimony did indeed prevent the plaintiffs from "fully and fairly" presenting their case, even though the plaintiffs had been entitled to cross-examine expert but decided not to do so. Specifically, the Eleventh Circuit ruled that where a party or its witness is engaged in fraud, failure of the opposing party to cross-examine the "misrepresenting" party or witness will not shield such fraudulent activity from Rule 60(b)(3) relief. The *Harre* court stated:

**\*18** Of the numerous expert witnesses for the defense, Dr. Keith was the only one who purportedly had conducted or directed wicking studies. His testimony went to the ultimate issue of causation,

and he was the last defense witness in a twelve day trial. We are convinced that, had counsel for [plaintiffs] been aware that Dr. Keith had not actually directed, participated in or even observed the experiments he described, it would have made a difference in their approach to the case, and particularly in their cross-examination of Dr. Keith.... [Plaintiffs'] counsel had no discovery information on these studies. Realistically, [plaintiffs'] counsel expected Dr. Keith would testify consistently with his testimony on direct examination, and it would not have been in [plaintiffs'] best interest to emphasize such testimony on cross-examination. We do not think that failure to discover perjury on cross-examination of an expert witness should be a bar to a Rule 60(b)(3) motion.

*Id.* at 1505.

Similarly, in *Krock v. Electric Motor & Repair Co.*, 339 F.2d 73 (1st Cir.1964), the First Circuit overruled a district court that had imputed a notion of "due diligence" in a ruling denying relief where fraud was alleged. The district court had ruled that "by further investigation before trial defendant could have ascertained the errors in [plaintiff's] testimony" and could have used "due diligence" to discover before the trial the evidence now newly discovered. *Id.* at 74. In overruling the reasoning of the district court, the First Circuit stated:

It is, of course, true that the federal pre-trial discovery procedures are available for use, and conceivably in some particular case--we express no opinion in this one--failure to pursue them would be negligence on the part of counsel. But to determine, as the court apparently did, that neglect gives the other party carte blanche to introduce testimony that is mistaken or worse, insulated from any further proceedings, would be to accept an evil far graver than waste of the court's or litigant's time.

*Id.* at 74. The *Krock* court theorized on the possible effect of the district court's position:

[I]f a party were compelled to ascertain in advance the testimony that might be

introduced against him at the cost of being irretrievably bound by whatever was offered if he did not, and thus face perjury introduced without fear of consequences so as far as the suit was concerned, ..., the resulting burden upon both parties to exhaust all pre-trial remedies in order to anticipate this might well be intolerable.

*Id.* at 75 n. 3.

In this case, defense counsel was confronted for the first time at trial with plaintiff's claim that he was fired from Riverbus because of defendants' defamatory remarks. *Cf. Bunch v. United States,* 680 F.2d 1271, 1283 (9th Cir.1982) (denying 60(b)(3) relief where plaintiff was already aware of information contained in allegedly withheld material at time of trial and failed to cross-examine). Indeed, the firing was a mere three (3) weeks before the trial and nine (9) months after the close of discovery. [FN12] Even though counsel's strategy of not extensively cross-examining plaintiff in hindsight may be questioned, it was entirely plausible at the time, given the historic admonitions against venturing into unchartered waters on cross- examination.

**\*19** The fact that the events were only three (3) weeks old and accrued long after discovery had been completed would be strong grounds to allow some mid- trial relief--even an afternoon recess, or overnight opportunity to depose plaintiff on the new information. If plaintiff had only told the truth in response to his own counsel's questions concerning the reasons for the termination, defendant could have applied to the court for a continuance to pursue the new information. However, defense counsel's trial strategy decisions, good or bad, should never make his client fair game for perjury. For this reason, the court concludes that plaintiff's fraud prevented defendants from "fully and fairly" presenting their case. [FN13]

c. Jury's Award Based On Fraud

The jury returned a verdict of special damages and there is no question but that it was plaintiff's Riverbus testimony, and

*only* this testimony, that could have been a sufficient basis for the award of $554,000.00. [FN14]   The jury was told that plaintiff was receiving $37,000.00 a year at Riverbus, that plaintiff was thirty-seven (37) years old, and that the *only* reason that Riverbus fired plaintiff was because of the background check that caused the employer to learn that plaintiff had refused to take a drug test when he was employed by McAllister. Because plaintiff did not reveal other reasons for his discharge, the jury was guided to isolate the termination of his Riverbus employment for that reason alone. Indeed, because that firing episode had only taken place a few weeks before the trial testimony, it gave greater credence to plaintiff's statement regarding the grounds for his termination.

