ORIGINAL

> ⅞ ⅘

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY,                          :
      **Plaintiff**                    :
                           :       **No. 1:01-CV-0206**
     **v.**                         :
                             :       **(Judge Kane)**

SCOTT BROWN, PAUL EVANKO,             :
BERON F. STEAGER, AND BARRY L.        :
BRINSER, **et al.,**                  :
      **Defendants**                 :

**FILED**
HARRISBURG, P

MAR 0 7 2003

MARY E. D'ANDREA, Cl
Per _____
Deputy Clerk

## EXHIBITS IN SUPPORT OF
## DEFENDANTS' BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A NEW TRIAL

**D. MICHAEL FISHER**
Attorney General

**GREGORY R. NEUHAUSER**
Senior Deputy Attorney General

**SUSAN J. FORNEY**
Chief Deputy Attorney General
Chief Litigation Section

DATE: March 7, 2003

## Table of Contents

| | EXHIBIT |
|---|---|
| **Order #1 of Dec. 31, 2002 (Dkt. No. 62)** | **A** |
| **Order #2 of Dec. 31, 2002 (Dkt. No. 63)** | **B** |
| **Transcript of Proceedings, Jan. 6, 2003** <br>     **Testimony of Scott Brown** | **C** |
| **Transcript of Proceedings, Jan. 7, 2003** <br>     **Excerpt of In-Chambers Conference** | **D** |
| **Transcript of Proceedings, Jan. 7, 2003** <br>     **Testimony of Scott Brown** | **E** |
| **Letter from State Employees Retirement** <br>     **System re: retirement of Scott Brown, Dec. 31, 2002** | **F** |

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RANDY YORDY,                          :
                                      :
        Plaintiff,                    :
                                      :        CIVIL ACTION NO. 1:CV-01-0206
        v.                            :
                                      :        (Judge Kane)
SCOTT BROWN, PAUL EVANKO,             :
BERON F. STEAGER, AND                 :
BARRY L. BRINSER, et. al.,            :
                                      :
        Defendants                    :

**ORDER**

        AND NOW, this 31st day of December, 2002, **IT IS ORDERED THAT** the trial of the

above-captioned matter shall be bifurcated. The selection of the jury to hear both matters will

occur on January 6, 2003. The trial on liability and damages as to Defendants Brown, Steager

and Brinser will commence immediately after jury selection. On a finding of liability as to any

Defendant, immediately thereafter, the jury shall consider the liability and damages as to

Commissioner Evanko.

                                      _____
                                      Yvette Kane
                                      United States District Judge

Office of Attorney General
RECEIVED
JAN 7 2003
Litigation Section

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDY YORDY, | : | |
| **Plaintiff,** | : | |
| | : | CIVIL ACTION NO. 1:CV-01-0206 |
| v. | : | |
| | : | (Judge Kane)    FILED |
| SCOTT BROWN, PAUL EVANKO, | : | |
| BERON F. STEAGER, AND | : | |
| BARRY L. BRINSER, et. al., | : | |
| | : | |
| **Defendants** | : | |

## ORDER

Before the Court is Defendants' Motion in limine requesting that the Court exclude from

evidence testimony and documentation of Defendant Brown's employment history with the

Pennsylvania State Police. For the reasons explained below, this Court will deny the motion and

permit the evidence to be introduced for a limited purpose.

### I.    Background

Plaintiff brought this civil rights action against three Pennsylvania State Troopers,

Defendants Scott Brown, Beron Steager, and Barry Brinser; four Pennsylvania State Police

Defendants designated as John Does; and the Commissioner of the State Police, Paul Evanko.

Plaintiff alleges that Trooper Brown assaulted him during a traffic stop on February 4, 1999, and

that Troopers Steager and Brinser also assaulted him later the same day along with the unnamed

Defendants. Plaintiff argues that this was excessive use of force in violation of his constitutional

rights.

Plaintiff argues that Commissioner Evanko is liable under § 1983, in addition to the

troopers, "(1) because Evanko had supervisory control over Brown and Evanko failed to act to

correct Brown's conduct, (2) because Evanko's inaction in the face of Brown's terrible record

constituted deliberate indifference to the right of persons with whom Brown came into contract, and (3) because Evanko's inaction created a danger which deprived the Plaintiff of his Fourteenth Amendment substantive due process right." (Pl. Br. at 10) (citations omitted).

## II.    Discussion

Defendants argue that pursuant to Rule 404(b) of the Federal Rules of Evidence, evidence of Brown's employment history prior to February 4, 1999 is inadmissible to prove that Brown violated Plaintiff's constitutional rights on that date. They also argue that the evidence is irrelevant to Plaintiff's theory of liability against Commissioner Evanko and that, alternatively, its probative value is outweighed by its prejudicial effect.

Defendant Brown's employment file with the Pennsylvania State Police reveals several instances of misconduct. In 1996, Brown was subjected to disciplinary action for, among other things, unbecoming conduct and use of deadly force during an off-duty traffic incident. Brown pursued someone who had rear-ended his car, jumped into the individual's car through the sun roof, drew his gun, and became involved in a physical altercation that led to a serious car accident and disabling injuries. (Def. Br. Exh. D.) In 1997, Brown received a one-day deduction from sick leave for using foul language, yelling, and threatening during an investigation of a bicycle theft. (Def. Br. Exh B.) In 1998, he received a reprimand for improperly touching a female employee. (Def. Br. Exh. A.) There is also evidence of other incidents occurring in 2000, which Plaintiff concedes are less relevant to the case since they occurred after the events giving rise to this action. One of the later incidents involved reckless driving and one involved Brown waving his weapon, stranding his partner, and abandoning an individual lying handcuffed in a busy street during heavy rain while he pursued another vehicle. (Pl. Br. Exh. 10.)

2

### A.    Admissibility against Trooper Brown

Federal Rule of Evidence 404(b) excludes evidence of other crimes, wrongs, or acts in order to show the defendant's propensity to commit the act in question; but permits the introduction of such evidence for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Fed. R. Evid. 404(b). The four-prong test for determining the admissibility of Rule 404 evidence is: "(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the district court must charge the jury to consider the evidence only for the limited purpose for which it was admitted." Becker v. ARCO Chemical Co., 207 F.3d 176, 189 (3d. Cir. 2000) (internal citations omitted).

Here, Plaintiff brought a § 1983 claim against Trooper Brown alleging that Brown assaulted him during an on-duty stop of Plaintiff's vehicle. In both the incident in question and the 1996 incident, Trooper Brown filed lawsuits against the alleged victim claiming that he, Brown, suffered injures and should be compensated. Therefore, in a footnote, Plaintiff argues that the evidence of this prior act is admissible, not to show propensity, but to show motive: "Brown's behavior demonstrates his recurring motive to profit financially from his altercations with members of the public." (P. Br. at 10, n.3.) However, Brown's alleged financial motive subsequent to the altercation is not relevant to the issues of the instant case; namely, whether or not Brown violated Plaintiff's civil rights on the date in question. Plaintiff has failed to establish the relevance of the other incidents to any of the issues of the case other than propensity. As a result, the incidents noted in Trooper Brown's employment file cannot be introduced as evidence against him.

