A Everything was fine.

Q Courteous?

A Absolutely.

Q The point that you had told him that you were placing him under arrest was when he began to resist?

A Yes, sir.

MR. NEUHAUSER: Nothing further at this time, Your Honor.

THE COURT: All right, thank you, Mr. Neuhauser.

Jurors we're going to take a short break here for our court reporter and come back at twelve o'clock and then we'll go until our regular lunch hour.

Miss Kennedy, would you escort the jury please.

(The jury left the courtroom at 11:49 a.m.)

THE COURT: We'll be in recess until twelve o'clock.

(A recess began at 11:50 a.m. and the case continued at 12:00 p.m. in chambers.)

THE COURT: A new issue for you gentlemen, so sit down. I don't have any familiarity with any of the parties in this case, but it occurred to me last night after I went home to check what is on my kitchen table as a pending traffic ticket involving my daughter, and it turns out that one of the defendants has written that ticket, and it is pending. It was interesting to me, I don't -- her father is

handling it for me, so I haven't paid much attention to it, but we got a notice in the mail or she got a notice in the mail the other day continuing it, and I called him and said, "Why is this getting continued? How are these things happening?" He said, "Well, I'll look at it. It's usually the officer continues it."

MR. NEUHAUSER: You called who?

THE COURT: I beg your pardon?

MR. NEUHAUSER: You called who?

THE COURT: The child's father --

MR. NEUHAUSER: Okay.

THE COURT: -- who has done some defense work, so he's handling it.

MR. NEUHAUSER: I understand.

THE COURT: But, in any event, when I looked at it last night, it sort of came together that the case got continued by one of the officers because he's here, so I wanted you to know about that.

MR. LAPPAS: Which officer was it?

THE COURT: It's Officer Steager.

Now, I don't expect you to answer now because it's not fair to put you in that position, I think when there is -- the law requires that the judge disclose any information that could lead to -- lead a reasonable person to believe that he or she is biased or prejudiced in the case and then

give the parties an opportunity to request recusal of the judge and to do it without the judge knowing which one has requested that. So I'll give you an opportunity to do that.

In the normal course these things occur not in the middle of trial, and we --

MR. NEUHAUSER: This is a first.

THE COURT: Actually this is the second. We had been trying a case a few weeks ago involving a lawyer who's now associated with a lawyer who's suing me in federal court, and I recuse on all of his cases, but I didn't know until we were in the middle of picking a jury of that association. So I gave the lawyers an opportunity to discreetly exercise their options, and one of them did opt to ask that I be removed from the case. Conflict or potential conflict was not waived.

So just to keep things moving, what I will do here is go ahead and finish up with Trooper Brown, and then I will -- Miss Kennedy will give you a written disqualification form which you will execute and return to the clerk's office. She does not even see them, only Gary Hollinger, the deputy clerk, receives those, and then we'll know where we are. But I wanted you to know about this.

MR. NEUHAUSER: Thank you.

MR. LAPPAS: Well, good luck to your daughter on the traffic violation.

THE COURT: This is a first in our family. I got one the other day for an expired inspection sticker, but this is our first speeding violation, so --

MR. LAPPAS: Okay, very well.

MR. NEUHAUSER: Thank you, Your Honor.

(The discussion in chambers concluded at 12:04 p.m. and the case continued in the courtroom at 12:08 p.m.)

THE COURT: Mr. Lappas.

MR. LAPPAS: Thank you, Your Honor.

(Scott Allen Brown continued as the witness.)

CROSS EXAMINATION

BY MR. LAPPAS:

Q Mr. Brown, is there any medical or psychiatric reason why you feel you're not able to testify or testify truthfully today?

A Not that I know of.

Q Would you acknowledge that as of February 4, 1999 you had a violent temper?

A Since when?

Q On February 4, 1999 that you had a violent temper?

A No.

Q That's your testimony?

A Yes, sir.

Q You have filed a -- you contend that as a result of hitting your head on February 4, 1999 you suffered mental

injuries. Correct?

A Yes, sir.

Q You told Mr. Neuhauser yesterday that it was your belief that you had a closed head injury. Correct?

A Yes, sir.

Q And is it your belief that this closed head injury causes violent mood swings in your behavior?

A Not violent, sir, but mood swings, yes.

Q Mood swings, and it also affects your memory, does it not?

A Yes, sir, it does.

Q And because of these closed head injuries that you claim to have sustained, you are taking various kinds of medication. Correct?

A Yes, sir, I am.

Q Do any of those medications interfere with your ability to either control yourself or to testify properly?

A If I understand your question correctly, it's no.

Q Well, I'll break it down, do any of these medications that you are taking now prevent you from being able to control yourself, not -- specifically your anger?

A No.

Q Do any of these medications prevent you from being able to testify appropriately?

A No.

Q Were you taking any kind of psychiatric medication on February 4, 1999?

A No.

Q That is not true, is it?

A No, it's not. It is true I don't --

Q It is true?

A I was not taking any medication at the time.

Q All right, what I would like you to do is open the binder that contains your medical records. I'm going to give you the number in a moment. It is Binder No. 3, Plaintiff's Binder No. 3, and I want you to turn to Exhibit Tab 13. Have you found that?

A Yes, sir.

Q And do you recognize that these are documents which purport to be your medical records from an admission at the Hershey Medical Center?

A Yes, sir, they do.

MR. LAPPAS: Your Honor, may I approach the witness to point to a particular page?