The jury did not return, nor was it asked to return, a verdict that specifically set forth the basis upon which the damages were based. If any part of the verdict was based upon plaintiff's discharge from Riverbus, it is clear that the jury was misled and that the damages verdict is tainted because of plaintiff's personal concealment of material facts under oath.

Plaintiff asserts that the Third Circuit in *Bethel v. McAllister Bros., Inc.,* slip op., No. 93-1358 (3d Cir. February 4, 1994), ruled that the three sources of evidence that support plaintiff's damages were alternative sources; that is, if this court finds that one of the sources, namely the Riverbus discharge incident, was in some way tainted by fraud or misconduct, then the other remaining sources of damages could still support the jury's award. The court disagrees. *See* note 14 *supra.*

The court is not permitted to speculate selectively which ground could have been the basis for the verdict. Rather, it is the obligation of the court, especially in the face of the relief from judgment that is supported by this record, to try to determine what the jury did do--not what it could have done. The court will never know what the ultimate basis was for the assessment of the damages by the jury. Thus, the court cannot accurately assess the effects of plaintiff's fraudulent conduct

on the jury's assessment of damages. This means quite simply that the jury's verdict could easily have been and most likely was based primarily on the Riverbus discharge and not on the other sources of damages as was the apparent view of the Third Circuit.

For this reason, the entire jury verdict entered in favor plaintiff is suspect and must be vacated. *See Fraige v. American-Nat'l Watermattress Corp.*, 996 F.2d 295 (Fed. Cir.1993) (each finding by jury becomes suspect where jury was presented testimony based on fraudulent documentation, and where testimony was relevant and material to critical issue); *Advanced Medical, Inc. v. Arden Medical Sys., Inc.*, 955 F.2d 188, 199-200 (3d Cir.1992). [FN15]

### d. Issue Of Per se Damages

**\*20** Finally, plaintiff asserts that the Third Circuit ruled that, regardless of whether plaintiff satisfied his burden to establish evidentiary sources for the jury's finding of special damages, the jury's award is valid inasmuch as this award would constitute per se damages. [FN16] Even this holding by the court of appeals, however, is undermined by the evidence offered in the Rule 60(b) motion. The issue of whether defendants' statements were slander per se, while it may have been raised in a cursory fashion during the trial, was not substantively raised in the context of not having to prove special damages. Indeed, the jury was not even instructed as to the law regarding per se damages. Regardless of whether that ruling was correct, the court cannot now merely switch the labels on the jury's finding of special damages and call them something else. For these reasons, and because the dictum in the Third Circuit's opinion is not controlling nor a basis for the disposition of the issue before the court, the requested relief must be denied.

### IV. *Motions Pursuant To Rule 60(b)(2) And 60(b)(6)*

Rule 60(b)(2) allows a court to relieve a party from final judgment due to "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule

59(b)." Third Circuit law requires that the moving party demonstrate that the new evidence is "(1) material and not merely cumulative, (2) could not have been discovered prior to trial through the exercise of reasonable diligence, and (3) would probably have changed the outcome of the trial." *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir.1991) (emphasis in original) (citing *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir.1983)).