3

**B.    Admissibility against Commissioner Evanko**

Defendants argue that Brown's employment history is not relevant to claims against Commissioner Evanko. Relevant evidence, under Rule 401, "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Section 1983 claims against a commissioner must be based upon some affirmative conduct by him. Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d. Cir. 1990). Supervisor liability can be shown "either through allegations of personal direction or of actual knowledge and acquiescence or through proof of direct involvement by the supervisor. . . . [or for his own actions in adopting and maintaining a practice, custom or policy of deliberate indifference to instances of known violations." Martin v. City of Philadelphia, No. CV-99-543, 2000 WL 1052150, at *11 (E.D. Pa. 2000). "Normally, an unreasonable risk in a supervisor liability case will be shown by evidence that such harm has in fact occurred on numerous occasions. Similarly, deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries." Sample v. Diecks, 885 F.2d 1099, 1118 (3d. Cir. 1989).

The evidence of prior instances of misconduct contained in Brown's employment file is clearly relevant to the determinations of whether Commissioner Evanko had knowledge of and acquiesced in Trooper Brown's conduct and whether Commissioner Evanko adopted a practice of deliberate indifference to known violations. See, e.g., Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d. Cir. 1996) (determining that the use of past complaints had evidentiary value for the issue of whether the city and its policymakers had a pattern of approving excessive force). These records are, therefore, relevant and admissible under Rule 401. Evidence of misconduct

4

subsequent to the events giving rise to this lawsuit are not relevant and shall be excluded at trial pursuant to Rules 401 and 402 of the Federal Rules of Evidence.

Defendants argue that even if evidence of prior misconduct is relevant, it is unfairly prejudicial and should be excluded under Rule 403. Under Rule 403, evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Rule 403 is a trial-oriented rule and therefore "pretrial Rule 403 exclusions should rarely be granted." In re Paoli R.R. Yard PCB Litigation, 916 F.2d 829, 859 (3d Cir. 1999). Defendants do not argue that the evidence is unfairly prejudicial as to Commissioner Evanko but rather that the jury may be confused and use the evidence for an improper purpose against Brown or the other troopers. However, this Court's Order bifurcating the trial eliminates the potential for undue prejudice against the other Defendants. Therefore, relevant evidence in Brown's employment file is admissible as to Defendant Evanko during the second stage of trial.

5

### III.    Order

AND NOW, therefore, **IT IS ORDERED THAT** Defendant's motion in limine (Doc.

No. 29) is **GRANTED** in part and **DENIED** in part.  Evidence pertaining to disciplinary actions

against Defendant Brown and the facts on which they were based are excluded in the first stage

of trial pursuant to Fed. R. Evid. 404(b).  Evidence of disciplinary actions against Brown

predating Brown's alleged assault on Plaintiff is relevant to the action against Commissioner

Evanko and my be admitted during the second stage of the trial.  Evidence related to disciplinary

actions occurring after the alleged assault on Plaintiff is not relevant and is therefore excluded.


Yvette Kane
United States District Judge


Date: ___31 Dec___, 2002


6

1

```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RANDY YORDY,                        :
              Plaintiff

                 v.                     CIVIL ACTION NO. 01-CV-206
                                    :   (Judge Kane)
SCOTT BROWN, individually and
in his official capacity as         :
an employee and agent of the
Pennsylvania State Police;          :
PAUL EVANKO, individually and
in his official capacity as         :
an employee and agent of the
Pennsylvania State Police;          :
BERON F. STEAGER, individually
and in his official capacity        :
as an employee and agent of
the Pennsylvania State Police;      :
BARRY L. BRINSER, individually
and in his official capacity        :
as an employee and agent of the
Pennsylvania State Police,          :
et al.,
              Defendants
```

                    TRANSCRIPT OF PROCEEDINGS
                           JURY TRIAL
                 TESTIMONY OF SCOTT ALLEN BROWN

              Before:  Hon. Yvette Kane, Judge
                       and a Jury
              Date:  January 6, 2003

              Place:  Courtroom No. 4
                      Federal Building
                      Harrisburg, Pa.

COUNSEL PRESENT:

     SPERO T. LAPPAS, Esquire
          For - Plaintiff

     GREGORY R. NEUHAUSER, Esquire
          For - Defendants

                                Monica L. Zamiska, RPR
                                Official Court Reporter

2

INDEX TO WITNESS

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Scott Allen Brown | 3 | 11 | 13 | 15 |

INDEX TO EXHIBITS

| | Identified | Admitted |
|---|---|---|
| For the Plaintiff: | | |
| P X 2 (7-9-02 Scott Allen Brown's deposition) | 5 | |
| P X 40 (photograph of Randy Yordy) | 4 | |
| P X 42 (photograph of Scott Allen Brown) | 3 | |

1          MR. LAPPAS:  Call Scott Brown.

2          SCOTT ALLEN BROWN, called as a witness, being duly

3    sworn or affirmed, testified as follows:

4          THE CLERK:  Please be seated and state your full

5    name for the record.

6          THE WITNESS:  My full name is Scott Allen Brown.

7                    DIRECT EXAMINATION

8    BY MR. LAPPAS:

9    Q    Mr. Brown, you acknowledge, I take it, that you are the

10   person depicted in Plaintiff's Exhibit 42?

11   A    Yes, sir, that is me.

12   Q    And this photograph was taken after the events of

13   February 4, 1999?

14   A    Yes, sir, they were.

15   Q    How long after was it taken?

16   A    I do not recall, it was the next morning.

17   Q    And the mark that I'm pointing to (Indicating) on

18   Plaintiff's Exhibit 42, a small red circular or oval mark, do

19   you contend that that is an injury that you sustained during

20   the events of February 4, 1999?

21   A    Yes, sir, it's an abrasion.

22   Q    An abrasion, and you'd agree that this photograph

23   doesn't show any other facial injuries at all.  Correct?

24   A    No, none that I can see.

25   Q    Would you further acknowledge for me that Plaintiff's

4

1  Exhibit 40, being a photograph of Randy Yordy, accurately

2  depicts how he looked after the events of February 4?

3  A    I apologize, sir, I cannot say that because I didn't

4  see him afterwards.  Not only that, I don't recall what

5  happened after I was taken to the hospital.

6  Q    I'm interested in the time being about the events that

7  transpired before you were taken to the hospital.  Is that

8  how Mr. Yordy looked after you and he parted company on

9  February 4, 1999?

10  A    No, he did not.

11  Q    He did not?

12  A    No, would you like me to describe it?

13  Q    I would like you to tell me in what way you feel he

14  looked differently than as depicted on that photograph.

15  A    Bruising takes a while.  So obviously that looks later

16  on, does not appear when it happened.  When it happened, he

17  had a cut on his forehead due to the fight that we had had.

18  I had broken his nose, and he had been bleeding not only from

19  the nose, but he was also bleeding from the head.