THE COURT: You may.

MR. LAPPAS: I apologize, Your Honor, these should have been numbered.

BY MR. LAPPAS:

Q Mr. Brown, I'm going to show it to you in another binder in which I can easily find it, and then I will find it

for you in this one. When you went to the hospital, you spoke to nurses as you were being admitted. Do you remember that?

A I don't remember anything about the hospital, sir.

MR. NEUHAUSER: Excuse me, Your Honor, may I have a reference?

MR. LAPPAS: Oh, I'm sorry, I apologize.

(Mr. Lappas and Mr. Neuhauser spoke off the record.)

BY MR. LAPPAS:

Q Do you remember telling the people at the Hershey Medical Center on February 4, 1999 that you were taking Prozac and had taken it on February 4, 1999?

A Sorry, I don't recall that. I don't recall anything that happened at the hospital.

Q Is it true that you were taking Prozac on February 4, 1999?

A I don't believe so. I have taken it in the past, but I don't believe it was during that time frame. My wife would be better to tell you.

Q Well, in light of your testimony a moment ago that you were not taking any sort of psychiatric medication --

A To my knowledge. I took it in the past for depression.

Q I understand. I'm going to show you a nursing note, admission nursing assessment, --

A Yes, sir.

Q -- for February 4, 1999, time 23:50 hours, Scott Brown.

A Where do you see that?

Q (Indicating.)

A Oh, up here.

Q Okay, it indicates Prozac dosage 30 milligrams. Frequency OD and then last taken 2-4-99. Do you see that?

A Yes, sir, I do see that.

Q Do you remember giving that information to the people at the hospital?

A No, sir. I told you again, I don't remember anything from the hospital.

Q And you don't remember whether or not you were in fact taking Prozac or any other psychiatric medication on February 4, 1999?

A I do not recall, I'd have to refer to my wife.

Q From 1996 into 1999 were you being treated for any anger management problems?

A No, depression due to marital problems and my daughter. My daughter was born with a disability, I had a hard time dealing with that.

Q I'm specifically asking you about anger management problems. Were you seeing a psychologist for anger management problems?

A I was seeing a psychologist, yes, but not for anger.

Q And that was a Dr. Walker?

A Yes, sir.

Q And when you saw Dr. Walker, did you frequently tell him that you were having problems with handling your anger because of work related matters?

A No, not having problems handling my anger. I had depression due to my job.

Q So you would deny that between '96 and '99 you reported to Dr. Walker that you were having anger related problems due to work matters?

A No, not to my knowledge. I saw him again for marital situations.

Q Specifically on December 2, 1997, for example, did you tell Dr. Walker that you were angry because of some action at work?

MR. NEUHAUSER: Your Honor, I'm going to object at this point, relevance, two years before the incident.

THE COURT: Sustained.

MR. LAPPAS: I'm sorry, did you say sustained?

THE COURT: Sustained.

BY MR. LAPPAS:

Q Well, then closer in time to the incident, closer in time to February 4, 1999, did you consult with Dr. Walker or any other practitioner relative to problems with your anger management?

A No, sir, at that point I had stopped seeing Dr. Walker due to his affiliation with the state police.

Q You continued to see him until February 12, 1999, did you not?

A I don't recall the dates.

Q With respect to the incidents of February 4, 1999 I want to direct your attention to that part of your testimony that deals with what happened when you went to the side of the pickup truck after Mr. Yordy had reentered and after you sprayed him with pepper spray. Do you remember that part of your testimony?

A Yes, sir.

Q Now you stated that you reached into the truck, if I understand you correctly, you reached into the truck to pull him out and your sleeve was nipped at by one or more dogs?

A Yes, sir.

Q And where were these dogs?

A In the cab.

Q Does that truck have a super cab with a front and back seat?

A No, it has, if I remember correctly, just a regular cab.

Q And the ignition would be on the right side, the ignition key lock would be on the right side of the steering column?

A Yes, sir.

Q All right, so your testimony is you reached in with one of your hands to pull Mr. Yordy out and was -- you were nipped at by these dogs. Is that correct?

A No, sir, I think you have that backwards. First, we had wrestled at the side. I was pulling his jacket. He got in, I -- that's when I tried to grab him out and the dog nipped me.

Q All right, let's --

A I then retreated, and he got in, and that's when I reached in through the window.

Q Let's talk about the biting dogs again.

A Yes.

Q At what time were you -- what were you doing when the dogs bit you?

A Wrestling with Mr. Yordy, trying to pull him out of the cab.

Q So he was in the cab, you reached in to pull him out, and the dogs bit you?

A We were both kind of half in the cab, I mean, we were right at the door.

Q The dogs never came out of the truck?

A No.

Q And there were two of them --

A If I recall correctly, yes.

Q -- on the front seat of a regular pickup truck, and the pickup truck had no back seat?

A Yes, sir. They were small dogs. Like I had testified, they were like Huskies but they weren't, they were small.

Q And then you reached in with your left hand to reach for the key, --

A Yes, sir.

Q -- ignition key? How did you know the key was still there?

A I just assumed it. I saw -- actually, no, I'm sorry, I take that back.

Q I don't want you to assume. I want you to tell me how you knew the key was there.

A He had tried to start it, and started it, and the vehicle jumped, and that's when I shut it off and tried to pull it out.

Q So your testimony is that he had started -- the car was turned off, you're standing by the side of the car, he starts it up, and only then did you reach in for the key?