In this case, it would have been difficult for defendants to have discovered the concealed information before trial for two reasons. First, discovery had been closed as of October 1, 1991, and second, plaintiff's discharge from Riverbus had occurred just three weeks prior to trial. However, at a minimum, defendants could have undertaken relatively inexpensive and uncomplicated discovery pursuant to Fed.R.Civ.P. 33 that would have carried with it an unquestioned duty, pursuant to Fed.R.Civ.P. 26(e), on the part of opposing party to supplement under oath any pertinent changes relating to the facts and damages of plaintiff's claim. For this reason, the court finds that defendants cannot satisfy the second condition of Rule 60(b)(2) in regard to the evidence complained of by defendants in their motion, inasmuch as it could have been discovered by defendants prior to the trial. Thus, the court will deny defendants' Rule 60(b)(2) motion.

Moreover, Rule 60(b)(6) allows a court to relieve a party from final judgment for "any other reason justifying relief from the operation of the judgment." Third Circuit law only permits the granting of a Rule 60(b)(6) motion if the movant can "allege and prove such extraordinary circumstances as will be sufficient to overcome our overriding interest in the finality of judgments." *Wilson v. Fenton*, 684 F.2d 249, 251 (3d Cir.1982) (quoting *Mayberry v. Maroney*, 529 F.2d 332, 337 (3d Cir.1976) (Gibbons, J., concurring)). Where a moving party's proposed reasons for relief can be classified under clauses (b)(2) and (b)(3), this court cannot consider the Rule 60(b)(6) motion, regardless of its failure to grant relief under the other clauses. *Harduvel v. General*

*Dynamics Corp.*, 801 F.Supp. 597, 613 (M.D. Fla.), *cert. denied,* 494 U.S. 1030 (1992); *Flynt v. Brownfield, Bowen & Bally,* 726 F.Supp. 1106, 1111 (S.D. Ohio 1989). *See also* 7 Moore's Federal Practice § 60.27[1] (2d Ed.1985) (Rule 60(b)(6) motion "must be based upon some other reason other than those stated in clauses (1)-(5)."). For this reason, where defendants can properly proceed under Rule 60(b)(2) and 60(b)(3), the court will deny defendants' motion pursuant to Rule 60(b)(6).

### V. *Conclusion*

**\*21** During the review of defendants' motion and plaintiff's response, the court has been mindful of the influence plaintiff's trial testimony had on his appeal, as well as his course of action thereafter respecting the appeal. In most cases, a plaintiff, as a verdict winner, is an appellee who merely has to hold on to what he or she has won in the trial court, leaving the loser with the burden of setting the verdict aside. Here, however, where the trial court set plaintiff's verdict aside, plaintiff found himself with a burden of persuasion on appeal just as he had before the jury. Undaunted, plaintiff caused his attorney to send off to the printer for inclusion in his appellate brief, the same incomplete facts concerning his Riverbus job performance and termination as he had given to the jury in his trial testimony. [FN17]

Plaintiff then had his attorney offer up the same fare to the court of appeals during the oral argument for the appeal that he had delivered to the jury at the trial. [FN18] We now know that plaintiff knew that the court of appeals would be considering his appeal based on his version of the facts at trial. We know this because at the arbitration hearing held on May 17, 1993, plaintiff testified to the arbitrators as follows:

Q. Now, you talked about a litigation, Mr. Bethel. What happened in that litigation after the jury award?
A. I received--the judge ruled on it as a matter of law, that in that defamation two items fell short of evidence. *That will be filed Friday, the appeal to that at the Third Circuit Court of Appeals.*

*See* Arbitration Transcript, May 17, 1993, at 128-30 (emphasis added). Plaintiff was absolutely correct. Plaintiff filed his notice of appeal on April 20, 1993, and filed his brief on June 7, 1993. The court of appeals heard oral argument on the issues on December 6, 1993. The court is quick to acknowledge that plaintiff's counsel in the district court and the court of appeals was not plaintiff's counsel before the arbitration and there is no basis for the district court to conclude that plaintiff's trial and appellate counsel had any knowledge of plaintiff's testimony before the arbitration board.

Nevertheless, plaintiff's counsel, without this knowledge, unwittingly both briefed and argued the question of plaintiff's discharge from the Riverbus position as being based solely and exclusively on the background check that revealed the failure to take a drug test. It is perfectly plain that plaintiff misled the district court and jury, and has caused his appellate counsel to mislead the court of appeals as to the material facts that plaintiff knew to be untrue and incomplete.