20  Q    So you acknowledge breaking his nose?

21  A    Yes, sir, I do.

22  Q    Would it be accurate to state that as of February 4,

23  1999 you considered yourself to be, and I'm quoting now, a

24  tough son of a bitch?

25  A    I was a strong person, yes, and I was quoting -- you're

1   misquoting me, sir.  What it was quoted as was the fact that

2   internally I was a tough son of a bitch.

3   Q    What I'm doing now is simply asking you if you

4   acknowledge that that's the way you looked at yourself on and

5   before February 4, 1999.  Is that accurate or not?

6   A    It's accurate.

7   Q    In fact I want you to look, since you brought up the

8   issue of quotation, I want you to look please at Plaintiff's

9   Exhibit Binder No. 1 which should be directly in front of

10   you.

11   A    Yes, sir.

12   Q    Turn please to Exhibit Tab No. 2.  Do you recognize

13   Exhibit No. 2 to be the transcript of a deposition which you

14   gave on February -- I'm sorry, on July 9, 2002?

15   A    It's possible.  I don't recall the dates.  I don't

16   recall -- I do recall giving a statement and giving a

17   deposition.

18   Q    Do you recall giving a deposition at the office of

19   Attorneys Schmidt, Ronca & Kramer?

20   A    Yes, sir, I do.

21   Q    209 State Street, Harrisburg, Pennsylvania.

22   A    Yes, sir, I do, but I do not recall the exact date.

23   Q    Turn please to page 131.  Look at lines 2 and 3.

24   Reading now it says -- and this is your testimony.  Correct?

25   You acknowledge this to be your testimony?

1    A    I don't know, sir, it says A.  If A is me, then I would

2    assume, yes.

3    Q    "I mean before, yeah, I was a tough son of a bitch."

4    Do you see that answer?

5    A    Yes, sir.

6    Q    Now I want you to look at the bottom of that same page

7    131 to lines -- to specifically line 20.

8    A    Yes, sir.

9    Q    Nineteen and 20.

10    A    Yes, sir.

11    Q    Your answer to a question is:  "But I'll admit I was a

12    strong -- out in the animal world they call it the alpha

13    male."  Do you acknowledge that testimony to have been your

14    testimony on this date?

15    A    Yes, sir.  It also goes on to say I was a dominant

16    leader, I am.

17    Q    A dominant leader, an alpha male and a tough son of a

18    bitch, that's the way you saw yourself on or before February

19    4, 1999?

20    A    Yes, sir.  You have to be when you are a state trooper

21    to encounter people like your client.

22    Q    I see.  Do you agree that during the episode that took

23    place off camera on February 4, 1999 you told Mr. Yordy, "I'm

24    going to shoot you, you fuck"?

25    A    I do not recall saying that at that specific time, no.

1    Q    Do you acknowledge that you said it at sometime?

2    A    Yes, sir, I do, but I don't believe it was at that

3    particular moment.  I was in a fight for my life, sir.  I

4    wanted to get home to my wife and children.

5    Q    I'd like you to wait until I finish asking a question

6    before you answer.

7    A    Yes, sir.

8    Q    The question on the floor is did you tell him, "I'm

9    going to shoot you, you fuck"?

10   A    Yes, sir, when I was being dragged down the highway.

11   Q    I want you to turn to page 56 of Exhibit 2.  Starting

12   at line 22 of your testimony, I'll read it, you tell me if

13   I'm reading it correctly:  "At one point he had -- he was on

14   top of me, and I told him I'm going to shoot you, you fuck."

15   Now was he on top of you as he was, to use your language,

16   dragging you down the highway?

17   A    No.

18   Q    So the only time he would have ever been, according to

19   your claims, on top of you, would have been during the tussle

20   off camera?

21   A    You're right, sir.

22   Q    So it was at that time you said this to him?

23   A    I believe so, that's what I testified to, but again I

24   do not recall.

25   Q    It was the same time -- this is your previous

1    testimony?

2    A    Yes, sir, it is.

3    Q    Under oath?

4    A    Yes, sir.

5    Q    Sworn testimony?

6    A    Yes, sir, I am just -- I have done this six times for

7    this thing in different cases, and it's been over three

8    years.  I apologize that I don't have a photographic memory.

9    Q    Getting to the question of your memory, do you have any

10   difficulty remembering the events of February 4, 1999?

11   A    Only after I struck my head on the concrete.  After

12   that it's pretty fuzzy.

13   Q    Haven't you claimed in other proceedings that by

14   hitting your head that night you suffered psychiatric

15   injuries which cause you to have a bad memory?

16   A    Not a bad memory, sir, but, yes, I have psychiatric

17   problems.  I do seek help as a result of what your client did

18   to me.

19   Q    Your testimony under oath is that you have never

20   claimed to have had a bad memory as a result of psychiatric

21   problems?

22   A    I'm sorry, sir, I don't recall, it's possible.

23   Q    Is your memory so bad you can't remember if you have a

24   bad memory?

25   A    No, sir.

9

1    Q    Turn to page 128 of that exhibit please.

2    A    I do remember stating that I can't remember certain

3    facts like I delivered both my children --

4    Q    Turn to page 128 of that exhibit please.

5    A    Yes, sir.

6    Q    We're going to start with line 3.

7    A    Yes, sir.

8    Q    The question put to you was:  "Has your memory been

9    affected since the incident?"  And what was your answer?

10   A    "Absolutely."

11   Q    And the question was:  "You said you were

12   scatterbrained I think was your testimony?"  And you answered

13   it by saying:  "I can't remember what I had for dinner last

14   night, but I'll tell you what, what's really weird, really

15   weird is I remember shit that happened ten years ago."  Was

16   that your sworn testimony?

17   A    Yes, sir, and that is true.

18   Q    Well, let's talk about what happened three years ago.

19   Is it your testimony that you do or do not claim to have a

20   clear recollection of the events of February 4, 1999?

21   A    I have a very good recollection of what happened.

22   Q    So you don't remember what you had for dinner last

23   night, but you remember what happened on February 4, 1999?

24   A    Yes, I do, sir.

25   Q    How many times would you acknowledge striking Randy

1    Yordy when you were fighting with him off camera?

2    A    Probably five or six ballpark.  I was pretty strong.  I

3    was lifting at the time.

4    Q    Uh-huh, how many punches do you think it took you to

5    break his nose?

6    A    One, that was the initial hit that I had made.

7    Q    You acknowledge that you took a full can of mace and

8    sprayed it in his face?

9    A    Absolutely, sir.

10   Q    And emptied it out?

11   A    Yes, sir, I did.

12   Q    Taking special care to make sure you got it in his

13   eyes?

14   A    As I am taught.

15   Q    You acknowledge that at the side of the truck you drew

16   your service weapon and shot out one of his tires?

17   A    I was in fear for my life.

18   Q    While he was in the car?

19   A    Yes, sir, I was in fear for my life.  I was being

20   dragged down the highway.