A No, simultaneously as he was trying to start it. The keys were in the ignition.

Q My question is how did you know that?

A I don't recall, I just know they were.

Q Well, you hadn't seen them.

A I just know they were.

Q You hadn't seen them there, had you?

A I don't recall, I just remember knowing that they were there.

Q But you can't tell us how you knew that?

A Possibly I saw them, I don't recall.

Q Have you ever -- in all of the testimony, you said yesterday you have testified over the years in very many cases, have you ever testified to your knowledge that you saw the keys in the ignition?

A I don't recall.

Q Do you remember telling the nurse the information that we elicited from Trooper Caruso that your true reason in reaching into the Yordy vehicle was to grab or restrain Mr. Yordy?

A That's part of what I was doing, sir.

Q Well, but --

A I was trying to restrain him and keep him from driving away.

Q Well, but were you trying -- you had your left hand on the keys and your right hand on your gun.

A No, I had my right hand on Mr. Yordy.

Q You had your right hand on Mr. Yordy?

A Well, first I had it on the pepper spray, and when that -- when that exhausted, that's when I threw it down.

Q Right.

A And I came back in to hold on him,--

Q Uh-huh.

A -- and that's -- at that point when he got started again is when I went for my weapon. But he had started it for the second time when I went for my weapon.

Q I see, so it's your testimony that instead of -- as he was grabbing at you to pull you down the road, instead of grabbing your right hand which is right on him --

A No, it was on my gun at that point.

Q Well, you said you had your right hand on him and your left hand on the keys.

A Yes.

Q Instead of grabbing your right hand, which is actually right on him, he decided to reach around the steering wheel, grab at your left hand. Is that your testimony?

A He didn't reach around, no, that's not my testimony, sir. What my testimony is is I had started to reach for my weapon when I saw that he -- it started. It was a split second. I saw him start the car. I knew he was going to start it again.

Q You knew he was --

A He had -- as he was --

Q You knew he was going to start it. How could you know he was going to start it?

A Because I observed his right hand going back for the

keys.

Q You testified you didn't know the keys were there until his hand moved towards the ignition switch.

A That's not what I testified to, sir, you need to go to the court reporter. What I testified to was that he had started the vehicle already once. You can assume that the keys were in it if he had started the vehicle once.

Q He started the vehicle once and then --

A And I shut off the keys, I shut off the ignition. With the key in the ignition he had started it. The key was in the ignition when I shut it off.

Q So the reason the keys --

A I tried to pull --

Q Go on.

A I tried to pull the keys out, the keys were locked in the ignition. I could not pull them out.

Q The reason you knew the keys were in the ignition was because you had seen him start the car once before?

A Yes, that's when I reached in.

Q I see.

A You can review the videotape if you watch it.

Q You don't honestly believe that the videotape shows you reaching for keys to the car.

A No, I think the videotape shows the transition. It shows the time line that you're trying to --

Q You --

A -- that you're trying to put forth.

Q Do you believe that the videotape shows your hand in the car reaching for the keys?

A Not in the car, it shows where my position was at the time.

Q So --

A It shows me throwing the pepper spray down.

Q -- your testimony is that you reached your left hand in the car --

A Uh-huh.

Q -- between the steering wheel and the dashboard. Correct?

A Yes, sir.

Q Then down over the steering column and back to where the ignition switch is. Is that correct?

A It's more like just over, like that. (Indicating.)

Q Okay, that's your left hand. Your right hand is restraining Mr. Yordy?

A I had him by the jacket I believe.

Q And then when you saw him --

A But this is through the window, sir, this is through the window.

Q Oh, I know, the door is closed. When you saw him turn the ignition, you released your hold on him and went for the

gun. Is that your testimony?

A The second time he started the vehicle, not the first time.

Q You're reaching over the steering column.

A Uh-huh.

Q You're reaching for the keys.

A Yes, sir.

Q In fact you actually had your hands on the keys because you knew that they were locked in the ignition lock.

A Yes, sir.

Q You have your right hand on Mr. Yordy.

A I had the pepper spray at first, then dropped the pepper spray, grabbed him, grabbed him.

Q Okay, and then Mr. Yordy turns the ignition key from off to on. Right?

A For the first or second time, sir?

Q At the time that you had him by the jacket, at the time that you reached in -- your testimony, as I understand it, is that you reached in because you knew the keys were there. The reason you knew the keys were there was because he had already turned the car on the first time.

A Yes, sir, so now you're talking about the second time.

Q You grab him by the jacket?

A Yes, sir.

Q One hand on the ignition?

A Because I had shut it off.
Q One hand on the jacket. Right?
A Yes, sir.
Q Did you say you shut it off?
A The first time he started it and the vehicle jumped, yes, I shut the vehicle off. That's why it jumped.
Q So then did he put his hand -- you had a hold of the keys in order to shut them off?
A Yes.
Q Because he put his hand on top of yours to reignite it?
A Yes, sir.
Q He did?
A And when he started it for the second time, he had it on, and I -- that's when I tried to get out, and I went for my weapon.
Q You released his coat?
A I released his coat. He had -- he had the ignition. I reached for my weapon and tried to pull my arm out, and that's when he pinned it with his left arm. (Indicating.)
Q Which arm did he pin, you're demonstrating your left arm.
A Yes, sir. With his left arm, (Indicating) pinned it right on the armrest of the door and pinned it there and took off. And at the same time, at the same time --
Q Excuse me, we're getting away from my question.