The significance of this other evidence is that disclosure of it could very likely have given the jury strong grounds to believe that Riverbus had reasons other than a failure to take a drug test to discharge plaintiff. The concealed material facts went to the heart of plaintiff's claim of discharge from the *only* employer that plaintiff was fired from.

**\*22** The court finds especially disturbing the fact that, at the time plaintiff was looking the jury in the eye and testifying, he *knew* that the testimony he was giving was wrong. Indeed, plaintiff may have had in his pocket at that very moment the document that the jury had a right to see that stated the employer's basis for discharging plaintiff; that is, that plaintiff was fired because of a bad background check and because he failed to perform his job properly. [FN19] The jury was deprived of these crucial facts and the court can only conclude as it does that there was a knowing concealment by plaintiff. [FN20]

The only remedy here is to award a new trial on all issues to the estate because plaintiff's offer of the Riverbus evidence was relevant to both liability and damages.

The jury was instructed, correctly, that a factor in establishing liability in a defamation claim is that the defamatory statements were published to a third person who believed the falsehood to be true. *See* Transcript of Charge of the Court, at 22, 24-29. Thus, the liability portion hinged on whether defendant told, and therefore "published," to Riverbus that plaintiff refused to take a drug test; and, whether Riverbus believed it to be true.

It was not disputed that McAllister published to Riverbus the fact that plaintiff refused to take a drug test. The jury no doubt believed it was true because the jury was told by plaintiff that following that revelation, he was fired by Riverbus, presumably because he was thereby deemed unfit for his job. We know now though that there were a number of other reasons that could easily have supported a finding of unfitness had the jury been made aware of them. What finding the jury would have made had the truth been told can never be known.

Furthermore, the jury relied on plaintiff's testimony to award damages, since this was the only evidence that would either warrant damages for loss of earnings, inasmuch as the weakness of the economy did not warrant a loss of earnings as a full time docking pilot, or, which bore the refreshing quality of precision, where the part-time docking work was so general, vague, and uncorroborated as to be virtually worthless. The same holds true for the jury's award of punitive damages. While a majority of the panel of the court of appeals was not prepared to go as far as the trial court did in setting the verdict aside because of the weakness of the evidence, it did characterize plaintiff's evidence as "weak," "not strong," and "thin." *See* Slip op. at 7, 9, & 10.

The only thing that supported the verdict, was the Riverbus episode. Indeed, it will be recalled that at the argument in the court of appeals, a panel member, sensing the crucial posture of the Riverbus

experience in upholding the verdict, asked plaintiff's counsel the following question:

> COURT: So, your contention is that even if he can't ascribe to the defendants' conduct his inability to get employment as a docking pilot, because apparently they weren't hiring docking pilots, the evidence of damage is in the record in view of his being fired as a ferry boat captain.

**\*23** *See Bethel v. McAllister Bros., Inc.*, No. 93-1358 (3d Cir. February 4, 1994), Audiotape of Oral Argument, dated 12/6/94. There is no question that the force of plaintiff's argument was aimed at the Riverbus experience for both the liability claim and damages claim.

While the court grants defendants a new trial, the court is equally cognizant that such relief will place a heavy burden on plaintiff's estate, now that plaintiff is deceased. That is, of course, true for a number of reasons that come immediately to mind. First, plaintiff is not available to testify. Second, plaintiff's false version of the facts could be offered to the jury by reading plaintiff's prior testimony, which evidence, of course, would be offset by his later contradictory testimony under oath at the arbitration proceedings. This chemistry produces a difficult credibility by-product and several secondary reactions: (a) it burdens the claim with two contradictory statements under oath of a crucial fact; (b) it has the potential of burdening plaintiff as an unreliable oath-taker--at some time, and possibly at both times--which usually does not lend itself to the recovery of a large verdict; (c) the undisputed letter, received by plaintiff on July 5, 1992, that we now know from plaintiff's own testimony was received two weeks before his jury testimony, seems to pinpoint solidly the time of the deception to be at the jury trial and not the arbitration hearing; (d) von Bergen's testimony would be available to contradict plaintiff's former jury trial testimony and to corroborate plaintiff's arbitration testimony; [FN21] and finally, (e) even if all went well for the estate at the second trial, plaintiff's unfortunate death soon after the trial would substantially reduce the jury's calculation for future losses,

whether they are general, special, or both.