21   Q    And I believe you have previously testified that the

22   one and only thing that you regret about the events of

23   February 4, 1999 is not, quoting, blowing his head off.  Is

24   that accurate?

25   A    That would be accurate, sir, and I was upset.

1          MR. LAPPAS:  Those are my only questions of the

2   witness at this time.

3          THE COURT:  All right, thank you.  Mr. Neuhauser.

4          MR. NEUHAUSER:  Just a few at this time, Your

5   Honor.

6                      CROSS EXAMINATION

7   BY MR. NEUHAUSER:

8   Q    Trooper Brown, when you say you were in fear for your

9   life, can you describe why you felt that at that particular

10  time?

11  A    Mr. Yordy was in a rage.  I couldn't control him.  I

12  have never encountered an individual like that before.

13  Q    Did you ever have the occasion to use your pepper

14  spray --

15  A    Yes, sir.

16  Q    -- before that?

17  A    And it had worked every time.  I have used it at least

18  four times, five times prior to, and it's worked every time.

19  Q    But in this occasion it did not.  Correct?

20  A    No, sir, had no affect on the man.

21  Q    What was the reason that you attempted to pull Mr.

22  Yordy out of the truck, to keep him from going back into the

23  truck?

24  A    I didn't want him to drive into a busload of kids or

25  somebody's mother.  I mean, it's very important that you

12

1    keep, you know, people who drive intoxicated off the road.

2    Q    And why did you feel you needed to use -- to fire your

3    service weapon at the wheel of his truck?

4    A    I have never been in a situation like that, sir,

5    before.  The only thing going through my mind was I want to

6    go home to my kids, to my wife.  I know tires make the

7    vehicle go, so I shot the tire out hoping it would stop, and

8    then when it didn't, I had no other choice but to go further.

9    It's called the use of force continuum.

10    Q    Had you tried what you thought were levels of force

11    consistent with bringing Mr. Yordy into control, under

12    control, before you used your service weapon?

13    A    Absolutely, I tried everything, every tool at my

14    command.  I used verbal commands.  I shouted at him, yeah, I

15    swore at him.  I had to get his attention somehow.  The man

16    was just -- he was just going off.  He was just, you know,

17    like this, and -- I told him to stop, you know, "Don't be an

18    asshole, knock it off.  You're under arrest."  I don't know

19    how many times I had said that, and it had no affect on him.

20    I then, you know, I tried to bear hug him and hold him.  I

21    tried wrestling with him, and he just seemed to keep coming

22    and coming and moving and moving, and there is nothing I

23    could do, and all I wanted to do was get home.  I wanted to

24    end my shift.

25         MR. NEUHAUSER:  That's all I have at this time,

1    Your Honor.

2             THE COURT:  All right, thank you.  Anything else

3    for this witness, counsel?

4             MR. LAPPAS:  Just a few on redirect, Your Honor.

5                      REDIRECT EXAMINATION

6    BY MR. LAPPAS:

7    Q    When you said -- Mr. Neuhauser asked you why you shot

8    out the tire, and your answer was, "I have never been in a

9    situation like this before."

10   A    Uh-huh.

11   Q    What kind of a situation is it that you have never been

12   in before?

13   A    Being in a fist fight and then being dragged down the

14   highway by my arm while somebody is holding onto it.

15   Q    The four or five people you had maced before Mr. Yordy,

16   did any of them have broken noses and severe facial injuries

17   caused by you?

18   A    No, sir.

19   Q    And with respect to this use of force continuum that

20   you have testified to, --

21   A    Yes, sir.

22   Q    -- does the use of force continuum describe -- the use

23   of force continuum is a phrase that describes the progressive

24   application of physical force during police work.  Correct?

25   A    Yes, sir, it is.

1    Q    And you feel that in this particular case you utilized

2    the use of force continuum.  Is that correct?

3    A    Yes, sir, I did, sir.  I even backed off going from the

4    fisticuffs to the pepper spray.

5    Q    Does the use of force continuum include something

6    referred to as an ass-kicking contest?

7    A    No, sir, that would be slang terms.

8    Q    Turn to page 57 of Exhibit 2, the same deposition you

9    spoke of a moment ago.

10   A    Yes, sir.

11   Q    On page 7 you're talking  -- I'm sorry, line 7 you're

12   talking about the use of force continuum, and then you stated

13   quote, "Then it goes to an ass-kicking contest where you

14   fight," close quote.

15   A    Yes, sir, that would be fisticuffs.

16   Q    Which is what happened in this case.  Correct?

17   A    Yes, sir, it does.

18   Q    So your testimony is that you've never experienced

19   anybody that kept coming and coming and coming like Randy

20   Yordy, and because of this you were in fear for your life?

21   A    Yes, sir.

22   Q    You broke his nose --

23   A    It had no affect.

24   Q    -- one punch, first punch.  Hit him, by your testimony,

25   five or six times more.  Maced him with a full can of pepper

15

1    spray and after this ass-kicking contest you ended up looking

2    like this, Exhibit 42.   Correct?

3    A    Yes, sir.

4    Q    And you were in fear for your life?

5    A    Absolutely, sir.

6         MR. LAPPAS:  No questions.

7         THE COURT:  All right.

8                   RECROSS EXAMINATION

9    BY MR. NEUHAUSER:

10   Q    Those weren't the only injuries you sustained.

11   Correct?

12   A    Correct.

13   Q    There were other injuries that you were treated for at

14   the Hershey Medical Center?

15   A    Yes, sir.  Although I'm not bruised, my nose did hurt,

16   he did make contact with my nose, but he didn't hit me hard

17   enough.  But I -- as far as the -- what the doctors say I had

18   is I have a closed head injury.

19        MR. LAPPAS:  Objection, Your Honor.  This is

20   hearsay.

21        THE COURT:  Sustained.

22   A    I have a closed head injury.

23   BY MR. NEUHAUSER:

24   Q    What is the understanding of the nature of your

25   injuries as a result of the incident of February 4, 1999?

1    A    My understanding is that I have a closed head injury,

2    post-traumatic stress disorder, post-concussion syndrome.

3    Q    Did you sustain any injuries to your shoulders and neck

4    area as a result of the incident?

5    A    Yes, yes, I did.  They were very sore, nothing broken,

6    but I was very sore.

7              MR. NEUHAUSER:  That's all I have, Your Honor.

8              THE COURT:  Thank you.  You may step down.

9              THE WITNESS:  Thank you, ma'am.

10              (The testimony of Scott Allen Brown concluded.)

11

12         I hereby certify that the proceedings and evidence

13    of the court are contained fully and accurately in the notes

14    taken by me on the testimony of Scott Allen Brown from the

15    jury trial of the within cause and that this is a correct

16    transcript of the same.