A Okay.

Q At one point you've got your left hand on the ignition switch, you have got your right hand on Mr. Yordy. Right?

A Yes, sir.

Q What were the dogs doing?

A I don't know.

Q You have two dogs in the truck that nip at you because you come to the door, and your testimony is you're leaning with both arms and hands in the truck, your left hand way past the steering column on the ignition, your right hand grabbing their master, and these dogs are just doing nothing. Is that your testimony?

A That's not my testimony.

Q Okay.

A I'm sure the dogs were doing something, sir, but I was more interested in what was going on --

Q Were the dogs attacking you was the question.

A -- with Mr. Yordy. What's that?

Q Were the dogs attacking you at this point is the question.

A I don't recall.

Q You don't recall?

A No, sir, I don't recall. I don't think they were. I don't think they were.

Q Is the reason you don't --

A Mr. Yordy was sitting in the seat.

Q Is the reason you don't recall because of the memory problems you have been having?

A No, sir, I was concentrating on Mr. Yordy and making sure I got Mr. Yordy under arrest.

Q You were concentrating on Mr. Yordy to the extent that you would not remember whether or not you were attacked by two dogs?

A I was wearing a heavy jacket. All I remember is that the dogs were small, they were just like Huskies but they were smaller, and only once did I realize that they were even in there when they were rip -- they had grabbed a hold of my jacket and tugged at my jacket, that's why I retreated.

Q You started to say they ripped your jacket. Isn't that what they did the first time?

A I don't recall.

Q Well, because you don't recall I'm going to ask you to turn to a statement that you made to a Corporal Mrgich and a Trooper -- I believe his name is Trooper Oberdorf. Do you remember speaking to those gentlemen on March 23, 1999?

A Internal affairs, is that what you're talking about?

Q I didn't ask you to identify their work assignment. I asked you if you remember speaking to them on that date.

A I remember speaking to two individuals, state policemen who were internal affairs, which I assume you were speaking

of. I don't know their -- I don't recall their names.

Q All right, look at Yordy' Binder No. 3, Exhibit 11. Have you found that?

A Yes, sir.

Q Exhibit 11 has a number of attachments to it. They are numbered. I want you to turn to page 87 of Exhibit 11, which is part of attachment No. 10.

A Okay, wait a minute, you want me to go to a different attachment now?

MR. LAPPAS: May I, Your Honor?

THE COURT: Please.

THE WITNESS: You want me to go back to attachment 11?

THE COURT: He will assist you.

THE WITNESS: Thank you.

BY MR. LAPPAS:

Q Now if you need to turn back a few pages, please do. I want you to acquaint yourself with this exhibit and determine that this is a transcript of a statement which you gave to Corporal Robert Mrgich and Trooper Jerry Oberdorf on March 23, 1999.

A Yes, sir, it is.

Q All right, and again without saying why you spoke to them, would you agree that the subject of conversation was the events that took place on February 4, 1999 between you

and Mr. Yordy?

A Yes, sir. Yes, sir.

Q All right, now turn to page -- it's page 4 of this statement. There is also an inked number at the bottom that says 000087.

A Uh-huh.

Q Have you found that page?

A Yes, sir, I did.

Q All right, now almost exactly halfway down the page there is a line that starts with the word uh, u-h. Please find that.

A Have it.

Q This statement reports that you said -- we're going to start about halfway through this line: "I remember grabbing him, I remember the dog coming at me and actually grabbing my uh, my jacket and uh, I should have brought my jacket but there is a hole in my jacket ..." Do you see that?

A Yes, sir.

Q All right, so does that refresh your recollection as to whether this dog tore your jacket?

A Yes, sir.

Q It did tear your jacket?

A It put a hole in it.

Q With its teeth?

A Yes, it was a small hole.

Q So this dog that put a hole, large or small, in your jacket by biting at you a moment ago is now doing nothing that you can remember while you have both hands in the car, one on the ignition and one on its master. Is that really the testimony you'd like to leave with this jury today?

A Yes, sir, I was fighting. There was a lot going on.

Q Right, do you know an individual by the name of Lieutenant Francis H. Grolemund?

A No.

Q You do not know an individual by the name of --

A Maybe by sight but I don't recall the name Francis. If I knew what he looked like, I might know him. There is over 4,000 of us.

MR. LAPPAS: Your Honor, this relates to the matter which we discussed with the Court earlier and requires me to distribute Exhibit Binder 4.

THE COURT: Thank you.

THE WITNESS: Thank you.

BY MR. LAPPAS:

Q I want you to turn to Exhibit 23 in this exhibit binder, review it silently and tell me if this refreshes your recollection as to whether you know Lieutenant Francis H. Grolemund, Jr. from Troop "S", Milesburg of the Pennsylvania State Police.

A Oh, yes, it did. It does, it does refresh my memory.

This was prior to the interstate being dissolved. At the time I was a patrolman on the interstate in York.

Q Your testimony is --

A That troop is no longer around.

Q You did not immediately recognize the name Lieutenant Grolemund because of the reorganization of Troop "S"?

A Yes, sir. Yes, sir, he was the last commander of Troop "S".

Q I see, and one of his duties, I take it, was to speak to you on May 8, 1997 relative to an investigation that he was conducting. Correct?

A Yes, sir.

Q And on that -- during that investigation he asked you to provide certain information concerning a matter that he was investigating, a matter that involved you. Correct?