These are admittedly enormous burdens facing plaintiff's estate, but that prospect is no more an excuse to allow the tainted verdict to stand than it would be to allow a person to keep ill-gotten gains because to set them aside would render that person penniless. The fact that plaintiff's heirs will be prejudiced by the relief granted misses the mark, where grounds exist to provide relief from judgment where plaintiff falsely testified under oath. The focus must be on the conduct that has already taken place and its effect that is already in place, *i.e.*, the entry of an improper judgment against defendants.

For these reasons, the court will deny defendants' motion for relief pursuant to Rule 60(b)(2) and 60(b)(6), and will grant defendants' Rule 60(b)(3) motion for relief. Accordingly, the court will vacate the April 12, 1994 Order, entering judgment in favor of plaintiff and against defendants, and will grant defendants a new trial on all issues except plaintiff's claim under the Jones Act.

ORDER

AND NOW, TO WIT, this 11th day of July, 1994, upon consideration of the motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b) of defendants McAllister Brothers, Inc., and Frank J. Huesser, the response of plaintiff Thomas Bethel, as Administrator of the Estate of John Bethel, and all replies thereto, IT IS ORDERED as follows:
**\*24** 1) Defendants' motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(2) and 60(b)(6) is *denied.*
2) Defendants' motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(3) is *granted.*
3) Judgment entered by the court's Order, dated April 12, 1994, is hereby *vacated.*
4) Defendants are hereby *granted* a new trial on all issues, except plaintiff's claim under the Jones Act.

FN1. For the reasons set forth herein, the court will deny defendants' motion pursuant to Fed.R.Civ.P. 60(b)(2) and 60(b)(6).

FN2. Defendants did not appeal the jury's award regarding plaintiff's Jones Act claim.

FN3. The court will cite to the Third Circuit's opinion throughout this Memorandum as "Slip op. at".

FN4. O'Neill was the president of the Docking Pilots Association of which Bethel was a member. Apparently, it is customary for docking pilots to seek the assistance of the Association's officers in handling employment disputes.

FN5. Rule 60(b)(3) reads in full:
(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.
On motion and upon such terms as are just, the court may relieve a party or a party's representative from a final judgment, order, or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;....
Fed.R.Civ.P. 60(b)(3).

FN6. The court notes that defendants served no interrogatories on plaintiff, but rather elected to proceed simply on the basis of pretrial discovery which consisted of depositions and the interrogatories served by plaintiff.

FN7. This letter is attached to defendants' Reply to Plaintiff's Opposition to Defendants' Motion For Relief, exhibit "L". The letter is also attached to the Arbitration Opinion and Award, employer exhibit "3". The letter states in full as follows:
This is to confirm that an unsatisfactory background check and performance rating has been given to Captain John Bethel and that is placed on probationary status

until further notice. This has taken place during his 90 day probationary period and it is understood that further employment with this copy will remain on probationary status.
/s/ Edward von Bergen, President

Importantly, it should be remembered that this is the same letter to which plaintiff refers during his trial testimony wherein he states that it is because of this letter that he knew that he was being fired only because of a background check. Plaintiff, however, on direct and cross examination withheld the fact that the letter also stated that he was being fired because of an "unsatisfactory ... performance rating."

FN8. The court notes that the actual veracity of von Bergen's statements to Bethel regarding the reasons for his termination are irrelevant. The issue is not whether Bethel was indeed fired for the list of reasons that von Bergen told him, but rather what did Bethel understand those reasons to be at the time of trial.

FN9. In addition, the court found that whether plaintiff was receiving pension benefits is a fact uniquely in the control of defendant, plaintiff's former employer, and should have been known. *Id.* at 259-60.