17                        *Monica L. Zamiska*

18                        Monica L. Zamiska, RPR

19                        Official Court Reporter

20

21

22

23

24

25

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RANDY YORDY,                           :
                    Plaintiff

                                       :

            v.                              CIVIL ACTION NO. 01-CV-206
                                       :   (Judge Kane)

SCOTT BROWN, individually and
in his official capacity as            :
an employee and agent of the
Pennsylvania State Police;             :
PAUL EVANKO, individually and
in his official capacity as            :
an employee and agent of the
Pennsylvania State Police;             :
BERON F. STEAGER, individually
and in his official capacity           :
as an employee and agent of
the Pennsylvania State Police; :
BARRY L. BRINSER, individually
and in his official capacity           :
as an employee and agent of the
Pennsylvania State Police,             :
et al.,
                    Defendants         :


            TRANSCRIPT OF PROCEEDINGS
                    JURY TRIAL
        EXCERPT FROM IN CHAMBERS CONFERENCE


            Before:  Hon. Yvette Kane, Judge
                     and a Jury
            Date:  January 7, 2003

            Place:  Judge's Chambers
                    Federal Building
                    Harrisburg, Pa.

COUNSEL PRESENT:

      SPERO T. LAPPAS, Esquire
            For - Plaintiff

      GREGORY R. NEUHAUSER, Esquire
            For - Defendants

                              Monica L. Zamiska, RPR
                              Official Court Reporter

2

1          MR. LAPPAS:  The other matter, Your Honor, and the

2     second thing that I discussed with Mr. Neuhauser this morning

3     is this, during the course of this trial, both in openings,

4     in the examination of other witnesses and in specifically the

5     -- Mr. Neuhauser's examination of Scott Brown yesterday, he

6     has been referring, Mr. Neuhauser; that is, has been

7     referring to Scott Brown as Trooper Brown.  I have made it a

8     point consistently to refer to him as Mr. Brown.  It's my

9     understanding that Scott Brown's current status with the

10    Pennsylvania State Police is that he is suspended.  He's been

11    terminated subject to an arbitration proceeding.  His current

12    status is either terminated or suspended without pay.  In

13    either occasion it's my belief that he has been told, and

14    that the state police regulations provide, that he is not to

15    represent himself to be a member of the Pennsylvania State

16    Police and is not to refer to himself or allow others to

17    refer to him or address him as trooper.

18          The next time he testifies I would like to ask him

19    or propose to cross examine him on the question of whether he

20    is a trooper in the Pennsylvania State Police and whether

21    he's been instructed not to call himself trooper.  I think it

22    provides -- presents a false image to this jury to have this

23    man on the witness stand to be calling him trooper as if he's

24    still a member in good standing when in fact he is not.

25          THE COURT:  You may be right on that point, but he

1    hardly did anything to invite that.

2        MR. LAPPAS:  Well, he has --

3        THE COURT:  He's not responsible for Mr.

4    Neuhauser's misslip, if it is one.

5        MR. LAPPAS:  Well, whether he's responsible or not

6    I think it's a matter that the jury needs to -- the jury

7    should be allowed to receive corrected information.

8        THE COURT:  Mr. Neuhauser, what's his status?

9        MR. NEUHAUSER:  Well, first of all, I don't know

10   what the regulations provide because this was just given to

11   me this morning as an issue, and I haven't had a chance to

12   check it.

13       My client tells me that he's allowed to call

14   himself a trooper as long as he's a member of the state

15   police no matter what duty status he may be in.  I have no

16   reason to doubt that.  That's his explanation.

17       Secondly, he's recently been approved for a

18   disability retirement with the state employees retirement

19   system.  So once again if we're going to get into semantics

20   as to whether he is or isn't a full time trooper, we have to

21   have the opportunity to explain and go into the situation as

22   to having the retirement approved and its going into effect,

23   and once again we're delving into collateral matters.

24       I don't think it was a misstatement on my part to

25   call him a trooper when the event -- the only events in

4

1    question happened three years ago when he was a trooper.

2    What he is now, whether retired or he quit or he was let go

3    or whatever, I think questions or calls into question again

4    the Court's ruling on none of these post-incident situations

5    coming into evidence.

6         THE COURT:  Absolutely, we don't want to get near

7    that.  Can you find out from somebody whether he's still to

8    be called trooper, and if he's not, just call him Mr. Brown?

9         MR. NEUHAUSER:  Well, as I said, he has told me

10   just moments ago that he is allowed to do that.  I don't have

11   anyone in superior rank with me at the present time to be

12   able to find that out, but I can try in the meantime.

13        THE COURT:  Okay, all right.  I was under the

14   impression that he was no longer a trooper and he was not

15   entitled to be called trooper.  You didn't object.  I didn't

16   correct Mr. Neuhauser even though I may have been under the

17   wrong impression because I thought, as he did, at the time of

18   these events he was a trooper, and we were talking about

19   these events when he was addressed as such, so I don't think

20   it was a terrible problem, but it is a big problem, let's

21   clarify what he is.  If he's not a trooper, call him Mr.

22        MR. NEUHAUSER:  Okay.

23        (The excerpt concluded.)

24

25

5

        I hereby certify that the proceedings and evidence
of the court are contained fully and accurately in the notes
taken by me on the excerpt from the jury trial of the within
cause and that this is a correct transcript of the same.

                    *Monica L. Zamiska*

                    Monica L. Zamiska, RPR

                    Official Court Reporter

1

          IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RANDY YORDY,                          :
          Plaintiff

                                      :
          v.                                    CIVIL ACTION NO.  01-CV-206
                                      :         (Judge Kane)
SCOTT BROWN, individually and
in his official capacity as           :
an employee and agent of the
Pennsylvania State Police;            :
PAUL EVANKO, individually and
in his official capacity as           :
an employee and agent of the
Pennsylvania State Police;            :
BERON F. STEAGER, individually
and in his official capacity          :
as an employee and agent of
the Pennsylvania State Police;        :
BARRY L. BRINSER, individually
and in his official capacity          :
as an employee and agent of
the Pennsylvania State Police,        :
et al.,
             Defendants               :

              TRANSCRIPT OF PROCEEDINGS
                     JURY TRIAL
            TESTIMONY OF SCOTT ALLEN BROWN

          Before:  Hon. Yvette Kane, Judge
                   and a Jury
          Date:  January 7, 2003

          Place:  Courtroom No. 4
                  Federal Building
                  Harrisburg, Pa.

COUNSEL PRESENT:

     SPERO T. LAPPAS, Esquire
          For - Plaintiff

     GREGORY R. NEUHAUSER, Esquire
          For - Defendant

                        Monica L. Zamiska, RPR
                        Official Court Reporter

2

INDEX TO WITNESS

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

For the Defendants:

Scott Allen Brown                    3        24

  (recalled)


INDEX TO EXHIBITS

|  | Identified | Admitted |
|---|---|---|

For the Plaintiff:

P X 11 (4-9-99 Pa. State Police general        41

        investigation report with

        attachments)

P X 13 (Penn State Geisinger medical           26

        records for Scott Allen Brown)

P X 23 (5-9-97 Pa. State Police general        43

        investigation report)

P X 26 (arbitration opinion and award)         46

1    MR. NEUHAUSER:  Defendant calls Scott Brown.

2    SCOTT ALLEN BROWN, called as a witness, being duly

3 sworn or affirmed, testified as follows:

4        DIRECT EXAMINATION

5 BY MR. NEUHAUSER:

6 Q Sir, I know we discussed yesterday briefly the incident

7 involving Mr. Yordy, but we didn't get to discuss the

8 entirety and some of the other related issues or questions

9 that I'd like to ask, so let me start by asking you were you

10 on duty February 4, 1999 as a state trooper?