A He wasn't investigating, sir. He was the disciplinary.

Q You could call it an investigation, an inquiry, an examination, he was doing something which required him to obtain information from you involving a matter that related to you. Correct?

A No, sir.

Q No.

A He was the basic -- he was my commanding officer. It wasn't his job to do the investigation. I believe, I'm not really sure who did this investigation, but I know it wasn't

him. He's -- he was the commanding officer. It wasn't his job to do the investigating.

Q Still with Exhibit 23, is there an officer listed in block 3, in the top right-hand corner, an officer who indicated he was, quoting here, the investigating officer?

A Yes, Lieutenant Francis Grolemund, Jr.

Q All right, so let's talk about investigating officer Lieutenant Francis Grolemund. Isn't it true that during the course of his investigation involving an incident relating to you --

A Uh-huh.

Q -- you provided him with intentionally false information?

A Not that I recall.

Q You do not recall telling him, quoting from this report --

A May I read it?

Q Oh, I thought you had. You may certainly read this entire report, yes, sir.

A Thank you. (Witness reading.) I now remember this incident.

Q Do you now remember that during the course of Lieutenant Grolemund's investigation of you and your conduct you provided him, intentionally provided him, you lied to him, you intentionally gave him false information?

A Yes, sir, I did.

Q And do you now remember that you stated to Lieutenant Grolemund that the reason you lied about an investigation into your affairs was to avoid getting into trouble?

A I don't recall using that language, no.

Q Do you remember that that is the reason you lied to him?

A I lied to him because I didn't want to get disciplined for swearing. I used foul language.

Q You lied to him to avoid being disciplined?

A Yes, sir.

Q Is that what you just said?

A Yes, sir.

Q Do you know whether or not the Pennsylvania State Police regulations allow you to lie to senior officers --

A No.

Q -- if you choose to do so?

A You're not allowed to, and I was disciplined for it.

Q I want you to look in that same binder, Binder No. 4, at Exhibit 26. Now I do not want you to identify this, I just want you to look at it. I don't want you to say out loud what it is at this point.

A Okay.

Q I would just like you to look at it and tell me if you know what it is.

A Please give me a second to read it.

Q Certainly.

A (Witness reading.) Yes, sir, it's relative to what you just told me before, the previous thing we talked about.

Q The previous matter that we discussed concerning your lie to Lieutenant Grolemund?

A Where I fibbed, yes.

Q Fibbed?

A Yes, that's what it was, omission, fib. It wasn't an out and out lie, it was an omission.

Q It was an omission?

A It was an omission, I didn't tell him, and I should have said that I called the person a mother fucker.

Q Lieutenant Grolemund states that you told him that you intentionally and deliberately lied in order to stay out of trouble. Is that true or not?

A That's not true, I omitted telling him the truth.

Q I see. Well, now that you have examined Exhibit No. 26, you recognize it, you know what it is?

A Yes, sir, I do, sir.

Q All right, do you remember that you gave a sworn deposition in this case, testimony under oath, at my office on January 18, 2002?

A I do remember us meeting, yes. I don't recall the exact date but --





Q Do you remember that we did more than meet, that you were asked questions under oath and you gave sworn testimony?

A Oh, yeah. Yes, sir.

Q And do you remember that at the time of that deposition we discussed the matters contained in Exhibit 26?

A I believe we did touch on that, yes, sir.

Q Yes, now I want you to look at Exhibit Binder No. 1. Please keep that one open to Exhibit 26.

A This one right here.

Q No. 4, please keep that one open.

A Okay.

Q Then open Binder No. 1 to Exhibit 1.

A Okay.

Q Do you recognize that as a transcript of your sworn testimony on the day of January 18, 2002?

A That's what it does look like, sir, yes.

Q Turn to page 19.

A Yes, sir.

Q At the top of page 19 starting with the word however, read that paragraph to yourself.

A Just the top one?

Q Yeah.

A (Witness reading.) Yes, sir.

Q All right, will you agree that at that point at your deposition that you were testifying about the decision that I

directed your attention to a moment ago, Exhibit 26?

A Oh, no.

Q Oh, no?

A No, sir.

Q You will not agree to that?

A No, I will not agree to that. There was three arbitrations, and --

Q Turn back --

A -- I was referring to the other one, the heart and lung issue.

Q Excuse me, I want you to turn back to page 17 where we start talking about what you have now said to be an arbitration decision.

A Seventeen.

Q Now again I don't want you to give any details about what the incident involved or --

A Okay, okay.

Q -- what was involved, but I want you to look at page 17 or really at any other page of this deposition transcript that you need to in order to identify the matter that we were discussing at page 19.

A I'm fully aware of the incident in which we talked.

Q All right, starting about two-thirds of the -- well, actually on line 20 of page 17 there is an individual's name. Without telling me what that name is, does that help you

recognize --

A Absolutely, sir, but there were three arbitrations that arose from this one incident.

Q Turn to --

A You're twisting it around.

Q Am I?

A Yes, sir, I was referring to the heart and lung issue, not this one right here.

Q Heart and lung is a kind of workers' compensation program that covers Pennsylvania State Police troopers, is that correct, and other --

A Yes, sir, when we get hurt --

Q -- and other police officers?

A -- on duty.

Q And heart and lung is something that applies without regard to who's at fault for a particular incident. Correct?

A I don't know, I'm not a lawyer.