FN10. Plaintiff also relies on legal precedent that denied relief to the moving party under Rule 60(b)(3) where a court found that no fraud occurred where the alleged new evidence turned out to be simply cumulative or to be of no relevance. *See Ulloa v. Philadelphia,* 692 F.Supp. 481 (E.D.Pa.1988) (minor discrepancies of defendant's expert witness found not fraudulent); *Anderson v. Department of Health and Human Servs.,* 907 F.2d 936 (10th Cir.1990) (inconsistent testimony not clear and convincing evidence of fraud sufficient to overturn jury

verdict where inconsistencies could represent differences of opinion as to a party's intentions). As noted above, the concealed evidence in this case was neither cumulative nor irrelevant.

FN11. In a later decision by the Eleventh Circuit in this case, the court of appeals vacated any references to perjury and false testimony contained in its previous opinion because the expert witness was later acquitted of perjury charges. Instead it left the proper characterization of the expert's testimony to the trial court that would be conducting the new trial. *Harre v. A.H. Robins Co., Inc.,* 866 F.2d 1303, 1304 (11th Cir.1989).

FN12. Discovery closed in this case on October 1, 1991.

FN13. Plaintiff also cites to *In re M/V Peacock,* 809 F.2d 1403 (9th Cir.1987) (plaintiff could have uncovered alleged new evidence prior to trial, and that, therefore, the misrepresentation lacked a causal nexus with the plaintiff's inability to prepare her case) and *Optimal Health Care Servs., Inc. v. Travelers Ins. Co.,* 801 F.Supp. 1558 (E.D. Tex.1992) ( "Information regarding the alleged fraud was available to [plaintiff] from the outset of litigation."). These decisions, however, are factually distinguishable. The alleged concealed information in these decisions could have been discovered very early in the course of the litigation, whereas plaintiff's termination from his Riverbus position occurred only three weeks prior to trial. Indeed, in the *Peacock* decision, the information could have been discovered some two (2) years prior to trial. Moreover, these decisions have implicitly read into Rule 60(b)(3) a "due diligence" requirement. The decisions have wrongly interpreted that where a party could have uncovered the concealed evidence prior to the act

of fraud, then such party was not prevented from "fully and fairly" presenting its case. The court disagrees and will not follow these decisions for the reasons set forth *supra.*

FN14. It is recalled that the only other two sources that could possibly supply a basis for the jury's award were either the full time docking pilot positions or the part-time positions. The court of appeals made reference to the very weak evidence warranting full time employment docking pilot positions. *See* Slip op. at 9-10. The only other source of damages other than the Riverbus position was the possible part-time employment as a docking pilot, but this evidence was vague, conclusory and speculative. Neither the full time nor part-time opportunities, either alone or together, could support any calculable verdict, let alone one for $554,000.00.

FN15. In *Advanced Medical,* the plaintiff in a breach of contract action had presented two independent theories of recovery. 955 F.2d at 199. In addition, the district court had admitted parol evidence regarding other *alleged* additional agreements that also presented a basis for which the jury could have determined defendant's liability. On appeal, the Third Circuit ruled that the district court erred in admitting the parol evidence. *Id.* In granting a new trial on all issues because of this trial error, the Third Circuit stated: We recognize that the other theories of breach may have been the basis of the jury's verdict. However, we cannot say under the rigorous *McQueeney* [harmless error] standard that admission of parol evidence under this theory was harmless. *Id.* at 200. The court ruled that the mixture of the admissible evidence with inadmissible evidence

required that the case be remanded for a new trial.
Similarly, in our case, there are in reality two independent rationales for determining liability and damages, the part-time docking work and the Riverbus position. Where one of those reasons is now tainted by the evidence presented in the Rule 60(b) motion, the court concludes that the fraud cannot be said to be harmless. It is clear that the jury quite reasonably might have concluded that plaintiff lost his job as a ferry captain because of the defamatory comments and might have awarded damages on that theory of damages alone. Indeed, this is the only plausible reasoning for the award. Therefore, the fraud cannot be said to be harmless.