11 A Yes, sir, I was.

12 Q Where were you stationed?

13 A I was stationed out of the Jonestown barracks, which is

14 in Lebanon County, right off of Route 72.

15 Q And in the early evening hours what were your duties

16 and responsibilities at that time?

17 A Well, I was a patrolman.  I was assigned by my corporal

18 to work the western part of Lebanon County, which would be

19 the Hanovers, what we call the Hanovers, north, south, east

20 and west.

21 Q When did you first come upon Mr. Yordy that evening?

22 A Well, I was running radar out on Jonestown Road or 22,

23 and being a trooper in the area for so long, there is areas

24 that you make loops on, and you pull out, you get a violator,

25 you pull out, pull them over, and then you work your way back

1  to where you were sitting prior to.  Well, part of that was

2  going on a section of T-601, which is what everybody has been

3  referring to as Old Jonestown Road.

4  Q     Is that the road that goes past the Thoroughbred Bar

5  that we have heard testimony about?

6  A     Yes, sir, it is, and I go to 743, which was previously

7  testified, and work my way back.

8  Q     Did you have an occasion to go in the vicinity of the

9  Thoroughbred Bar that evening?

10  A     Yes, sir, I did.

11  Q     What did you observe?

12  A     Well, as I was passing the Thoroughbred Bar, a black

13  pickup truck cut me off and headed towards the Harrisburg

14  area, towards Dauphin County.

15  Q     Pulled out in front of you in other words?

16  A     Yes, sir, pulled out in front of me so much so I

17  slammed on my brakes.  I could not believe he did not see a

18  fully marked state car.

19  Q     How far in front of your vehicle was he when he pulled

20  out in front approximately?

21  A     Two car lengths.

22  Q     What did you do at that point?

23  A     I observed his driving, he was all over the road.

24  Q     Can you describe how he was all over the road?

25  A     Well, he was weaving.  He went over the center of the

5

1    roadway, came back, hit the berm.  I think he went over the

2    center about three times and over onto the berm twice.

3    Q    What did you do in response to that?

4    A    I immediately put on my lights.  There was no response

5    to the operator of the vehicle.  I hit my siren.  I still had

6    no response, did not pull over.  A half a mile after I

7    started my lights and siren, we had gone from Lebanon County

8    into Dauphin County, and he finally pulled over once we were

9    through the town of Grantville.  So I basically was behind

10   him the whole time with the lights and siren.

11   Q    You were present in court when we showed the video of

12   the traffic stop.  Correct?

13   A    Yes, sir.

14   Q    And that video camera was placed on your cruiser.  Is

15   that right?

16   A    Yes, sir, I'm trained on that.

17   Q    Okay, where was the video camera placed on your

18   cruiser?  Where in --

19   A    Oh, it's mounted -- it's mounted inside.  Essentially

20   you have to take the mirror off.  They take the mirror off

21   where the mirror is, and they mount it right there where your

22   rear view mirror would be to, so it takes the view, the shot

23   of the center, from the center out.

24   Q    Now according to the scene that we saw in the video the

25   camera was slightly off center.  Do you recall that?

1    A     Yes, sir.  That's --

2    Q     What is the reason for that?

3    A     Well, that's a tactical thing.  What we're taught in

4    the academy is you off center the vehicle to the vehicle in

5    front of you to the left.  What that does is it protects you

6    from possibly anybody else who comes down, sees the lights,

7    at least they'll hit the cruiser first and give you a chance

8    to jump.  That's what I was taught how to do it.  Plus

9    it's --

10   Q     Your vehicle -- let me interrupt you there -- your

11   vehicle is placed slightly to the left of the vehicle --

12   A     Left of center, yes, sir.

13   Q     Left of center, and that's to prevent someone from

14   coming -- you have to get out of your vehicle and walk

15   alongside the car along the road, that would prevent someone

16   from clipping you.  Is that right?

17   A     Yes, it would give you some minimal protection.  It's

18   what I was taught in the academy.  Also it's a tactical thing

19   where what you do is you turn your wheel and in case you get

20   into say a shootout or something, it makes it so you have

21   some protection that you can get back to your car and the car

22   is off center.  If you were straight on, you'd have no

23   protection, but being off center you do.

24   Q     Now we saw on the video that you exited your cruiser

25   and went up and spoke to Mr. Yordy in the pickup truck.

1    Right?

2    A    Yes, sir.

3    Q    Did he cooperate with you in giving you his

4    information?

5    A    Absolutely.

6    Q    What did you observe of him at that particular time?

7    A    I observed that he had bloodshot, glassy eyes. They

8    were a little yellowish in color. He spoke with a slur, had

9    a strong odor of an alcoholic beverage emitting from his

10   person, basically smelled like alcohol or like a beer or

11   something.

12   Q    What did you decide to do at that point?

13   A    I was going to do a field sobriety test based on his

14   driving, based on his, you know, his manual dexterity, the

15   way he was fumbling, he kept fumbling with his cards. That

16   gave me reason to believe that he was drunk.

17   Q    We saw in the video that you took the cards and went

18   back to your car. Correct?

19   A    Yes, sir.

20   Q    Do you recall that?

21   A    Yes, sir.

22   Q    What was the reason for that?

23   A    That's another tactical thing. You pull back so you

24   can have room to do the field sobriety test.

25   Q    Well, before you moved the car back, I mean, you

8

1    stepped away from Mr. Yordy's pickup truck and went back to

2    your car with his cards.   Right?

3    A      Uh-huh.

4    Q      What were you doing with --

5    A      Well, you call it in.   You call in his 27 and his 28.

6    What that is is you call in his driver's record and his --

7    the tag number, and you tell the dispatch that, "I have a

8    possible DUI.   I'm going to be doing a field sobriety test on

9    the individual," and they run him in the computer.

10   Q      And what are they checking for?

11   A      Warrants, wants, stuff like that.

12   Q      Okay, now you mentioned that you backed up your

13   vehicle, we saw that on the video.

14   A      Yes, sir.

15   Q      What was the reason for that?

16   A      Give room, I needed room to do the field sobriety test.

17   On the walk and turn you go nine steps one way and nine steps

18   back.   You need at least two car lengths.   It's preferably

19   tactically on a traffic stop to be within one car length, but

20   once you do field sobriety, you have got to back the car up

21   because there is just not enough room between the front of

22   your car and the back of their car.

23   Q      What do you recall was the first test that you

24   administered to Mr. Yordy?