MR. LAPPAS: Your Honor, it actually might take some time to go through this with the witness, would you like to break for lunch now? May I ask that the witness over the lunch hour examine his deposition testimony and the exhibit that I have referred him to to facilitate the continued cross examination.

THE COURT: I invite you to do that.

THE WITNESS: Yes, ma'am, I will.

THE COURT: Thank you.

All right, jurors, we're going to break now for lunch. I'm sure you are all getting hungry, I know our court reporter is. We'll be back at two o'clock.

Miss Kennedy, would you escort the jury please.

(The jury left the courtroom at 12:50 p.m.)

THE COURT: Mr. Lappas, if you will stay close by, I have a document to give to counsel --

MR. LAPPAS: Absolutely, Your Honor, I will not leave the courtroom.

THE COURT: -- forthcoming.

We'll be in recess.

(A recess began at 12:51 p.m. and the case continued at 2:10 p.m.)

THE COURT: Mr. Lappas.

MR. LAPPAS: Thank you, Your Honor.

(Scott Allen Brown continued as the witness on cross examination.)

BY MR. LAPPAS:

Q Mr. Brown, do you still have those two exhibits available to you?

A Yes, sir, I do.

Q All right, I want you to turn to Exhibit 25.

A Which book?

Q I'm sorry, 26, it's in Binder 4.

A Okay, I'm there.

Q And I want you to read to yourself silently the second to the last paragraph on page 4 of that exhibit starting -- it starts with the word on April 30.

A Got it. (Witness reading.) Yes, sir.

Q All right, does that help you identify the issues that this particular report dealt with?

A Yeah, I do.

Q All right, and you're familiar with those issues. Correct?

A Yes, sir.

Q And with the incident that was involved?

A Oh, yeah.

Q All right, now I'm going to ask you to turn to Exhibit 1, which is your deposition. It's in Binder No. 1.

A Okay.

Q And turn to page 18 of that exhibit, --

A Have it.

Q -- line 15. The question is -- starts with the word so. I want you to read that question and answer to yourself silently.

A Yes, sir, got it.

Q All right, now that being the case, will you now acknowledge that both of these exhibits deal with the same incident and the same matter?

A I already said that, but it's not -- you wanted me to say that I was referring to that in my testimony. I was not referring to that, I was referring to the other arbitration.

Q All right.

A But they are -- I understand what you just said connects, but it --

Q Both deal generally with the subject involving 10 days. Correct?

A Yes, sir.

Q All right, both deal with a decision that someone made. Correct?

A No, this one deals with a decision, that one doesn't, that was my testimony. One is my testimony; one is a decision.

Q Do you acknowledge that in your testimony in Exhibit 1, specifically at pages 18 and 19, you are attempting to describe the decision that appears as Exhibit 26?

A No, I was not.

Q You were not.

A If you look in here, it says he felt, his findings, he found, and if you look at the beginning, the name of the arbitrator was a woman.

Q I know that.

A If I was referring to this specific decision, would it not have said she, her? I was not referring to this

decision.

Q So your testimony is there is a separate decision that deals with this same issue, --

A Yes.

Q -- that deals with the same 10 day matter --

A There is three of them.

Q Let me finish please. There is another decision that deals with the same matter, with the same 10 day issue that was decided by a male arbitrator?

A Yes, it was all the same subject, all the same incident, it was just different decisions for different things. One was for heart and lung, one was for this and the third one was a county court case. I can't remember, that was about the attorney.

Q Did the heart and lung issue have anything to do with a 10 day time period?

A The heart and lung had to do with me being hurt.

Q Did it have anything to do with a 10 day time period?

A No, I don't believe so.

Q All right.

A If I'm on the same page as you are, I'm trying to answer you as truthfully as I can, and you got me confused. You got me going to three different things here. I'm just making sure I gave you the right answer.

Q Did the heart and lung case have anything to do with a

10 day time period?

A No.

Q All right, the decision of this female arbitrator that you told us about does deal with a 10 day time period. Correct?

A Yes, it does.

Q Your testimony at page 18 and 19 of your deposition deals with a 10 day time period. Correct?

A Yes, it does.

Q Did the county court case that you referred to have anything to do with a 10 day time period?

A Yes, it did.

Q It did?

A Yes, it did.

Q Was that handled by an arbitrator in Dauphin County Court?

A No, I think it was handled by a judge, an actual judge, county court judge.

Q So at page 18 of your deposition transcript again at Exhibit 1 when I say to you at line 20 that was the decision of an arbitrator, what was your answer?

A All right, --

Q Line 20, page 18.

A Please give me your question again.

Q At line 20, page 18 of your deposition --

A Hold on, I'm still back on 20 where you had me, page 18.
Q Line 20.
A Line 20.
Q I say to you was that the decision of an arbitrator, what was your answer?
A "Yes, sir."
Q So we know that the county court matter that you say dealt with a 10 day issue was not the decision of an arbitrator, that was a judge. Correct?
A I believe so.
Q Were there any other cases that arose out of this particular incident that dealt with a 10 day time period that were the subject matter of a decision by an arbitrator?
A There were two.
Q Were there any other cases --
A Any other cases.
Q -- involving this particular incident --
A Okay.
Q -- that dealt with a 10 day time period that resulted in the decision by an arbitrator?
A Sir, I apologize, but I don't know what the heck you're getting at. I'm trying -- I want to give you a right answer here, but you got me confused.
Q What I'm getting at is this, Mr. Brown, Exhibit 26,

which is a certain arbitration award, deals with a 10 day situation.