FN16. The Third Circuit stated in pertinent part:
We also note that we could probably sustain the jury's verdict on the ground that defendants' statements constituted slander per se. Under Pennsylvania law, slander that adversely affects one's fitness for the proper conduct of one's lawful business constitutes slander per se.... This is true even when the statement is subject to more than one interpretation.... Thus, because defendants' statements implied Bethel was unfit for his business, they probably constituted slander per se. Bethel was therefore likely entitled to a presumption of damages absent proof by defendants that no real injury resulted.... Defendant [sic] probably did not meet *that* burden as a matter of law, but we do not need to decide this issue definitively.
*See* Slip op. at 12 n. 5 (emphasis added).

FN17. Plaintiff argued in his appellate brief that "despite Bethel's satisfactory performance of all his duties on the ferry service, Bethel was summarily discharged following an unsatisfactory

'background check.' " *See Bethel v. McAllister Bros., Inc.*, No. 93-1358 (3d Cir. February 4, 1994), Brief For Appellant, at 27-28. Appellant continued arguing that: "[A]t the time of his discharge, the owner of the ferry service told Bethel that he had just learned from McAllister that Bethel had been discharged for refusing to take a drug test. What could be stronger evidence of the injurious character of appellees' defamatory statements?" *Id.* Finally, plaintiff's reply brief argued that the uncontroverted evidence shows that "Bethel was immediately discharged from a full time position as port captain for a ferry service when the owners learned, again from McAllister, that he had been fired from McAllister because he refused to take a drug test." *See id.,* Reply Brief Of Appellant, at 19-20.

FN18. During oral argument before the court of appeals, plaintiff's counsel argued on two separate occasions that a source of damages included plaintiff's firing from his Riverbus job. Counsel stated that plaintiff was discharged from his job as a ferry boat captain because of an unfavorable background check; that is, that Riverbus called McAllister, and found out that plaintiff had refused to take a drug test. Counsel for plaintiff also argued that plaintiff was discharged from his position with Riverbus only because of a background

check. *See Bethel v. McAllister Bros., Inc.*, No. 93-1358 (3d Cir. February 4, 1994), Audiotape of Oral Argument, dated 12/6/93.

FN19. *See* note 7 *supra.*

FN20. In this case, where the source of the fraud is plaintiff himself, the court is not confronted with those more removed situations where the fraud was committed by persons or witnesses once or twice removed and a connection between such person and the adverse party would be required.

FN21. While the Pennsylvania Deadman's Statute would be initially available to plaintiff to block von Bergen's testimony, the bar of the statute would fall if plaintiff's former testimony were to be offered to a new jury, which presumably would necessarily have to occur in order for plaintiff's estate to prevail in its case-in-chief. *See Rosche v. McCoy,* 156 A.2d 307 (Pa.1959) (party who represents the interests of decedent waives protection afforded by Dead Man's Act where such party offers decedent's sworn testimony into evidence).

1994 WL 328350, 1994 WL 328350 (E.D.Pa.)

END OF DOCUMENT

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*
*2080 Linglestown Road*
*Suite 201*
*Harrisburg, Pennsylvania 17110-9670*
*Telephone (717) 540-9170*
*Fax (717) 540-5481*
*By:    SPERO T. LAPPAS, Esquire*
*        Pa. Supreme Court ID no. 25745*
*        slappas@ssbc-law.com*

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served a true copy of the attached document upon the person(s) named below by mailing a copy addressed as follows, postage pre-paid, deposited into the U. S. Mail at Harrisburg, Pa.

GREGORY NEUHAUSER, ESQUIRE
OFFICE OF ATTORNEY GENERAL
LITIGATION SECTION
15TH FLOOR, STRAWBERRY SQUARE
HARRISBURG, PA. 17120

*RESPECTFULLY SUBMITTED,*

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*

*By:* _____
*SPERO T. LAPPAS, Esquire*
*Pa. Supreme Ct. ID no. 25745*
*2080 Linglestown Road*
*Suite 201*
*Harrisburg, PA 17110-9670*
*(717) 540-9170*