25   A      I believe it was the one-legged stand.

1    Q    And what is he supposed to do in the one-legged stand?

2    A    On the one-legged stand just -- I have a routine.    I

3    was taught when I first came on the job by --

4    Q    What is he supposed to do on the one-legged stand in

5    order for you to assess --

6    A    Oh, he -- basically you explain to him, "Sir, I'm going

7    to do a field sobriety test on you.    What we're going to do

8    is I want you to listen to me, I want you to watch me.    Do

9    not do anything until I tell you to do it."    It's part of the

10    test, following directions.    "First thing, sir, I'm going to

11    ask you to pick a leg and pick it up off the ground standing

12    at the position of attention.    I want you to keep your leg

13    approximately 6 inches off the ground, knee straight.    I want

14    you to count 1,001, 1,002, 1,003, 1,004, 1,005 all the way up

15    to -- all the way up to 1,030.    If at any time you lose your

16    balance or you put your foot down, please continue the test,

17    bring your foot back up, and then we'll continue the test."

18    Q    Did Mr. Yordy comply with your directions?

19    A    He tried to start early, which is an indicator.    Every

20    time something is done not the way you're supposed to do it

21    or the way you observe it, that's a point.

22    Q    Okay.

23    A    Once you get so high on the point scale, that would

24    determine what his intox- -- how much you would have for

25    probable cause.

10

1   Q      In your opinion did he pass or fail the one-legged

2   stance?

3   A      He failed it miserably.

4   Q      Did you administer any other test to him?

5   A      He tried to do the walk and turn, he also failed that.

6   Would you like me to explain the walk and turn?

7   Q      Well, I think we saw it on the video, but you described

8   that he needs to take nine steps.

9   A      Nine steps forward, then what you do is on the ninth

10  step, you keep that foot there, then what you do is you plant

11  your other foot out and you pivot, you make three small turns

12  pivoting until you are back facing in the opposite direction.

13  At that time you walk nine steps heel to toe backwards or

14  back to where I'm -- where I am.

15  Q      Could Mr. Yordy perform that test?

16  A      No, sir, he could not.

17  Q      At that point in time what was your decision or your

18  intention when he failed those two tests?

19  A      He was going to be taken to Hershey Medical Center for

20  blood.  He was under arrest for DUI.  He was going to be

21  taken to the Hershey Medical Center for blood.  Once the

22  blood test was over, he was going home.  Pennsylvania has a

23  law that says, it's Rule 102 I think under Rules of Criminal

24  Procedure, he goes home, and then he gets charged later on.

25  Q      Okay, did you ever inform Mr. Yordy that he was under

1    arrest for DUI?

2    A    Absolutely.

3    Q    When did you inform him of that?

4    A    I told him -- well, you got to understand Miss Smith

5    arrived after the one-legged stand.

6    Q    I understand, and you asked her to stand off to the

7    side?

8    A    I asked her to step aside, and then I turned my -- I

9    said, "All right, Mr. Yordy, why don't you just stand over

10   there, okay, I'm going to do some field sobriety tests on

11   Miss Smith." And I told him he was under arrest when they

12   were both together. Towards the end there they were both

13   together, and I pulled out my handcuffs, and I had my

14   handcuffs in my hand, and I said, "Mr. Yordy, you're under

15   arrest for DUI."

16   Q    What was your concern about Miss Smith being there at

17   that time while you were administering the field sobriety

18   test?

19   A    It's dangerous. You can't keep your eyes on two people

20   at once. Backup, my backup was 20 minutes away, so it's not

21   like I had a choice on having somebody there, I didn't.

22   Q    Now we saw in the video that Mr. Yordy went to the

23   front of the truck.

24   A    Yes, sir.

25   Q    I think he testified to retrieve his jacket.

1    A    Yes, sir.

2    Q    Do you recall that happening?

3    A    I allowed him to do that because he was cold, and I

4    wanted to keep the -- I wanted to keep the situation as

5    friendly as possible.  I did not want it to go where it went.

6    The idea was I kept him in my sight.  I could see him.  I

7    mean, you know.

8    Q    Now when you -- after you informed Mr. Yordy that he

9    was under arrest, what did you attempt to do?

10    A    Handcuff him.

11    Q    And can you describe for us how you attempted to

12    handcuff him?

13    A    Well, I had had my handcuffs out, and he was standing

14    there with Miss Smith, and I told him he was under arrest,

15    and I turned around to get around him, and that's when she

16    left, she started to leave, and kind of pushed off his chest.

17    Kind of just went like that to him (Indicating) because they

18    were arguing back and forth.  And what I did was I put my --

19    Q    Let me stop you there, your testimony is that Miss

20    Smith pushed off Mr. Yordy?

21    A    Yes, very lightly, very lightly.  You know, it was more

22    of a, you know.  (Indicating.)

23    Q    Okay.

24    A    She was doing that to me, too.  She kept -- she kept --

25    for some reason she just kept touching me every time she

1  talked.  She made me nervous.  She kept trying to get to my

2  side and behind me, and I didn't know what her intentions

3  were, so I kept backing up.  You can see it on video.  I just

4  kept backing up and backing up and changing my position

5  because she would come in where -- she would come in and

6  interfere with me.

7  Q    Now you're attempting to place Mr. Yordy in handcuffs?

8  A    Yes, sir.

9  Q    And you were describing for us how that took place.

10  A    Well, she did that and started to leave, and when she

11  started to leave, I went like this.  (Indicating.)  I had my

12  handcuffs in my right hand.  Mr. Yordy saw my handcuffs.

13  Q    Did he say anything to you at that point?

14  A    No.  I said, "Sir, you're under arrest.  We're just

15  going for blood.  Don't let this escalate."  Because they had

16  gotten into an argument.  They were arguing.

17  Q    Okay.

18  A    And when she did that, then she left.

19  Q    What happened when you attempted to place the handcuffs

20  on Mr. Yordy?

21  A    Well, I grabbed -- I grabbed his wrist because that's

22  where the handcuffs go, and he started pulling away.  So I

23  tried to turn his wrists so he couldn't -- so he couldn't

24  pull away.

25  Q    And what happened?

1    A    I tried to put the handcuff on his wrist.

2    Q    Did he say anything to you at that point?

3    A    Yes, sir, he did.  I didn't know at the time but he

4    said, "I'm not letting you fuckers do this to me again."

5    Q    Okay, were you able to put the handcuffs on Mr. Yordy?

6    A    I'm sorry, I misquoted, "I'm not letting you fucking

7    staties do this to me again."

8    Q    Were you able to put the handcuffs on Mr. Yordy?

9    A    No, sir, I was not.

10    Q    Why was that?

11    A    He kept resisting arrest.  You know, I tried to pin him

12    up against the back of the pickup truck, and I tried to --

13    I'm giving verbal commands.  In the use of force that we went

14    into before, verbal commands are essential to the use of

15    force.

16    Q    What are these verbal commands that you're giving to

17    Mr. Yordy?

18    A    Relax, knock it off, don't let this escalate, don't be

19    an asshole, I swore.