A Yes, it does.

Q You were one of the parties to that matter. Correct?

A Yes, I was.

Q You prevailed in that case because the state police had missed a time deadline.

MR. NEUHAUSER: Your Honor, I'm going to object at this point, well beyond the scope of the Court's ruling on this issue.

MR. LAPPAS: I'm simply trying to identify this in such a way that the witness is compelled to admit that we're dealing with the same thing.

THE COURT: I don't think you're getting there, Mr. Lappas. I think he's explained his answer as best he can. There is nowhere else to go with this. Let's move on.

MR. LAPPAS: All right.

BY MR. LAPPAS:

Q Now with respect to the events of February 4, 1999, do you contend that Vicki Smith attacked you in any way?

A Yes.

Q At what point during these events do you contend that she attacked you?

A Um, when we were on the ground, she kicked me. To be honest with you, the only reason I know that is I watched the

video.

Q So your testimony is you did not know it when she kicked you, but then you saw it in the video?

A She was hovering over us, and I went like this, (Indicating) you know, trying to, as we were fighting, just swinging so she would stay back, but as far as kicking me, no, I had to watch the video for that.

Q Did you feel her kick you on the night of February 4?

A Sir, I was on the ground with a probably 200 pound man on top of me. I was only interested in getting out from under.

Q Is that a no?

A I would assume so, yes.

Q Turn to page 60 of Exhibit 2 in Binder 1. This is another deposition.

A Binder 1?

Q Yes. Have you found that page?

A Yes, sir.

Q Now this was sworn testimony that you gave at a law firm in Harrisburg on July 9, 2002. Is that correct?

A I cannot confirm the date, I don't have my date book with me, but, yes, I did give testimony there.

Q Now on page 60 you describe the alleged kicking by Vicki Smith, correct, starting at line 2 --

A Hold on, I got to get there. At line --

Q Two.

A Yes, sir.

Q Would you read how you describe that kicking incident.

MR. NEUHAUSER: Your Honor, I'm going to object. This isn't proper cross examination. He's acknowledged previous questioning. The answer that Mr. Lappas is seeking now he's trying to introduce testimony that is not inconsistent.

THE COURT: Sustained.

BY MR. LAPPAS:

Q You testified I believe earlier today that you do not presently have a problem with violent mood swings. Is that accurate?

A That's true, due to medication. Medication helps me.

Q But you will acknowledge, would you not, that you have a great deal of anger?

A Yes.

Q That anger is at least in part directed to my client?

A Yes, for what I have been through, but I'm dealing with it. I'm seeing a psychiatrist. I'm getting help. Eventually I'll lay this down.

Q On February 4 when Vicki Smith first approached you, your testimony is she was friendly and cordial towards you. Correct?

A Yes, she was. She was overly friendly, touching me to

the point that it made me nervous, but I just figured she was just a happy drunk.

Q She was pleading with you, was she not?

A At one point she was, yes, sir. I know she did not want me to arrest him. She wanted me to release him to her.

Q And Randy, I'm sorry, Mr. Yordy, was also cordial and friendly with you at the beginning according to your testimony?

A Yes, sir. Yes, sir.

Q And this situation went from being cordial and friendly to a situation where they both assaulted and attacked you. Is that your testimony?

A Yes, sir, it is.

Q Now you acknowledged yesterday that you broke Randy Yordy's nose with your first punch. Correct?

A Yes, sir, I did.

Q And will you acknowledge that you fell to the ground hard enough to the side of the road to cause him to break his arm?

A I don't know when that happened, sir, but we fell but I'd say no because he hit me. I mean, I cushioned his blow, he was on top of me. Maybe if he was on the bottom, I'd say yes, but, no, I cannot say when it happened.

Q Please turn to your Deposition Exhibit No. 1. It's in Binder 1, Exhibit 1.

A Yes, sir.

Q Page 71.

A Yes, sir.

Q The question that begins on line 23: "Did you do anything during the course of this incident which could have, in your judgment, resulted in a broken arm to him?" Do you see that question?

A Uh-huh. Yes, sir.

Q And what was your answer at the top of page 72?

A "Yeah, we went down hard, and I landed on top of him."

Q You landed on top of him, keep going.

A "You know, like I said, we lost our footing, and 200 pounds came -- and 200 pounds coming down on you. And it was all rock. It wasn't any -- it wasn't any dirt. It was all gravel and rock in the area."

Q All right, now does that change your testimony as to whether anything happened between you and him that could have caused him to break his arm?

A It's possible, but I don't remember testifying -- saying that. I don't remember saying that I landed on top of him because he landed on top of me.

Q Do you dispute the accuracy of this transcript?

A Yes, I may have misspoke. That's all I'm saying. I may have misspoken.

Q You may have said the wrong thing?

A Yes.
Q But you're not saying this transcript is itself incorrect?
A Oh, no, I'm human, I make mistakes.
Q When you said: "You know, like I said, we lost our footing, and 200 pounds coming down on you," you were referring to your weight, 200 pounds coming down on Randy Yordy.
A No, I was referring to him. He was a pretty strong, pretty stocky man.
Q So when you said, "... I landed on top of him. You know, ... 200 pounds coming down on you."
A I weighed 180 pounds at the time. I now weigh 200. At the time I weighed 180.
Q During your interview with Corporal Mrgich did you tell him when you were on the ground with Randy Yordy you threatened to blow his head off?
A I don't recall. Do you have that? May I read that?
Q It is Attachment 10. To read it, Mr. Brown, you're going to need Plaintiff's Exhibit Binder 3.
A Got it.
Q You're going to need to turn to Exhibit 11.
A Got it.
Q And you're going to need to find Attachment 10. Each of the attachments is numbered at the bottom right-hand

corner.