20    Q    Did he desist?

21    A    No, he kept resisting arrest.

22    Q    Now we saw in the video at some point that you --

23    A    I was trying to wrestle with him --

24    Q    I understand.

25    A    -- until he punched me.

1    Q    When did he punch you?

2    A    He punched me at the back of the truck when we were

3    just about to go down, and he essentially -- I don't know if

4    we tripped or he tripped me or what, but we went down, and he

5    --

6    Q    And how did you land on the ground?

7    A    Me on the bottom, him on the top, and he was in a rage.

8    I mean, he was just --

9    Q    Okay, hang on a second, that's what happened off to the

10   side of the truck on the video.  Right?

11   A    Yes, sir.

12   Q    The two of you were on the ground?

13   A    Yes, sir.

14   Q    Can you describe what was going on at that point in

15   time when you were on the ground?

16   A    I, you know, I called him an f'ing asshole.  He's --

17   he's growling.  The man was out of control.  He was growling

18   like an animal at me.

19   Q    What did you do in response to his behavior?

20   A    I tried to get up, I tried to get off because we were

21   fighting.  He's throwing punches, and I was taught by my dad

22   to -- my dad took some boxing when he was in the navy.  There

23   is a maneuver called, and he taught it to me, it's called the

24   turtle maneuver.  Okay.

25   Q    Can you describe what you did in this maneuver?

A     Well, what you do is they can hit you on the top of the
head and they're not going to hurt your head because of this
big bone, so you basically go down like this.  (Indicating.)
You protect your face.  So he was punching me in the sides.
He was punching me here, (Indicating) you know, and I was
protecting my head, and when I got the opportunity, that's
when I (Indicating) and broke his nose.  And that was the
time that I was able to, once I punched him in the nose, I
kicked him in the groin and spun him, and we just wrestled
around.  I mean, we wrestled, we fought.

Q     And what was your intention, what was your purpose in
using the force that you used on Mr. Yordy on the ground?

A     My God, to survive.  The man was out of control.  I
didn't know -- I couldn't control him.  I wanted to get home
to my wife and my kids, and that's the only thing I was
thinking about.

Q     Now there came a point in time when, as we saw in the
video, where Mr. Yordy got up and went back to the driver's
side of his truck.  Right?

A     Yes, sir.

Q     What did you do when you saw Mr. Yordy get up?

A     Well, during the wrestling match, fight, I had gotten
on top of Mr. Yordy, and we were basically he was facing me,
I was facing him, and I had -- I wrestled in high school.  I
got my legs locked into his legs and sprawled him out.  And

1    I'm trying to grab his arms, and the man is a strong man.

2    Q    Okay, but what did you do when he started to get up?

3    A    Well, he started to get the better of me again, and I

4    was exhausted.  At that point I was just totally exhausted.

5    I pushed off of him.  I made the decision to push off of him

6    and go down a level to pepper spray.  I have seen that pepper

7    spray work on people before.  You hit them with the pepper

8    spray, it's over.

9    Q    Okay.

10    A    It's over.

11    Q    When you say you went down a level, what do you mean by

12    that?

13    A    Well, the use of force continuum has several levels,

14    going the least amount of force to deadly force, and I had

15    gone from this use of force of telling him you're under

16    arrest, and he escalated it to fisticuffs, which is up here,

17    (Indicating) to basically what I said in the testimony, an

18    ass-kicking contest.  That's what it was.  He was trying to

19    beat the hell out of me, and I wasn't about to let it happen.

20    Q    Okay.

21    A    But I decided below the fisticuffs is pepper spray.

22    Usually what happens is you go from verbal command to pepper

23    spray to physical wrestling with the individual or fighting.

24    Q    Right.

25    A    And then from there you go to the asp baton and then

1   you go -- which is a big metal stick, to use of deadly force,

2   which is your weapon.

3   Q    When you took it back to the use of the pepper spray,

4   what was your intention at that point?

5   A    To stop, to just stop his action, to stop it and get

6   him handcuffed, take him in and in three hours go home at the

7   end of my shift.

8   Q    When you saw him moving towards the driver's side of

9   his pickup truck, we saw in the video that you were spraying

10  him with pepper spray, what was your intent at that point?

11  A    To get him to stop and keep him from driving.  That's a

12  4,000 pound vehicle.

13  Q    We saw he was able to get into the truck despite your

14  pulling him, and what happened at that point?

15  A    Um, I tried to keep him out of the truck.  There were

16  two dogs in there.  They kind of looked like Huskies, but

17  they weren't, they were a smaller breed, but they kind of

18  looked like Huskies.  And when I had gotten in to pull him

19  out, one of the dogs grabbed a hold of my jacket, didn't bite

20  me, just grabbed my jacket to let me know it was there.

21  That's when I stepped back and Mr. Yordy got totally in the

22  vehicle.  Well, I reached in with my left hand, I had my

23  right hand in there, you know, and I started -- I finished

24  the pepper spray on him as I was turning the key off.  I went

25  -- I went between where the steering wheel is and the

19

1   dashboard, and I went between there and reached up over and

2   shut the vehicle off.  I tried to pull the keys out, but the

3   keys wouldn't come.  It has one of those -- it's one of the

4   newer cars that has the lock, the key lock.  I don't have a

5   Ford, I don't know -- I didn't know how to take it.

6   Q     So you couldn't get the key out of the ignition.

7   A     I could not get the key out of the ignition.  If I had

8   the key out of the ignition, I would have backed off.

9   Q     What did Mr. Yordy do at that point?

10  A     What's that?

11  Q     What did Mr. Yordy do at that point when you turned the

12  car off?

13  A     He turned it back on and took off, and he was holding

14  onto my arm.  He had my arm pinned inside the vehicle.

15  Q     What did you do at that point?

16  A     At that point I decided I got to get this vehicle

17  stopped, I wanted to live.

18  Q     What did you do?

19  A     Pulled my service weapon, I shot out the back tire.  I

20  didn't know it at the time, I was told later on, I had made

21  contact with it.

22  Q     Did that stop Mr. Yordy's truck?

23  A     No, it did not stop him.  I then decided to take his

24  life.

25  Q     You pulled your weapon up towards Mr. Yordy?

1    A    Yes, sir, I did.

2    Q    What did he do at that point?

3    A    He saw the gun, he looked right at me, and he let go of

4    me.

5    Q    And is that the point that you fell off the truck onto

6    the pavement?

7    A    Yes, sir, I did.

8    Q    Now we saw in the video that there was a period of time

9    where you were on the pavement and not moving.  Do you recall

10   that at all?

11   A    No, sir.  The only -- after I hit my head I don't

12   recall very much.  I remember being in the ambulance briefly.

13   I really don't remember the hospital other than the

14   commissioner coming to visit me the next morning, and then I

15   went home.

16   Q    Okay, up until the point that you attempted to place

17   Mr. Yordy under arrest had there been any bad words between

18   the two of you, any kind of altercation up until that point?

19   A    Before what, before I tried to put handcuffs on him?

20   Q    Yes.

21   A    No, it was cordial.  I had absolutely no reason up

22   until that point to even suspect he would have resisted

23   arrest.

24   Q    Okay, so up until that point in time everything was

25   cordial?