A I have Attachment 10 but it's this. (Indicating.)

Q Perhaps we're not looking at the same document.

A Binder 3.

Q What you're looking at is Attachment 2.

A Oh, I'm sorry, I just saw the numbers on the bottom. Okay.

Q Have you got the right exhibit?

A Thank you. Calm down, you're under arrest, stop fighting me. It doesn't appear so.

Q All right, one final point. I want you to turn to Binder No. 3, Exhibit No. 3, I'm sorry, Exhibit No. 13, Binder No. 3.

A Oh, that's more like it. Penn State Geisinger?

Q Yes.

A Okay. Do you want me to keep my hand on the other one?

Q Not necessary. Approximately the third or maybe fourth page there is a document called Emergency Department Note. Date of February 4, 1999.

A Okay.

Q Have you found that?

A Yes, I found that.

Q The second paragraph of that note indicates, quoting, "The patient's medications are Prozac." Do you see that?

A Yes, sir. I told you I don't recall anything about the

hospital. I had previously been on Prozac because, well, quite frankly, my daughter is disabled. She was born that way. I had a hard time dealing with it.

Q Well, this note relates to information that the hospital personnel received on February 4, 1999. Did you tell them that or did you not?

A I don't recall anything that happened in the hospital. They could have pulled it from my records, I don't know.

Q Was your wife with you at the hospital?

A Nobody was with me.

Q Well, you told us earlier today that your wife would have better information.

A Yes, she would have the time frames of when I was, when I was taking them.

Q She was not at the hospital to advise the doctor, the personnel, of your Prozac taking?

A No, no.

MR. LAPPAS: Thank you. I have no further questions of this witness.

THE COURT: Thank you. Mr. Neuhauser.

MR. NEUHAUSER: May I have a moment, Your Honor?

THE COURT: Please.

(Pause.)

MR. NEUHAUSER: I have no redirect, Your Honor.

THE COURT: All right, thank you.

Trooper, thank you. You may step down.

THE WITNESS: Thank you.

(The testimony of Scott Allen Brown concluded.)

I hereby certify that the proceedings and evidence of the court are contained fully and accurately in the notes taken by me on the testimony of Scott Allen Brown from the jury trial of the within cause and that this is a correct transcript of the same.

Monica L. Zamiska

Monica L. Zamiska, RPR

Official Court Reporter

PSP CHIEF COUNSEL 7177722883 02/19 '03 17:56 NO.448 02/04
JAN. 02 '2003 14:44 717 787 5 ST.EMP.RET.SYS. HBG,PA. #1580 P.001/001



COMMONWEALTH OF PENNSYLVANIA
STATE EMPLOYEES' RETIREMENT SYSTEM
30 NORTH THIRD STREET - P.O. BOX 1147
HARRISBURG, PENNSYLVANIA 17108-1147
TOLLFREE: 1-800-633-5461
www.sers.state.pa.us



F

December 31, 2002

RECEIVED
Office of Attorney General
FEB 19 2003
Litigation Section

SCOTT A BROWN
36 RITTER RIDGE RD
UNITYVILLE PA 17774

SSN : 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

Dear Mr. Brown :

Your application for disability retirement has been reviewed by our medical staff, and they have granted you a temporary disability annuity for a period of one year.

Since this is a temporary disability benefit, you will be required to furnish further medical evidence next year in order to have your disability annuity continued. You will be notified two (2) months prior to December 2003 when this reevaluation will be done.

PLEASE NOTE: Failure to furnish medical information which substantiates the continuance of your disability retirement by our medical staff will result in withholding of your monthly annuity checks.

Upon receipt of any additional necessary information we may need from the agency in which you were last employed, we will then be able to begin processing your benefit for payment. You will be hearing from us in the near future regarding the details of this payment.

If you should need any further assistance, please contact the Disability and Death Benefit Section at (717) 783-7306.

Sincerely,

Linda M. Miller

Linda M. Miller, Director
Benefit Determination Division

c.c.: Josephine Fure, PA State Police
Martha Hoover, SERS Montoursville Field Office Manager

AIN08

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RANDY YORDY,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:01-CV-0206** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **SCOTT BROWN, PAUL EVANKO,** | : | |
| **BERON F. STEAGER, AND BARRY L.** | : | |
| **BRINSER, et al.,** | : | |
| **Defendants** | : | |

**CERTIFICATE OF SERVICE**

I, **GREGORY R. NEUHAUSER,** Senior Deputy Attorney General for the Commonwealth of Pennsylvania, Office of Attorney General, hereby certify that on **March 7, 2003**, I caused to be served a true and correct copy of the foregoing document **Exhibits in Support of Defendants' brief in Opposition to Plaintiff's Motion For A New Trial**, by depositing it in the United States mail, first-class postage prepaid to the following:

Spero T. Lappas, Esquire
Serratelli, Schiffman, Brown & Calhoon, P.C.
2080 Linglestown Road, Suite 201
Harrisburg, PA 17110

**GREGORY R. NEUHAUSER**
**Senior Deputy Attorney General**